# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### OFFICE OF THE CLERK
WAYNE L. MORSE UNITED STATES COURTHOUSE
405 EAST EIGHTH AVENUE
ROOM 2100
EUGENE, OREGON 97401
(541) 431-4105

**SHERYL S. McCONNELL**
CLERK OF COURT

**CRAIG A. STARR**
DIVISION MANAGER

June 3, 2008

Clerk of the Court
Northern District of California
450 Golden Gate Ave.
Clerk's office is on the 16th Floor
San Francisco, CA 94102

**Subject:**    Sunpower Corporation Systems v.
Sunlink Corporation et al
USDC No.  08-148-AA

## CV 08 — 2807
## E-filing

## HRL

Dear Clerk:

Enclosed, please find the file for the following case:

Sunpower Corporation Systems v. Sunlink Corporation et al

The order transferring this case to your District was signed by the Honorable Ann L. Aiken on May 20, 2008. The original court file is enclosed along with a certified copy of the docket sheet. Please acknowledge receipt of this file on the enclosed copy of this letter and return it to our office. If we can answer any questions, please contact our office.

Sincerely,

Charlene Pew
Civil Docket Clerk

cc:    Case File

TERMINATED

# U.S. District Court
## District of Oregon (Eugene)
## CIVIL DOCKET FOR CASE #: 6:08-cv-00148-AA

Sunpower Corporation Systems v. Sunlink Corporation et al

Assigned to: Judge Ann L. Aiken

Cause: 28:1331 Fed. Question

Date Filed: 02/05/2008

Date Terminated: 05/21/2008

Jury Demand: Defendant

Nature of Suit: 830 Patent

Jurisdiction: Federal Question

### Plaintiff

**Sunpower Corporation Systems**     represented by     **Brenna Kristine Legaard**
Chernoff Vilhauer McClung & Stenzel, LLP
601 SW Second Avenue
Suite 1600
Portland, OR 97204
(503) 227-5631
Fax: (503) 228-4373
Email: brenna@chernofflaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Craig Compton**
Fish & Richardson PC
500 Arguello Street
Suite 500
Redwood City, CA 94063
(650) 839-5070
Fax: (650) 839-5071
Email: compton@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frank E. Scherkenbach**
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
(617) 542-5070
Fax: (617) 542-8906
Email: scherkenbach@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard G. Pollack**
Fish & Richardson, P.C.
500 Arguello Street

Suite #500
Redwood City, Ca 94063
(650) 839-5070
Fax: (650) 839-5071
Email: pollack@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Kent**
Fish & Richardson, PC
500 Arguello Street
Suite 500
Redwood City, CA 94063
(650) 839-5113
Fax: (650) 839-5071
Email: rjk@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan D. Pitchford**
Chernoff Vilhauer McClung & Stenzel,
LLP
601 SW Second Avenue
Suite 1600
Portland, OR 97204
(503) 227-5631
Fax: (503) 228-4373
Email: sdp@chernofflaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Sunlink Corporation**            represented by   **Doyle B. Johnson**
*a Delaware corporation*                            Reed Smith, LLP
                                                    Two Embarcadero Center
                                                    Suite 2000
                                                    San Francisco, CA 94111
                                                    (415) 543-8700
                                                    Fax: (415) 391-8269
                                                    Email: dbjohnson@reedsmith.com
                                                    *TERMINATED: 04/23/2008*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **James D Daire**
                                                    Reed Smith LLP
                                                    Two Embarcadero Center
                                                    Suite 2000

San Francisco, CA 94111
(415) 543-8700
Fax: (415) 391-8269
Email: jdaire@reedsmith.com
*TERMINATED: 04/23/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Morgan W. Tovey**
Quinn Emanuel Urquhart Oliver &
Hegdes LLP
50 California St, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Fax: (415) 875-6700
Email:
morgantovey@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven T. Lovett**
Stoel Rives LLP
900 SW 5th Avenue
Suite 2600
Portland, OR 97204
(503) 294-9364
Fax: (503) 220-2480
Email: stlovett@stoel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randolph C. Foster**
Stoel Rives LLP
900 SW 5th Avenue
Suite 2600
Portland, OR 97204
(503) 294-9453
Fax: (503) 220-2480
Email: rcfoster@stoel.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Advanced Energy**
*an Oregon limited liability company*
*TERMINATED: 03/20/2008*

represented by    **David D. VanSpeybroeck**
Bullivant Houser Bailey, PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204
(503) 228-6351
Fax: (503) 295-0915
Email:

David.Vanspeybroeck@bullivant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan L. Ford**
Bullivant Houser Bailey, PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204
(503)499-4536
Fax: (503)295-0915
Email: susan.ford@bullivant.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Sunlink Corporation**       represented by   **Doyle B. Johnson**
*a Delaware corporation*                                (See above for address)
*TERMINATED: 04/23/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James D Daire**
(See above for address)
*TERMINATED: 04/23/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Morgan W. Tovey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven T. Lovett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randolph C. Foster**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Sunpower Corporation Systems**    represented by   **Brenna Kristine Legaard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Craig Compton**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frank E. Scherkenbach**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard G. Pollack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Kent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan D. Pitchford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/05/2008 | 1 | Complaint. Filing Fee in amount of $350 collected. Receipt No. 19649 issued. Summons issued as to SunLink Corporation c/o Regsitered Agent The Corporate Trust Company, Advanced Energy Systems LLC c/o Registered Agent David Parker. Filed by Sunpower Corporation Systems against Sunlink Corporation, Advanced Energy. (Attachments: # 1 Exhibit A# 2 Exhibit B) (kt) (Entered: 02/06/2008) |
| 02/05/2008 | 2 | Corporate Disclosure Statement. Filed by Sunpower Corporation Systems. (kt) (Entered: 02/06/2008) |
| 02/05/2008 | 3 | Discovery and Pretrial Scheduling Order and Notice of Case Assignment to the Honorable Ann L. Aiken. Discovery is to be completed by 6/4/2008. Joint Alternate Dispute Resolution Report is due by 7/7/2008. Pretrial Order is due by 7/7/2008. Ordered by Judge Ann L. Aiken. (kt) (Entered: 02/06/2008) |
| 02/08/2008 | 4 | **Patent Report:** This report is submitted pursuant to Title 35 Section 290 USC which requires the clerks of the courts of the United States, within one month after the filing of an action under this title shall give notice thereof in writing to the Commissioner, setting forth so far as known the names and addresses of the parties, name of the inventor, and the designating number of the patent upon which the action has been brought. (cp) (Entered: 02/08/2008) |
| 02/20/2008 | 5 | Affidavit of Service of Complaint, 1 upon Advanced Energy served on |

| | | |
|---|---|---|
| | | 2/6/2008 *Summons & Complaint, Corporate Disclosure Statement, Civil Case Assignment Order, and Discovery & Pretrial Scheduling Order Packet served on Advanced Energy Systems* filed by Sunpower Corporation Systems Filed by Sunpower Corporation Systems. (Legaard, Brenna) (Entered: 02/20/2008) |
| 02/21/2008 | 6 | Unopposed Motion for Extension of Time to Answer , *Respond or Otherwise Object to Summons and Complaint* Complaint, 1. Filed by Advanced Energy. (Ford, Susan) (Entered: 02/21/2008) |
| 02/21/2008 | 7 | Declaration of Susan Ford *in Support of Motion for Extension of Time to Answer, Respond or Otherwise Object to Summons and Complaint*. Filed by Advanced Energy. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition6.) (Ford, Susan) (Entered: 02/21/2008) |
| 02/21/2008 | 8 | **ORDER:** Granting Motion for Extension of Time to 3/25/08, to file an Answer 6. Ordered by Judge Ann L. Aiken. (cw) (Entered: 02/21/2008) |
| 02/22/2008 | 9 | Stipulated Motion for Extension of Time to Answer *for Defendant Sunlink to Respond to* Complaint, 1. Filed by Sunpower Corporation Systems. (Pitchford, Susan) (Entered: 02/22/2008) |
| 02/22/2008 | 10 | Memorandum in Support *of Stipulated Motion for Extension of Time for Defendant Sunlink to Respond to Complaint*. Filed by Sunpower Corporation Systems. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition9.) (Pitchford, Susan) (Entered: 02/22/2008) |
| 02/25/2008 | 11 | **ORDER:** Granting Stipulated Motion for Extension of Time to 3/25/08 for Defendant Sunlink to Respond to Complaint 9. Ordered by Judge Ann L. Aiken. (lae) (Entered: 02/25/2008) |
| 02/25/2008 | 12 | Affidavit of Service of Complaint, 1 upon Sunlink Corporation served on 2/6/2008 filed by Sunpower Corporation Systems Filed by Sunpower Corporation Systems. (Legaard, Brenna) (Entered: 02/25/2008) |
| 02/26/2008 | 13 | Order Granting Application for Special Admission Pro Hac Vice of Robert Kent for Sunpower Corporation Systems. Application Fee in amount of $100 collected. Receipt No. 19888 issued. Signed on February 26, 2008 by Judge Ann L. Aiken. (cp) (Entered: 02/26/2008) |
| 02/26/2008 | 14 | Order Granting Application for Special Admission Pro Hac Vice of Howard G. Pollack for Sunpower Corporation Systems. Application Fee in amount of $100 collected. Receipt No. 19888 issued. Signed on February 26, 2008 by Judge Ann L. Aiken. (cp) (Entered: 02/26/2008) |
| 02/26/2008 | 15 | Order Granting Application for Special Admission Pro Hac Vice of Frank E. Scherkenbach for Sunpower Corporation Systems. Application Fee in amount of $100 collected. Receipt No. 19888 issued. Signed on February 26, 2008 by Judge Ann L. Aiken. (cp) (Entered: 02/26/2008) |
| 02/28/2008 | 16 | Order Granting Application for Special Admission Pro Hac Vice of Craig Compton for Sunpower Corporation Systems. Application Fee in amount |

| | | |
|---|---|---|
| | | of $100 collected. Receipt No. 19947 issued. Signed on February 26, 2008 by Judge Ann L. Aiken. (cp) (Entered: 02/29/2008) |
| 03/11/2008 | 17 | Notice of Appearance of Randolph C. Foster appearing on behalf of Sunlink Corporation *(Additional Counsel)*.Filed by on behalf of Sunlink Corporation. (Foster, Randolph) (Entered: 03/11/2008) |
| 03/13/2008 | 18 | Fed. R. Civ. P. 26(a)(1) Agreement *RULE 26.2 DISCOVERY AGREEMENT*. Filed by Sunpower Corporation Systems. (Pitchford, Susan) (Entered: 03/13/2008) |
| 03/13/2008 | 19 | Report *JOINT REPORT OF THE PARTIES' PLANNING MEETING*. Filed by Sunpower Corporation Systems. (Pitchford, Susan) (Entered: 03/13/2008) |
| 03/17/2008 | 20 | Record of Order by Ann L. Aiken : The parties' Joint Report 19 is entered as agreed upon by the parties. Regarding the parties areas of scheduling disagreement, the following pretrial schedule is entered: Fact Discovery is to be completed by 10/10/2008. Expert Discovery Closes 12/10/08. Summary Judgment Motions are due by 12/22/2008. Responses are due by 1/15/2009. Replies are due by 1/30/2009. A summary judgment hearing, pretrial conference and trial dates will be set upon the conclusion of summary judgment motion briefing.The court declines to delineate and specify the parties' discovery schedule. Any discovery disputes will be resolved by a motion to compel without oral argument.This schedule is subject to change and modification upon request by the parties and review by the court, and subject to change upon stipulation by the parties. Ordered by Judge Ann L. Aiken. (lae) (Entered: 03/17/2008) |
| 03/17/2008 | 21 | Order Granting Application for Special Admission Pro Hac Vice of Morgan W. Tovey for Sunlink Corporation. Application Fee in amount of $100 collected. Receipt No. 20238 issued. Signed on March 13, 2008 by Judge Ann L. Aiken. (cp) (Entered: 03/17/2008) |
| 03/17/2008 | 22 | Order Granting Application for Special Admission Pro Hac Vice of Doyle B. Johnson for Sunlink Corporation. Application Fee in amount of $100 collected. Receipt No. 20240 issued. Signed on March 13, 2008 by Judge Ann L. Aiken. (cp) (Entered: 03/17/2008) |
| 03/17/2008 | 23 | Order Granting Application for Special Admission Pro Hac Vice of James D Daire for Sunlink Corporation. Application Fee in amount of $100 collected. Receipt No. 20241 issued. Signed on March 13, 2008 by Judge Ann L. Aiken. (cp) (Entered: 03/17/2008) |
| 03/20/2008 | 24 | Notice of Dismissal of Party *JOINT NOTICE OF PARTIAL DISMISSAL*.Filed by Sunpower Corporation Systems. (Pitchford, Susan) (Entered: 03/20/2008) |
| 03/25/2008 | 25 | Answer to Complaint with Jury Demand *Answer and Counterclaims by Sunlink Corporation and Demand for Jury Trial*, Counterclaim Sunpower Corporation Systems. Filed by Sunlink Corporation. (Foster, Randolph) (Entered: 03/25/2008) |
| | | |

| | | |
|---|---|---|
| 03/25/2008 | 26 | Corporate Disclosure Statement. Filed by Sunlink Corporation. (Foster, Randolph) (Entered: 03/25/2008) |
| 03/25/2008 | 27 | Motion to Change or Transfer Venue *SunLink Corporation's Notice of Motion and Motion to Transfer - EXPEDITED HEARING REQUESTED*. Oral Argument requested. Filed by Sunlink Corporation. (Foster, Randolph) (Entered: 03/25/2008) |
| 03/25/2008 | 28 | Memorandum in Support *SunLink Corporation's Memorandum of Points and Authorities in Support of Motion to Transfer*. Filed by Sunlink Corporation. (Related document(s): Motion to change/transfer venue 27.) (Foster, Randolph) (Entered: 03/25/2008) |
| 03/25/2008 | 29 | Declaration of Morgan W. Tovey *In Support of SunLink Corporation's Motion to Transfer*. Filed by Sunlink Corporation. (Related document(s): Motion to change/transfer venue 27.) (Foster, Randolph) (Entered: 03/25/2008) |
| 03/25/2008 | 30 | Declaration of Christopher Tilley *In Support of SunLink Corporation's Motion to Transfer*. Filed by Sunlink Corporation. (Related document(s): Motion to change/transfer venue 27.) (Foster, Randolph) (Entered: 03/25/2008) |
| 04/04/2008 | 31 | Memorandum in Opposition *PLAINTIFF SUNPOWER'S MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER* to Motion to Change or Transfer Venue *SunLink Corporation's Notice of Motion and Motion to Transfer - EXPEDITED HEARING REQUESTED* 27. Filed by Sunpower Corporation Systems. (Legaard, Brenna) (Entered: 04/04/2008) |
| 04/04/2008 | 32 | Declaration of Howard Pollack *in Support of Memo In Opposition to Sunlink's Motion to Change or Transfer - EXHIBITS TO BE FILED SEPARATELY*. Filed by Sunpower Corporation Systems. (Related document(s): Memorandum in Opposition, 31.) (Legaard, Brenna) (Entered: 04/04/2008) |
| 04/04/2008 | 33 | Supplement *EXHIBITS B THROUGH F to Declaration of Howard Pollack, Docket #32*. Filed by Sunpower Corporation Systems. (Related document(s): Declaration, 32.) (Attachments: # 1 Exhibit C# 2 Exhibit D# 3 Exhibit E# 4 Exhibit F) (Legaard, Brenna) Additional attachment(s) added on 4/9/2008 (Pew, Charlene). (Entered: 04/04/2008) |
| 04/04/2008 | 34 | Supplement *EXHIIBT G to Declaration of Howard Pollack, Docket # 32*. Filed by Sunpower Corporation Systems. (Related document(s): Supplement, 33, Declaration, 32.) (Legaard, Brenna) Additional attachment(s) added on 4/9/2008 (Pew, Charlene). (Entered: 04/04/2008) |
| 04/04/2008 | 35 | Supplement *EXHIBITS H through O [END OF EXHIBITS] to Declaration of Howard Pollack, Docket #32*. Filed by Sunpower Corporation Systems. (Related document(s): Supplement, 33, Declaration, 32, Supplement 34.) (Attachments: # 1 Exhibit I# 2 Exhibit J# 3 Exhibit K# 4 Exhibit L# 5 Exhibit M# 6 Exhibit N# 7 Exhibit O) (Legaard, Brenna) Additional attachment(s) added on 4/9/2008 (Pew, |

| | | |
|---|---|---|
| | | Charlene). (Entered: 04/04/2008) |
| 04/07/2008 | 36 | Supplement *EXHIBIT A TO 04-04-08 DECLARATION OF HOWARD POLLACK, Docket No. 32 [ECF System would not accept EX A for filing on 04-04-08].* Filed by Sunpower Corporation Systems. (Related document(s): Declaration, 32.) (Legaard, Brenna) Additional attachment (s) added on 4/9/2008 (Pew, Charlene). (Entered: 04/07/2008) |
| 04/08/2008 | 37 | Motion to Amend/Correct *PLAINTIFF'S MOTION FOR ADMINISTRATIVE CORRECTION OF THE RECORD* Supplement, 35, Supplement36, Supplement, 33, Supplement34. Filed by Sunpower Corporation Systems. (Attachments: # 1 CAPTION PAGE FOR DOCKET NO. 33# 2 CAPTION PAGE FOR DOCKET NO. 34# 3 CAPTION PAGE FOR DOCKET NO. 35# 4 CAPTION PAGE FOR DOCKET NO. 36) (Legaard, Brenna) (Entered: 04/08/2008) |
| 04/09/2008 | 38 | **ORDER:** Granting Plaintiff's Motion for Administrative Correction of the Record 37. Ordered by Judge Ann L. Aiken. (lae) (Entered: 04/09/2008) |
| 04/14/2008 | 39 | Response *PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSE TO DEFENDANT SUNLINK'S COUNTERCLAIMS.* Filed by Sunpower Corporation Systems. (Pitchford, Susan) (Entered: 04/14/2008) |
| 04/15/2008 | 40 | Reply - *Sunlink Corporation's Reply Brief In Support of/ to Motion to Change or Transfer Venue SunLink Corporation's Notice of Motion and Motion to Transfer - EXPEDITED HEARING REQUESTED*27. Filed by Sunlink Corporation. (Daire, James) (Entered: 04/15/2008) |
| 04/15/2008 | 41 | Declaration of Morgan W. Tovey *In Support of Sunlink Corporation's Reply Brief Re Motion to Transfer.* Filed by Sunlink Corporation. (Related document(s): Reply to Motion, 40.) (Daire, James) (Entered: 04/15/2008) |
| 04/23/2008 | 42 | Notice of Change of Address *SUNLINK CORPORATION'S NOTICE OF SUBSTITUTION OF COUNSEL,* Notice of Attorney Withdrawal: *Doyle B. Johnson and James Daire (Reed Smith LLP).*Filed by Sunlink Corporation. (Foster, Randolph) (Entered: 04/23/2008) |
| 05/21/2008 | 43 | **ORDER:** Defendant's Motion to Transfer this case to the United States District Court for the Northern District of California (Related Doc #27) is granted. Further, defendant's motion for expedited hearing is denied as unnecessary. Signed on May 20, 2008 by Judge Ann L. Aiken. (cp) (Entered: 05/21/2008) |
| 05/21/2008 | 44 | Judgment: This action is transferred to the United States District Court for the Northern District of California. Signed May 21, 2008 by Deputy Clerk, Leslie Engdall. (cp) (Entered: 05/21/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/23/2008 12:52:29 | | | |
| **PACER Login:** | us4077 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:08-cv-00148-AA |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

Brenna K. Legaard, OSB No. 00165
E-mail: brenna@chernofflaw.com
Susan D. Pitchford, OSB No. 98091
E-mail: sdp@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Attorneys for Plaintiffs, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>**SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,<br><br>DefendantS. | Case No. _____<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL REQUESTED**<br><br>**PATENT CASE** |

Plaintiff SunPower Corporation hereby alleges as follows:

PAGE 1 – **COMPLAINT FOR PATENT INFRINGEMENT**

## THE PARTIES

1.      SunPower Corporation, Systems ("SunPower") is incorporated under the laws of the state of Delaware, and has a regular and established place of business at 1414 Harbor Way South, Richmond, California 94804.

2.      Upon information and belief, defendant SunLink Corporation is incorporated under the laws of the state of Delaware, with its headquarters located at 100 Larkspur Landing Circle, Larkspur, California 94939.

3.      Upon information and belief, defendant Advanced Energy Systems LLC is organized under the laws of the state of Oregon, with its headquarters located at 2990 Forest Boulevard, Eugene, Oregon 97405.  (SunLink Corporation and Advanced Energy Systems LLC hereinafter collectively, "SunLink et al.")

## JURISDICTION AND VENUE

4.      This action arises under the patent laws of the United States, Title 35 U.S.C. § 1 et seq.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

5.      Upon information and belief, this Court has personal jurisdiction over defendant Advanced Energy Systems LLC because it is organized, doing business, and advertising in this judicial District.

6.      Upon information and belief, this Court has personal jurisdiction over defendant SunLink Corp. because defendant makes, uses, offers for sale, and/or sells products in this

PAGE 2 – **COMPLAINT FOR PATENT INFRINGEMENT**

judicial District that infringe the claims of one or more valid, duly issued U.S. Patents owned by plaintiff SunPower.

7.      Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400 because the defendants are subject to personal jurisdiction in this judicial District.

## GENERAL ALLEGATIONS

8.      SunLink Corp.'s products include its SunLink (TM) PV Module Mounting System that is used for the installation of photovoltaic energy systems on building roofs.

9.      Upon information and belief, defendant SunLink Corp. manufactures the SunLink (TM) PV Module Mounting System, and directly and through its affiliates, uses, imports, sells, installs and offers to sell and install the same throughout the United States, including Oregon.

10.     Upon information and belief, defendant Advanced Energy Systems LLC sells, installs, uses, imports, and offers to sell and install the SunLink (TM) PV Module Mounting System in Oregon.

## FIRST CAUSE OF ACTION

## INFRINGEMENT OF U.S. PATENT NO. 5,505,788

11.     The allegations of paragraphs 1-10 are incorporated as though fully set forth herein.

PAGE 3 – **COMPLAINT FOR PATENT INFRINGEMENT**

12.     SunPower is now the assignee and sole owner of all right, title, and interest in United States Patent No. 5,505,788, entitled "Thermally regulated photovoltaic roofing assembly" ("the '788 patent"), which was duly and legally issued on April 9, 1996. A true and correct copy of the '788 patent is attached hereto as Exhibit A.

13.     Upon information and belief, defendants SunLink et al. have been and are now infringing, inducing infringement, and contributing to the infringement of the '788 patent by making, using, importing, selling and/or offering to sell devices, including the SunLink (TM) PV Module Mounting System, and/or inducing or contributing to the importation, use, offer for sale, and sale by others of such devices covered by one or more claims of the '788 patent, all to the injury of SunPower.

14.     Upon information and belief, Defendant SunLink Corp. was made aware of the '788 patent by a February 7, 2006 letter from SunPower's predecessor, PowerLight, to SunLink Corp.'s parent company, Eastwood Energy. The letter was addressed to John Eastwood of Eastwood Energy who, on information and belief, is presently the Chairman and CFO of SunLink Corp.

15.     Defendants' acts of infringement have injured and damaged SunPower.

16.     Defendants' infringement has caused irreparable injury to SunPower and will continue to cause irreparable injury until defendants are enjoined from further infringement by this Court.

## SECOND CAUSE OF ACTION

## INFRINGEMENT OF U.S. PATENT NO. RE38,988

17.     The allegations of paragraphs 1-10 are incorporated as though fully set forth herein.

18.     SunPower is now the assignee and sole owner of all right, title, and interest in United States Patent No. RE38,988, entitled "Lightweight, self-ballasting photovoltaic roofing assembly" ("the '988 patent"), which was duly and legally issued on February 28, 2006.  A true and correct copy of the '988 patent is attached hereto as Exhibit B.

19.     Upon information and belief, defendants SunLink et al. have been and are now infringing, inducing infringement, and contributing to the infringement of the '988 patent by making, using, importing, selling and/or offering to sell devices, including the SunLink (TM) PV Module Mounting System, and/or inducing or contributing to the importation, use, offer for sale, and sale by others of such devices covered by one or more claims of the '988 patent, all to the injury of SunPower.

20.     Upon information and belief, defendant SunLink Corp. was made aware of the then-pending application, 10/414,347 from which the '988 patent issued, by a February 7, 2006 letter from SunPower's predecessor, PowerLight, to SunLink Corp.'s parent company, Eastwood Energy.  The letter was addressed to John Eastwood of Eastwood Energy who, on information and belief, is presently the Chairman and CFO of SunLink Corp.

21.     Defendants' acts of infringement have injured and damaged SunPower.

PAGE 5 – **COMPLAINT FOR PATENT INFRINGEMENT**

22.    Defendants' infringement has caused irreparable injury to SunPower and will continue to cause irreparable injury until defendants are enjoined from further infringement by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

(a)    judgment against defendants as to infringement of the '788 patent;

(b)    judgment against defendants as to infringement of the '988 patent;

(c)    a permanent injunction preventing defendants and their officers, directors, agents, servants, employees, attorneys, licensees, successors, assigns, and customers, and those in active concert or participation with any of them, from making, using, importing, offering to sell or selling any device that infringes any claim of the '788 or '988 patents;

(d)    judgment against defendants for money damages sustained as a result of defendants' infringement of the '788 and '988 patents;

(e)    costs and reasonable attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285;

(f)    an accounting for any additional damages accrued before entry of judgment; and

(g)    such other and further relief as this Court finds just and proper.

## JURY DEMAND

Plaintiff requests trial by jury.

DATED:  February 5, 2008

                              CHERNOFF, VILHAUER, McCLUNG &
                              STENZEL, LLP

                              Brenna K. Legaard, OSB No. 00165
                              Susan D. Pitchford, OSB No. 98091
                              Telephone:  (503) 227-5631
                              Of Attorneys for Plaintiff

US005505788A

# United States Patent [19]

## Dinwoodie

| [11] | Patent Number: | 5,505,788 |
|---|---|---|
| [45] | Date of Patent: | *Apr. 9, 1996 |

[54] **THERMALLY REGULATED PHOTOVOLTAIC ROOFING ASSEMBLY**

[76] Inventor: **Thomas L. Dinwoodie**, 2550 Benvenue, Berkeley, Calif. 94704

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,316,592.

[21] Appl. No.: **267,499**

[22] Filed: **Jun. 29, 1994**

[51] Int. Cl.⁶ ........................... E04D 13/18; H01L 31/052
[52] U.S. Cl. ........................... 136/246; 136/244; 136/251; 136/291; 52/173.3
[58] Field of Search .................................... 136/244, 246, 136/251, 291; 52/173.3

[56] **References Cited**

U.S. PATENT DOCUMENTS

| 3,769,091 | 10/1973 | Leinkram et al. | ..................... | 136/246 |
|---|---|---|---|---|
| 4,040,867 | 8/1977 | Forestieri et al. | ..................... | 136/244 |
| 4,189,881 | 2/1980 | Hawley | ..................... | 52/220 |
| 4,321,416 | 3/1982 | Tennant | ..................... | 136/244 |
| 4,389,533 | 6/1983 | Ames | ..................... | 136/248 |
| 4,674,244 | 6/1987 | Francovitch | ..................... | 52/173.3 |
| 4,677,248 | 6/1987 | Lacey | ..................... | 136/244 |
| 4,835,918 | 1/1989 | Dippel | ..................... | 52/63 |
| 4,860,509 | 10/1989 | Laaly et al. | ..................... | 52/173.3 |
| 4,886,554 | 12/1989 | Woodring et al. | ..................... | 136/244 |
| 5,092,393 | 3/1992 | Nath et al. | ..................... | 136/251 |
| 5,112,408 | 5/1992 | Melchior | ..................... | 136/251 |
| 5,316,592 | 5/1994 | Dinwoodie | ..................... | 136/244 |
| 5,338,369 | 8/1994 | Rawlings | ..................... | 136/244 |

FOREIGN PATENT DOCUMENTS

| 3611542 | 10/1987 | Germany | ..................... | 136/246 |
|---|---|---|---|---|

| 3-200376 | 9/1991 | Japan | ..................... | 136/251 |
|---|---|---|---|---|

Primary Examiner—Aaron Weisstuch
Attorney, Agent, or Firm—Townsend and Townsend and Crew

[57]                    **ABSTRACT**

A photovoltaic roofing assembly comprises a roofing membrane (102), a plurality of photovoltaic modules (104, 106, 108, 110) disposed as a layer on top of the roofing membrane (102), and a plurality of pre-formed spacers, pedestals or supports (112, 114, 116, 118, 120, 122) which are respectively disposed below the plurality of photovoltaic modules (104, 106, 108, 110) and integral therewith, or fixed thereto. Spacers (112, 114, 116, 118, 120, 122) are disposed on top of roofing membrane (102). Membrane (102) is supported on conventional roof framing, and attached thereto by conventional methods. In an alternative embodiment, the roofing assembly may have a tapered profile for orienting modules (204, 206, 208, 210) in a direction of increased sun exposure. Other embodiments include the use of phase change material for temperature regulation, and incorporating an insulation block into the assembly as a means of spacing and of building thermal control. Such construction results in a simple, readily assembled roofing assembly which regulates the temperature of the photovoltaic module and roofing membrane and avoids the need for rooting penetrations for hold-down to the building rooftop. Photovoltaic modules (104, 106, 108, 110) serve the purpose of electric generator, and in addition, the multiple purposes of ballast, UV block, and weather protector for the insulation block and roofing membrane below. A fluid convects within the passageways created by the spacers, transferring heat from the backside of the photovoltaic modules. Rainwater drains through the joints between the integral modules, onto and over the roofing membrane below.

**43 Claims, 9 Drawing Sheets**



**U.S. Patent**          Apr. 9, 1996          Sheet 1 of 9          **5,505,788**

Fig. 1a



Fig. 1b



Fig. 1c



Fig. 1d



### Fig. 2a



### Fig. 2b



### Fig. 2c



**Fig. 3a**



**Fig. 3b**



**Fig. 3c**

Fig. 4a



Fig. 4b



Fig. 4c



Fig. 5a



Fig. 5b



Fig. 5c



**U.S. Patent**          Apr. 9, 1996          Sheet 6 of 9          **5,505,788**

Fig. 6a



Fig. 6b

**U.S. Patent**          Apr. 9, 1996          Sheet 7 of 9          **5,505,788**

Fig. 7a



Fig. 7b



Fig. 7c



**U.S. Patent**    Apr. 9, 1996    Sheet 8 of 9    **5,505,788**

Fig. 8a



Fig. 8b



Fig. 8c



Fig. 9



904

902

5,505,788

| 1 | 2 |

**THERMALLY REGULATED PHOTOVOLTAIC ROOFING ASSEMBLY**

**FIELD OF THE INVENTION**

This invention generally relates to a photovoltaic roofing assembly, and in particular to a photovoltaic roofing assembly which can regulate the temperatures experienced by the solar cells and requires no roof penetrations for hold-down to the roof surface.

**DESCRIPTION OF THE PRIOR ART**

As the cost of solar cells declines, the non-solar cell components necessary for a functioning photovoltaic system begin to dominate the overall system costs. For this reason, there is a growing trend to develop photovoltaic assemblies which eliminate or reduce non-solar cell components, and where the photovoltaic cell displaces conventional building components. An integral photovoltaic roofing assembly can avoid the cost of purchasing or renting land, and/or constructing a support structure for the photovoltaic array. A further savings is achieved when the photovoltaic roofing assembly displaces the cost of purchasing and installing conventional roofing materials. Due to the extreme sensitivity of future photovoltaic markets to photovoltaic system costs, a key objective in developing a photovoltaic roofing assembly is to eliminate non-essential costs and components, in part by designing components to perform multiple functions.

A prior-art photovoltaic roofing assembly is shown in U.S. Pat. No. 4,886,554 issued Dec. 12, 1989 to Woodring et al. Woodring's assembly includes a plurality of insulation blocks disposed as a layer on top of a roofing membrane, a plurality of concrete pavers disposed as a layer on top of the plurality of insulation blocks, and a plurality of photovoltaic cells, each supported on a respective paver. A key feature of Woodring's assembly is the attachment of the solar cell to the supporting paver. But such attachment suffers from several disadvantages:

    a) by including a roofing paver, the assembly is more complicated than necessary and more costly to manufacture.

    b) the assembly does not employ a method by which to limit the temperatures experienced by the solar cells and other components. Solar cells are known to decline in efficiency with increasing temperatures. Hence, by offering no mechanism for temperature abatement, the assembly will operate less efficiently, with unknown long-term effects due to high temperature exposure.

    c) by placing both a concrete paver and photovoltaic module onto the insulation block, the insulation block is inhibited from ventilating and expiring moisture. As a result, upon exposure to moisture, the insulation block takes longer to dry out, thus reducing its insulating value and degrading the integrity of the insulation block over time.

    d) the assembly has multiple modes of potential failure, which include the paver component and its means of bonding. These components will be subjected to 20–30 years of an exposed and harsh weather environment at elevated temperatures. Any form of delamination is unacceptable. Delamination would cause dislocation of solar cells due to wind loading, and potential exposure of the insulation and membrane layers below.

Another prior-art solar roofing assembly is shown in U.S. Pat. No. 4,674,244 issued Jun. 23, 1987 to Frankovitch. Frankovitch's assembly includes a roof substrate which is substantially flat, an insulation structure thereon having an inclined surface, an elastomeric membrane over the substrate and the structure, the membrane being applied to and supported by the substrate and structure, and supporting an array of photocells. A key feature of this assembly is the attachment of the solar cell directly to the roofing membrane. By such attachment, this assembly suffers from several disadvantages:

    a) the assembly does not employ a method by which to limit the temperatures that will be experienced by the solar cells and roofing membrane, thus reducing the efficiency of the solar cells and reducing the life of the roofing membrane.

    b) the assembly has multiple modes of potential failure, which include failure due to thermal stresses on the roofing membrane and its means of bonding.

    c) the assembly requires roof fasteners which penetrate the protective roofing membrane, which make the installation much more complicated and more costly than is necessary. In addition, such penetrations increase the risk of water leakage, with consequent damage to the building and its contents.

Another prior-art photovoltaic roofing assembly is shown in U.S. Pat. No. 5,316,592 issued May 31, 1994 to Dinwoodie. Dinwoodie's assembly includes a plurality of insulation blocks disposed as a layer on top of a roofing membrane, and a plurality of photovoltaic cells disposed as a layer on top of the insulation block. A key feature of Dinwoodie's assembly is the attachment of the solar cell to the insulation block. Such attachment suffers from a disadvantage in the use of certain photovoltaic cell materials. The assembly does not employ a method by which to limit the temperatures experienced by the photovoltaic cells, and hence will operate at less efficiency than otherwise. Other patents related to a photovoltaic roofing assembly include U.S. Pat. Nos. 4,835,9 18 issued Jun. 6, 1989 to Dippel; 4,189,881 issued Feb. 26, 1980 to Hawley; 3,769,091 issued Oct. 30, 1973 to Linkram et al; 4,040,867 issued Aug. 9, 1977 to Forestieri et al; 4,321,416 issued Mar. 23, 1982 to Tennant; 4,860,509 issued Aug. 29, 1989 to Laaly et al; 5,092,393 issued March, 1992 to Nath et al; and 5,112,408 issued May, 1992 to Melchior.

**OBJECTS AND ADVANTAGES OF THE INVENTION**

Accordingly, several objects and advantages of the present invention are:

    a) to provide an improved roofing assembly which offers the following features: a photovoltaic portion which protects the insulation and membrane layers from ultraviolet radiation and adverse weather, thus extending the life of these components; a longer-lived roofing assembly, compatible with the life of the photovoltaic portion; a roofing assembly which weighs roughly one half the cost of conventional ballasted roofs; an assembly which works with virtually all built-up and single ply membranes; an assembly which has considerable safety factor against wind uplift; and an assembly which is free of CFC's.

    b) to provide a simple and low-cost photovoltaic roofing assembly, where components within the product provide multiple functions as follows:

Sunpower v. Sunlink, et al.
COMPLAINT         EXHIBIT A, Page 11 of 19

5,505,788

3

1) the solar module provides multiple functions as a roofing component, including ballast, weather protection, and UV protection for the insulation and waterproof membrane below, and

2) a pre-formed structure supports the photovoltaic module, while facilitating temperature regulation through heat transfer to a convecting fluid and/or phase change material.

c) to provide a photovoltaic roofing assembly which limits temperatures experienced by the photovoltaic module and the roofing membrane, thus maximizing the efficiency of the solar cells, while prolonging the life of the roofing membrane. d) to provide a low-cost assembly which eliminates the need for roofing penetrations.

e) to provide a photovoltaic roofing assembly which enjoys ease of fabrication due to its simple construction.

f) to provide a product which preserves the integrity of the insulation layer of the building roof.

g) to provide a photovoltaic roofing assembly whereby, in its embodiment utilizing an insulation block as a layer between the photovoltaic module and roofing membrane, exposure of the photovoltaic modules and their respective electrical connections to moisture is minimized as a result of rainwater passing by the edges of the insulation block to the roofing membrane below, causing the entire assembly to "float" above the membrane.

h) to provide a photovoltaic roofing assembly that displaces the costs of conventional roofing materials and their installation, thereby enhancing the value of the photovoltaic portion as a synergistic building component.

i) to provide a product with minimal modes of potential failure.

j) to provide a product that is similar in construction to an existing commercial roofing assembly to facilitate acceptance by the market and by the construction trades.

k) to provide a roofing assembly which yields social benefits by making photovoltaic technology more cost competitive. This facilitates transition to a clean, renewable energy economy, and helps to mitigate air pollution and global warming.

The foregoing and other objects, advantages and novel features of the invention will be more fully apparent from the description of the preferred embodiments of the invention when read in connection with the accompanying drawings.

SUMMARY OF THE INVENTION

According to the present invention, a solar cell roofing assembly is formed with three portions. One portion consists of a conventional roofing membrane installed over roofing insulation which rests on conventional roof framing. A second portion consists of a plurality of photovoltaic modules, together with pre-formed spacers which enable heat exchange with a convecting fluid and/or phase change material. The photovoltaic modules with pre-formed spacers have interlocking edges. A third portion is a conventional roofing paver. The photovoltaic module portion is situated over the roofing membrane in a manner to be exposed to solar radiation and electrically connected for transport of electricity. The paver portion is situated over the same

4

roofing membrane so is to provide walkways between aggregate areas of photovoltaic modules, and to provide perimeters around roof penetrations and equipment. The photovoltaic module performs the multiple functions normally provided by a roofing paver, including ballast, UV protection, and weather protection for the membrane and insulation layers below. A fan or pump unit may be added to force convection of the cooling fluid, which is preferably air, but could include other liquid or gaseous fluids. Together the three portions serve the dual function of a self-ballasted paver roofing system and a thermally regulated array of solar cells for the collection of radiant energy.

In an alternate embodiment, the solar cell roofing assembly is formed with four portions. The first portion consists of a roofing membrane which rests on conventional roof framing. The second portion consists of a plurality of insulation blocks. The third portion consists of a plurality of photovoltaic modules, together with pre-formed spacers which enable heat exchange with a convecting fluid and/or phase change material, and which rests on the plurality of insulation blocks. The insulation blocks with photovoltaic modules and pre-formed spacers have interlocking edges. The photovoltaic module performs the multiple functions normally provided by a roofing paver, including ballast, UV protection, and weather protection for the membrane and insulation layers below.

A fourth portion of this alternate embodiment is a conventional roofing paver, located between aggregate areas of the photovoltaic modules, which provides walkways and perimeters around roof penetrations and equipment. Together the four portions serve the dual function of a protected membrane roofing system and a thermally regulated array of solar cells for the collection of radiant energy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1a to 1d show sectional views of the invention with a flat profile and configured to enable fluid convection below the photovoltaic modules.

FIGS. 2a to 2c show sectional views of a second embodiment of the invention, whereby the invention shown in FIG. 1 has a tapered profile.

FIGS. 3a to 3c show sectional views of a third embodiment, whereby the invention has incorporates a phase change material and has a flat profile.

FIGS. 4a to 4c show sectional views of a fourth embodiment, whereby the invention of FIG. 3 has a tapered profile.

FIGS. 5a to 5c show sectional views of a fifth embodiment, whereby the invention includes an insulation block above the roofing membrane and has a flat profile.

FIGS. 6a to 6b show sectional views of a sixth embodiment, whereby the invention of FIG. 5 has a tapered profile.

FIGS. 7a to 7c show sectional views of a seventh embodiment, whereby the invention of FIG. 6 incorporates a phase change material and has a flat profile.

FIGS. 8a to 8c show sectional views of an eighth embodiment, whereby the invention of FIG. 7 has a tapered profile.

FIG. 9 shows a plan view of a building with a photovoltaic roofing assembly installed according to the invention.

DETAILED DESCRIPTION OF THE INVENTION

Description off FIGS. 1a–1d: Flat Profile with Convective Layer

FIG. 1a shows a sectional view of a photovoltaic roofing assembly. The assembly includes a plurality of photovoltaic

5,505,788

| 5 | 6 |

modules **104, 106, 108, 110**, a plurality of preformed spacers, pedestals, or supports **112, 114, 116, 118, 120, 122** which are respectively disposed below the plurality of photovoltaic modules **104, 106, 108, 110** and integral therewith, or fixedly connected thereto. Spacers **112, 114, 116, 118, 120, 122** are disposed on top of a roofing membrane **102**.

Membrane **102** is supported on conventional roof framing (not shown), and attached thereto by conventional methods, such as fasteners or adhesives. Membrane **102** may also rest directly on insulation block which is supported on conventional roof framing. Modules **104, 106, 108, 110** are connected to conventional conductors (not shown) and are arranged in an array of modules. Each of modules **104, 106, 108, 110** has at least one photovoltaic cell. Examples of photovoltaic modules include those incorporating thin-film deposition onto glass, stainless steel or ceramic substrates and manufactured by such companies as Advanced Photovoltaic Systems, Inc., Solarex Corporation, United Solar Systems Corporation, and Astropower, Inc., and modules of single or polycrystalline silicon cells such as those manufactured by Texas Instruments, Astropower, Inc., Siemens Solar Industries, and Solarex Corporation.

Spacers **112, 114, 116, 118, 120, 122** of the assembly can take several forms, including linear channels, point supports, or area supports. FIG. 1*b* shows a sectional view of an embodiment of the assembly wherein pre-formed spacers **124, 126** are disposed on top of membrane **102** and provide point support along the edges or corners for modules **104, 106, 108** to which they are fixedly connected or made integral. FIG. 1*b* shows dimension d, representing the spacing between modules, and dimension h, representing the distance between the module and the roofing membrane. The assembly has preferred dimensions whereby h measures ½ inch to 4 inches, depending upon the temperature to which the module and other components are to be limited. In addition, the ratio of d/h preferably approaches 2 or greater in order to facilitate pressure equalization between the top and bottom side of the photovoltaic modules, thus reducing the forces of wind uplift. The photovoltaic modules are preferably sized in the range of 1 ft by 1 ft to 4 ft by 8 ft, in order to be readily handled by a roofing installation crew. The size and number of the spacers are minimized in order to minimize material costs, but sufficient to provide support for the photovoltaic modules in accordance with the module material strength.

FIG. 1*c* shows a sectional view of an alternate embodiment of the assembly wherein spacers **130, 132, 134** are disposed on top of membrane **102** and provide area support for modules **104, 106, 108** to which they are fixedly connected or made integral. Spacers **130, 132, 134** may be made of glass, concrete, plastic, insulation block, integral concrete over insulation block (such as the product known as Lightguard™, by T. Clear Corporation), or other material. The spacing and dimensions of the spacers are predetermined to provide multiple functions, including temperature modulation resulting from heat exchange by fluid convection on the backside of modules **104, 106, 108**, enabling pressure equalization between the top side and bottom side of modules **104, 106, 108**, and enabling drainage of rainwater.

FIG. 1*d* shows an expanded view of spacer **112, 114** which is identical in construction to spacers **116, 118, 120, 122** and has a top adhesive layer **140, 142** for bonding or laminating modules **104, 106, 108** thereto in the field or in the shop. However, any system can be used for attaching modules **104, 106, 108** to the spacers. In addition, it is possible to avoid positive attachment of the spacers to the

modules provided the modules have positive edge to edge connection. Spacer **114**, which is identical to spacers **118, 122** preferably has a grooved profile **152**, and spacer **112**, which is identical to spacers **116, 120** preferably has a tongued profile **154**. In this way, interlocking joints are formed between adjacent integral assemblies for better resistance to wind uplift. However, any means of integral locking is possible.

The preferred method of manufacture of the solar roofing assembly is indicated as follows: Modules **104, 106, 108, 110** are added to, bonded to, or otherwise attached to respective spacers **112, 114, 116, 118, 120, 122, 124, 126, 130, 132, 134** in the manufacturing plant or in the field. A roofing membrane is placed on a roof. The modules and spacers are placed in arrays on top of the roof membrane. Roofing pavers are situated around the perimeter of photovoltaic module Such construction results in a simple, readily assembled roofing assembly which regulates the temperature of the photovoltaic module and roofing membrane. A semi-continuous spatial layer is created below photovoltaic modules **104, 106, 108, 110** which enables the convection of a fluid, preferably air, through passageways created by the spacers. The fluid convects within the passageways created by the spacers, transferring heat from the backside of the photovoltaic modules. A fan or pump unit may be added to three convection of the fluid. Rainwater drains through the joints between the integral modules, onto and over the roofing membrane below.

The advantages of the foregoing assembly include:

1. The photovoltaic roofing assembly, which can be used on a flat or mildly sloping roof, minimizes water leakage through the roof.

2. A pre-formed pedestal or spacer supports the photovoltaic module while facilitating temperature regulation through heat transfer to a convecting fluid.

3. The photovoltaic module provides multiple functions as a roofing component, including ballast, weather protection, and UV protection for the membrane layer below.

4. By displacing roofing components and their installation, the value of the photovoltaic module is enhanced, thereby enhancing the cost-competitiveness of energy from a clean and renewable resource.

5. The assembly is lightweight relative to conventional roofing assemblies, relying on a combination of ballast weight and edge to edge connection to resist the forces of wind uplift.

6. Modules **104, 106, 108, 110** are interconnected, which prevents dislodging of individual modules, because each module is held in place by its adjoining modules.

7. The cost of installation of the assembly is minimized due to ease of fabrication and simple construction. Quality control is maximized by using shop-assembled integral.

8. The solar roofing modules are reusable. They can be readily disconnected and reassembled onto other roof tops.

9. The force of wind uplift at the interface between the module and paver portions of the assembly is reduced by introducing a spoiler of laminar air flow. This spoiler may provide multiple functions such as 1) edge to edge connection between module and paver portions of the assembly, and 2) raceway for electrical wiring.

Description of FIGS. 2*a*–2*c*: Tapered Profile with Convective Layer

FIGS. 2*a*–2*c* show sectional views of a second embodiment of the invention. In FIG. 2*a*, the assembly includes a

5,505,788

7

plurality of photovoltaic modules 204, 206, 208, a plurality of pre-formed spacers, pedestals or supports 212, 214, 216 which are respectively disposed below modules 204, 206, 208 and integral therewith, or fixed thereto. The spacers 212, 214, 216 are disposed on top of a roofing membrane 202.

Spacers 212, 214, 216 of the assembly can take several forms, including linear channels, point supports, or area supports.

FIG. 2b shows a sectional view of an embodiment of the assembly wherein spacers 224, 226 are disposed on top of membrane 202 and provide point support along the edges or corners for modules 204, 206, 208 to which they are fixedly connected or made integral. Spacers 224, 226 also ensure consistent spacing between modules 204, 206, 208 and enable water drainage.

FIG. 2c shows a sectional view of an alternate embodiment of the assembly wherein spacers 230, 232, 234 are disposed on top of membrane 202 and provide area support for modules 204, 206, 208 to which they are fixedly connected or made integral. Spacers 230, 232, 234 may be made of glass, concrete, plastic, insulation block, or other material.

In the photovoltaic roofing assembly of FIG. 2 with a tapered profile, the distance between adjoining edges of the photovoltaic modules may be minimized, as the modules may ventilate by natural convective means on their back side.

The advantages of the assembly of FIG. 2, which are in addition to the advantages of the assembly shown in FIG. 1, include:

1. Inclined photovoltaic modules 204, 206, 208 operate at a relatively high efficiency, due to their top surfaces being close to a plane normal to solar radiation.

2. By inclining the photovoltaic modules, natural convection using outside air as a convective fluid is enhanced, due to the facilitation of convective currents on the backside of a planar surface when that surface is inclined.

3. By inclining the photovoltaic modules, the top planar surface of the array of modules presents a rough surface to wind currents flowing over the top of the modules, as opposed to a smooth surface when the modules are not inclined. Such a rough surface serves to disrupt the laminar flow of wind, thereby reducing the forces of wind uplift. This condition is true up to a limit on the height differential between the uppermost and lowermost edges of the photovoltaic modules. Beyond a certain height differential, the modules will "catch" the wind, and the design loses efficiency in terms of reducing the forces of wind uplift. The allowable height differential is a complex function of the module weight, the nature of the edge to edge connection, the module size, and other factors. Wind tunnel testing is required to verify the relative height dimensions for each set of module conditions.

### Description of FIGS. 3a–3d: Flat Profile with Phase Change Material

FIGS. 3a–3c show sectional views of a third embodiment of the invention. In FIG. 3a, the assembly includes a plurality of photovoltaic modules 304, 306, 308, a plurality of pre-formed containers or supports 312, 314, 316 which are respectively disposed below the plurality of modules 304, 306, 308 and integral therewith, or fixed thereto.

8

Containers 312, 314, 316 are disposed on top of a roofing membrane 302.

Containers 312, 314, 316 of the assembly may be made of open-cell foam, concrete, or other material into which a phase change material 350, 352, 354 has been imbibed or otherwise contained. A phase change material is a material which absorbs a relatively high amount of heat energy per unit of weight in the process of changing phase from a solid to liquid at its melting point temperature, or from a liquid to gas at its boiling point temperature. The amount of heat absorbed in each case is commonly referred to as the material's heat of fusion and heat of vaporization, respectively.

The means of containment of a phase change material 350, 352, 354 can take several forms. FIG. 3b shows pre-formed assemblies 324, 326, 328 which are preferably metal in order to conduct heat more effectively and form pockets or channels to enable transfer of heat from phase change material 360, 362, 364, 366, 368 to a convecting fluid, preferably air.

FIG. 3c shows a sectional view of a commercially available aluminum sandwich honeycomb structure 340, 342, 344 which contains phase change material and which is bonded to the bottom side of modules 304, 306, 308 and supported on spacers 346, 348.

The phase change material is preferably of the type known as linear crystalline alkyl hydrocarbons due to their low cost and melting temperatures in the range of 35–70 degrees centigrade.

The advantages of the assembly of FIG. 3, which are in addition to the advantages of the assembly shown in FIG. 1, include:

1. By incorporating a phase change material with a predetermined melting point temperature, it is possible to specify precisely the maximum temperature experienced by the assembly and also by the building roof below. By doing so, the photovoltaic module efficiency is enhanced, and the building thermal efficiency is increased.

2. The container of the phase change material can also serve as spacer or support structure for the photovoltaic module, thus reducing material costs.

3. The assembly of FIG. 3 is especially suited for thin-film photovoltaic materials which can benefit from lamination to a rigid substrate. An example is the photovoltaic "bead" technology developed by Texas Instruments, Inc. which incorporates crystalline silicon beads onto a thin metal foil.

### Description of FIGS. 4a–4c: Tapered Profile with Phase Change Material

FIGS. 4a–4c show sectional views of a fourth embodiment of the invention. In FIG. 4a, the assembly includes a plurality of photovoltaic modules 404, 406, 408, a plurality of pre-formed containers or supports 412, 414, 416, which are respectively disposed below the plurality of modules 404, 406, 408, and integral therewith, or fixed thereto. Containers 412, 414, 416, are disposed on top of a roofing membrane 402.

Containers 412, 414, 416 of the assembly may be made of open-cell foam, concrete, metal or other material into which a phase change material 450, 452, 454 has been imbibed or otherwise contained. However, the means of containment of phase change material 450, 452, 454 can take several forms.

5,505,788

9

FIG. 4b shows means of containment using pre-formed pockets or channels 424, 426, 428.

FIG. 4c shows a detail of a sectional view of a commercially available aluminum sandwich honeycomb structure 440, 442, 444 which contains phase change material and which is bonded to the bottom side of modules 406, 408 and supported on spacers 446, 448.

The advantages of the assembly of FIG. 4, which are in addition to the advantages of the assembly shown in FIG. 1 and FIG. 3, include:

1. Inclined photovoltaic modules 404, 406, 408 operate at a relatively high efficiency, due to their top surfaces being close to a plane normal to solar radiation.

2. By inclining the photovoltaic modules, natural convection using outside air as a convection fluid is enhanced. This will result in the need for less phase change material in reducing peak temperatures, thus reducing material costs for the assembly.

3. By inclining the photovoltaic modules, the top planar surface of the array of modules presents a rough surface to wind currents flowing over the top of the modules. A rough surface of pre-determined dimensions can serve to disrupt laminar flow, thereby reducing the forces of wind uplift.

Description of FIGS. 5a–5e: Flat Profile with Insulation Block and Convective Layer

FIG. 5a shows a sectional view of a fifth embodiment of the invention. The assembly includes a plurality of photovoltaic modules 504, 506, 508, 510, a plurality of pro-formed insulation blocks 512, 514, 516, 518 which are respectively disposed below the plurality of modules 504, 506, 508, 510 and integral therewith, or fixedly connected thereto. Insulation blocks 512, 514, 516, 518 are disposed on top of a roofing membrane 502. Insulation block 514, which is identical in construction to insulation blocks 512, 516, 518, preferably has a grooved profile 550 along one edge, and a tongued profile 552 along the opposite edge. In this way, interlocking joints are formed between adjacent assemblies for better resistance to wind uplift. However, any means of integral locking is possible.

In FIG. 5b, modules 504, 506, 508 of the roofing assembly are connected to spacers, pedestals or supports 520, 522, 524, 526 which rest on insulation blocks 532, 534, 536 situated over roofing membrane 502. Module 506, attached to spacers 522, 524 may span and be bonded to insulation blocks 532, 534 in order to provide a positive connection between adjacent insulation blocks 532, 534. In this way, module 506 and module 508 may positively connect insulation blocks 534, 536 and 536, 538, respectively, forming an edge to edge integral assembly. However, any means of positive connection between modules 504, 506, 508 is possible. Spacers 520, 522, 524, 526 may be made of metal, insulation block, plastic, fiberglass, or other material and have pre-determined spacing and dimensions to provide multiple functions, including enabling heat exchange by fluid convection on the backside of modules 504, 506, 508; enabling pressure equalization between the topside and bottomside of modules 504, 506, 508; enabling insulation blocks 532, 534, 536 to ventilate and expire moisture, thus maintaining their insulation value and extending their life; and enabling drainage of rainwater.

FIG. 5c shows an expanded view of spacer 522, which is identical in construction to spacers 520, 524, 526 and has a top adhesive layer 560 for bonding or laminating module

10

506 thereto in the field or in the shop. Spacer 522 has a bottom adhesive layer 562 for bonding or laminating insulation block 534 thereto in the field or in the shop. However, any system can be used for attaching module 506 to spacer 522 and spacer 522 to insulation block 532.

The preferred method of fabrication of the solar roofing assembly is indicated hereafter. Insulation blocks 512, 514, 516, 518 are bonded or otherwise attached on their top surface to modules 504, 506, 508, 510 either in the shop, thereby forming a shop-assembled, two-layer solar roofing module, or at the site of construction. The solar roofing modules are laid in the field over roofing membrane 502. Roofing pavers are situated around the arrays of solar roofing modules. Electrical raceways are installed along those edges of the array of solar roofing modules, or the raceways are made integral to the solar roofing modules or roofing pavers.

Such construction results in a simple, readily assembled roofing assembly which regulates the temperature of the photovoltaic module and roofing membrane. A semi-continuous spatial layer created below modules 504, 506, 508, 510 enables the convection of a fluid, preferably air. The fluid convects within the passageways created by the pre-formed insulation blocks or spacers, transferring heat from the backside of the photovoltaic modules. A fan or pump unit may be added to force convection of the fluid. Rainwater drains through the joints between the integral modules, onto and over the roofing membrane below.

The advantages of the assembly of FIG. 5, which are in addition to the advantages of the assembly shown in FIG. 1, include:

1. The assembly provides added protection for the roofing membrane against degradation resulting from exposure to ultraviolet radiation, weather elements, and from high temperatures, thus extending the life of the membrane.

2. The assembly displaces the need for building insulation placed below the roofing membrane.

3. By placing building insulation above the roofing membrane, moisture condensation is eliminated from the building's interior, since the dew point temperature is located above the membrane.

4. Since rainwater travels between the edges of the insulation block to form a layer between the insulation blocks and the roofing membrane below, the insulation block, spacers and photovoltaic modules will float as an integral unit over the rainwater. With the assembly floating above the rainwater, the photovoltaic modules and their respective electrical connectors are less exposed to moisture, thus extending their life and increasing the safety and reliability of the system. This is particularly important in those applications where the rooftop drainage system is not adequate to drain the roof quickly.

5. By making a positive connection edge-to-edge between adjacent PV modules, the assembly avoids the need for roof hold-downs and penetrations, thus reducing the cost and complexity of the installed system.

Description of FIGS. 6a–6b: Tapered Profile with Insulation Block and Convective Layer

FIGS. 6a–6b show sectional views of a sixth embodiment of the invention. In FIG. 6a, the assembly includes a plurality of photovoltaic modules 604, 606, 608, a plurality

5,505,788

**11**

of insulation blocks 612, 614, 616 respectively disposed below the plurality of modules 604, 606, 608 and integral therewith, or fixed thereto. Insulation blocks 612, 614, 616 are disposed on top of a roofing membrane 602 and have a tapered profile in order to orient modules 604, 606, 608 toward a direction of increased sun exposure.

Insulation block 614, which is identical in construction to insulation blocks 612, 616, preferably has a grooved profile 650 along one edge, and a tongued profile 652 along the opposite edge. In this way, interlocking joints are formed between adjacent assemblies for better resistance to wind uplift. However, any means of integral locking is possible.

In FIG. 6b, a variation of the assembly of FIG. 6a shows photovoltaic modules 604, 606, 608 connected to spacers, pedestals or supports 620, 622, 624 which rest on insulation blocks 632, 634, 636 situated over roofing membrane 602.

The advantages of the assembly of FIG. 6, which are in addition to the advantages of the assembly shown in FIG. 5, include:

1. Inclined photovoltaic modules 604, 606, 608 operate at a relatively high efficiency, due to their top surfaces being close to a plane normal to solar radiation.

2. By inclining the photovoltaic modules, natural convection using outside air as a convection fluid is enhanced. This will result in the need for less phase change material in shaving peak temperatures, thus reducing material costs for the assembly.

3. By inclining the photovoltaic modules, the top planar surface of the array of modules presents a rough surface to wind currents flowing over the top of the modules. A rough surface serves to disrupt laminar flow, thereby reducing the forces of wind uplift.

### Description of FIGS. 7a–7c: Flat Profile with Insulation Block and Phase Change Material

FIGS. 7a–7c show sectional views of a seventh embodiment of the invention. In FIG. 7a, the assembly includes a plurality of photovoltaic modules 704, 706, 708, 710, a plurality of pre-formed insulation blocks 712, 714, 716, 718 which are respectively disposed below the plurality of photovoltaic modules 704, 706, 708, 710 and integral therewith, or fixed thereto. Insulation blocks 712, 714, 716, 718 are disposed on top of a roofing membrane 702. Insulation blocks 712, 714, 716, 718 of the assembly contain a phase change material 750, 752, 754, 756.

Whereas the assembly shows insulation blocks 712, 714, 716, 718 as a means of containment of phase change material 750, 752, 754, 756, the means of containment can take several forms.

FIG. 7b shows pre-formed containers 724, 726, 728 which contain phase change material and which are formed to enable fluid convection for transferring heat away from the phase change material. Channels 724, 726, 728 are preferably metal in order to conduct heat effectively.

FIG. 7c shows a sectional view of a commercially available aluminum sandwich honeycomb structure 760, 762, 764 which contains phase change material and which is bonded to the bottom side of modules 704, 706, 708 and supported on insulation block 776, 778, 780.

Alternatively, the photovoltaic modules, bonded to the honeycomb structure could rest on spacers over the roofing membrane.

The advantage of the assembly of FIG. 7 is that it combines the advantages of the assemblies of FIG. 3 and FIG. 5.

**12**

### Description of FIGS. 8a–8c: Tapered Profile with Insulation Block and Phase Change Material

FIGS. 8a–8c show sectional views of an eighth embodiment of the invention. In FIG. 8a, the assembly includes a plurality of photovoltaic modules 804, 806, 808, a plurality of pre-formed insulation blocks 812, 814, 816 which are respectively disposed below the plurality of modules 804, 806, 808 and integral therewith, or fixed thereto. Insulation blocks 812, 814, 816 are disposed on top of a roofing membrane 802 and have a tapered profile for orientation of their sloped surface in the direction of maximum sun exposure. Insulation blocks 812, 814, 816 contain phase change material 850, 852, 854.

Whereas the assembly of FIG. 8a shows insulation blocks 812, 814, 816 as a means of containment of phase change material 850, 852, 854, the means of containment of a phase change material can take several forms.

FIG. 8b shows pre-formed containers 824, 826, 828 which are shaped to contain phase change material 850, 852, 854 and to enable fluid convection for transferring heat. Containers 824, 826, 828 are preferably metal in order to conduct heat effectively.

Alternatively, FIG. 7c shows a sectional view of a commercially available aluminum sandwich honeycomb structure 860, 862, 864 which contains phase change material and which is bonded to the bottom side of modules 804, 806, 808 and supported on insulation blocks 876, 878, 880.

The advantage of the assembly of FIG. 8 is that it combines the advantages of the assemblies of FIG. 4 and FIG. 5.

### Description of FIG. 9: Perspective View of the Photovoltaic Roofing Assembly

FIG. 9 shows a perspective view of the photovoltaic roofing assembly where solar roofing modules form an array 902 which is situated on a building rooftop. Roofing paver sections 904 are situated between predetermined areas of array 902 to provide walkways and perimeters around roof penetrations, such as vents, and around roof equipment, such as heating, ventilating, and air conditioning equipment.

While the invention has been described in its preferred embodiments, it is to be understood that the words which have been used are words of description rather than limitation and that changes may be made within the purview of the appended claims without departing from the true scope and spirit of the invention in its broader aspects.

### SUMMARY, RAMIFICATIONS, AND SCOPE

The present invention provides a simple, efficient, quickly installed, reusable, and low-cost solar module assembly for roofs or other flat or mildly sloping surfaces.

While the above description contains many specificities, these should not be construed as limitations on the scope of the invention, but rather as an exemplification of one preferred embodiment thereof. Many other variations are possible.

For example, the integral solar module unit consisting of a solar module bonded to insulation block can be utilized independent of a roofing membrane.

As a further example, the solar roofing assembly may include an additional layer consisting of fabric or other material disposed above the roofing membrane and below the photovoltaic module with spacers, which layer may

5,505,788

**13**

provide an additional protective barrier for the roofing membrane and/or topsheet.

As a further example, the solar modules with pedestals or spacers may include leveling plates placed under or over the pedestals or spacers for leveling the photovoltaic modules, or for achieving a pre-determined slope of the photovoltaic modules.

As a further example, the insulation block may be coated with an intumescent coating or other means of fireproofing in order to achieve a desired fire rating as a building roofing assembly.

As a further example, whereas the edge-to-edge connection between adjacent modules was often shown as a tongue and groove assembly, any means of edge connection is possible, including mechanical clips, adhesives, "skewer" inserts which penetrate the insulation block, and other means. In addition, the positive connection between modules may be accomplished as follows. The photovoltaic modules may rest on spacers which in turn rest on insulation board which is loose laid on the roofing membrane. The photovoltaic modules may then span and be bonded to adjacent insulation blocks which would provide a positive connection between adjacent insulation blocks and adjacent photovoltaic modules. The latter would assist the assembly in resisting the forces of wind uplift.

As a further example, where there is a phase change material contained within a pre-formed insulation block, the insulation block may include a lining for containment of the phase change material.

As a further example, the top of all insulation blocks may be painted with a paint which is opaque to ultraviolet radiation, thereby lengthening the life of the insulation block in applications where the photovoltaic module is not opaque to ultraviolet radiation.

As a further example, the spacers need not be made integral with the photovoltaic module in the shop, but may be laid in the field as stringers and the PV modules attached thereto in the field.

Accordingly, the scope of the invention should be determined not by the embodiments illustrated, but by the appended claims and their legal equivalents.

I claim:

1. A photovoltaic roofing assembly, comprising:
   a roofing membrane;
   a plurality of photovoltaic modules disposed as a layer on top of said roofing membrane, and
   means for regulating the temperature of said photovoltaic modules.

2. The assembly of claim 1 wherein said means of temperature regulation includes a plurality of pre-formed spacers located below said photovoltaic modules, whereby said photovoltaic modules are separated from said roofing membrane by a pre-determined distance, thus enabling heat transfer from the backside of said photovoltaic modules to a convecting fluid.

3. The assembly of claim 2 wherein said spacers have a top surface which is joined to said photovoltaic modules, forming integral units.

4. The assembly of claim 3 wherein said integral units have adjoining sides and a joint is disposed between the photovoltaic modules of said integral units, whereby water may drain between said photovoltaic modules and whereby the pressure differential between the top and bottom sides of said photovoltaic modules due to windflow over the top of said photovoltaic modules is reduced.

**14**

5. The assembly of claim 4 wherein said integral units have a tapered profile, and the photovoltaic modules which are the top side of said integral units have a top surface which can be installed so as to face in a direction of increased sun exposure.

6. The assembly of claim 1 wherein said means of temperature regulation includes a phase change material together with a container for containing said phase change material, disposed as a layer below said plurality of photovoltaic modules.

7. The assembly of claim 6 wherein said container which contains said phase change material has a top surface which is joined to its respective photovoltaic module, forming a three-pan integral unit.

8. The assembly of claim 7 wherein each three-part integral unit has adjoining sides with a joint disposed between said adjoining sides for water drainage and for pressure equalization between the bottom and top sides of said three-part integral units.

9. The assembly of claim 8 wherein each of said three-pan integral units includes a container which is pre-formed to enable fluid convection along at least one surface to facilitate heat transfer away the phase change material which it contains.

10. The assembly of claim 9 wherein said three-pan integral unit has a tapered profile, and the photovoltaic module disposed as the top side of said three-part integral unit has a top surface which can be installed so as to face in a direction of increased sun exposure.

11. The assembly of claim 7 further including spacers which are joined on their top side to the bottom surface of said three-part integral units, with the bottom of said spacers resting on the roofing membrane.

12. The assembly of claim 11 wherein said three-part integral units with supporting spacers have adjoining sides and a joint disposed between said sides for water drainage and for pressure equalization between the bottom and top sides of said three-part integral units.

13. The assembly of claim 12 wherein said three-part integral units with supporting spacers have a tapered profile and the photovoltaic module disposed as the top side of said thru-part integral units has a top surface which can be installed so as to face in a direction of increased sun exposure.

14. The assembly of claim 12 wherein the container portion of said three-part integral units is an aluminum honeycomb.

15. The assembly of claim 14 wherein said three-part integral units have a tapered profile, and the top surface of said three-part integral units can be installed so as to lace in a direction of increased sun exposure.

16. A method of making a solar roofing assembly comprising: assembling photovoltaic modules having a bottom surface bonded to supporting spacers, thereby forming integral units; installing a roofing membrane over a roof; installing said integral units as a layer on top of said roofing membrane, whereby the completed assembly limits the temperatures experienced by the photovoltaic modules and eliminates the need for roofing penetrations for hold-down of said integral units.

17. A method of making a photovoltaic roofing assembly, comprising installing in the field a roofing membrane; installing in the field pre-formed spacers in substantially straight lines; and installing photovoltaic modules on top of said pre-formed spacers; whereby the completed assembly limits the temperatures experienced by the photovoltaic modules and eliminates the need for roofing penetrations for hold-down of any of its components.

5,505,788

| 15 | 16 |

18. A method of making a solar roofing assembly comprising: assembling photovoltaic modules having a bottom surface bonded to a container containing a phase change material, thereby forming three-part integral units; installing a roofing membrane over a roof; installing said integral units as a layer on top of said roofing membrane using supporting spacers; whereby the completed assembly has predetermined dimensions and edge connections which limit the temperatures experienced by the photovoltaic modules and eliminate the need for roofing penetrations for hold-down of its components.

19. A photovoltaic roofing assembly, comprising:

a roofing membrane;

a plurality of insulation blocks disposed as a layer on top of said roofing membrane;

a plurality of photovoltaic modules disposed as a layer on top of said insulation blocks; and

means for regulating the temperature of said photovoltaic modules.

20. The assembly of claim 19, wherein said means of temperature regulation includes pre-forming said insulation blocks with pre-determined grooves on their top surface, whereby a layer is formed on the top side of said insulation blocks which enables convective fluid flow for heat transfer away from the backside of said photovoltaic modules and allows pressure equalization between the bottom and top sides of said photovoltaic modules.

21. The assembly of claim 20 wherein each of said insulation blocks have adjoining sides with a joint disposed between said sides for water drainage.

22. The assembly of claim 21 wherein each of said insulation blocks has a top surface which is joined to its respective photovoltaic module, forming a two-part integral unit.

23. The assembly of claim 22 wherein each of said insulation blocks has a tapered profile, and said photovoltaic module disposed above said insulation block has a top surface which can be installed so as to face in a direction of increased sun exposure.

24. The assembly of claim 19 wherein said means of temperature regulation includes a plurality of pre-formed spacers which separate said photovoltaic modules from said insulation blocks, thus enabling heat transfer from the backside of said photovoltaic modules to a convecting fluid.

25. The assembly of claim 24 wherein each of said spacers has a top surface which is joined to its respective photovoltaic module, thus forming a two-part integral unit.

26. The assembly of claim 25 wherein each of said two-part integral units are attached on their bottom sides to the top surface of the insulation blocks, with a joint disposed between the sides of said two-part integral units for water drainage and for pressure equalization between the bottom and top sides of said two-part integral units.

27. The assembly of claim 26 wherein said two-part integral units have a tapered profile, and the photovoltaic module on the top side of said two-part integral units have a top surface which can be installed so as to face in a direction of increased sun exposure.

28. The assembly of claim 25 wherein each of said two-part integral units have adjoining sides with a joint disposed between said sides for water drainage and for pressure equalization between the bottom and top sides of the two-part integral units.

29. The assembly of claim 28 wherein each of said two-part integral units has a tapered profile, and the photovoltaic module on the top side of said two-part integral unit has a top surface which can be installed so as to face in a direction of increased sun exposure.

30. The assembly of claim 19 wherein said means of temperature regulation includes a phase change material together with a container for containing said phase change material, disposed as a layer below said plurality of photovoltaic modules.

31. The assembly of claim 30 wherein said container has a top surface which is joined to its respective photovoltaic module, forming a two-part integral unit.

32. The assembly of claim 31 wherein said two-part integral units have adjoining sides with a joint disposed between said sides for water drainage and for pressure equalization between the bottom and top sides of said two-part integral units.

33. The assembly of claim 32 wherein the container portion of said two-part integral units is pre-formed to enable fluid convection along at least one surface to facilitate heat transfer away from the phase change material which it contains.

34. The assembly of claim 33 wherein said container has a tapered profile, and the photovoltaic module disposed above said container has a top surface which can be installed so as to face in a direction of increased sun exposure.

35. The assembly of claim 32 further including spacers which elevate said two-part integral units above said roofing membrane.

36. The assembly of claim 35 wherein said spacers have a tapered profile, and said two-part integral units disposed above spacers have a top surface which can be installed so as to face in a direction of increased sun exposure.

37. The assembly of claim 35 wherein the container portion of said two-part integral units is an aluminum honeycomb which contains said phase change material.

38. The assembly of claim 37 wherein said spacers have a tapered profile, and said two-part integral units disposed above said spacers have a top surface which can be installed so as to face in a direction of increased sun exposure.

39. A method of making a solar roofing assembly comprising: pre-forming an insulation block to include channels on its top surface; assembling a photovoltaic module having a bottom surface bonded to said insulation block, thereby forming a two-part integral unit; installing a roofing membrane over a roof; installing said two-part integral units as a layer on top of said roofing membrane; installing roofing pavers around the perimeter areas of said two-part integral units; whereby the completed assembly limits the temperatures experienced by the photovoltaic modules and eliminates the need for roofing penetrations for hold-down of its components.

40. A method of making a photovoltaic roofing assembly, comprising installing in the field a roofing membrane over a roof; installing in the field a plurality of insulation blocks disposed as a layer on top of said roofing membrane; installing pre-formed spacers in substantially straight lines as a layer on top of said insulation blocks; installing photovoltaic modules on top of said pre-formed spacers; whereby the completed assembly limits the temperatures experienced by the photovoltaic modules and eliminates the need for roofing penetrations for hold-down of its components.

41. A method of making a photovoltaic roofing assembly, comprising assembling a photovoltaic module having a bottom surface attached to pre-formed spacers forming two-part integral units; installing in the field a roofing membrane over a roof; installing in the field a plurality of insulation blocks disposed as a layer on top of said roofing membrane; installing said two-part integral units as a layer on top of said insulation blocks; whereby the completed

5,505,788

17

assembly limits the temperatures experienced by the photovoltaic modules and eliminates the need for roofing penetrations for hold-down of its components.

42. A method of making a solar roofing assembly comprising: assembling a photovoltaic module having a bottom surface bonded to a container which contains a phase change material, thereby forming a three-part integral unit; installing a roofing membrane over a roof; installing a plurality of insulation blocks as a layer on top of said roofing membrane; installing said three-part integral units as a layer on top of said insulation blocks; whereby the completed assembly eliminates the need for roofing penetrations for hold-down of its components and limits the temperatures experienced by the photovoltaic modules.

18

43. A method of making a solar roofing assembly comprising: assembling a photovoltaic module having a bottom surface bonded to a container which contains a phase change material, thereby forming a three-part integral unit; installing a roofing membrane over a roof; installing a plurality of insulation blocks as a layer on top of the roofing membrane; installing spacers as a layer on top of said insulation blocks; installing said three-part integral units as a layer on top of said spacers; whereby the completed assembly eliminates the need for roofing penetrations for hold-down of its components and limits the temperatures experienced by the photovoltaic modules and roofing membrane.

*    *    *    *    *



US00RE38988E

(19) **United States**

(12) **Reissued Patent**
Dinwoodie

(10) Patent Number: **US RE38,988 E**
(45) Date of Reissued Patent: **Feb. 28, 2006**

(54) **LIGHTWEIGHT, SELF-BALLASTING PHOTOVOLTAIC ROOFING ASSEMBLY**

(76) Inventor: **Thomas L. Dinwoodie**, 934 Kingston Ave., Piedmont, CA (US) 94611

(21) Appl. No.: **10/414,347**

(22) Filed: **Apr. 15, 2003**

**Related U.S. Patent Documents**
Reissue of:
(64) Patent No.: **5,746,839**
    Issued: **May 5, 1998**
    Appl. No.: **08/629,052**
    Filed: **Apr. 8, 1996**

(51) Int. Cl.
    *E04D 13/18*      (2006.01)
    *H01L 31/048*      (2006.01)

(52) U.S. Cl. ....................... 136/251; 136/246; 136/291; 52/173.3

(58) Field of Classification Search ................ 136/251, 136/246, 291; 52/173.3
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,769,091 A | * | 10/1973 | Leinkram et al. | 136/246 |
| 4,040,867 A | * | 8/1977 | Forestieri et al. | 136/244 |
| 4,189,881 A | * | 2/1980 | Hawley | 52/91.3 |
| 4,321,416 A | * | 3/1982 | Tennant | 136/244 |
| 4,389,533 A | * | 6/1983 | Ames | 136/248 |
| 4,674,244 A | * | 6/1987 | Francovitch | 52/173.3 |
| 4,677,248 A | * | 6/1987 | Lacey | 136/244 |
| 4,835,918 A | * | 6/1989 | Dippel | 52/63 |
| 4,860,509 A | * | 8/1989 | Laaly et al. | 52/173.3 |
| 4,886,554 A | * | 12/1989 | Woodring et al. | 136/244 |
| 5,092,939 A | * | 3/1992 | Nath et al. | 136/251 |
| 5,112,408 A | * | 5/1992 | Melchoir | 136/251 |
| 5,316,592 A | * | 5/1994 | Dinwoodie | 136/244 |
| 5,338,369 A | * | 8/1994 | Rawlings | 136/246 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | 3611542 A1 | * | 10/1987 | |
| JP | 59-175168 A | * | 10/1984 | |
| JP | 59-175169 A | * | 10/1984 | |
| JP | 59-175169 | * | 2/1985 | |
| JP | 1-65154 U | | 4/1989 | |
| JP | 3-200376 A | * | 9/1991 | |
| JP | 5-280168 A | * | 10/1993 | |
| JP | 5-280168 A | | 10/1993 | |
| JP | 8-274364 A | | 10/1996 | |

OTHER PUBLICATIONS

Dinwoodie et al, "Optimizing Roof–Integrated Photovoltaics: A Case Study of the PowerGuard Roofing Tile," Proceedings of the First World Conference on Photovoltaic Energy Conversion, Dec. 4–9, 1994.*
Dinwoodie et al "Optimizing Roof–Integrated Photovoltaics: A Case Study of the PowerGuard™ Roofing Tile," IEEE/First World Conference on Photovoltaic Energy Conversion, Dec. 4–9, 1994, Waikoloa, Hawaii.

*Primary Examiner*—Alan Diamond

(57) **ABSTRACT**

A photovoltaic roofing assembly comprises a roofing membrane (102), a plurality of photovoltaic modules (104, 106, 108) disposed as a layer on top of the roofing membrane (102), and a plurality of pre-formed spacers, pedestals or supports (112, 114, 116, 118, 120, 122) which are respectively disposed below the plurality of photovoltaic modules (104, 106, 108) and integral therewith, or fixed thereto. Spacers (112, 114, 116, 118, 120, 122) are disposed on top of roofing membrane (102). Membrane (102) is supported on conventional roof framing, and attached thereto by conventional methods. In an alternative embodiment, the roofing assembly may have insulation block (322) below the spacers (314, 314', 315, 315'). The geometry of the pre-formed spacers (112, 114, 116, 118, 120, 122, 314, 314', 315, 315') is such that wind tunnel testing has shown its maximum effectiveness in reducing net forces of wind uplift on the overall assembly. Such construction results in a simple, lightweight, self-ballasting, readily assembled roofing assembly which resists the forces of wind uplift using no roofing penetrations.

**73 Claims, 8 Drawing Sheets**



**US RE38,988 E**

Page 2

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,505,788 A | * | 4/1996 | Dinwoodie | 136/246 |
| 5,524,401 A | * | 6/1996 | Ishikawa et al. | 52/173.3 |
| 5,647,915 A | * | 7/1997 | Zukerman | 136/251 |
| 6,061,978 A | * | 5/2000 | Dinwoodie et al. | 52/173.3 |
| 6,148,570 A | * | 11/2000 | Dinwoodie et al. | 52/173.3 |
| 6,495,750 B1 | * | 12/2002 | Dinwoodie | 136/251 |
| 6,498,289 B1 | * | 12/2002 | Mori et al. | 136/244 |
| 6,501,013 B1 | * | 12/2002 | Dinwoodie | 136/251 |
| 6,534,703 B1 | * | 3/2003 | Dinwoodie | 136/251 |
| 6,570,084 B1 | * | 5/2003 | Dinwoodie | 136/251 |
| 2003/0154666 A1 | * | 8/2003 | Dinwoodie | 52/173.3 |
| 2003/0154667 A1 | * | 8/2003 | Dinwoodie | 52/173.3 |
| 2003/0154680 A1 | * | 8/2003 | Dinwoodie | 52/519 |
| 2004/0007260 A1 | * | 1/2004 | Dinwoodie | 136/251 |

* cited by examiner

**U.S. Patent**    Feb. 28, 2006    Sheet 1 of 8    **US RE38,988 E**



Fig. 1A

Fig. 1B

**U.S. Patent**     Feb. 28, 2006     Sheet 2 of 8     US RE38,988 E

Fig. 1C



Fig. 1D



**U.S. Patent**    Feb. 28, 2006    Sheet 3 of 8    US RE38,988 E

Fig. 2A



Fig. 2B



Fig. 2C



**U.S. Patent**     Feb. 28, 2006     Sheet 4 of 8     **US RE38,988 E**

Fig. 2D



Fig. 3A



Fig. 3B

Fig. 3C



Fig. 3D



**U.S. Patent**　　Feb. 28, 2006　　Sheet 7 of 8　　**US RE38,988 E**

**Fig. 4A**



**Fig. 4B**

Fig. 5



US RE38,988 E

**1**

## LIGHTWEIGHT, SELF-BALLASTING PHOTOVOLTAIC ROOFING ASSEMBLY

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

This invention was made with Government support under Agreement No. FG09-95EE15638 awarded by the Department of Energy. The Government has certain rights in this invention.

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is related to U.S. Pat. No. 5,316,592, issued May 31, 1994 to Dinwoodie, and U.S. Pat. No. 5,505,788, issued Apr. 9, 1996 to Dinwoodie, the disclosures of which are incorporated by reference.

### BACKGROUND OF THE INVENTION

This invention generally relates to a photovoltaic roofing assembly, and in particular to a lightweight photovoltaic roofing assembly requiring no roofing penetrations and which resists wind up-lift due to specialized component geometry and by acting as an integral assembly.

As the cost of solar cells declines, the non-solar cell components necessary for a functioning photovoltaic system begin to dominate the overall system costs. For this reason, there is a growing trend to develop photovoltaic assemblies which eliminate or reduce non-solar cell components, and where the photovoltaic cell displaces conventional building components. Special care must be taken to ensure that new products based on photovoltaic materials remain safe with respect to environmental factors such as wind-loading and environmental stresses.

A prior art photovoltaic roofing assembly is shown in U.S. Pat. No. 4,886,554 issued Dec. 12, 1989 to Woodring et al. Woodring's assembly includes a plurality of insulation blocks disposed as a layer on top of a roofing membrane, a plurality of concrete pavers disposed as a layer on top of the plurality of insulation blocks, and a plurality of photovoltaic cells, each supported on a respective paver. A key feature of Woodring's assembly is the attachment of the solar cell to the supporting paver. But such attachment suffers from several disadvantages:

a) by including a roofing paver, the assembly is more complicated than necessary and more costly to manufacture.

b) the assembly does not employ a method by which to limit the temperatures experienced by the solar cells and other components. Solar cells are known to decline in efficiency with increasing temperatures. Hence, by offering no mechanism for temperature abatement, the assembly will operate less efficiently, with unknown long-term effects due to high temperature exposure.

c) by placing both a concrete paver and photovoltaic module onto the insulation block, the insulation block is inhibited from ventilating and expiring moisture. As a result, upon exposure to moisture, the insulation block takes longer to dry out, thus reducing its insulating value and degrading the integrity of the insulation block over time.

d) the assembly has multiple modes of potential failure, which include the paver component and its means of bonding. These components will be subjected to 20–30 years of an exposed and harsh weather environment at elevated temperatures. Any form of delamination is unacceptable. Sunpower v. Sunlink, et al.

**2**

Delamination would cause dislocation of solar cells due to wind loading, and potential exposure of the insulation and membrane layers below.

Another prior art solar roofing assembly is shown in U.S. Pat. No. 4,674,244 issued Jun. 23, 1987 to Francovitch. Francovitch's assembly includes a roof substrate which is substantially flat, an insulation structure thereon having an inclined surface, an elastomeric membrane over the substrate and the structure, the membrane being applied to and supported by the substrate and structure, and supporting an array of photocells. A key feature of this assembly is the attachment of the solar cell directly to the roofing membrane. By such attachment, this assembly suffers from several disadvantages:

a) the assembly does not employ a method by which to limit the temperatures that will be experienced by the solar cells and roofing membrane, thus reducing the efficiency of the solar cells and reducing the life of the roofing membrane.

b) the assembly has multiple modes of potential failure, which include failure due to thermal stresses on the roofing membrane and its means of bonding.

c) the assembly requires roof fasteners which penetrate the protective roofing membrane, which make the installation much more complicated and more costly than is necessary. In addition, such penetrations increase the risk of water leakage, with consequent damage to the building and its contents.

Other patents related to a photovoltaic roofing assembly include U.S. Pat. Nos. 4,835,918 issued Jun. 6, 1989 to Dippel; 4,189,881 issued Feb. 26, 1980 to Hawley; 3,769,091 issued Oct. 30, 1973 to Leinkram et al; 4,040,867 issued Aug. 9, 1977 to Forestieri et al; 4,321,416 issued Mar. 23, 1982 to Tennant; 4,860,509 issued Aug. 29, 1989 to Laaly et al; 5,092,393 issued March, 1992 to Nath et al; 5,112,408 issued May, 1992 to Melchior, 4,389,533 issued Jun. 21, 1983 to Ames; 4,677,248 issued Jun. 30, 1987 to Lacey; 5,338,369 issued Aug. 16, 1994 to Rawlings; German patent No. DE 3611542 A1 issued Apr. 5, 1986 to Cohausz et al.; and Japanese patent No. 3-200376 issued Sep. 2, 1991.

### SUMMARY OF THE INVENTION

According to the present invention, a lightweight, self-ballasting solar cell roofing assembly is preferably formed with two portions. One portion consists of a plurality of photovoltaic modules, together with spacers which rest on a conventional building rooftop. The spacers are preferably pre-formed and are sized and configured to provide passageways beneath the photovoltaic modules extending from at least two sides of the modules to reduce uplift forces on the modules. The photovoltaic modules with spacers preferably have interlocking edges or corners. The second portion is a means of perimeter securement which avoid roof membrane penetrations, such as the use of roofing pavers.

The photovoltaic module portion is situated over the building rooftop in a manner to be exposed to solar radiation and electrically connected for transport of electricity. The paver portion is situated over the same building and interlocks with the photovoltaic modules with spacers. Other means of perimeter securement are possible, including placing metal flashing along the edge of the perimeter modules and connecting the flashing end-to-end around the array perimeter, or adhering said flashing to the roofing membrane. The photovoltaic module performs the multiple functions normally provided by a roofing paver, including ballast, UV protection, and weather protection for the membrane and insulation layers below. Together the two portions

3

serve the dual function of a self-ballasted protective roof covering and an assembly for the collection of radiant energy.

In an alternate embodiment, the solar cell roofing assembly is formed with three portions. The first portion consists of a plurality of insulation blocks which are situated on a conventional roofing membrane. The second portion consists of a plurality of photovoltaic modules, together with spacers which rests on the plurality of insulation blocks. The insulation blocks with photovoltaic modules and spacers have interlocking edges. The photovoltaic module performs multiple functions, including ballast, UV protection, and weather protection for the membrane and insulation layers below. A third portion is a means of perimeter securement, such as metal flashing or conventional roofing pavers, located at the perimeter of arrays of photovoltaic modules and tying the entire array together as an integral assembly. Other means of perimeter securement are also possible. Together the three portions serve the dual function of a protected membrane roofing system and an assembly for the collection of radiant energy.

Accordingly, the present invention provides several features and advantages:

a) a detailed geometry for lightweight photovoltaic roofing tiles and assemblies which ensure adequate resistance to wind uplift forces acting on a building rooftop while eliminating the need for roof membrane penetrations for holddown;

b) a roofing assembly which weighs roughly one-sixth to one-third that of conventional ballasted roofs, thus reducing or eliminating the need for added building structural support;

c) an assembly which works with virtually all built-up and single ply membranes, and an assembly which can be free of chlorinated fluorocarbon;

d) a simple and low-cost photovoltaic roofing assembly, where components within the product provide multiple functions as a roofing component, including ballast, weather protection, and UV protection for the insulation and waterproof membrane below;

e) a photovoltaic roofing assembly which enjoys ease of fabrication due to its simple construction;

f) a photovoltaic roofing assembly that displaces the costs of conventional roofing materials and their installation, thereby enhancing the value of the photovoltaic portion as a synergistic building component;

g) a product with minimal modes of potential failure;

h) a roofing assembly which yields social benefits by making photovoltaic technology more cost competitive. This facilitates transition to a clean, renewable energy economy, and helps to mitigate air pollution and global warming.

The foregoing and other features and advantages of the invention will be more fully apparent from the description of the preferred embodiments of the invention when read in connection with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A to 1D show views of one embodiment of the invention with spacers resting directly on a roofing membrane and with spacer geometry designed to minimize wind uplift on the overall assembly;

FIGS. 2A to 2D show views of a second embodiment of the invention, whereby the invention shown in FIG. 1 is a panelized system of photovoltaic modules;

4

FIGS. 3A to 3D shows views of an alternate embodiment of the invention whereby spacers are attached to an insulation block and arranged in a geometry which minimizes wind uplift on the overall assembly, the outline of the location of the photovoltaic module shown in dashed lines in FIG. 3D;

FIGS. 4A to 4B show views of various means of perimeter securement installed according to the invention; and

FIG. 5 shows a plan view of a building with a photovoltaic roofing assembly installed according to the invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Description of FIGS. 1A–1D:

Spacer Geometry Directly on Roofing Membrane

FIG. 1A shows a sectional view of a photovoltaic roofing assembly. The assembly includes a plurality of photovoltaic modules 104, 106, 108, a plurality of pre-formed spacers, pedestals, or supports 112, 114, 116, 118, 120, 122 which are respectively disposed below the plurality of photovoltaic modules 104, 106, 108 and integral therewith, or fixedly connected thereto. Spacers 112, 114, 116, 118, 120, 122 are disposed on top of a roofing membrane 102. Photovoltaic modules 104, 106, 108 and the associated spacers 112–122 define open regions 123 beneath the photovoltaic modules.

Membrane 102 is supported on conventional roof framing (not shown), and may be attached thereto by conventional methods, such as fasteners or adhesives. Membrane 102 may also rest directly on an insulation block which is supported on conventional roof framing. Modules 104, 106, 108 are electrically connected using electrical conductors (not shown) and are arranged in an array of modules. Each of modules 104, 106, 108 has at least one photovoltaic cell. Examples of photovoltaic modules include those incorporating thin-film deposition onto glass, stainless steel or ceramic substrates and manufactured by such companies as Solarex Corporation, United Solar Systems Corporation, Energy Photovoltaics, Inc. and Astropower, Inc., and modules of single or polycrystalline silicon cells such as those manufactured by Astropower, Inc., Siemens Solar Industries, and Solarex Corporation.

FIG. 1B shows a plan view of a detail of the assembly whereby pre-formed spacers 116, 118, 124, 126 are disposed on top of membrane 102 and provide support along the edges of module 106 to which they are fixedly connected or made integral. FIG. 1A shows dimension h representing the distance between the module and the roofing membrane. The assembly has preferred dimensions whereby h measures 2.5 cm (1 inch) to 15.2 cm (6 inches), depending upon the temperature to which the module and other components are to be limited. The photovoltaic modules are preferably sized in the range of 61 cm (2 feet) by 122 cm (4 feet) to 122 cm (4 feet) by 244 cm (8 feet), which dimension has been determined from wind tunnel test evaluation to be preferred from the standpoint of minimizing wind uplift and which dimension can be readily handled by a roofing installation crew.

FIG. 1C shows a sectional view of an alternate detail of the assembly whereby spacers 130, 132, 134 have a tapered profile and are disposed on top of membrane 102 and provide support for modules 104, 106, 108 to which they are fixedly connected or made integral. Spacers 130, 132, 134 may be made of glass, concrete, plastic (vacuum-formed or other), insulation block, integral concrete over insulation block (such as the product known as Lightguard, by T. Clear Corporation), or other material.

In FIGS. 1C and 1D spacer 132 is shown pre-formed with openings 150, 152 which enable free air exchange at the low

US RE38,988 E

5

and high sides of module 106 to the underside of the module 106. Such free air exchange with the spacer geometry shown has been determined through wind-tunnel testing to aid in the instantaneous equilibration of air pressures between the top and bottom side of module 106, thus reducing net forces of wind uplift.

In FIGS. 1C and 1D spacer 132 is shown pre-formed with a tapered profile 140 between its highest point along the high edge of module 106 extending downward to the low edge of adjacent module 108. Tapered profile 140 serves as an aerodynamic wind-block, causing wind which is traveling from the right in the drawing to flow over the top of module 106, and obstructing its entry to the backside of module 106.

In FIGS. 1C and 1D spacer 132 preferably has a tongue profile 160 along two edges and a groove profile 162 along its other two edges such that spacer 132 interlocks with adjacent spacers. In this way, interlocking joints are formed between adjacent integral assemblies for better resistance to wind uplift. However, any means of integral locking is possible.

The preferred method of manufacture of the solar roofing assembly is indicated as follows: Modules 104, 106, 108 are added to, bonded to, or otherwise attached to, respective spacers 112, 114, 116, 118, 120, 122, 124, 126 (or for sloped modules, spacers 130, 132, 134) in the manufacturing plant or in the field. A roofing membrane is placed on a roof. The modules and spacers are placed in arrays on top of the roof membrane. Roofing pavers are situated around the perimeter of photovoltaic modules and interlock at the perimeter of the modules. Such construction results in a simple, readily assembled roofing assembly which can be lightweight while resisting the forces of wind uplift.

The advantages of the foregoing assembly include:

1. The assembly is lightweight

(9.76–19.53 kg/sq. m or 2–4 pounds/sq. ft.) relative to conventional roofing ballast (48.8–73.2 kg/sq. m or 10–15 pounds/sq. ft.), relying on a combination of weight, edge to edge connection, and spacer geometry to resist the forces of wind uplift.

2. The photovoltaic roofing assembly, which can be used on a flat or mildly sloping roof, minimizes water leakage through the roof.

3. The photovoltaic module provides multiple functions as a roofing component, including ballast, weather protection, and UV protection for the membrane layer below.

4. By displacing roofing components and their installation, the value of the photovoltaic module is enhanced, thereby enhancing the cost-competitiveness of energy from a clean and renewable resource.

5. The cost of installation of the assembly is minimized due to ease of fabrication and simple construction. Quality control is maximized by using shop assembly.

6. The solar roofing modules are reusable. They can be readily disconnected and reassembled onto other rooftops. Spacers 112, 114, 116, 118, 120, 122 of the assembly can take several forms, but preferably follow the periphery of each of modules 104, 106, 108 while having openings that are between 5% to 50% of the edge length of the module. This geometry has been determined to be preferred as a result of extensive wind-tunnel testing, and results in near instantaneous and uniform equilibration of pressures at the top and bottom side of modules 104, 106, 108 under conditions of high windspeed, thus reducing net uplift forces due to wind-loads.

6

Description of FIGS. 2A–2D:
Spacers as Panelized System

FIGS. 2A–2D show section and plan views of a second embodiment of the invention. In FIG. 2A, the assembly includes a plurality of photovoltaic modules 204, 206, 208, 210, 212, a plurality of pre-formed spacers 220, 222, 224 which are respectively disposed below modules 204, 206, 208, 210, 212 and integral therewith, or fixed thereto. The spacers 220, 222, 224 rest on pedestals or supports 240, 242 which are disposed on top of a roofing membrane 202. Alternatively, spacers 220, 222, 224 may rest directly on membrane 202.

Spacers 220, 222, 224 of the assembly can take several forms, including c-channels, plastic tube, or metal bar.

FIG. 2B shows a plan view of a detail of the assembly whereby spacers 220, 220', 222, 222', 226, 226' provide support for modules 204, 206, 208, 210, 212, 214, 216, 218 to which they are fixedly connected or made integral. Spacers 220, 220', 222, 222', 226, 226', 228, 228' also ensure consistent spacing between PV modules and enable water drainage.

FIG. 2C shows a sectional end-view of the assembly whereby spacers 228, 222', 222, 226 are disposed on top of pedestals 240, 240' which are disposed on membrane 202. Pedestals 240, 240' may be made of concrete, plastic, insulation block, or other material and interlock with spacers 228, 222, 222', 226. Whereas FIG. 2C shows interlocking by intersecting c-channels, any means of interlocking is possible.

In FIG. 2D, the assembly of FIG. 2A is modified by sloping modules 204, 206, 208, 210, 212 and introducing windspoils 260, 262, 264, 266, 268 in order to deflect surface winds from entering below modules 204, 206, 208, 210, 212.

The advantages of the assembly of FIG. 2, which are in addition to the advantages of the assembly shown in FIG. 1, include:

1. Inclined photovoltaic modules 204, 206, 208, 210, 212 operate at a relatively high efficiency, due to their top surfaces being close to a plane normal to solar radiation.

2. By inclining the photovoltaic modules, natural convection using outside air as a convection fluid is enhanced, due to the facilitation of convective currents on the backside of a planar surface when that surface is inclined.

Description of FIGS. 3A–3D:
Spacer Geometry over Insulation Block

FIG. 3A shows a sectional view of a photovoltaic roofing assembly. The assembly includes a plurality of photovoltaic modules 304, 306, 308, a plurality of pre-formed spacers, pedestals, or supports 312, 314, 316 which are respectively disposed below the plurality of photovoltaic modules 304, 306, 308 and integral therewith, or fixedly connected thereto. Spacers 312, 314, 316 are disposed on top of insulation blocks 320, 322, 324 which are disposed on a roofing membrane 302.

FIG. 3B shows a plan view of a single roofing tile 301, made of insulation block 322 and spacers 314, 314', 315, 315'. The outline of the position of photovoltaic module 306 is shown in dashed lines. Spacers 314, 315' preferably follow the periphery of module 306 while leaving openings to the interior of tile 301 that are between 5% to 50% of the edge length of module 306. This geometry results in the formation of negative interior pressures under conditions of high windspeed, thus reducing net uplift forces due to wind-loads, as determined by wind-tunnel testing.

Looking at FIG. 3B, wind tunnel investigations determined that the preferred mode of operation is where spacers

US RE38,988 E

7                                                                          8

are normal to the direction of the wind and following close to the perimeter of the module. Poor performance is experienced where there is continuous blocking of the interior cavity around the perimeter of the module. Optimal hold-down occurs where the modules have some small degree of opening to the interior cavity, in the range of 10%–30%. In the latter configuration, the best performance is experienced when the ratio of d/h is in the range of 0.2–0.6, or greater than 1.20.

FIG. 3C shows a sectional view of an alternate detail of the assembly whereby tile 301' consists of photovoltaic module 306 supported by spacer 350 resting on insulation block 340. Insulation block 340 has a tapered profile in order to orient module 306 in the direction of increased sun exposure. Alternatively, spacer 350 could have a tapered profile. Insulation block 340 is shaped such that its top-most portion blocks the entry of surface winds from entering beneath module 306.

Looking at FIG. 3C, wind tunnel investigations determined that system performance is relatively insensitive to module slope where slope is in the range of 5°–12°. Better performance was experienced where the shape of the cavity beneath the PV module is triangular, as in FIG. 3C, rather than rectangular.

FIG. 3D shows a plan view of tile 301' whereby spacers 350, 352, 354 are located below module 306 and fixedly connected thereto, thus enabling free air exchange at the low and high sides of module 306. Such free air exchange with the spacer geometry shown has been determined through wind-tunnel testing to aid in the instantaneous equilibration of air pressures between the top and bottom side of module 306, thus reducing net forces of wind uplift.

In FIGS. 3C and 3D spacer 340 is shown pre-formed with a tapered profile 356. Tapered profile 340 serves as an aerodynamic wind-block, causing wind which is traveling from the right in the drawing to flow over the top of module 306, and obstructing its entry to the backside of module 306.

The advantages of the foregoing assembly include, in addition to the advantages of FIG. 1:

1. The spacer geometry serves to reduce to net forces of wind uplift, thus enabling the assembly to be lightweight (9.76–19.53 kg/sq. m or 2–4 pounds/sq. ft.) relative to conventional roofing ballast (48.8–73.2 kg/sq. m or 10–15 pounds/sq. ft).

2. The roofing tiles provide roofing insulation as well as ballast, weather and UV protection for the membrane layer below.

Description of FIGS. 4A–4B:

Perimeter Securement

FIGS. 4A–4B shows sectional views of alternate means of perimeter securement for the roof tile system. FIG. 4A shows metal flashing 410 running the perimeter of an array of roof tiles and interlocking with insulation block 404. Metal flashing 410 is shaped to accept electrical conductors (not shown) which run the perimeter of the assembly. FIG. 4B shows concrete paver 412 interlocking with insulation block 404. Whereas FIG. 4B shows interlocking by tongue and groove, any other means of interlocking is possible, including the use of metal z-flashing between the insulation block and paver.

Description of FIG. 5

Plan View of the Photovoltaic Roofing Assembly

FIG. 5 shows a perspective view of the photovoltaic roofing assembly where solar roofing tiles 504 form an array 502 which is situated on a building rooftop. Perimeter securement 510 runs the perimeter of array 502 and ties the roofing tiles 504 into an integral assembly.

While the invention has been described in its preferred embodiments, it is to be understood that the words which have been used are words of description rather than limitation and that changes may be made within the purview of the appended claims without departing from the true scope and spirit of the invention in its broader aspects.

The present invention provides a simple, efficient, quickly installed, reusable, and low-cost solar module assembly for roofs or other flat or mildly sloping surfaces whereby internal geometries of the roofing tile components minimize the net forces of wind uplift.

While the above description contains many specificities, these should not be construed as limitations on the scope of the invention, but rather as an exemplification of one preferred embodiment thereof. Many other variations are possible. For example, the integral solar module unit consisting of a solar module bonded to insulation block can be utilized independent of a roofing membrane. As a further example, the solar roofing assembly may include an additional layer consisting of fabric or other material disposed above the roofing membrane and below the photovoltaic module with spacers, which layer may provide an additional protective barrier for the roofing membrane and/or slipsheet.

As a further example, the solar modules with pedestals or spacers may include leveling plates placed under or over the pedestals or spacers for leveling the photovoltaic modules, or for achieving a pre-determined slope of the photovoltaic modules.

As a further example, the insulation block may be coated with an intumescent coating or other means of fireproofing in order to achieve a desired fire rating as a building roofing assembly.

As a further example, whereas the edge to edge connection between adjacent modules was often shown as a tongue and groove assembly, any means of edge connection is possible, including mechanical clips, adhesives, "skewer" inserts which penetrate the insulation block, and other means. In addition, the positive connection between modules may be accomplished as follows. The photovoltaic modules may rest on spacers which in turn rest on insulation board which is loose laid on the roofing membrane. The photovoltaic modules may then span and be bonded to adjacent insulation blocks which would provide a positive connection between adjacent insulation blocks and adjacent photovoltaic modules. The latter would assist the assembly in resisting the forces of wind uplift.

As a further example, the top of all insulation blocks may be painted with a paint which is opaque to ultraviolet radiation, thereby lengthening the life of the insulation block in applications where the photovoltaic module is not opaque to ultraviolet radiation.

As a further example, the spacers need not be made integral with the photovoltaic module in the shop, but may be laid in the field as stringers and the PV modules attached thereto in the field.

As a further example, the angle of the photovoltaic module can range from about 0°–30°, preferably about 5°–30°, and more preferably about 5°–12°.

Accordingly, the scope of the invention should be determined not by the embodiments illustrated, but by the appended claims and their legal equivalents.

What is claimed is:

1. A photovoltaic assembly comprising:

a building rooftop;

a photovoltaic module having sides and having upper and lower surfaces;

a spacer secured to the lower surface of the photovoltaic module *and supported by the building rooftop;*

US RE38,988 E

**9**

said spacer sized and configured to define:

an open region beneath said lower surface, *said open region extending between and in contact with the lower surface and in direct contact with the building rooftop,* and

including access openings formed therein for fluidly coupling said open region to said upper surface;

said access openings extending along at least two sides of said photovoltaic module;

whereby wind uplift forces are resisted when said photovoltaic assembly is mounted to [a support surface] *the building rooftop.*

2. The assembly according to claim 1 wherein said photovoltaic module has at least three sides.

3. The assembly according to claim 2 wherein said spacer comprises multiple spacer elements, at least one said spacer element secured to said lower surface along each of said *at least three* sides.

4. The assembly according to claim 2 wherein said access openings extend along said at least three sides of said photovoltaic module.

5. The assembly according to claim 1 wherein said at least two sides comprise two opposite sides of said photovoltaic module.

6. The assembly according to claim 1 wherein said access openings extend along about 5% to 50% of the length of at least two said sides.

7. The assembly according to claim 1 wherein said spacer has a lower spacer surface and an upper spacer surface tapered relative to said lower spacer surface, said tapered upper spacer surface supporting said photovoltaic module so said open region is a tapered open region tapering between said access openings along two of said sides.

8. The assembly according to claim 7 wherein said tapered upper spacer surface is at an angle of about 5°–12° relative to the lower spacer surface so said photovoltaic module is oriented at an angle of about 5°–30° relative to the [support surface] *building rooftop.*

9. The assembly according to claim 7 wherein said photovoltaic module has an upper side, said photovoltaic module extending downwardly from said upper side, and further comprising a wind deflection surface having an upper edge near said upper side, said wind deflecting surface extending downwardly and outwardly away from said upper side.

10. The assembly according to claim 9 wherein said upper edge is about the same elevation as the upper side.

[11. The assembly according to claim 1 further comprising an insulation member securable to the spacer when said spacer is situated between said photovoltaic module and said insulation member.]

[12. The assembly according to claim 11 wherein said spacer and insulation member forms a variable-height support structure for said photovoltaic module so that said open region is a tapered open region tapering between said access openings along two of said sides.]

[13. The assembly according to claim 12 wherein said photovoltaic module has an upper side, said photovoltaic module extending downwardly from said upper side, and wherein said insulation member comprises a wind deflection surface having an upper edge near said upper side, said wind deflection surface extending downwardly and outwardly away from said upper side.]

14. The assembly according to claim [13] *1* wherein said spacer comprises a plurality of elongate tapered spacers spaced apart from one another.

[15. The assembly according to claim 11 wherein said photovoltaic module, insulation member, and spacer have a combined weight of about two to four pounds per square foot.]

**10**

[16. The assembly according to claim 11 wherein said photovoltaic assembly comprises means for interengaging said photovoltaic module, spacer, and insulation member to create an integral assembly for resisting the forces of wind uplift thus enabling lower installed weight per unit area.]

17. The assembly according to claim 1 wherein said photovoltaic assembly comprises means for interlocking one said photovoltaic [module] *assembly* to another said photovoltaic [module] *assembly.*

18. The assembly according to claim 1 wherein said photovoltaic module and spacer have a combined weight of about two to four pounds per square foot.

19. [A photovoltaic assembly,] *The assembly according to claim 1 further* comprising:

a plurality of *said spacer, said plurality of said spacer comprising* spacers configured for disposal on top of [a building roof] *the building rooftop; and*

a plurality of *said photovoltaic module, said plurality of said photovoltaic module comprising* photovoltaic modules [having sides and] disposed on top of said spacers to form a photovoltaic array[; and

said spacers:

being arranged in a geometry which generally follows the sides of said photovoltaic modules; and

having openings that are between about 5% and 50% of the length of at least two sides of each photovoltaic module;

whereby said geometry enables said photovoltaic assembly to resist forces of wind uplift].

20. The assembly of claim 19 wherein said spacers have a top surface which is joined to said photovoltaic modules, forming an integral unit.

21. The assembly of claim 19 wherein said spacers are positioned adjacent to one another with said photovoltaic modules spaced apart from one another, whereby water may drain between said photovoltaic modules.

22. The assembly of claim 19 further comprising perimeter ties situated around the *photovoltaic* array and joined with said *photovoltaic* array to make an integral array assembly.

23. The assembly of claim 22 wherein said perimeter ties are joined with one another whereby the integral array assembly is tied together and strengthened.

24. The assembly according to claim 22 wherein said perimeter ties comprise a chosen one of concrete pavers and hollow metal flashing units.

25. The assembly of claim 19 wherein said assembly further comprises means for resisting forces of wind uplift sufficiently to eliminate the need for penetrations of [a building roof] *the building rooftop.*

26. The assembly of claim 19 wherein said spacers are preformed spacers.

27. The assembly of claim 19 wherein said spacers have a tapered profile for orienting the photovoltaic modules in a direction for increased sun exposure.

28. The assembly of claim 27 wherein said spacers have tapered profiles with first outwardly and downwardly tapered portions supporting said photovoltaic modules and defining a tapered air-space and second outwardly and downwardly tapered portions, whereby wind is caused to flow over the spacers and not underneath the photovoltaic modules,

whereby internal pressures within the tapered air-space created by the spacers offset external pressures which aids the overall assembly in resisting net forces of wind uplift.

US RE38,988 E

11

29. The assembly of claim 19 wherein said spacers are sized to orient the photovoltaic modules at an angle of about 5°–12° and create a tapered air space beneath the photovoltaic modules.

30. The assembly according to claim 19 wherein said photovoltaic array has a weight of about two to four pounds per square foot.

31. A photovoltaic roofing assembly, comprising:

a plurality of insulation blocks disposed as a layer on top of a roofing membrane;

a plurality of spacers configured for disposal on top of said insulation blocks;

a plurality of photovoltaic modules having *first, second, third and fourth* sides and disposed on top of said spacers to form a photovoltaic array; and

said spacers:

being arranged in a geometry which generally follows the sides of said photovoltaic modules; and

having openings that are between 5% and 50% of the length of [at least two] *each of the first, second, third and fourth* sides of each photovoltaic module;

whereby said geometry enables said photovoltaic assembly to resist forces of wind uplift.

32. The assembly of claim 31 wherein each of said insulation blocks have adjoining sides with a joint disposed between said sides for water drainage.

33. The assembly of claim 31 wherein said insulation blocks have top surfaces which are joined to the spacers which in turn are joined to photovoltaic modules, forming three-part integral units.

34. The assembly of claim 31 wherein said spacers are sized to orient the photovoltaic modules at an angle of about 5°–12° and create a tapered air space beneath the photovoltaic modules.

35. The assembly according to claim 31 wherein said photovoltaic array has a weight of no more than about four pounds per square foot.

36. A photovoltaic roofing assembly comprising:

a plurality of photovoltaic assemblies, each said photovoltaic assembly comprising:

a photovoltaic module having upper, lower, and lateral sides and having upper and lower surfaces; and

a variable-height spacer secured to the lower surface of the photovoltaic module so to orient said photovoltaic module at an angle with said lateral sides extending downwardly from said upper side to said lower side, said angle being about 5°–30° from horizontal;

said spacer sized and configured to define:

a tapered open region beneath said lower surface; and

access openings along said upper and lower sides fluidly coupling said open region to said upper surface;

whereby wind uplift forces are resisted when said photovoltaic assembly is mounted to a support surface; and

means for interengaging adjacent photovoltaic assemblies into an array of photovoltaic assemblies, said array defining a perimeter.

37. The assembly according to claim [36] *57* wherein said perimeter assembly comprises a concrete paver.

38. The assembly according to claim 36 wherein said photovoltaic assembly further comprises a wind deflection surface, having an upper edge near the upper side, extending downwardly and outwardly away from said upper side.

39. The assembly of claim 38 wherein said spacer provides said wind deflection surface.

12

40. The assembly according to claim 36 wherein said [array] *plurality* of photovoltaic assemblies has a weight of no more than about four pounds per square foot.

41. A method of making a photovoltaic roofing assembly, comprising the following steps:

joining a spacer to a photovoltaic module *having first, second, third and fourth sides;*

sizing and positioning said spacer to provide an open region beneath said photovoltaic module and openings into said open region [on at least two]*, the openings extending along about 5% to 50% of each of the first, second, third and fourth* sides of said photovoltaic module to reduce wind uplift forces on the photovoltaic module;

joining an insulation layer to said spacer to create a three-part integral assembly; and

installing in the field said three-part integral assembly as a layer on top of a roofing membrane without forming penetrations through a roof surface;

whereby the completed assembly resists the forces of wind uplift.

[42. The method of claim 41 further comprising the step of sizing said openings to comprise about 5% to 50% of the length of at least two sides of said photovoltaic module.]

[43. The method of claim 41 further comprising the step of providing said openings on all sides of said photovoltaic module.]

44. The method of claim 41 further comprising the step of configuring said spacer to have a tapered surface to which said photovoltaic module is joined, said tapered surface having an angle of about 5°–30° from horizontal thereby forming said open region as a tapered open region.

45. The method according to claim 41 further comprising the step of providing said integral [assemblies] *assembly* with interengagable lateral edges, and said installing step [is carried out so that] *comprises installing a first said integral assembly and a second said integral assembly adjacent to one another with* said lateral edges of [adjacent integral units are] *said first integral assembly and said second integral assembly* interengaged.

46. The method according to claim 41 further comprising the steps of:

installing a plurality of said integral [assemblies] *assembly* to form an array of [said] integral assemblies, said array having a periphery; and

joining perimeter ties to said periphery to stabilize said array.

47. A method of making a photovoltaic roofing assembly, comprising the following steps:

joining a spacer to a photovoltaic module to create a two-part integral assembly;

sizing and positioning said spacer to provide an open region beneath said photovoltaic module and openings into said open region to reduce wind uplift forces on the photovoltaic module;

configuring said spacer to support said photovoltaic module in a manner to form said open region as a tapered open region;

positioning said openings on at least two sides of said photovoltaic module, said two sides being opposite sides of said photovoltaic module, said tapered open region tapering between said openings on said two opposite sides;

installing in the field said two-part integral assembly as a layer above a roofing membrane;

US RE38,988 E

13

whereby the completed assembly resists the forces of wind uplift.

48. The method of claim 47 further comprising the step of joining an insulation layer to said spacer to create a three-part integral assembly.

49. The method of claim 47 wherein said spacer configuring step is carried out so [that said] *as to provide a* tapered surface [has] *having* an angle of about 5°–30°.

50. The method of claim 47 wherein said installing step is carried out without forming penetrations through, or adhering the unit to, a roof surface.

51. The method according to claim 47 further comprising the steps of:

installing a plurality of said integral [assemblies] *assembly* to form an array of [said] *integral* assemblies, said array having a periphery; and

joining perimeter members to said periphery to stabilize said array.

52. A photovoltaic assembly comprising:

an array of interlocking photovoltaic units, said array having a perimeter, each said photovoltaic unit comprising:

a photovoltaic module having an upper surface *and first, second, third and fourth sides*;

an insulation layer;

a spacer coupling the photovoltaic module and the insulation layer and defining an open region therebetween, *the spacer extending along each of the first, second, third and fourth sides*; and

[an] access opening fluidly coupling said upper surface of said photovoltaic module and the open region, *the openings extending along about 5% to 50% of each of the first, second, third and fourth sides*; and

said array having a weight of about two to four pounds per square foot;

whereby the configuration of the photovoltaic assembly resists wind uplift without the need for roof surface penetrating elements.

53. The photovoltaic assembly according to claim 52 further comprising a perimeter assembly joined to said perimeter of said array.

54. A method for making a photovoltaic roofing assembly comprising the following steps:

selecting a photovoltaic unit having an outer photovoltaic module, an insulation layer, and a spacer coupling the photovoltaic module and insulation layer to define an open region therebetween, the outer photovoltaic module having an outer surface *and first, second, third and fourth sides*;

the selecting step comprising the step of selecting a photovoltaic unit weighing no more than about four pounds per square foot;

placing a plurality of said photovoltaic units on a roof surface without securing the units to the roof surface to form an array of said photovoltaic units;

said selecting and placing steps further comprising the step of providing at least one access opening *extending along about 5% to 50% of each of the first, second, third and fourth sides* for each said photovoltaic unit *thereby* fluidly coupling the outer surface of said photovoltaic module and said open region; and

surrounding the array with a perimeter assembly without securing the perimeter assembly to the roof surface.

55. A photovoltaic assembly comprising:

a photovoltaic module having sides and having upper and lower surfaces; and

14

a spacer secured to the lower surface of the photovoltaic module, the spacer being mountable directly to a building rooftop;

said spacer sized and configured to define:

an open region beneath said lower surface, said open region extending between and in contact with the lower surface and in direct contact with the building rooftop, and

including access openings formed therein for fluidly coupling said open region to said upper surface;

said access openings extending along at least two sides of said photovoltaic module;

whereby wind uplift forces are resisted when said photovoltaic assembly is mounted to the building rooftop.

56. A photovoltaic/building rooftop assembly comprising:

a building rooftop;

a photovoltaic module having sides and having upper and lower surfaces; and

a spacer secured to the lower surface of the photovoltaic module to create a photovoltaic assembly, the spacer being mounted directly to the building rooftop to create a photovoltaic/building rooftop assembly;

said spacer sized and configured to define:

an open region beneath said lower surface, said open region extending between and in contact with the lower surface and in direct contact with the building rooftop, and

including access openings formed therein for fluidly coupling said open region to said upper surface;

said access openings extending along at least two sides of said photovoltaic module;

whereby wind uplift forces are resisted when said photovoltaic assembly is mounted to the building rooftop.

57. The assembly according to claim 36 further comprising a perimeter assembly, along said perimeter, interlocking with said photovoltaic assemblies.

58. The assembly according to claim 1 wherein said photovoltaic module and spacer have a combined weight of about 1.67–5.0 pounds per square foot.

59. The assembly according to claim 36 wherein said photovoltaic module and spacer have a combined weight of about 1.67–5.0 pounds per square foot.

60. The assembly according to claim 47 further comprising limiting the two-part integral assembly to a combined weight of about 1.67–5.0 pounds per square foot.

61. The assembly according to claim 55 wherein said photovoltaic module and spacer have a combined weight of about 1.67–5.0 pounds per square foot.

62. The assembly according to claim 56 wherein said photovoltaic module and spacer have a combined weight of about 1.67–5.0 pounds per square foot.

63. The assembly according to claim 36 wherein said photovoltaic module and spacer have a combined weight of about two to four pounds per square foot.

64. The assembly according to claim 47 further comprising limiting the two-part integral assembly to a combined weight of about two to four pounds per square foot.

65. The assembly according to claim 55 wherein said photovoltaic module and spacer have a combined weight of about two to four pounds per square foot.

66. The assembly according to claim 56 wherein said photovoltaic module and spacer have a combined weight of about two to four pounds per square foot.

67. The assembly according to claim 19 wherein said photovoltaic assembly comprises means for interlocking one said photovoltaic assembly to another said photovoltaic assembly.

US RE38,988 E

15

68. The assembly according to claim 33 wherein said photovoltaic roofing assembly comprises means for interlocking one said integral unit to another said integral unit.

69. The method according to claim 47 wherein the installing step comprises interengaging adjacent integral assemblies.

70. The method according to claim 54 wherein the placing step comprises interengaging adjacent photovoltaic units.

71. The assembly according to claim 55 wherein said photovoltaic assembly comprises means for interlocking one photovoltaic assembly to an adjacent photovoltaic assembly.

72. The assembly according to claim 56 wherein said photovoltaic/building rooftop assembly comprises means for interlocking one said photovoltaic assembly to another said photovoltaic assembly.

73. The assembly according to claim 1 wherein said assembly further comprises means for resisting forces of wind uplift sufficiently to eliminate the need for penetrations of the building rooftop.

74. The assembly according to claim 19 wherein the photovoltaic assembly is mountable to a building roof without forming penetrations through the building rooftop.

75. The assembly according to claim 31 wherein the photovoltaic roofing assembly is disposed on the roofing membrane without forming penetrations through the roofing membrane.

76. The assembly according to claim 36 wherein the photovoltaic assemblies are mountable to a building rooftop without forming penetrations through the building rooftop.

16

77. The method according to claim 47 wherein the installing step is carried out without forming penetrations through the roofing membrane.

78. The assembly according to claim 55 wherein the photovoltaic assembly is mountable to the building rooftop without forming penetrations through the building rooftop.

79. The assembly according to claim 56 wherein the photovoltaic assembly is mounted to the building rooftop without forming penetrations through the building rooftop.

80. A photovoltaic assembly comprising:

a building rooftop;

a photovoltaic module having sides and having upper and lower surfaces; and

a plurality of spacers secured to the lower surface of the photovoltaic module and supported by the building rooftop;

said spacers sized and configured to define:

an open region beneath said lower surface, said open region extending between and in contact with the lower surface and in direct contact with the building rooftop, and

including access openings formed therein for fluidly coupling said open region to said upper surface;

said access openings extending along at least two sides of said photovoltaic module;

whereby wind uplift forces are resisted when said photovoltaic assembly is mounted to the building rooftop.

*　*　*　*　*



Brenna K. Legaard, OSB No. 00165
E-mail: brenna@chernofflaw.com
Susan D. Pitchford, OSB No. 98091
E-mail: sdp@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

FILED'08 FEB 5 12:56USDC-ORP

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | CV '08 - 0 1 4 8 - AA<br>Case No. _____ |
| Plaintiff, | CORPORATE DISCLOSURE STATEMENT |
| v. | |
| SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, | PATENT CASE |
| Defendants. | |

Pursuant to Fed.R.Civ.P. 7.1, plaintiff SunPower Corporation, Systems certifies that it is wholly owned by SunPower Corporation and that no publicly held company owns 10% or more of its stock.

PAGE 1 – CORPORATE DISCLOSURE STATEMENT

DATED: February 5, 2008

CHERNOFF, VILHAUER, McCLUNG &
    STENZEL, LLP

Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
Telephone:  (503) 227-5631
Of Attorneys for Plaintiff

PAGE 2 – CORPORATE DISCLOSURE STATEMENT

# UNITED STATES DISTRICT COURT

## District of Oregon

Sunpower Corporation, Systems,

                       Plaintiff(s),

vs.                                    **Case No:**     **6:08-CV-148-AA**

Sunlink Corporation et al.,

                       Defendant(s).

## Civil Case Assignment Order

    **(a)**    **Presiding Judge:**  The above referenced case has been filed in the Eugene Division of the US District Court for the District of Oregon and is assigned for all further proceedings to:

> Presiding Judge  . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Hon. Ann Aiken**
>
> Presiding Judge's Suffix Code* . . . . . . . . . . . . . . . . . . . . . . . . . . . **AA**
>
>      *These letters must follow the case number on all future filings.

    **(b)**    **Courtroom Deputy Clerk:**  Questions about the status or scheduling of this case should be directed to Leslie Engdall at (541) 431-4102 or leslie_engdall@ord.uscourts.gov

    **(c)**    **Civil Docket Clerk:**  Questions about CM/ECF filing requirements or docket entries should be directed to Charlene Pew at (541) 431-4105 or charlene_pew@ord.uscourts.gov

    **(d)**    **Place of Filing**: Pursuant to LR 3.4(b) all conventionally filed documents must be submitted to the Clerk of Court, Wayne L. Morse United States Courthouse, 405 E. Eighth Avenue, Suite 2100, Eugene, Oregon 97401. (See also LR 100.4)

    **(e)**    **District Court Website:** Information about local rules of practice, CM/ECF electronic filing requirements, and other related court information can be accessed on the court's website at www.ord.uscourts.gov.

**(f)**    **Consent to a Magistrate Judge:**  In accordance with 28 U.S.C. Sec. 636(c) and Fed. R. Civ. P. 73, all United States Magistrate Judges in the District of Oregon are certified to exercise civil jurisdiction in assigned cases and, with the consent of the parties, may also enter final orders on dispositive motions, conduct trial, and enter final judgment which may be appealed directly to the Ninth Circuit Court of Appeals (instead of to a District Judge).

Parties are encouraged to consent to the jurisdiction of a Magistrate Judge by signing and filing the Consent to Jurisdiction by a United States Magistrate Judge (a copy of the consent form is included with this assignment order).  There will be no adverse consequences if a party elects not to file a consent to a Magistrate Judge.

Additional information about United States Magistrate Judges in the District of Oregon can be found on the court's website at www.ord.uscourts.gov.

**Dated:**  February 5, 2008

_/s/ M. Kenney_____
**By:**    M. Kenney, Deputy Clerk

**For:**    **Sheryl S. McConnell, Clerk of Court**

## UNITED STATES DISTRICT COURT

### District of Oregon

Sunpower Corporation, Systems,

                        Plaintiff(s)

vs.                                                       Case No:    6:08-CV-148-AA

Sunlink Corporation et al.,

                        Defendant(s).

---

### Discovery and Pretrial Scheduling Order

       In order to facilitate and expedite discovery and the effective management of this case, the Court orders that:

       **(a)**    **Corporate Disclosure Statement:**  In accordance with Fec. R. Civ. P. 71, any non-governmental corporate party must file a corporate disclosure statement concurrently with the filing of a first appearance.

       **(b)**    **Initial Conference of Counsel for Discovery Planning:**

            (1)    Except in cases exempted under Fed. R. Civ. 26(a)(1)(E), upon learning the identity of counsel for Defendant(s), counsel for the Plaintiff(s) shall initiate communications with counsel for Defendant(s).

            (2)    All counsel shall then confer as required by Fed. R. Civ. P. 26(f) within thirty (30) days after all Defendants have been served (*See* LR 26.1).

            (3)    In accordance with LR 16.2(b) and LR 16.4(c), counsel shall also discuss their client's positions regarding consent to a Magistrate Judge and Alternate Dispute Resolution options.

            (4)    If counsel for all of the parties agree to forego the initial disclosures required by Fed. R. Civ. P. 26(a)(1), they can use the Court form issued with this order (*See* LR 26.2).  Whether or not the parties agree to forego the initial disclosures, they may seek discovery once the initial conference of counsel for discovery planning contemplated by Fed. R. Civ. P. 26(f) has occurred (*See* LR 26.1).

**(c)    Rule 16(b) Court Conference for Scheduling and Planning:** At any time after the Rule 26(f) conference of counsel (paragraph (b)(2), above) and before the Pretrial and Discovery Deadline (paragraph (e), below), counsel for Plaintiff(s) and for Defendant(s) may contact the assigned judge's deputy clerk and schedule a Rule 16(b) conference for scheduling and planning.

At the conference the parties will be prepared to discuss discovery, consent to a Magistrate Judge, scheduling or other issues presented by this action, including proposed modifications to the initial schedule set forth below (*See* LR 16.2).

**(d)    Pretrial and Discovery Deadlines:** Not later than 120 days from the date of this order, counsel for all parties shall:

(1)    File all pleadings pursuant to Fed. R. Civ. P. 7(a) and 15;

(2)    Join all claims, remedies and parties pursuant to Fed. R. Civ. P. 18 and 19;

(3)    File all pretrial, discovery and dispositive motions;

(4)    Complete all discovery; and

(5)    Confer as to Alternate Dispute Resolution pursuant to LR16.4(c).

**(e)    Pretrial Order Deadline:** Unless otherwise waived by the court, not later than 150 days from the date of this order, counsel shall lodge a Joint Pretrial Order (*See* LR 16.6), and file a Joint Alternate Dispute Resolution Report (*See* LR 16.4).

**(f)    Service of this Order:** Counsel for the Plaintiff shall serve this order, and all attachments, upon all other parties to the action.

**(g)    CM/ECF Electronic Filings:** Beginning September 1, 2006, all Registered CM/ECF users must electronically file pleadings, documents, and other papers (other than the initial complaint or removal papers), pursuant to LR 100.1(b).  Prior to that date, electronic filing by registered CM/ECF users is authorized and encouraged, although not required.  More information about CM/ECF and the Court's electronic filing requirements, including Local Rule 100, can be found on the court's website at www.ord.uscourts.gov.

**Dated:  February 5, 2008**

/s/ M. Kenney

**By:**    M. Kenney, Deputy Clerk

**For:**    **Sheryl S. McConnell, Clerk of Court**

# UNITED STATES DISTRICT COURT

## District of Oregon

Sunpower Corporation, Systems,

                                        Plaintiff(s)

vs.                                                      Case No:    6:08-CV-148-AA

Sunlink Corporation et al.,

                                        Defendant(s).

_____

## Fed. R. Civ. P. 26(a)(1) Discovery Agreement

In accordance with LR 26.2, I state that the parties who have been served and who are not in default,

have agreed to forego the disclosures required by Fed. R. Civ. P. 26(a)(1).

**DATED:**

| | |
|---:|---|
| **Signature:** | _____ |
| **Name & OSB ID:** | _____ |
| **e-mail address:** | _____ |
| **Firm Name:** | _____ |
| **Mailing Address:** | _____ |
| **City, State, Zip:** | _____ |
| **Phone Number:** | _____ |
| **Parties Represented** | _____ |

cc:    Counsel of Record

Revised June 1, 2006                              Fed. R. Civ. P. 26(a)(1) Discovery Agreement

# UNITED STATES DISTRICT COURT

## District of Oregon

**Sunpower Corporation, Systems,**

Plaintiff(s)

vs.                                                      Case No:    6:08-CV-148-AA

**Sunlink Corporation et al.,**

Defendant(s).

---

### Consent to Jurisdiction by a Magistrate Judge
### and Designation of the Normal Appeal Route

      In accordance with Fed. R. Civ. P 73(b), as counsel for the party (parties) identified below, I consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including entry of orders on dispositive motions, trial, and entry of final judgment.  I understand that withholding consent will not result in any adverse consequences.  In accordance with Fed. R. Civ. P. 73(c), I agree that any appeal from a final order or judgment entered by a United States Magistrate Judge shall proceed directly to the United States Court of Appeals for the Ninth Circuit, and not to a District Judge of this Court.

**DATED:**

| | |
|---:|---|
| **Signature:** | _____ |
| **Name & OSB ID:** | _____ |
| **e-mail address:** | _____ |
| **Firm Name:** | _____ |
| **Mailing Address:** | _____ |
| **City, State, Zip:** | _____ |
| **Phone Number:** | _____ |
| **Parties Represented** | _____ |

cc:    Counsel of Record

---

**Revised December 1, 2004**                                              **Magistrate Consent Form**

## US District Court – Oregon
## Civil Case Management Time Schedules

| Local Rule | Event or Requirement | Time Frame | Comment |
|---|---|---|---|
| LR 16.1(d) | Discovery and Pretrial Scheduling Order (with attachments) | Issued by the clerk's office at the time of filing, along with the summonses | Required to be served on all parties by the filing party |
| LR 26.1 | Initial Conference for Discovery Planning | Within 30 days from service of the last defendant | Held between parties |
| LR 16.2(a) | Rule 16(b) Conference | Scheduled by the assigned judge after the required LR 26.1 Discovery Conference | Affirmative duty on all counsel to contact the assigned judge's courtroom deputy (*See* LR 16.2(a) |
| LR 16.4(c) | ADR Conference Requirements | Within 120 days from the date the discovery order is issued | Parties must confer with other attorneys and unrepresented parties to discuss ADR options |
| | Joint Status Report | Within 120 days from the date the discovery order is issued | Required at (c)(1) of the Discovery and Pretrial Scheduling Order |
| LR 16.2(e) | Completion of Discovery | Unless otherwise ordered by the court, within 120 days from the date the discovery order is issued | Discovery deadlines are set forth in the Discovery and Pretrial Scheduling Order |
| LR 16.4(d) | Joint ADR Report | Within 150 days from the date the discovery order is issued | The parties must file a Joint ADR Report |
| LR 16.6 | Joint Pretrial Order | Unless otherwise modified pursuant to LR 16.6(a), within 150 days from the date the discovery order is issued | PTO filing deadline is established in the Discovery and Pretrial Scheduling Order |
| LR 16.4(f)(1)(D) | Notice to the Court that the Parties Are Unable to Select a Volunteer Mediator | Within ten (10) days after entry of a court order directing reference to a volunteer mediation | Plaintiff's attorney is responsible for notifying the court |
| LR 16.4(h)(1) | Notification of Private ADR Results | Within seven (7) days after the conclusion of private ADR proceedings | Plaintiff's attorney is responsible for notifying the court |
| LR 16.4(h)(2) | Report of Court Appointed Private or Volunteer Mediation | Promptly if no settlement is achieved | Court appointed private or volunteer mediator is responsible for notifying the court |

✎ AO 120 (Rev. 3/04)

| TO: | **Mail Stop 8**<br>**Director of the U.S. Patent and Trademark Office**<br>**P.O. Box 1450**<br>**Alexandria, VA 22313-1450** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT OR**<br>**TRADEMARK** |
|---|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been

filed in the U.S. District Court _____District of Oregon_____ on the following    X Patents or  ☐ Trademarks:

| DOCKET NO.<br>08-148-AA | DATE FILED<br>February 5, 2008 | U.S. DISTRICT COURT<br>District of Oregon |
|---|---|---|
| PLAINTIFF<br>Sunpower Corporation Systems | | DEFENDANT<br>Sunlink Corporation<br>Advanced Energy Systems, LLC |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 5,505,788 | April 9, 1996 | Thomas L. Dinwoodie |
| 2 | US RE38,988 E | February 28, 2006 | Thomas L. Dinwoodie |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY | |
|---|---|---|
| | ☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading | |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK<br>Sheryl L. McConnell | (BY) DEPUTY CLERK<br>/s/ C. Pew | DATE<br>2/8/08 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Director    Copy 3—Upon termination of action, mail this copy to Director**
**Copy 2—Upon filing document adding patent(s), mail this copy to Director    Copy 4—Case file copy**

# United States District Court
## DISTRICT OF OREGON

SUNPOWER CORPORATION SYSTEMS, )
                                Plaintiff, )          Case No. CV'08-0148 AA
        vs.                              )
                                         )
SUNLINK CORPORATION, et al.,             )          AFFIDAVIT OF SERVICE
_____ Defendant. )

STATE OF OREGON  )
                 ) ss.
County of Lane   )

    I, Anne Walsh, hereby certify that I am a competent person 21 years of age or older, a citizen of the United States and a resident of the state of service and that I am not a party to nor an attorney for any party in the within named action. I further certify that I made service of certified true copies of the following documents:

*SUMMONS; COMPLAINT; EXHIBITS A and B; CORPORATE DISCLOSURE STATEMENT; CIVIL CASE ASSIGNMENT ORDER; DISCOVERY AND PRETRIAL SCHEDULING ORDER PACKET*

    Upon **ADVANCED ENERGY SYSTEMS, LLC,** by delivering such true copy, personally and in person, to David Parker, who is the Registered Agent thereof, at 2990 Forest Boulevard, Eugene, Oregon 97405, on February 6, 2008 at 6:30 p.m.

    I declare under the penalty of perjury that the above statements are true and correct.

_____
Anne Walsh                          334066

SUBSCRIBED AND SWORN to before me the _11_ day of February, 2008.



_____
Notary Public

OFFICIAL SEAL
T. WHITE
NOTARY PUBLIC—OREGON
COMMISSION NO. 386659
MY COMMISSION EXPIRES JAN. 21, 2009

✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____ Oregon _____

SUNPOWER CORPORATION, SYSTEMS,  a
Delaware corporation,

V.

SUNLINK CORPORATION, a Delaware
corporation; et al.,

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

CV '08 - 0 1 4 8 ˙ AA

TO: (Name and address of Defendant)

Advanced Energy Systems LLC
c/o Registered Agent
David Parker
2990 Forest Boulevard
Eugene, OR 97405

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

an answer to the complaint which is served on you with this summons, within _____ twenty _____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

SHERYL S. McCONNELL                                      FEB - 5 2008

CLERK                                                                      DATE

(By) DEPUTY CLERK

**David VanSpeybroeck**, OSB #954440
E-mail: david.vanspeybroeck@bullivant.com
**Susan L. Ford**, OSB #970362
E-mail: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915
Attorneys for Defendant Advanced Energy
Systems LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, <br><br> Defendants. | Civil No.: 08CV0148 AA <br><br> **UNOPPOSED MOTION FOR EXTENSION OF TIME TO ANSWER, RESPOND OR OTHERWISE OBJECT TO SUMMONS AND COMPLAINT** |

Pursuant to Fed R Civ P 6(b), defendant Advanced Energy Systems LLC ("AES")

moves for an Order enlarging the time in which it must answer, respond or otherwise object

to the Summons and Complaint to March 25, 2008.  No previous extension of time has been

obtained from plaintiff or granted by this Court.  In accordance with LR 7.1, counsel for

defendant certifies that they have conferred in good faith with plaintiff's counsel concerning

///

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO ANSWER, RESPOND OR OTHERWISE OBJECT TO SUMMONS AND COMPLAINT**
**Page 1**

this motion, and plaintiff's counsel has advised that he has no objection to the extension of time requested herein.

  This motion is made in good faith and for the reasons stated in the Declaration of Susan Ford filed herewith.

  DATED this 21st day of February, 2008.

BULLIVANT HOUSER BAILEY PC

BY <u>/S/ Susan L. Ford</u>       
   **David VanSpeybroeck**
   OSB #954440
   **Susan L. Ford**
   OSB #970362
   Telephone: 503.228.6351
   Attorneys for Defendant Advanced Energy Systems
   LLC

10456837.1

**Bullivant|Houser|Bailey PC**

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO ANSWER, RESPOND OR OTHERWISE OBJECT TO SUMMONS AND COMPLAINT**
**Page 2**

**David VanSpeybroeck**, OSB #954440
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**, OSB #970362
E-mail: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915
Attorneys for Defendant Advanced Energy
Systems LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>        Defendants. | Civil No.: 08CV0148 AA<br><br>**DECLARATION OF SUSAN FORD IN SUPPORT OF MOTION FOR EXTENSION OF TIME TO ANSWER, RESPOND OR OTHERWISE OBJECT TO SUMMONS AND COMPLAINT** |

I, Susan Ford, state as follows:

    1.    I am one of the attorneys for Defendant Advanced Energy Systems, LLC

("AES") in this matter.

    2.    AES's first appearance is due on February 26, 2008.

///

Bullivant|Houser|Bailey PC

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon  97204-2089
Telephone: 503.228.6351

**DEC. OF SUSAN FORD IN SUPPORT OF MOTION FOR
EXTENSION OF TIME TO ANSWER
Page 1**

3.    AES requests additional time, until March 25, 2008, to file its first appearance.

4.    I have discussed this request with plaintiff's California counsel, Howard G. Pollack of Fish & Richardson P.C., and he has agreed to provide AES an extension until March 25, 2008, in which to file an Answer, respond or object to the Summons and Complaint.

5.    This motion is made in good faith and not for purposes of delay.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED this 21st day of February, 2008.

BY _____
        **Susan L. Ford**

10456841.1

**Bullivant|Houser|Bailey PC**

888 S.W. Fifth Avenue, Suite 300
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEC. OF SUSAN FORD IN SUPPORT OF MOTION FOR
EXTENSION OF TIME TO ANSWER
Page 2**

**Susan D. Pitchford, OSB No. 98091**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 00165**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation, | Case No. CV 08-00148-AA |
| Plaintiff, | **STIPULATED MOTION FOR EXTENSION OF TIME FOR DEFENDANT SUNLINK TO RESPOND TO COMPLAINT** |
| v. | |
| **SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company, | **PATENT CASE** |
| Defendants. | |

## LOCAL RULE 7.1 CONFERRAL

Defendant SunLink Corporation's (hereinafter "SunLink") counsel conferred with

plaintiff SunPower Corporation, Systems' (hereinafter "SunPower") counsel, and said counsel

stipulate to this motion.  Plaintiff's counsel also conferred with defendant Advanced Energy

Systems LLC's (hereinafter "AES") counsel who does not oppose this request.

PAGE 1 – STIPULATED MOTION FOR EXTENSION OF TIME FOR DEFENDANT
        SUNLINK TO RESPOND TO COMPLAINT

## MOTION

Plaintiff SunPower moves the court for an Order enlarging the time for defendant SunLink to respond to the Complaint until March 25, 2008. The parties listed below stipulate to this request. Defendant AES does not oppose this request.

IT IS SO STIPULATED:

Dated: 2/22/08

Susan D. Pitchford, OSB No. 98091
Brenna K. Legaard, OSB No. 00165
Of Attorneys for Plaintiff,
SUNPOWER CORPORATION, SYSTEMS

Dated: Feb. 22, 2008

Morgan W. Tovey  CSBN 136242
REED SMITH LLP
Of Attorneys for Defendant,
SUNLINK CORPORATION

PURSUANT TO THE STIPULATION, IT IS SO ORDERED:

Dated: _____

Honorable Ann Aiken
United States District Judge

PAGE 2 – STIPULATED MOTION FOR EXTENSION OF TIME FOR DEFENDANT
   SUNLINK TO RESPOND TO COMPLAINT

**Susan D. Pitchford, OSB No. 98091**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 00165**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation, | Case No. CV 08-00148-AA |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF STIPULATED MOTION FOR EXTENSION OF TIME FOR DEFENDANT SUNLINK TO RESPOND TO COMPLAINT** |
| v. | |
| **SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company, | **PATENT CASE** |
| Defendants. | |

Defendant SunLink was served with the summons and complaint on February 6, 2008.

Defendant's response is due February 26, 2008.  Defendant SunLink's undersigned counsel

contacted counsel for plaintiff SunPower to request an extension of time to file an answer to the

complaint, and was informed that plaintiff does not oppose an enlargement of time until March

25, 2008 for SunLink to respond to the Complaint.  Defendant SunLink further requested that

Plaintiff draft this stipulation, as Defendant SunLink has not yet retained local counsel.  Plaintiff

agreed to this request as a courtesy to Defendant SunLink.  Defendant AES does not oppose this

request.


Dated:  February 22, 2008                    /s/ Susan D. Pitchford_____
                                             Susan D. Pitchford, OSB No. 98091
                                             Brenna K. Legaard, OSB No. 00165
                                             Of Attorneys for Plaintiff,
                                             SUNPOWER CORPORATION, SYSTEMS

# United States District Court
## DISTRICT OF OREGON

SUNPOWER CORPORATION SYSTEMS,

                   *Plaintiff(s),*

    vs.

SUNLINK CORPORATION,

                  *Defendant(s).*

Case No. CV'08-0148 AA

DECLARATION OF SERVICE

STATE OF DELAWARE   }

                } ss.

County of New Castle   }

    I, William Golt, hereby certify that I am a competent person 18 years of age or older, a resident of the State of Delaware and that I am not a party to nor an attorney for any party in the within named action; that I made service of true copies of the following documents:

*SUMMONS; COMPLAINT; EXHIBITS A and B; CORPORATE DISCLOSURE STATEMENT; CIVIL CASE ASSIGNMENT ORDER; DISCOVERY AND PRETRIAL SCHEDULING ORDER PACKET*

    Upon **SUNLINK CORPORATION**, by personal service upon Scott LaScala, who is a clerk on duty in the office of the registered agent, The Corporate Trust Company, at 1209 Orange Street, Wilmington, Delaware 19801 on February 6, 2008 at 2:15 p.m.

    I declare under the penalty of perjury that the above statement is true and correct.

                                William Golt           (2243.334067)

SUBSCRIBED AND SWORN to before me the 7ᵗʰ day of February, 2008.

KIMBERLY J. RYAN
NOTARY PUBLIC-DELAWARE
My Commission Expires June 15, 2008

                        Notary Public



**NATIONWIDE PROCESS SERVICE, INC.**

420 Century Tower
1201 SW 12ᵗʰ Avenue
Portland, OR 97205
(503) 241-0636

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____ Oregon _____

SUNPOWER CORPORATION, SYSTEMS, a
Delaware corporation,

V.

SUNLINK CORPORATION, a Delaware
corporation; et al.,

### SUMMONS IN A CIVIL ACTION

CASE NUMBER:
**CV 08 - 0 1 4 8   AA**

TO: (Name and address of Defendant)

SunLink Corporation
c/o Registered Agent
The Corporate Trust Company
Corporate Trust Center
1209 Orange Street
Wilmington, DE 19801

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

an answer to the complaint which is served on you with this summons, within _____ twenty _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

SHERYL S. McCONNELL

CLERK                                                                    FEB - 5 2008

(By) DEPUTY CLERK

UNITED STATES DISTRICT COURT

FILED'08 FEB 26 15:29USDC-ORE

DISTRICT OF OREGON

RECVD '08 FEB 19 11:38USDC-ORP

**SUNPOWER CORPORATION,
SYSTEMS,** a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a
Delaware corporation; **ADVANCED
ENERGY SYSTEMS LLC,** an Oregon
limited liability company,

Defendants.

Case No:  CV 08-00148-AA

**APPLICATION OF ROBERT KENT
FOR SPECIAL ADMISSION**
*– Pro Hac Vice*

**PATENT CASE**

As local counsel in the above-captioned case and in accordance with LR 83.3, I

am recommending the following attorney for admission *pro hac vice* and certify that the

information contained in this application is true.

    1.    **Pro Hac Vice Attorney Certification.**  I have read and understand the

requirements of LR 83.3, and certify that the following information is correct:

        **(A)**    **Personal Data:**

            (1)    Name: **Robert Kent**

            (2)    Firm:  **Fish & Richardson P.C.**

            (3)    Mailing Address:  **500 Arguello Street, Suite 500
Redwood City, CA 94063**

            (4)    Business Email:  **rjk@fr.com**

            (5)    Business Telephone: **(650) 839-5113**

            (6)    Fax Number: **(650) 839-5071**

PAGE 1 – APPLICATION OF ROBERT KENT FOR
        SPECIAL ADMISSION – *Pro Hac Vice*

*19388*

**(B)      Bar Admissions Information:**  I certify that I am now a member in good standing of the following state and/or federal bar associations:

(1)      State Bar Admissions:  **California State Bar, admitted on November 19, 2007, State Bar No. 250905**

**(C)      Certification of Disciplinary Proceedings:**

___✓___      I certify that I am not now, nor have I been subject to any disciplinary action by any state or federal bar association or administrative agency; or

_____      I certify that I am now, or have been subject to disciplinary action from a state or federal bar association or administrative agency.  (See attached letter of explanation).

**(D)      Certification of Professional Liability Insurance:**  I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

**(E)      Representation Statement:**  I am representing the following party(s) in this case:  SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation.

**(F)      CM/ECF Registration:**  Concurrent with approval of this *pro hac vice* application, I acknowledge that I will automatically be registered to access the court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I also consent to electronic service pursuant to Fed. R. Civ. P. 5(b)(2)(D) and LR 100.13(a).

PAGE 2 – APPLICATION OF ROBERT KENT FOR
            SPECIAL ADMISSION – *Pro Hac Vice*

2.    **Certification of Associated Local Counsel:**  I certify that I am a member in good standing of the Bar of this Court, that I have read and understand the requirements of LR 83.3(d), and that I will serve as designated local counsel in this particular case.

DATED this 12 day of February 2008

Brenna K. Legaard
CHERNOFF, VILHAUER, MCCLUNG
  & STENZEL, LLC
601 SW Second Avenue, Suite 1600
Portland, OR 97204-3157
E-mail: Brenna@ chernofflaw.com
Telephone: (503) 227-5631
Fax: (503) 228-4373

Robert Kent
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-Mail: rjk@fr.com
Telephone: (839-5113
Fax: (650) 839-5071

---

## COURT ACTION

---

X    Application approved subject to payment of fees

_____    Application approved and fee waived

_____    Application denied

2/24/07
Date

United States Judge

PAGE 3 – APPLICATION OF ROBERT KENT FOR
SPECIAL ADMISSION – *Pro Hac Vice*

FILED '08 FEB 26 15:29 USDC-ORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**SUNPOWER CORPORATION,**
**SYSTEMS,** a Delaware corporation,

RECVD '08 FEB 19 11:38 USDC-ORE

Case No:  CV 08-00148-AA

Plaintiff,

**APPLICATION OF HOWARD**
**POLLACK FOR SPECIAL**
**ADMISSION –** *Pro Hac Vice*

v.

**PATENT CASE**

**SUNLINK CORPORATION,** a
Delaware corporation; **ADVANCED**
**ENERGY SYSTEMS LLC,** an Oregon
limited liability company,

Defendants.

As local counsel in the above-captioned case and in accordance with LR 83.3, I

am recommending the following attorney for admission *pro hac vice* and certify that the

information contained in this application is true.

    1.    **Pro Hac Vice Attorney Certification.**  I have read and understand the

requirements of LR 83.3, and certify that the following information is correct:

        (A)    **Personal Data:**

            (1)    Name: Howard Pollack

            (2)    Firm:  Fish & Richardson P.C.

            (3)    Mailing Address:    500 Arguello Street, Suite 500
                                                      Redwood City, CA 94063

            (4)    Business Email:      pollack@fr.com

            (5)    Business Telephone:  (650) 839-5070

            (6)    Fax Number:  (650) 839-5071

PAGE 1 – APPLICATION OF HOWARD POLLACK FOR
            SPECIAL ADMISSION – *Pro Hac Vice*

*19888*

**(B)** **Bar Admissions Information:** I certify that I am now a member in good standing of the following state and/or federal bar associations:

(1) State Bar Admissions: California Supreme Court, admitted on December 22, 1992, California State Bar No. 162897

(2) Federal Bar Admissions: Federal Circuit Court of Appeals, admitted on August 2, 1994; United States District Court for the Northern District of California, admitted on March 2, 1995; United States District Court for the Eastern District of California, admitted on March 29, 1995; United States District Court for the Central District of California, admitted on June, 5, 1995.

**(C)** **Certification of Disciplinary Proceedings:**

___✓___ I certify that I am not now, nor have I been subject to any disciplinary action by any state or federal bar association or administrative agency; or

_____ I certify that I am now, or have been subject to disciplinary action from a state or federal bar association or administrative agency. (See attached letter of explanation).

**(D)** **Certification of Professional Liability Insurance:** I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

PAGE 2 – APPLICATION OF HOWARD POLLACK FOR
SPECIAL ADMISSION – *Pro Hac Vice*

    **(E)**    **Representation Statement:**  I am representing the following

party(s) in this case:  SUNPOWER CORPORATION, SYSTEMS, a Delaware

corporation.

    **(F)**    **CM/ECF Registration:**  Concurrent with approval of this *pro hac*

*vice* application, I acknowledge that I will automatically be registered to access the

court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I

also consent to electronic service pursuant to Fed. R. Civ. P. 5(b)(2)(D) and LR

100.13(a).

    **2.**    **Certification of Associated Local Counsel:**  I certify that I am a

member in good standing of the Bar of this Court, that I have read and understand the

requirements of LR 83.3(d), and that I will serve as designated local counsel in this

particular case.

    DATED this 14th day of February 2008

Brenna K. Legaard
CHERNOFF, VILHAUER, MCCLUNG
  & STENZEL, LLC
601 SW Second Avenue, Suite 1600
Portland, OR 97204-3157
E-mail: Brenna@ chernofflaw.com
Telephone: (503) 227-5631
Fax: (503) 228-4373

Howard Pollack
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-Mail: pollack@fr.com
Telephone: (839-5113
Fax: (650) 839-5071

**COURT ACTION**

_____X_____          Application approved subject to payment of fees

_____          Application approved and fee waived

_____          Application denied


_____7/26/08_____                    _____
Date                                                 United States Judge


PAGE 4 – APPLICATION OF HOWARD POLLACK FOR
SPECIAL ADMISSION – _Pro Hac Vice_

UNITED STATES DISTRICT COURT

FILED'08 FEB 26 15:29USDC-ORE

DISTRICT OF OREGON

**SUNPOWER CORPORATION,**
**SYSTEMS,** a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a
Delaware corporation; **ADVANCED**
**ENERGY SYSTEMS LLC,** an Oregon
limited liability company,

Defendants.

Case No:  CV 08-00148-AA

**APPLICATION OF FRANK**
**SCHERKENBACH FOR SPECIAL**
**ADMISSION** – *Pro Hac Vice*

**PATENT CASE**

As local counsel in the above-captioned case and in accordance with LR 83.3, I

am recommending the following attorney for admission *pro hac vice* and certify that the

information contained in this application is true.

1.    **Pro Hac Vice Attorney Certification.**  I have read and understand the

requirements of LR 83.3, and certify that the following information is correct:

    **(A)    Personal Data:**

        (1)    Name: Frank Scherkenbach

        (2)    Firm:  Fish & Richardson P.C.

        (3)    Mailing Address:    225 Franklin Street
                                 Boston, MA  02110-2804

        (4)    Business Email:    scherkenbach@fr.com

        (5)    Business Telephone: (617) 542-5070

        (6)    Fax Number:  (617) 542-8906

PAGE 1 – APPLICATION OF FRANK SCHERKENBACH FOR
      SPECIAL ADMISSION – *Pro Hac Vice*

*19888*

**(B)**   **Bar Admissions Information:**  I certify that I am now a member

in good standing of the following state and/or federal bar associations:

> **(1)**   State Bar Admissions:
>
> > Massachusetts State Bar, Good Standing, May 14, 2003, #653819
> > California State Bar, Good Standing, December, 1989, #142549
> > CA Supreme Court, Good Standing, December 11, 1989
>
> **(2)**   Federal Bar Admissions:
>
> > U.S. Court of Appeals for the Federal Circuit, Good Standing, April 4, 1990, #22329
> > U.S. Supreme Court, Good Standing, May 1, 1995
> > USDC, C.D. CA, Good Standing, December 28, 1993
> > USDC, E.D. CA, Good Standing, November 22, 1995
> > USDC, N.D. CA, Good Standing, November 5, 1991
> > USDC, N.D. GA, Good Standing, June 1992
> > USDC, D. CO, Good Standing, July 23, 2003
> > USDC, D. MA, Good Standing, February 25, 2004
> > USDC, E.D. MI, Good Standing, December 14, 2005

**(C)**   **Certification of Disciplinary Proceedings:**

> __✓__   I certify that I am not now, nor have I been subject to
>
> any disciplinary action by any state or federal bar
>
> association or administrative agency; or
>
> _____   I certify that I am now, or have been subject to
>
> disciplinary action from a state or federal bar
>
> association or administrative agency.  (See attached
>
> letter of explanation).

PAGE 2 – APPLICATION OF FRANK SCHERKENBACH FOR
      SPECIAL ADMISSION – *Pro Hac Vice*

**(D)** **Certification of Professional Liability Insurance:** I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

**(E)** **Representation Statement:** I am representing the following party(s) in this case: SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation.

**(F)** **CM/ECF Registration:** Concurrent with approval of this *pro hac vice* application, I acknowledge that I will automatically be registered to access the court's Case Management/Electronic Case File system. (See ecf.ord.uscourts.gov). I also consent to electronic service pursuant to Fed. R. Civ. P. 5(b)(2)(D) and LR 100.13(a).

**2.** **Certification of Associated Local Counsel:** I certify that I am a member in good standing of the Bar of this Court, that I have read and understand the requirements of LR 83.3(d), and that I will serve as designated local counsel in this particular case.

DATED this 14 day of February 2008

Brenna K. Legaard
CHERNOFF, VILHAUER, MCCLUNG
  & STENZEL, LLC
601 SW Second Avenue, Suite 1600
Portland, OR 97204-3157
E-mail: Brenna@ chernofflaw.com
Telephone: (503) 227-5631
Fax: (503) 228-4373

Frank Scherkenbach
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-Mail: pollack@fr.com
Telephone: (839-5113
Fax: (650) 839-5071

PAGE 3 – APPLICATION OF FRANK SCHERKENBACH FOR
    SPECIAL ADMISSION – *Pro Hac Vice*

**COURT ACTION**

_____X_____        Application approved subject to payment of fees

_____        Application approved and fee waived

_____        Application denied


_____7/24/08_____                    _____Ann Cerken_____
Date                                 United States Judge

FILED '08 FEB 28 13:27 USDC-ORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RECVD '08 FEB 21 14:43 USDC-ORP

**SUNPOWER CORPORATION,**
**SYSTEMS,** a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a
Delaware corporation; **ADVANCED**
**ENERGY SYSTEMS LLC,** an Oregon
limited liability company,

Defendants.

Case No: CV 08-00148-AA

**APPLICATION OF CRAIG**
**COMPTON FOR SPECIAL**
**ADMISSION –** *Pro Hac Vice*

**PATENT CASE**

As local counsel in the above-captioned case and in accordance with LR 83.3, I

am recommending the following attorney for admission *pro hac vice* and certify that the

information contained in this application is true.

 1. **Pro Hac Vice Attorney Certification.** I have read and understand the

requirements of LR 83.3, and certify that the following information is correct:

  **(A)** **Personal Data:**

   (1) Name: Craig Compton

   (2) Firm:  Fish & Richardson P.C.

   (3) Mailing Address: 500 Arguello Street, Suite 500
           Redwood City, CA 94063

   (4) Business Email: compton@fr.com

   (5) Business Telephone: (650) 839-5070

   (6) Fax Number: (650) 839-5071

#199447

**(B)**    **Bar Admissions Information:**  I certify that I am now a member in good standing of the following state and/or federal bar associations:

        (1)    State Bar Admissions:  California Supreme Court, admitted in December 3, 2001, California State Bar No. 215491.

        (2)    Federal Bar Admissions:  Federal Circuit Court of Appeals, admitted on July 6, 2004; United States District Court for the Northern District of California, admitted on December 3, 2001; United States District Court for the Eastern District of California, admitted on May 5, 2004; United States District Court for the Central District of California, admitted on May 7, 2004.

**(C)**    **Certification of Disciplinary Proceedings:**

        __✓__    I certify that I am not now, nor have I been subject to any disciplinary action by any state or federal bar association or administrative agency; or

        _____    I certify that I am now, or have been subject to disciplinary action from a state or federal bar association or administrative agency.  (See attached letter of explanation).

**(D)**    **Certification of Professional Liability Insurance:**  I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

PAGE 2 – APPLICATION OF CRAIG COMPTON FOR
    SPECIAL ADMISSION – *Pro Hac Vice*

(E)    **Representation Statement:**  I am representing the following

party(s) in this case:  SUNPOWER CORPORATION, SYSTEMS, a Delaware

corporation.

(F)    **CM/ECF Registration:**  Concurrent with approval of this *pro hac*

*vice* application, I acknowledge that I will automatically be registered to access the

court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I

also consent to electronic service pursuant to Fed. R. Civ. P. 5(b)(2)(D) and LR

100.13(a).

2.    **Certification of Associated Local Counsel:**  I certify that I am a member

in good standing of the Bar of this Court, that I have read and understand the

requirements of LR 83.3(d), and that I will serve as designated local counsel in this

particular case.

DATED this 19 day of February 2008

Brenna K. Legaard
CHERNOFF, VILHAUER, MCCLUNG
  & STENZEL, LLC
601 SW Second Avenue, Suite 1600
Portland, OR 97204-3157
E-mail: Brenna@ chernofflaw.com
Telephone: (503) 227-5631
Fax: (503) 228-4373

Craig Compton
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-Mail: pollack@fr.com
Telephone: (839-5113
Fax: (650) 839-5071

PAGE 3 – APPLICATION OF CRAIG COMPTON FOR
SPECIAL ADMISSION – *Pro Hac Vice*

## COURT ACTION

X_____    Application approved subject to payment of fees

_____    Application approved and fee waived

_____    Application denied

2/26/08_____

Date

_____ United States Judge

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
Steven T. Lovett (OSB No. 910701)
Email: *stlovett@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (pending admission *pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269
Email: *mtovey@reedsmith.com*

Of Attorneys for Defendant
Sunlink Corporation

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION SYSTEMS, a Delaware corporation, | Civil No. 08-CV0148 AA |
| Plaintiff, | |
| v. | NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL FOR DEFENDANT SUNLINK CORPORATION |
| SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, | |
| Defendants. | |

Defendant Sunlink Corporation ("Sunlink"), a Delaware corporation, is represented in

this action by the following additional counsel:

Randolph C. Foster
E-mail:  rcfoster@stoel.com
Steven T. Lovett
E-mail:  stlovett@stoel.com
Stoel Rives LLP
900 SW Fifth Avenue, Suite 1700
Portland, Oregon 97204
Telephone:  503-224-3380
Facsimile:  503-220-2480

DATED:  March ⬤, 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    rcfoster@stoel.com
Steven T. Lovett, OSB No. 910701
E-mail:    stlovett@stoel.com
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL FOR DEFENDANT SUNLINK CORPORATION,** on the following named person(s) on the date indicated below by

☒ mailing with postage prepaid

☒ electronic delivery (pdf)

☐ facsimile transmission

☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

**David VanSpeybroeck**
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**
Email: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915

Attorneys for Defendant
ADVANCED ENERGY

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

DATED: March 10, 2008.          STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    rcfoster@stoel.com
Steven T. Lovett, OSB No. 910701
E-mail:    stlovett@stoel.com
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Page 4   -   NOTICE OF APPEARANCE

**Susan D. Pitchford, OSB No. 98091**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 00165**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Case No. CV 08-00148-AA

**SUNPOWER CORPORATION, SYSTEMS,**
a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a Delaware
corporation; **ADVANCED ENERGY
SYSTEMS LLC**, an Oregon limited liability
company,

Defendants.

**RULE 26.2 DISCOVERY AGREEMENT**

**<u>PATENT CASE</u>**

**Fed. R. Civ. P. 26(a)(1) Discovery Agreement**

In accordance with LR 26.2, I state that the parties who have been served and who are not in default, have agreed to forego the disclosures required by Fed. R. Civ. P. 26(a)(1).

DATED:  March 13, 2008

CHERNOFF, VILHAUER, McCLUNG &
    STENZEL, LLP


/s/ Susan D. Pitchford
Susan D. Pitchford, OSB No. 98091
Brenna K. Legaard, OSB No. 00165
Telephone:  (503) 227-5631
Of Attorneys for Plaintiff

**Brenna K. Legaard, OSB No. 00165**
E-mail: brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 98091**
E-mail: sdp@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG &**
**STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373


**Howard G. Pollack**
*Admitted pro hac vice*
E-mail: pollack@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071
Attorneys for Plaintiff,
SUNPOWER CORPORATION, SYSTEMS

**David VanSpeybroeck, OSB No. 954440**
E-mail: david.vanspeybroeck@bullivant.com
**Susan L. Ford, OSB No. 970362**
Email: susan.ford@bullivant.com
**BULLIVANT HOUSER BAILEY PC**
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915
Attorneys for Defendant,
ADVANCED ENERGY SYSTEMS LLC


**Randolph C. Foster (OSB No. 784340)**
Email: *rcfoster@stoel.com*
**STOEL RIVES** LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480


**Morgan W. Tovey**
(pending admission *pro hac vice*)
Email: *mtovey@reedsmith.com*
**REED SMITH** LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269
Attorneys for Defendant,
SUNLINK CORPORATION

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS**, a Delaware corporation,<br><br>     Plaintiff,<br><br>   v.<br><br>**SUNLINK CORPORATION**, a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,<br>     Defendants | Case No. CV 08-00148-AA<br><br><br>**JOINT REPORT OF THE PARTIES'**<br>**PLANNING MEETING**<br><br><br>**PATENT CASE** |

PAGE 1 – **REPORT OF THE PARTIES' PLANNING MEETING**

1.     The following persons participated in a Rule 26(f) conference on March 5, 2008 by telephone.  Brenna K. Legaard of Chernoff, Vilhauer, McClung & Stenzel and Howard G. Pollack and Craig Compton of Fish & Richardson P.C. representing SunPower Corporation, Systems, Susan Ford and David VanSpeybroeck of Bullivant Houser Bailey PC representing Advanced Energy Systems LLC, Randolph C. Foster of Stoel Rives LLP, and Morgan W. Tovey of Reed Smith LLP representing SunLink Corporation.

2.     **Initial Disclosures**.  The parties will waive the initial disclosures required by Rule 26(a)(1) pursuant to Local Rule 26.2.

3.     **Discovery Plan**.  The parties stipulate to the following changes to the discovery and deposition limitations set forth in the Federal Rule of Civil Procedure and Local Rules:[1]

(1) **Deposition Limits.**:  Maximum of seventy (70) hours for fact depositions per side.  Consistent with Federal Rule of Civil Procedure 30(d)(1), unless otherwise stipulated or ordered by the court, a deposition of any specific individual is limited to no more than 7 hours.

(2) **Electronic Discovery**:  The parties further agree that as to electronic discovery, the parties recognize that the burden of suspending normal policies regarding electronic backup systems for disaster recovery outweighs the potential relevance of documents that might only be captured by some interim backup on an unknown date.  Therefore, the parties agree that they can continue to utilize their standard disaster recovery systems, and specifically agree that each party may continue to recycle backup tapes per their standard disaster recovery systems protocol; provided however, that each party shall retain throughout the litigation one set

---

[1] Otherwise the Federal Rules of Civil Procedure and Local Rules shall control regarding discovery issues.

PAGE 2 – **REPORT OF THE PARTIES' PLANNING MEETING**

of backup tapes from its disaster recovery systems from a standard backup performed during the month of April.

(3) **Expert Discovery Agreement**: With reference to expert reports and discovery, the parties agree that final expert reports and materials identified by the experts as relied upon by the experts in their reports are discoverable. (If an expert indicates in deposition that he relied upon a document or source not otherwise specified in the final report, that information is discoverable. This will facilitate full disclosure from the experts). Attorney communication to and from an expert, draft reports and notes of experts relating to communication to or from attorneys are specifically not discoverable. Pursuant to Local Rule 30.8 and Rule 26(a)(4) of the Federal Rules of Civil Procedure, the parties hereby stipulate that experts whose opinions may be offered at trial, who have submitted a report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure or who have submitted expert testimony in an affidavit or declaration in support of a party's legal memorandum or brief, may be noticed for deposition and deposed by the other party or parties.

(4)     **E-mail service**: Pursuant to Federal Rule of Civil Procedure 5(b) the parties agree that service of documents by e-mail will equate to service made by hand delivery.

4.     **Protective Order:** The parties agree that the discovery and trial of this case may involve the exchange of sensitive information which constitutes trade secret, confidential research, development, or otherwise confidential commercial information within the meaning of Fed.R.Civ.P. 26(c). The parties further agree that the disclosure to the public of such information may be detrimental to the parties' respective privacy and commercial interests. Accordingly, the parties shall meet and confer regarding a stipulation for entry of a protective

PAGE 3 – **REPORT OF THE PARTIES' PLANNING MEETING**

order and intend to submit to the Court a proposed protective order governing all confidential information produced in these proceedings.

5.    **Case Schedule**.  The parties having met and conferred both telephonically and in writing and have agreed to some, but not all, of the contemplated discovery obligations and limitations, and pretrial schedule.  The chart below indicates the stipulated provisions:

| Event | Agreed Upon Dates |
|---|---|
| Plaintiff to identify asserted claims and accused products and produce documents related to its infringement contentions.[2] | April 17, 2008 |
| Both parties to identify any claim terms that require construction. | May 1, 2008 |
| Defendant to identify prior art to be relied upon as the basis for invalidity contentions. [3] | June 2, 2008 |
| Defendants to complete production of the following documents: (a) documents sufficient to show the operation of any aspects or elements of an accused product identified by Plaintiff; and (b) a copy or sample of the prior art identified by defendants which does not appear in the file history of the patent(s) at issue.[4] | June 2, 2008 |
| Exchange of proposed claim constructions, if any. | June 16, 2008 |
| Telephonic Rule 16 Conference to discuss need for earlier, separate claim construction proceedings | The week of June 23, 2008, subject to the Court's convenience |

---

[2] SunPower proposes that this date for disclosure is contingent upon defendants providing necessary discovery to identify relevant products.  SunLink has informed SunPower it sells only one product, its PV Module Mounting System.  In addition, and as set for the below, the parties disagree as to the particulars of this disclosure.

[3] As set for the below, the parties disagree as to the particulars of this disclosure.

[4] SunPower believes that the Defendants should timely produce documents that are responsive to document requests and that this is the last day for production of these specified documents.  Defendants believe that relevant prior art will depend in whole or in part on Plaintiff's asserted claims of the patents-in-suit.

| Pre-trial Conference | Week of March 2, 2009 |
| Trial | March 23, 2009 |

The parties, however, also disagree regarding some aspects of discovery obligations and limitations as well as some aspects of the pretrial schedule. Below, the parties set forth their respective proposals and positions:

### (1) Plaintiff's Proposed Schedule And Statement.

| Event | Plaintiff's Proposed Dates |
| --- | --- |
| Plaintiff to identify asserted claims and accused products. | April 17, 2008 |
| Plaintiff to produce the following documents: (a) Documents sufficient to evidence each discussion with, disclosure to, or other manner of providing to a third party, or sale of or offer to sell, or any public use of, the claimed invention(s) prior to the date of application for the patents-in-suit; (b) all documents evidencing the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the priority date for the respective patents; (c) a copy of the file history for the patents-in-suit; and (d) all documents evidencing ownership of patent rights. | April 17, 2008 |
| Both parties to identify any claim terms that require construction.[5] | May 1, 2008 |
| Deadline for parties relying on advice of counsel as part of a patent-related claim or defense to disclose opinions of counsel related thereto for which the attorney- | May 1, 2008 |

---

[5] SunPower does not believe that any claim terms require construction. SunPower asserts that all terms should be given their ordinary meaning.

| | |
|---|---|
| client and work product protection has been waived | |
| Defendant to identify prior art to be relied upon as the basis for invalidity contentions. | June 2, 2008 |
| Defendants to complete production of the following documents: (a) documents sufficient to show the operation of any aspects or elements of an accused product identified by Plaintiff; and (b) a copy or sample of the prior art identified by defendants which does not appear in the file history of the patent(s) at issue. | June 2, 2008 |
| Last day to amend pleadings. | June 2, 2008 |
| Exchange of proposed claim constructions, if any. | June 16, 2008 |
| Telephonic Rule 16 Conference to discuss need for earlier, separate claim construction proceedings | The week of June 23, 2008, subject to the Court's convenience |
| Defendants propose a deadline for parties to exchange (1) a preliminary proposed construction for each claim the parties have identified for claim construction purposes and (2) a preliminary identification of extrinsic evidence they contend support their respective constructions, (if required). | Premature to schedule – see Plaintiff's Statement below |
| Defendants propose a deadline for parties to file and serve their opening claim construction briefs, (if required). | Premature – see discussion below |
| Defendants propose a deadline for parties to file and serve their responsive claim construction briefs, (if required). | Premature -- see discussion below |
| Defendants propose claim construction hearing, (if required) | Premature – see discussion below |
| Close of fact discovery | September 5, 2008 |
| Opening expert reports on issues for which the party bears the burden of proof exchanged. | September 16, 2008 |
| Rebuttal expert reports exchanged. | October 7, 2008 |
| Close of expert discovery. | October 28, 2008 |

PAGE 6 – **REPORT OF THE PARTIES' PLANNING MEETING**

| Motions for summary judgment and claim construction, if any, due.[6] Motions for summary judgment | November 21, 2008 |
|---|---|
| Summary judgment and claim construction responses, if any, due. | December 12, 2008 |
| Summary judgment replies, if any, due. | December 19, 2008 |
| Summary judgment hearing and Markman hearing, if any. | The week of January 5, 2009 subject to the Court's convenience |
| Parties confer regarding ADR immediately following any ruling, or if no summary judgment. | TBD |
| Pre-trial Conference | Week of March 2, 2009 |
| Trial | March 23, 2009 |

**Plaintiff's Statement:** There are two scheduling issues that SunPower would like to

discuss at the initial case management conference. First, the parties disagree on when discovery

should commence concerning certain topics. SunLink wants to defer the production of technical

documents regarding its products until June 2, 2008, but at the same time it wants SunPower to

identify all accused products by April 17, 2008. SunPower has already identified one accused

product it its complaint. Despite Plaintiff Sunpower's request that SunLink identify its other

products so Plaintiff could also evaluate those against its patent, SunLink first represented to

plaintiff that is only sold one product on March 12 in providing its argumentative

counterstatement in this report. Plaintiff is amenable to identifying additional accused SunLink

products, if any, after having a reasonable amount of time to evaluate SunLink's production.

Some discovery is needed regarding this issue. Defendants also wants to defer discovery

---

[6] With respect to summary judgment briefing, SunPower seeks to waive any requirements for concise statements of material fact and to limit each party to a <u>total</u> of 35 pages for opening briefs, 35 pages for responses and 20 pages for replies. SunPower also believes opening briefs in support of summary judgment should be limited in their entirety to 35 pages per party. If claim construction is necessary, the parties agree that their respective opening claim construction briefs shall be limited to a total of 20 pages and that their respective responsive claim construction briefs shall also be limited to a total of 20 pages.

regarding prior art until June 2, 2008. SunPower does not have a problem with Defendants continuing to produce and identify prior art up through June 2, 2008, but if it knows of alleged prior art before that date and the art is responsive to document requests it should produce the art earlier. Finally, nothing prevents the parties from amending their contentions for good cause after June 2, 2008.

Next, SunPower believes it is premature to build into the schedule a four and half-month long process for Claim Construction (identify term on June 16th with proposed hearing in late October). The technology in this case relates to a relatively straightforward mechanical invention and the language of the claims includes simple English terms whose construction and application to the Defendants products is readily apparent. SunPower asserts no terms will need construction in this matter and even if a few limited terms do need construction, there is time within its proposed schedule to have a separate hearing or to decide the meaning of the terms during the summary judgment phase of the case, as many other Courts do. In other words there is no reason to extend the case by another two months for a hearing that might not happen. Even if the Court decides a separate hearing, apart from summary judgment, is necessary, that hearing could readily take place in August under the schedule proposed by SunPower.

### (2) Defendants' Proposed Schedule And Statement.

| Event | Defendants' Proposed Dates |
|---|---|
| Deadline for Plaintiff to serve (1) Disclosure of Asserted Claims and Infringement Contentions and (2) Documents it intends to rely on in support of the Contentions. . | April 17, 2008 |
| The Disclosure of Asserted Claims and Infringement | |

PAGE 8 – **REPORT OF THE PARTIES' PLANNING MEETING**

| | |
|---|---|
| Contentions shall contain: (a) each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. §271; (b) separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality of each opposing party of which the party is aware ("Accused Instrumentality"); (c) a chart identifying specifically where each limitation of each asserted claim is found within the Accused Instrumentality. | |
| Both parties to identify any claim terms that require construction.[7] | May 1, 2008 |
| Deadline for Defendants to serve (1) Invalidity Contentions and (2) Documents it intends to rely on in support of the Contentions.<br><br>The Invalidity Contentions shall contain: (a) The identity of each prior art that allegedly anticipates each asserted claim or renders it obvious; (b) whether each item of prior art anticipates each asserted claim or renders it obvious. If obviousness is alleged, an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness; (c) a chart identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found; and (d) any grounds of invalidity of any of the asserted claims. | June 2, 2008 |
| Deadline for parties to exchange list of claim terms for construction, if any. | June 16, 2008 |
| Telephonic Rule 16 Conference to discuss need for earlier, separate claim construction proceedings | The week of June 23, 2008, subject to the Court's convenience |
| Deadline for parties to exchange (1) a preliminary proposed construction for each claim the parties have identified for claim construction purposes and (2) a preliminary identification of extrinsic evidence they contend support their respective constructions, if required. | July 28, 2008 |

---

[7] Defendants reserve the right to determine and to disclose which terms require construction according to the case schedule.

PAGE 9 – **REPORT OF THE PARTIES' PLANNING MEETING**

| Deadline for parties to file and serve their opening claim construction briefs, (if required) | September 26, 2008 |
|---|---|
| Deadline for parties to file and serve their responsive claim construction briefs, (if required). | October 13, 2009 |
| Claim construction hearing, (if required) | The week of October 27, 2008, subject to the Court's convenience |
| Deadline for parties relying on advice of counsel as part of a patent-related claim or defense to disclose opinions of counsel related thereto for which the attorney-client and work product protection has been waived. | November 3, 2008 or within 10 days of a claims construction stipulation or order, whichever is later |
| Close of fact discovery | November 7, 2008 |
| Opening expert reports on issues for which the party bears the burden of proof exchanged. | November 21, 2008 |
| Rebuttal expert reports exchanged. | December 12, 2008 |
| Close of expert discovery. | January 16, 2009 |
| Motions for summary judgment due. | January 30, 2009 |
| Summary judgment responses due. | February 20, 2008 |
| Summary judgment replies, if any, due. | March 6, 2009 |
| Summary judgment hearing | The week of March 16, 2009 subject to the Court's convenience |
| Parties confer regarding ADR immediately following any ruling, or if no summary judgment. | TBD |
| Pre-trial Conference | Week of May 4, 2009 |
| Trial | May 18, 2009 |

**Defendants' Statement:** The primary differences between the discovery limitations and pretrial schedules relate to (1) whether some sequencing of discovery makes sense, including whether Plaintiff should provide its infringement contentions at the outset of the case before Defendants provide their invalidity contentions, (2) whether the schedule should be structured in a manner that would allow the Court to determine whether separate claim construction proceedings should occur and (3) whether trial should be set in March 2009 or May 2009. For the reasons set forth below, Defendants respectfully submit that the Court should adopt the discovery limitations and pretrial and trial schedule proposed by Defendants.

PAGE 10 – **REPORT OF THE PARTIES' PLANNING MEETING**

Plaintiff SunPower Corporation ("SunPower") filed its Complaint on February 5, 2008, alleging that Defendants SunLink Corporation ("SunLink") and Advanced Energy Systems ("AES"), one of SunLink's customers and installers of the accused assembly, infringe two patents. The Complaint, however, fails to allege which of the *120* claims across the two asserted patents it contends Defendants infringe. The Complaint also fails to provide any notice to Defendants as to whether the alleged infringement is direct or indirect (*i.e.,*, contributory or by inducement) and further fails to indicate whether the alleged infringement is literal or under the Doctrine of Equivalents.

After initially refusing to comply with Defendants request to identify which patent claims Plaintiff intends to assert, in a letter dated February 25, 2008, Plaintiff's counsel wrote that "SunLink products, including the SunLink ® PV Module Mounting System, installed as intended and instructed by SunLink, infringes [sic] *at least* claim 1 of United States Patent No. 5,505,788 and independent claims 36 and 55 of United States Patent No. RE38,898. SunPower reserves the right to identify additional claims in due course after the opportunity for discovery." Plaintiff's correspondence did not provide claim charts or allege its theory or theories of infringement.

During the course of the parties' early meeting, Plaintiff agreed to specify which claims it intends to assert but only on the condition that Defendants produced product information concerning both the accused and non-accused products.[8] Plaintiff's position ignores the pre-filing investigation duties imposed by Rule 11. Plaintiff has also refused to provide claim charts or otherwise provide its infringement contentions by interrogatory response (relying presumably on Local Rule 33.1(d)); indeed, Plaintiff suggested that it would not provide its infringement contentions anytime prior to expert discovery.

---

[8]    In fact, SunLink currently sells only one product, its PV Module Mounting System.

PAGE 11 – **REPORT OF THE PARTIES' PLANNING MEETING**

Defendants submit that Rule 11 requires Plaintiff to have a good faith basis to assert a claim for patent infringement. In the context of a patent infringement suit, Rule 11 requires "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300-01 (Fed. Cir. 2004). In short, before filing the Complaint, Plaintiff analyzed, or should have analyzed which patent claims it alleges are infringed and charted how each element "reads on" the accused assembly, either literally or equivalently, and whether the alleged infringement is direct or vicarious. Moreover, the courts have recognized that plaintiffs may not use the discovery process as a fishing expedition to bolster factual support for infringement claims. *See, e.g., Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co., Ltd.*, 2007 WL 4328482 (C.D.Cal.) (discovery in patent infringement cases should be limited to the specific products or services accused of infringement).

Because Plaintiff's choice of which claims to assert (especially where, as here, over 120 claims exist across the two patents) and contentions as to how each element of the asserted claims "reads on" the accused assembly substantially informs whether separate claims construction proceedings are necessary and whether Defendants will rely on non-infringement or invalidity defenses or both, Plaintiff should be required to come forward with these threshold disclosures before Defendants are required to expend enormous sums defending 120 separate claims under every conceivable theory.

The issues presented here are not unique to this patent case. Indeed, many federal district courts where substantial patent litigation is filed have adopted formally, or by custom, local rules that provide for a logical sequence of the exchange of certain information relevant in all patent cases. The types of information, both documentary and legal contentions, disclosed and the sequencing of the disclosure, allows the Court to address the merits of the case in an expeditious and efficient manner.

With these goals in mind, Defendants propose a certain sequencing of discovery and includes dates by which the parties set forth their contentions and builds in dates by which the Court can first determine whether separate claims construction proceedings are necessary, and, if so, sufficient time to conduct them. And, far from needlessly extending the case schedule in this matter, Defendants submit that a separate schedule for claim construction near the start of the litigation could truncate this dispute. Although Plaintiff contends that no terms of its patent-in-suits require construction, because Plaintiff has, to date, refused to explain how they believe the patents read on the accused assembly, Defendant reserve the right to determine and disclose which claim terms require construction after Plaintiff commits to which claims it intends to assert and explains, by claim chart, or otherwise, its theory or theories of infringement. Assuming that even two claim terms (one per patent) are in dispute, an early determination by the Court of what any disputed claim terms mean as a matter of law could be dispositive of one or both of the patents.

DATED: March 13, 2008

CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP

/s/ Susan D. Pitchford
Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
Telephone: (503) 227-5631

Howard G. Pollack
*Admitted pro hac vice*
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Of Attorneys for Plaintiff

PAGE 13 – **REPORT OF THE PARTIES' PLANNING MEETING**

SUNPOWER CORPORATION, SYSTEMS

DATED: _March 13_, 2008

BULLIVANT HOUSER BAILEY PC

_P( V 1_

David VanSpeybroeck, OSB No. 954440
Susan L. Ford, OSB No. 970362
Telephone: (503) 228-6371
Of Attorneys for Defendant
ADVANCED ENERGY SYSTEMS LLC

DATED: _March 12_, 2008

_email consent by Tovey_

Randolph C. Foster (OSB No. 784340)
Email: _rcfoster@stoel.com_
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (pending admission pro hac vice)
Email: _mtovey@reedsmith.com_
REED SMITH llp
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269
Attorneys for Sunlink Corporation ]

**PAGE 14 – REPORT OF THE PARTIES' PLANNING MEETING**

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
Steven T. Lovett (OSB No. 910701)
Email: stlovett@stoel.com
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

RECD'P 08 MAR 11 16:13USDC-ORP

Morgan W. Tovey (pending admission *pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269
Email: *mtovey@reedsmith.com*

Of Attorneys for Defendant
Sunlink Corporation

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>        Defendants. | Case No.: 08-CV0148 AA<br><br>**APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - FOR MORGAN W. TOVEY** |



In accordance with LR 83.3, I am presenting the following attorney for special admission:

1.    ***Pro Hac Vice* Attorney Certification:**  I certify that I have read and understand the requirements of LR 83.3, and that the following information is correct:

    **(A)**    **Personal Data:**

        (1)    Name:  Morgan W. Tovey

        (2)    Firm or Business Affiliation: Reed Smith LLP

        (3)    Mailing Address:

                2 Embarcadero Center, Suite 2000, San Francisco, CA  94111

        (4)    Business E-mail Address:    mtovey@reedsmith.com

        (5)    Business Telephone Number: (415) 543-8700

        (6)    Fax Telephone Number:        (415) 391-8269

    **(B)**    **Bar Admissions Information:**  I certify that I am now a member in good standing of the following State and/or Federal Bar Associations:

        (1)    State Bar Admissions:
                California State Bar:
                Admitted, December 1988, State Bar No. 136242.

        (2)    Federal Bar Admissions:
                Admitted in the United States District Courts for the Northern, Eastern, Central and Southern Districts of California, Ninth Circuit Court of Appeals and Federal Circuit Court of Appeals.

    **(C)**    **Certification of Disciplinary Proceedings:**

            X      I certify that I am not now, nor have I ever been subject to any disciplinary action by and State or Federal bar association or administrative agency; or

           _____      I certify that I am now, or have been subject to disciplinary action from State or Federal bar association or administrative agency (*See* attached letter of explanation)

(D)    **Certification of Professional Liability Insurance:**  I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

(E)    **Representative Statement:**  I am representing the following party in this case: Sunlink Corporation

(F)    **CM/ECF Registration:**  Concurrent with approval of this *pro hac vice* application, I acknowledge that I will automatically be registered to access the court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I consent to electronic service pursuant to Fed. R. Civ. P 5(b)(2)(D) and LR 100.2(c).

2.    **Certification of Associated Local Counsel:**  I certify that the information contained in this application is true, that I am a member in good standing of the Bar of this Court, that I have read and understand the requirements of LR 83.3, and that I will serve as designated local counsel in this particular case.

DATED this 7th day of March, 2008.

_____
(Signature of Associate Local Counsel)
Randolph C. Foster
E-mail:  rcfoster@stoel.com
Steven T. Lovett
E-mail:  stlovett@stoel.com
STOEL RIVES, LLP
Standard Insurance Center
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204-1268
Telephone:    (503) 224-3380
Facsimile:    (503) 221-1045

_____
(Signature of *Pro Hac Vice* Counsel)
Morgan W. Tovey
E-mail:  mtovey@reedsmith.com
Reed Smith LLP
2 Embarcadero Center, Suite 2000
San Francisco, CA  94111
(415) 543-8700
(415) 391-8269

## COURT ACTION

_____X_____     Application approved subject to payment of fees

_____     Application approved and fee waived

_____     Application denied

3/13/08
**Date**

**Judge's Signature**

cc:    Counsel of Record

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - FOR MORGAN W. TOVEY** on the following named person(s) on the date indicated below by

☒ mailing with postage prepaid

☒ electronic delivery (pdf)

☐ facsimile transmission

☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone:  (617) 542-5070
Fax: (617) 542-8906

**David VanSpeybroeck**
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**
Email: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915

Attorneys for Defendant
ADVANCED ENERGY

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email:  sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373

DATED:  March _10_ 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    rcfoster@stoel.com
Steven T. Lovett, OSB No. 910701
E-mail:    stlovett@stoel.com
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480
E-mail:    rcfoster@stoel.com

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
Steven T. Lovett (OSB No. 910701)
Email: stlovett@stoel.com
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

RECVD*08 MAR 11 16:15USDC-ORP

Doyle B. Johnson (pending admission *pro hac vice*)
Email: *dbjohnson@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:   +1 415 543 8700
Facsimile:   +1 415 391 8269
Email: *dbjohnson@reedsmith.com*

Of Attorneys for Defendant
Sunlink Corporation

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>             Plaintiff,<br><br>   vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>             Defendants. | Case No.: 08-CV0148 AA<br><br>**APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - FOR DOYLE B. JOHNSON** |



In accordance with LR 83.3, I am presenting the following attorney for special admission:

1.    *Pro Hac Vice* **Attorney Certification:** I certify that I have read and understand the requirements of LR 83.3, and that the following information is correct:

    **(A)**   **Personal Data:**

        (1)    Name:  Doyle B. Johnson

        (2)    Firm or Business Affiliation: Reed Smith LLP

        (3)    Mailing Address:

                2 Embarcadero Center, Suite 2000, San Francisco, CA  94111

        (4)    Business E-mail Address:   dbjohnson@reedsmith.com

        (5)    Business Telephone Number: (415) 543-8700

        (6)    Fax Telephone Number:      (415) 391-8269

    **(B)**   **Bar Admissions Information:**  I certify that I am now a member in good standing of the following State and/or Federal Bar Associations:

        (1)    State Bar Admissions:
                California State Bar:
                Admitted, December 1995, State Bar No. 180348.

        (2)    Federal Bar Admissions:
                Admitted in the United States District Courts for the Northern, Eastern, Central and Southern Districts of California, Ninth Circuit Court of Appeals, Federal Circuit Court of Appeals, and United States Patent & Trademark Office.

    **(C)**   **Certification of Disciplinary Proceedings:**

        ___X___    I certify that I am not now, nor have I ever been subject to any disciplinary action by and State or Federal bar association or administrative agency; or

        _____    I certify that I am now, or have been subject to disciplinary action from State or Federal bar association or administrative agency (*See* attached letter of explanation)

**(D)    Certification of Professional Liability Insurance:**  I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

**(E)    Representative Statement:**  I am representing the following party in this case:  Sunlink Corporation

**(F)    CM/ECF Registration:**  Concurrent with approval of this *pro hac vice* application, I acknowledge that I will automatically be registered to access the court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I consent to electronic service pursuant to Fed. R. Civ. P 5(b)(2)(D) and LR 100.2(c).

2.    **Certification of Associated Local Counsel:**  I certify that the information contained in this application is true, that I am a member in good standing of the Bar of this Court, that I have read and understand the requirements of LR 83.3, and that I will serve as designated local counsel in this particular case.

DATED this  $10$  day of March, 2008.

(Signature of Associate Local Counsel)

Randolph C. Foster
E-mail:  rcfoster@stoel.com
Steven T. Lovett
E-mail:  stlovett@stoel.com
STOEL RIVES, LLP
Standard Insurance Center
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204-1268
Telephone:    (503) 224-3380
Facsimile:    (503) 221-1045

(Signature of *Pro Hac Vice* Counsel)

Doyle B. Johnson
E-mail:  dbjohnson@reedsmith.com
Reed Smith LLP
2 Embarcadero Center, Suite 2000
San Francisco, CA  94111
(415) 543-8700
(415) 391-8629

PAGE 3 - APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - FOR DOYLE B. JOHNSON

## COURT ACTION

_____X_____          Application approved subject to payment of fees

_____          Application approved and fee waived

_____          Application denied

3/13/08
**Date**

_Auu Cihun_
**Judge's Signature**

cc:    Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - DOYLE B. JOHNSON** on the following named person(s) on the date indicated below by

      ☒ mailing with postage prepaid

      ☒ electronic delivery (pdf)

      ☐ facsimile transmission

      ☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

**David VanSpeybroeck**
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**
Email: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915

Attorneys for Defendant
ADVANCED ENERGY

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email:  sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373

DATED:  March |\, 2008.     STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:     rcfoster@stoel.com
Steven T. Lovett, OSB No. 910701
E-mail:     stlovett@stoel.com
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480
E-mail:     rcfoster@stoel.com

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: rcfoster@stoel.com
Steven T. Lovett (OSB No. 910701)
Email: stlovett@stoel.com
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

RECUD*08 MAR 11 16:17USDC-ORP

James A. Daire (pending admission *pro hac vice*)
Email: jdaire@reedsmith.com
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269
Email: jdaire@reedsmith.com

Of Attorneys for Defendant
Sunlink Corporation

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | Case No.: 08-CV0148 AA |
| Plaintiff, | **APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - FOR JAMES A. DAIRE** |
| vs. | |
| SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, | |
| Defendants. | |

*Po241*

In accordance with LR 83.3, I am presenting the following attorney for special admission:

1.    ***Pro Hac Vice* Attorney Certification:**  I certify that I have read and understand the requirements of LR 83.3, and that the following information is correct:

    **(A)**    **Personal Data:**

        (1)    Name:  James A. Daire

        (2)    Firm or Business Affiliation: Reed Smith LLP

        (3)    Mailing Address:

            2 Embarcadero Center, Suite 2000, San Francisco, CA  94111

        (4)    Business E-mail Address:   jdaire@reedsmith.com

        (5)    Business Telephone Number: (415) 543-8700

        (6)    Fax Telephone Number:    (415) 391-8269

    **(B)**    **Bar Admissions Information:**  I certify that I am now a member in good standing of the following State and/or Federal Bar Associations:

        (1)    State Bar Admissions:
            California State Bar:
            Admitted, December 2005, State Bar No. 239637.

        (2)    Federal Bar Admissions:
            Admitted in the United States District Courts for the Northern, Central and Southern Districts of California.

    **(C)**    **Certification of Disciplinary Proceedings:**

        [X]    I certify that I am not now, nor have I ever been subject to any disciplinary action by and State or Federal bar association or administrative agency; or

        _____    I certify that I am now, or have been subject to disciplinary action from State or Federal bar association or administrative agency (*See* attached letter of explanation)

**(D)    Certification of Professional Liability Insurance:**  I have a current professional liability insurance policy that will apply in this case, and that the policy will remain in effect during the course of these proceedings.

**(E)    Representative Statement:**  I am representing the following party in this case: Sunlink Corporation

**(F)    CM/ECF Registration:**  Concurrent with approval of this *pro hac vice* application, I acknowledge that I will automatically be registered to access the court's Case Management/Electronic Case File system.  (See ecf.ord.uscourts.gov).  I consent to electronic service pursuant to Fed. R. Civ. P 5(b)(2)(D) and LR 100.2(c).

2.    **Certification of Associated Local Counsel:**  I certify that the information contained in this application is true, that I am a member in good standing of the Bar of this Court, that I have read and understand the requirements of LR 83.3, and that I will serve as designated local counsel in this particular case.

DATED this 7ᵗʰ day of March, 2008.

(Signature of Associate Local Counsel)

Randolph C. Foster
E-mail:  rcfoster@stoel.com
Steven T. Lovett
E-mail:  stlovett@stoel.com
STOEL RIVES, LLP
Standard Insurance Center
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204-1268
Telephone:    (503) 224-3380
Facsimile:    (503) 221-1045

(Signature of *Pro Hac Vice* Counsel)

James A. Daire
E-mail:  jdaire@reedsmith.com
Reed Smith LLP
2 Embarcadero Center, Suite 2000
San Francisco, CA  94111
(415) 543-8700
(415) 391-8269

## COURT ACTION

_____X_____    Application approved subject to payment of fees

_____    Application approved and fee waived

_____    Application denied

__3|13|08__
**Date**

_____
**Judge's Signature**

cc:    Counsel of Record

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **APPLICATION FOR SPECIAL ADMISSION - *PRO HAC VICE* - JAMES A. DAIRE** on the following named person(s) on the date indicated below by

    ☒ mailing with postage prepaid

    ☒ electronic delivery (pdf)

    ☐ facsimile transmission

    ☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

**David VanSpeybroeck**
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**
Email: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915

Attorneys for Defendant
ADVANCED ENERGY

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email:  sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373


DATED:  March/12, 2008.          STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    rcfoster@stoel.com
Steven T. Lovett, OSB No. 910701
E-mail:    stlovett@stoel.com
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480
E-mail:    rcfoster@stoel.com

Of Attorneys for Defendant
Sunlink Corporation

Susan D. Pitchford, OSB No. 98091
E-mail: sdp@chernofflaw.com
Brenna K. Legaard, OSB No. 00165
E-mail: brenna@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

David VanSpeybroeck, OSB No. 954440
E-mail: david. vanspeybroeck@bullivant.com
Susan L. Ford, OSB No. 970362
E-mail: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower, 888 SW Fifth Avenue
Portland, OR 97204-2089
Telephone:  (503) 228-6351; Fax:  (503) 295-0915
Attorneys for Defendant, ADVANCED ENERGY SYSTEMS LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | Case No. CV 08-00148-AA |
| Plaintiff, | **JOINT NOTICE OF PARTIAL DISMISSAL** |
| v. | |
| SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, | <u>PATENT CASE</u> |
| Defendants. | |

## <u>NOTICE</u>

SunPower Corporation, Systems ("Plaintiff") notifies the Court that the underlying matter

PAGE 1 – JOINT NOTICE OF PARTIAL DISMISSAL

as to Advanced Energy Systems LLC ("AES") has been settled pursuant to a confidential

settlement agreement between Plaintiff and AES. Pursuant to FRCP 41(a)(1), claims against

Defendant AES should be dismissed with prejudice.

Dated: 3-20-08

Susan D. Pitchford, OSB No. 98091
Brenna K. Legaard, OSB No. 00165
Of Attorneys for Plaintiff,
SUNPOWER CORPORATION, SYSTEMS

Dated: 3-20-08

David VanSpeybroeck, OSB No. 954440
Susan L. Ford, OSB No. 970362
Of Attorneys for Defendant,
ADVANCED ENERGY SYSTEMS LLP

PAGE 2 – JOINT NOTICE OF PARTIAL DISMISSAL

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for SunLink Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>            Plaintiff,<br><br>   vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>           Defendants. | Case No.: 08-CV0148 AA<br><br>**ANSWER AND COUNTERCLAIMS BY SUNLINK CORPORATION AND DEMAND FOR JURY TRIAL** |

Defendant SunLink Corporation ("SunLink") hereby answers Plaintiff SunPower Corporation, Systems' ("SunPower) Complaint for Patent Infringement ("Complaint") as follows:

## THE PARTIES

1.    SunLink admits on information and belief that SunPower Corporation, Systems is incorporated under the laws of the state of Delaware, and has a regular and established place of business at 1414 Harbor Way South, Richmond, California 94804.

2.    SunLink admits that it is incorporated under the laws of the state of Delaware.  SunLink denies the remaining allegations contained in Paragraph 2 of the Complaint.

3.    SunLink admits that Advanced Energy Systems LLC ("AES") is organized under the laws of the state of Oregon.  Plaintiff has filed a notice of dismissal of all claims against AES with prejudice pursuant to a confidential settlement agreement. Accordingly, no case or controversy exists against AES.  On that basis, SunLink denies the remaining allegations contained in Paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.    SunLink admits the allegations of Paragraph 4 of the Complaint.

5.    Plaintiff has filed a notice of dismissal of all claims against AES with prejudice pursuant to a confidential settlement agreement.  Accordingly, no case or controversy exists against AES.  On that basis, SunLink denies the allegations contained in Paragraph 5 of the Complaint.

6.    SunLink admits that this Court has personal jurisdiction over SunLink. SunLink denies the remaining allegations contained in Paragraph 6 of the Complaint.

7.     SunLink admits the allegations of Paragraph 7 of the Complaint. Pursuant to its motion filed herewith, however, SunLink respectfully requests that this Court transfer this action to the Northern District of California for the convenience of parties, witnesses and in the interest of justice. 28 U.S.C. § 1404(a).

## GENERAL ALLEGATIONS

8.     SunLink admits that the SunLink™ PV Module Mounting System is SunLink's product. SunLink further admits that SunLink™ PV Module Mounting System may be installed on building roofs. SunLink denies the remaining allegations contained in Paragraph 8 of the Complaint.

9.     SunLink admits that it manufactures the SunLink™ PV Module Mounting System. SunLink further admits that it offers to sell the SunLink™ PV Module Mounting System throughout the United States. SunLink denies the remaining allegations contained in Paragraph 9 of the Complaint.

10.     Plaintiff has filed a notice of dismissal of all claims against AES with prejudice pursuant to a confidential settlement agreement. Accordingly, no case or controversy exists against AES. On that basis, SunLink denies the allegations contained in Paragraph 10 of the Complaint.

## FIRST CAUSE OF ACTION

### INFRINGEMENT OF U.S. PATENT NO. 5,505,788

11.     SunLink incorporates, by reference, its responses in each of the preceding paragraphs.

12.     SunLink admits that United States Patent No. 5,505,788 (the "'788 patent") issued on April 9, 1996, and that a copy of the '788 patent, entitled "Thermally

regulated photovoltaic roofing assembly" is attached as Exhibit A to the Complaint.

SunLink is without knowledge or information sufficient to form a belief as to the truth of

the remaining allegations contained in Paragraph 12 of the Complaint, and on that basis,

denies each and every remaining allegation.

13.    SunLink denies the allegations contained in Paragraph 13 of the

Complaint.

14.    SunLink admits SunPower's predecessor, PowerLight, sent a letter dated

February 7, 2006 to John Eastwood that mentioned the '788 patent. Sunlink further

admits that John Eastwood is presently the Chairman and CFO of SunLink. SunLink

denies the remaining allegations contained in Paragraph 14 of the Complaint.

15.    SunLink denies the allegations contained in Paragraph 15 of the

Complaint.

16.    SunLink denies the allegations contained in Paragraph 16 of the

Complaint.

## SECOND CAUSE OF ACTION

### INFRINGEMENT OF U.S. PATENT NO. RE38,988

17.    SunLink incorporates by reference its responses in each of the preceding

paragraphs.

18.    SunLink admits that United States Patent No. RE38,988 (the "'988

patent") issued on February 28, 2006, and that a copy of the '988 patent, entitled

"Lightweight, self-ballasting photovoltaic roofing assembly" is attached as Exhibit B to

the Complaint. SunLink is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in Paragraph 18 of the Complaint, and on that basis, denies each and every remaining allegation.

19.    SunLink denies the allegations contained in Paragraph 19 of the Complaint.

20.    SunLink admits SunPower's predecessor, PowerLight, sent a letter dated February 7, 2006 to John Eastwood that mentioned the '988 patent. Sunlink further admits that John Eastwood is presently the Chairman and CFO of SunLink. SunLink denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.    SunLink denies the allegations contained in Paragraph 21 of the Complaint.

22.    SunLink denies the allegations contained in Paragraph 22 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    SunPower has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

2.    SunLink has not directly infringed and is not directly infringing any of the claims of the '788 patent and/or the '988 patent, either literally or by the doctrine of equivalents, and has not induced or contributed to any activities of another which could possibly constitute an infringement of any of the claims of the '788 patent or the '988 patent. In view of the limitations of the claims, the prior art pertaining to the subject matter of said patents, and the amendments and statements made in the prosecution of said patents, the claims thereof cannot be interpreted to cover any product made, used or

sold by, or any method steps performed by SunLink.

### THIRD AFFIRMATIVE DEFENSE

3.    SunLink has not indirectly infringed and is not indirectly infringing any of the claims of the '788 patent and/or the '988 patent, either by contributory infringement or inducing infringement.  The products made, used or sold by SunLink are staple articles and/or commodities of commerce suitable for substantial noninfringing use.

### FOURTH AFFIRMATIVE DEFENSE

4.    The '788 patent and the '988 patent are invalid and/or unenforceable for failure to meet the requirements of the patent statutes set forth in Title 35 of the United States Code, including Sections 101, 102, 103 and/or 112 thereof.

### FIFTH AFFIRMATIVE DEFENSE

5.    Upon information and belief, SunPower's claims are barred by the reverse doctrine of equivalents.

### SIXTH AFFIRMATIVE DEFENSE

6.    SunPower's claims are barred from any recovery or any relief due to laches and estoppel.

### <u>COUNTERCLAIMS</u>

Defendant/Counterclaimant SunLink Corporation ("SunLink") hereby counterclaims against Plaintiff/Counterclaim Defendant SunPower Corporation, Systems ("SunPower") as follows:

### PARTIES

1.    SunLink is a Delaware corporation with its principal place of business in San Rafael, California.

6 - SUNLINK CORPORATION ANSWER AND COUNTERCLAIMS
    AND DEMAND FOR JURY TRIAL

2.    SunLink is informed and believes and thereon alleges that SunPower is incorporated under the laws of the state of Delaware, and has a regular and established place of business at 1414 Harbor Way South, Richmond, California 94804.

## JURISDICTION

3.    SunLink's counterclaims arise under the patent laws of the United States, Title 35 of the United States Patent Code, and the declaratory judgment provisions of Sections 2201 and 2202 of Title 28 of the United States Code.  The Court's jurisdiction over the subject matter of these Counterclaims is based on 28 U.S.C. Sections 1331, 1367(a), 1338(a), 2201 and 2202.

## VENUE

4.    Venue is currently the subject of SunLink's motion to transfer filed herewith.  Venue in the Northern District of California is proper under the provisions of 28 U.S.C. Sections 1391(b) and 1400(b).

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment of Non-Infringement of United States Patent No. 5,505,788)**

5.    SunLink repeats and realleges each and every allegation in the foregoing Paragraphs as though fully set forth herein.

6.    SunPower has alleged that it is the owner of United States Patent No. 5,505,788 (the "'788 patent") and that SunLink has infringed and is infringing one or more claims of that patent.

7.    SunLink has not infringed and is not now infringing, either directly, contributorily, or through inducement, any asserted claims of the '788 patent.

8.      As a result of SunPower's actions and statements, including the filing of this action, an actual controversy now exists between the parties regarding the alleged infringement by SunLink of any asserted claims of the '788 patent.

9.      SunLink is entitled to a declaration that it has not infringed and does not infringe any asserted claims of the '788 patent asserted by SunPower in this action.

WHEREFORE, SunLink prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Invalidity of '788 Patent)

10.     SunLink repeats and realleges each and every allegation in the foregoing Paragraphs as though fully set forth herein.

11.     SunLink is informed and believes and thereon alleges that any and all claims of the '788 patent asserted by SunPower in this action are invalid and unenforceable because the alleged invention claimed in that patent fails to satisfy requirements of the patent statutes set forth in Title 35 of the United States Code, including Sections 101, 102, 103 and/or 112.

12.     As a result of SunPower's actions and statements, including the filing of this action, an actual controversy now exists between the parties regarding the validity and enforceability of the asserted claims of the '788 patent.

13.     SunLink is entitled to a declaration that any and all claims of the '788 patent asserted by SunPower in this action are invalid and unenforceable.

WHEREFORE, SunLink prays for relief as set forth below.

## THIRD CLAIM FOR RELIEF

### (Declaratory Judgment of Non-Infringement of United States Patent No. RE38,988)

14.     SunLink repeats and realleges each and every allegation in the foregoing Paragraphs as though fully set forth herein.

15.     SunPower has alleged that it is the owner of United States Patent No. RE38,988 (the "'988 patent") and that SunLink has infringed and is infringing one or more claims of that patent.

16.     SunLink has not infringed and is not now infringing, either directly, contributorily, or through inducement, any asserted claims of the '988 patent.

17.     As a result of SunPower's actions and statements, including the filing of this action, an actual controversy now exists between the parties regarding the alleged infringement by SunLink of any asserted claims of the '988 patent.

18.     SunLink is entitled to a declaration that it has not infringed and does not infringe any asserted claims of the '988 patent asserted by SunPower in this action.

WHEREFORE, SunLink prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment of Invalidity of '988 Patent)

19.     SunLink repeats and realleges each and every allegation in the foregoing Paragraphs as though fully set forth herein.

20.     SunLink is informed and believes and thereon alleges that any and all claims of the '988 patent asserted by SunPower in this action are invalid and unenforceable because the alleged invention claimed in that patent fails to satisfy

requirements of the patent statutes set forth in Title 35 of the United States Code, including Sections 101, 102, 103 and/or 112.

21.    As a result of SunPower's actions and statements, including the filing of this action, an actual controversy now exists between the parties regarding the validity and enforceability of the asserted claims of the '988 patent.

22.    SunLink is entitled to a declaration that any and all claims of the '988 patent asserted by SunPower in this action are invalid and unenforceable.

WHEREFORE, SunLink prays for relief as set forth below.

## PRAYER FOR RELIEF

1.    An order dismissing SunPower's Complaint For Patent Infringement with prejudice and denying all relief requested therein.

2.    Judgment in favor of SunLink and against SunPower on all of SunPower's claims asserted in the Complaint For Patent Infringement.

3.    A judgment declaring that SunLink has not infringed and does not infringe, either directly, indirectly, contributorily, or through inducement, any of the claims of the '788 patent and the '988 patent asserted by SunPower in this action.

4.    A judgment declaring that the claims of the '788 patent and the '988 patent asserted by SunPower in this action are invalid, void, unenforceable, and without force and effect.

5.    A judgment declaring that this action is an exceptional case within the provisions of 35 U.S.C. Section 285 entitling SunLink to an award of its reasonable attorneys' fees and costs.

6.    That SunLink be awarded such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Defendant and Counterclaimant SunLink Corporation hereby demands a jury trial as to all such triable issues in this action.

DATED this the 25th day of March, 2008.

/s/ Morgan W. Tovey
Morgan W. Tovey (*pro hac vice*)
Email:  *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Telephone:      +1 415 543 8700
Facsimile:      +1 415 391 8269

Randolph C. Foster (OSB No. 784340)
Email:  *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480

Of Attorneys for Defendant
SunLink Corporation

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **ANSWER AND COUNTERCLAIMS BY SUNLINK CORPORATION AND DEMAND FOR JURY TRIAL** on the following named person(s) on the date indicated below by

- ☐ mailing with postage prepaid
- ☒ electronic delivery (pdf)
- ☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:    *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Defendant and Counterclaimant
SunLink Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>          Defendants. | Case No.: 08-CV0148 AA<br><br>**SUNLINK CORPORATION'S CORPORATE DISCLOSURE STATEMENT** |

Pursuant to Federal Rule of Civil Procedure 7.1, SunLink Corporation certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.


DATED this the 25th day of March, 2008.


/s/ Morgan W. Tovey
Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269


Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480


Of Attorneys for Defendant
SunLink Corporation

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **SUNLINK CORPORATION'S CORPORATE DISCLOSURE STATEMENT** on the following named person(s) on the date indicated below by

    ☐   mailing with postage prepaid

    ☒   electronic delivery (pdf)

    ☐   overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:    *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Defendant and Counterclaimant
SunLink Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>                    Plaintiff,<br><br>    vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>                    Defendants. | Case No.: 08-CV0148 AA<br><br>**SUNLINK CORPORATION'S NOTICE OF MOTION AND MOTION TO TRANSFER**<br>**EXPEDITED HEARING REQUESTED** |

Pursuant to Civil Local Rule 7.1(a)(1), Defendant and Counterclaimant SunLink Corporation ("SunLink") hereby certifies that the parties have made a good faith effort through telephone conference to resolve the dispute presented in this motion and have been unable to do so.

Accordingly, please take notice that SunLink will move and hereby does move this Court pursuant to 28 U.S.C. section 1404(a) for an Order transferring this case to the United States District Court for the Northern District of California. In addition, Sunlink hereby requests, pursuant to Civil Local Rule 7.1(f), an expedited hearing on its motion.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed in support of this Motion, the Declaration of Chris Tilley, the Declaration of Morgan Tovey, the pleadings and record in this case and any further evidence or argument provided at the hearing, if any, on this matter.

DATED this the 25th day of March, 2008.

/s/ Morgan W. Tovey
Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Of Attorneys for Defendant
SunLink Corporation

2 - SUNLINK CORPORATION'S
NOTICE OF MOTION AND MOTION TO TRANSFER
EXPEDITED HEARING REQUESTED

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **SUNLINK CORPORATION'S**

**NOTICE OF MOTION AND MOTION TO TRANSFER - EXPEDITED**

**HEARING REQUESTED** on the following named person(s) on the date indicated

below by

☐ mailing with postage prepaid

☒ electronic delivery (pdf)

☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said

person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:      *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:      *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Defendant and Counterclaimant
Sunlink Corporation

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>Defendants. | Case No. 08-CV0148 AA<br><br>**SUNLINK CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER** |

# I. .    PRELIMINARY STATEMENT

Although styled as a Complaint for patent infringement, this action is more accurately characterized as a case about competition.  Specifically, this action involves a large, publicly traded company's attempt to stifle innovation and squelch competition by asserting two dubious patents -- in a distant forum -- against a technically superior, but much smaller, start-up company.  Rather than competing in the marketplace, SunPower Corporation, headquartered in San Jose, California, through its wholly owned, Richmond, California-based subsidiary, SunPower Corporation, Systems (collectively, "SunPower"), invites the Court to enjoin legitimate competition by SunLink Corporation ("SunLink"), a start-up company that is also headquartered in the San Francisco Bay Area.  In a thinly-veiled effort to raise the stakes and concomitant high costs of patent litigation, SunPower eschewed the obvious choice of forum – the United States District Court for the Northern District of California – where both parties reside and most, if not all, of the material witnesses and documents are located, by invoking this Court's jurisdiction.

SunPower attempted to legitimize its geographically curious choice of forum by also joining – at least initially – a local company, Defendant Advanced Energy Systems ("AES"), an Oregon limited liability company headquartered in Eugene.  In joining AES, one of SunLink's customers and installers of the accused device, SunPower also upped the competitive ante by attempting to drive a wedge between SunLink and AES.  Then, no sooner had the Court issued a partial pretrial scheduling order and just before SunLink's response to the Complaint was due, SunPower promptly filed a Notice of Voluntarily Dismissal with Prejudice of its claims against AES pursuant to a secret settlement agreement.

With no nexus either to the remaining parties or to the facts underlying the dispute, the

Court is empowered under 28 U.S.C. Section 1404 to transfer the action to a more geographically logical venue – the United States District Court for the Northern District of California (the "Northern District of California" or "the proposed transferee Court"). The proposed transferee Court is not only a venue in which the action "could have been brought," the private interest factors relating to the convenience of the parties and the witnesses as well as the public interest factors relating to the interests of justice, militate in favor of granting the motion to transfer. Because SunLink, as a small, start-up company, has no interest in delaying the ultimate resolution of this matter on its merits, SunLink respectfully requests that the Court consider – and grant – this motion on an expedited basis.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties

Defendant Sunlink is a privately held start-up company with its *only* places of business in San Rafael, CA and Livermore, CA – locales within the boundaries of the Northern District of California. [Declaration of Chris Tilley ("Tilley Decl.") ¶ 2.] SunLink designs, manufactures and markets advanced engineered, environmental-friendly, and cost-effective assemblies for deploying and integrating solar electric (also known as "photovoltaic" or "PV") systems for commercial, flat rooftop and ground mounted applications. [*Id.* ¶ 4.] SunLink currently sells only one product – the product accused of infringement – the SunLink™ PV Module Mounting System (the "PV MMS"). [*Id.*] SunLink usually markets and sells the accused product to system integrators or installers. Exactly half of SunLink's sales of the accused device have occurred in California. [*Id.*] SunLink sold only 8, or 3.5 percent of its sales on a gross revenue basis, for installation in Oregon. [*Id.*] SunLink sold all 8 of those units intended for Oregon to

its installer/customer – and former Co-Defendant – AES. [*Id.*]

Plaintiff SunPower Corporation, Systems, a wholly-owned subsidiary of SunPower Corporation, a publicly traded, Delaware corporation with its principal place of business within the boundaries of the Northern District of California, is the successor-in-interest to PowerLight Corporation. [Docket No. 1 (Complaint) ¶ 14, 19; Docket No. 2 (Corporate Disclosure Statement.] PowerLight was founded by Thomas Dinwoodie, the named inventor on both of the SunPower asserted patent and the current Chief Technology Officer of SunPower. [Declaration of Morgan Tovey ("Tovey Decl.") ¶ 11.c.] Less than two months ago, on February 5, 2008, SunPower initiated this action by filing a Complaint alleging infringement of two patents, U.S. patent nos. 5,505,788 (the "'788 patent") and RE38,988 (the "RE'988 patent) by SunLink and its customer, AES, relating to the manufacture, sale and installation of SunLink's PV Module Mounting System. [Docket No. 1.]

SunPower seeks to enjoin SunLink from competing in the burgeoning market for providing green, alternative energy sources, particularly for commercial buildings. In particular, SunPower seeks to monopolize the market by asserting two patents that describe and claim PV modules and assemblies that are radically different from the accused product and by attempting to wage a war of attrition against its fledgling competitor by litigating its claims in a distant forum. Recognizing the inherent weakness in its claims, SunPower has studiously avoided litigating in any forum that would require the plaintiff to detail its infringement allegations at an early stage of the litigation. At the end of the day, depending on how SunPower tries to read its claims on the accused products, the asserted claims are either not infringed, invalid or both.

**B.    While The Case Is In Its Infancy, SunPower Dismisses AES**

This litigation is less than two months old and remains in its infancy. Approximately

three weeks after filing its Complaint, in a letter dated, February 25, 2008, SunPower "tentatively" identified for the first time which of the approximately 120 claims contained in the two patents it intends to assert in this matter: claim 1 of the '788 patent and claims 36 and 55 of the RE'988 patent. [Tovey Decl., Exh. I.] Notably, SunPower sued both SunLink and one of SunLink's customers/installers, AES, and although the two patents contain both apparatus and method of installation claims, SunPower asserts only apparatus claims. [*Id.*] Thus, even before dismissing its claims against AES, SunPower signaled that it apparently never intended to proceed against AES for alleged direct infringement of the method of installation claims in the asserted patents.

After counsel for SunPower, SunLink and AES met to discuss discovery limitations and pretrial scheduling, on March 13, 2008, the parties submitted a joint report of the parties' initial planning meeting. The parties also concurrently agreed to waive Rule 26 initial disclosures. [Docket Nos. 18-19.] The same day, the parties exchanged initial sets of written discovery requests. Four days later, on March 17, 2008, the Court issued a partial scheduling order. [Docket No. 20.] The Court deferred setting dates for a summary judgment hearing, a pretrial conference and for trial. [*Id.*] The parties have yet to exchange discovery responses or agree on the form of a proposed protective order governing the exchange of competitively sensitive and proprietary information. [Tovey Decl., Exh. C.]

Just three days after the Court entered its partial scheduling order, SunPower dismissed with prejudice its claims against AES pursuant to Federal Rule of Civil Procedure 41(a)(1). [Docket No. 24.] SunPower appears to have pointedly sandwiched its dismissal between the Court's partial scheduling order and the deadline for SunLink's responsive pleading five days later. Specifically, SunPower filed its notice of dismissal late in the afternoon of Thursday,

5- SUNLINK CORPORATION'S MEMORANDUM OF POINTS
  AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER

March 20, 2008, on the eve of a holiday weekend. [*Id.*] SunLink learned about the dismissal for the first time through the Court's Electronic Case Filing System sometime after 4:30 pm that afternoon.

## C.    SunPower Refuses To Stipulate To Transfer To The Northern District of California

As soon as SunLink learned that Plaintiff had moved to dismiss, pursuant to a secret settlement agreement, its claims against AES – the party providing the sole nexus to this forum – SunLink attempted to secure SunPower's stipulation to transfer the action to a more convenient and logical forum. [Tovey Decl. ¶¶ 3-9.] SunPower has, however, steadfastly refused to stipulate to transfer the action. [Tovey Decl. ¶ 10.]

Because the remaining parties, Plaintiff SunPower and Defendant SunLink, both maintain their principal places of business in the San Francisco Bay Area, SunLink proposed that the parties stipulate to transfer the action to the United States District Court for the Northern District of California. [Tilley Decl. ¶ 2; Tovey Decl. ¶¶ 3, 11.d.] Indeed, the proposed transferee Court is not only a venue in which the case "could have been brought," it is the most logical for multiple reasons. In addition to being the "home court" for *both* parties, most, if not all, of the key witnesses and material documents relative to conception, reduction to practice and sales of the alleged commercial embodiments of the asserted patents and development and sales of the accused device are located within the Northern District of California. [Tilley Decl. ¶¶ 3-6; Tovey Decl. ¶ 11.] Despite the obvious convenience to both parties and the key witnesses, Plaintiff refused to stipulate to transfer the action to a more geographically logical venue. [Tovey Decl. ¶ 10.] Indeed, during SunLink's multiple attempts to engage in a meaningful meet and confer discussion, Plaintiff steadfastly refused to stipulate either to expedite the resolution of the proposed motion or to stipulate to a mutually convenient briefing schedule. [*Id.*]

### III.   LEGAL ANALYSIS

**THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA**

**A.   The District Court Has Wide Discretion To Transfer A Case To Another Forum As A Matter Of Convenience For the Parties And Witnesses.**

This Court enjoys vast discretion under 28 U.S.C. Section 1404(a) to transfer civil action to any other district where the action may have been brought initially, as a matter of convenience for the parties and witnesses, and to further the interests of justice. *See Gulf Oil v. Gilbert*, 330 U.S. 501, 507 (1947) (*superseded on other grounds*); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986); *Wright v. Jack Hozack Co., Inc.*, 2000 WL 1721143, *4 (D. Or. Nov. 13, 2000) (granting motion to transfer to Western District of Washington where evidentiary sources and most witnesses resident in Washington). Section 1404(a) was enacted to allow "easy change of venue" and "reflects an increased desire to have federal suits tried in the federal system at a place called for in the particular case by considerations of convenience and justice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981); *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

A defendant requesting a transfer pursuant to Section 1404(a) must meet two threshold requirements. First, defendant must show that the transferee Court, in this case the Northern District of California (the "transferee Court") is one in which the action could have been commenced originally. *Van Dusen*, 376 U.S. at 634. In the instant case, SunLink must show that the transferee Court would have had subject matter jurisdiction, SunLink would have been subject to *personal jurisdiction* in the transferee Court, and venue would have been proper had

the case originally been filed in the transferee Court. *Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985), *cert. denied*, 474 U.S. 1021 (finding that transfer was proper when action properly could have been brought in transferee Court).

Second, defendant must show that transfer would result in greater convenience of the parties and witnesses, as well as be in the interest of justice. 28 U.S.C. § 1404(a); *Van Dusen*, 376 U.S. at 615. The court must balance the preference given to the plaintiff's choice of forum with the burden of litigating in an inconvenient forum. *Telephone Management Corp. v. Goodyear Tire & Rubber Co.*, 5 F.Supp.2d 896, 897 (D. Or. 1998) (citing *Decker Coal Co.*, 805 F.2d at 843. Accordingly, the court should consider a variety of additional factors, including the "public and private interest" factors pertinent to common law *forum non conveniens* motions. *Id.* at 897; *International Marketing Ltd. v. Archer Daniels Midland Co.*, 1998 WL 1180157, *14 (D. Or. April 10, 1998).)[1]

Here, as discussed more fully below, SunPower could have commenced the action in the transferee Court originally because subject matter jurisdiction is appropriate, the parties are subject to personal jurisdiction in the proposed transferee Court, and because venue is proper. Moreover, virtually every factor favors or strongly favors transfer to the proposed transferee Court. One of the factors is neutral, but none favors maintaining the action in the District of Oregon.

---

[1]    The Federal Circuit has held that the law of the appropriate regional circuit governs motion to transfer a patent infringement action. *See Storage Technology Corp. v. Cisco Systems, Inc.,* 329 F.3d 823, 836 (Fed. Cir. 2003). Thus, Ninth Circuit law governs.

8- SUNLINK CORPORATION'S MEMORANDUM OF POINTS
   AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER

**B.    The Action Could Have Been Brought In The Northern District Of California**

SunPower cannot credibly dispute that this action could have been brought in the proposed transferee Court.  The venue statute for patent cases provides that a patent infringement action may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.  *See* 28 U.S.C. § 1400(b).  The Federal Circuit has held that the general venue statutes extend venue in a patent infringement case to include any district where there would be personal jurisdiction over the corporate defendant at the time the action is commenced.  *Arete Power, Inc. v. Beacon Power Corp.*, 2008 WL 508477 (N.D.Cal. Feb. 22, 2008); citing *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1583 (Fed. Cir. 1990).[2]

In this case, SunPower readily concedes in its Complaint for patent infringement that SunLink (the sole existing Defendant) is headquartered in Northern California.  [Docket No. 1.]  Thus, this action "could have been brought" in the transferee Court, and remains proper in the proposed transferee Court.

**C.    The Convenience Of The Parties And Witnesses And The Interests of Justice Weigh Heavily In Favor Of Transfer To The Northern District of California**

Where, as here, an action "could have been brought" in the proposed transferee forum,

---

[2]      The former co-Defendant AES is irrelevant for the purpose of this analysis.  A transfer pursuant to Section 1404(a) may be granted where defendants as to whom venue would *not* be proper in the transferee Court have settled or been dismissed from the action.  Because settling and dismissed defendants are *no longer parties to the action*, it is immaterial that they could have objected to improper venue.  Under such circumstances, the court "is not required to confine its venue consideration to the facts as they existed at the time of the complaint."  *In re Fine Paper Antitrust Litig.* 685 F2d 810, 819 (3rd Cir. 1982).  However, even if AES were considered, the action could have been brought originally in the transferee Court because AES is likely subject to personal jurisdiction there by entering into a contract with SunLink, a company based in Northern California, to purchase and install the allegedly infringing assembly.  [Tilley Decl. ¶ 4.]

courts next evaluate whether transfer of the action serves the private and public interest factors

under the Ninth Circuit's multi-factor approach. The courts evaluate each of the factors listed in

Section 1404(a) (*that is,* (1) the convenience of parties; (2) the convenience of witnesses; and (3)

the interests of justice) and the following additional private factors:

> the relative ease of access to sources of proof; availability of compulsory process
> for attendance of unwilling, and the cost of obtaining attendance of willing,
> witnesses; possibility of view of premises, if view would be appropriate to the
> action; and all other practical problems that make trial of a case easy, expeditious
> and inexpensive....[The Court will weigh] relative advantages and obstacles to fair
> trial. *Los Angeles Memorial Coliseum Commission v. National Football League,*
> 89 F.R.D. 497, 499 (C.D. Cal. 1981), aff'd,726 F.2d 1381 (9th Cir. 1984); *see also*
> *Decker Coal Co.,* 805 F.2d at 843.

In addition, the courts may also consider other "public interest factors of systemic

integrity and fairness." *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 499 n. 21 (9th Cir. 2000)

In an earlier opinion, the Ninth Circuit recognized other public factors that could be weighed in

determining a transfer motion:

> the administrative difficulties flowing from court congestion; the local interest in
> having localized controversies decided at home; the interest in having the trial of
> a diversity case in a forum that is at home with the law that must govern the
> action; the avoidance of unnecessary problems in conflict of laws, or in the
> application of foreign law; and the unfairness of burdening citizens in an
> unrelated forum with jury duty. *Decker Coal,* 805 F.2d at 843.

Notably, not all of these factors carry the same weight. Because the most important of

these factors – the convenience of the parties and the convenience of witnesses – favor transfer

and because the remaining private and public interest factors either favor transfer or are neutral,

the Court should grant SunLink's motion to transfer.

## 1.     SunPower's Choice of Forum Is Entitled To Little Or No Weight

Under Section 1404(a) and the Ninth Circuit's multi-factor approach for evaluating

whether a case should be transferred for the "convenience of the parties and witnesses and in the

interests of justice," courts first assess the plaintiff's choice of forum. In most cases, a court should give a plaintiff's choice of forum great deference, and transfer is generally appropriate only where the defendant can show that other factors of convenience clearly outweigh the plaintiff's choice of forum. This case, however, is *not* typical. Indeed, because neither SunPower nor SunLink resides in this judicial district, Plaintiff's choice of forum is entitled to little, if any, weight.

It is well-settled that, "in contrast to the strong presumption in favor of a domestic plaintiff's forum choice, "a foreign plaintiff's choice deserves less deference." *Ravelo Monegro v. Rosa,* 211 F.3d 509, 513 (9th Cir. 2000) (citing *Piper Aircraft v. Reyno,* 454 U.S. 235, 256 (1981)). "The policy behind not deferring to a nonresident plaintiff's choice of venue appears tied into the notion that plaintiffs should be discouraged from forum shopping." *Williams v. Bowman,* 157 F.Supp.2d 1103, 1107 (N.D. Cal. 2001) (granting motion to transfer from the Northern District of California where plaintiff was non-resident and key facts did not take place there). Additionally, a plaintiff's choice of forum is afforded less deference when the facts giving rise to the action have little connection to the forum of original selection. *Pacific Car and Foundry Co. v. Pence,* 403 F.2d 949, 954 (9th Cir. 1968) ("If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration.") (footnote omitted). Not surprisingly, as deference to a plaintiff's choice of forum decreases, a defendant's burden to upset the plaintiff's choice of forum also decreases. *Chodock v. Am. Econ. Ins. Co.,* 2005 WL 2994451, *3 (D. Ariz. 2005).

Here, as noted above, SunPower's choice of forum is not entitled to deference for two dispositive reasons. First, SunPower (like SunLink, the only other remaining party) does not

reside in Oregon. [Docket No. 1 (Complaint) ¶ 2 (SunPower is "incorporated under the laws of the state of Delaware, and has a regular and established place of business at 1414 Harbor Way South, Richmond, California 94804.")] Second, key operative facts relating to SunPower's patent infringement allegations, including SunPower's conception, reduction to practice and marketing of the purported commercial embodiments of the asserted patents as well as the design, development and marketing of the accused device occurred within the judicial district of the proposed transferee Court. [Tilley Decl. ¶¶ 3-6; Tovey Decl. ¶ 11.]

Given the obvious nexus between the parties and operative facts on one hand and the proposed transferee Court on the other, Plaintiff's refusal to stipulate to transfer the action confirms what SunLink suspected all along: Plaintiff joined Co-Defendant AES solely to justify its choice of forum. The suspicious timing of SunPower's motion to dismiss its claims against AES –shortly after the Court issued a partial, pretrial scheduling order and just before SunLink's response to the Complaint was due – also strongly suggests that Plaintiff intended all along to join AES only temporarily and solely to try to justify its forum shopping.

Accordingly, SunPower's thinly-veiled and improper attempt to forum shop negates any of the deference typically afforded to a plaintiff's choice of venue. In short, in balancing the factors pertinent to a Section 1404(a) transfer motion, SunPower's choice of forum should be given zero weight.

## 2.    The Northern District of California Is More Convenient For Both Parties

While it is settled that a court should not transfer a case simply to shift the burden from one party to another, *Decker Coal Co.,* 805 F.2d at 843, here, the balance of the remaining private and public interest factors weigh heavily in favor of transfer. Indeed, granting SunLink's motion to transfer would *not* improperly shift the burden from Defendant to Plaintiff, because the

proposed transferee Court is objectively more convenient for *both* parties.

For SunLink, the costs and inconvenience of testifying and attending trial in the District of Oregon would create an enormous hardship. [Tilley Decl. ¶ 7.] Specifically, the costs of litigating in an out-of-state forum for a small company, like SunLink, are unduly burdensome because of the opportunity costs associated with diverting the attention of officers and employees from the tasks associated with running and growing a start-up enterprise. [*Id.*]

Moreover, transfer to the Northern District of California does not appear to create any genuine burdens for SunPower. Plaintiff SunPower Corporation, Systems is headquartered in the San Francisco Bay Area in Richmond, California. [Docket No. 1 (Complaint) ¶ 2.] As noted above, Plaintiff is wholly owned by SunPower Corporation, a large, publicly traded company that is headquartered in San Jose California, also within the Northern District of California. [Docket No. 2; Tovey Decl. ¶ 11.d.] Accordingly, notwithstanding its refusal to stipulate to a transfer, SunPower cannot seriously dispute that it would be more convenient for both parties to litigate this dispute in the proposed transferee Court.

**3.     The Northern District Of California Is More Convenient Than This Forum For Witnesses**

When balancing the private interest factors relative to convenience, courts also consider the convenience to potential witnesses. To that end, the Court should consider not only how many witnesses each side may have, but also the relative importance of their testimony. *Amazon.com v. Cendant Corp.*, 404 F.Supp.2d 1256, 1260 (W.D. Wash. 2005) (convenience of the most important lay and expert witnesses to the asserted patent and the accused device favored transfer).

In this case, most, if not all, of the currently known witnesses[3] reside in California. Members of SunLink's executive team who are most knowledgeable concerning the technical and financial aspects of the accused PV Module Mounting System include Christopher Tilley, CEO, and Robert Miros, Vice President of Product Design. [Tilley Decl. ¶ 3; Tovey Decl. ¶¶ 11.a; 11.b.] Both Messrs Tilley and Miros are expected to testify in this matter, and both reside in the San Francisco Bay Area. [Tovey Decl. ¶¶ 11.a; 11.b.] Further, two individuals involved in the design and development work for SunLink and its predecessors, Messrs. Michael Huber and Michael Bowler, are no longer employed or otherwise affiliated with SunLink. [Tilley Decl. ¶ 5.] Mr. Huber currently resides in Livermore, California in the San Francisco Bay Area. Mr. Bowler resides in Woodbridge, California, also located in Northern California but closer to Sacramento. [Id.] Accordingly, proceeding in this forum would be far less convenient for the party affiliated officers and employees and, as discussed below, may preclude live testimony from those witnesses who reside beyond the subpoena power of this Court.

With respect to key percipient witnesses who are employed by or otherwise associated with SunPower, the most important is Mr. Thomas Dinwoodie, the named inventor on both of the asserted patents. Mr. Dinwoodie also currently serves as Plaintiff's Chief Technology Officer. [Tovey Decl. ¶¶ 11.c.] According to the asserted patents, he is also resident near Oakland, California[4] in the San Francisco Bay Area. [Docket No. 1, Exhs. A, B.] In addition to Mr. Dinwoodie, the attorneys listed on the asserted patents as SunPower's prosecution attorneys

---

3    Because the case is less than two months old and the parties followed the Court's suggested practice of waiving Rule 26 Initial Disclosures, SunLink has not yet identified all of the percipient fact witnesses who may be required to testify in this matter.

4    One of the asserted patents lists Mr. Dinwoodie as a resident of Berkeley, CA and the other lists Mr. Dinwoodie as a resident of Piedmont, CA – both locales are near Oakland and both squarely fall within the judicial district of the proposed transferee court.

are with the Townsend law firm – a firm also based in the San Francisco Bay Area. [Tovey Decl., ¶ 11.d.] SunLink expects to present the testimony of various other witnesses employed by, or otherwise affiliated with, Plaintiff SunPower or its parent company [*Id.* ¶¶ 11.c., 11.d.] As noted above, SunPower's regular and established places of business, for both the Plaintiff and its sole shareholder and parent company, are located in the Northern District of California. Accordingly, transfer to the proposed transferee Court would be more convenient for these witnesses as well.

### 4.     Access to Proof Within The Northern District Of California Favors Transfer

With respect to the remaining private factors, in patent infringement actions, the preferred forum is "that which is the center of gravity of the accused activity." *Amazon.com,* 404 F.Supp.2d at 1260 (granting motion to transfer patent case to Delaware because the hub of allegedly infringing activity lied far to the east of Seattle), quoting *S.C. Johnson & Son, Inc., v. Gillette Co.,* 571 F.Supp. 1185, 1188 (N.D. Ill. 1983). The district court "ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production." *Id.*

The hub of activity here, as in most patent infringement actions, generally relates to the location of the proof, both oral and documentary, relating to not only the development and marketing of the accused device but also to the conception, development and marketing of the purported commercial embodiments of the alleged inventions described and claimed in the asserted patents. [Tilley Decl. ¶¶ 3-6; Tovey Decl. ¶ 11.] In this case, as discussed above, such sources of proof predominately reside in the San Francisco Bay Area.

5.     **Compulsory Process For Unwilling, Material Third Party Witnesses Is Available In The Northern District Of California, But Not In This Forum**

"The availability of compulsory process is significant for any non-party witnesses that may be unwilling to testify." *Hyundai Space & Aircraft Co. v. Boeing Co.*, No. C 99-3255 SI, 1999 WL 910131, *4 (N.D. Cal. Oct. 12, 1999). Here, at least two material witnesses, Messrs. Michael Huber and Michael Bowler, with personal knowledge of the development of the accused product are no longer employed by SunLink. Both of these potential third party witnesses reside in Northern California, outside this Court's compulsory process.[5]

Conversely, the only non-party witnesses identified by Plaintiff who fall within this Court's jurisdiction but who would not subject to compulsory process in the transferee Court are individuals employed by AES. More importantly, the only reason AES is a non-party is because SunPower voluntarily dismissed its claims against AES pursuant to a confidential settlement agreement. [*See* Tovey Decl. ¶ 3.] During the SunLink's attempt to resolve this motion informally, SunLink's counsel requested a copy of the settlement terms between SunPower and AES to determine whether the settlement required AES to cooperate with SunPower or at least respond to discovery requests from SunPower as if it were still a party. SunPower's counsel, however, refused to provide the settlement terms. [*Id.* ¶ 10.] Accordingly, SunPower should not be permitted to use its secret settlement agreement with AES as both a sword in opposing this motion to transfer and a shield from disclosing the nature of the resulting relationship between SunPower and AES or from disclosing AES' obligations pursuant to that settlement. In short,

---

5      As discussed above, Mr. Huber resides in Livermore, California, within the boundaries of the Northern District of California. Mr. Bowler resides in Woodbridge, California, closer to Sacramento.

the Court should neither reward nor condone SunPower's attempt to transmogrify a named party into a non-party for the purpose of inventing a witness convenient to this forum.

Accordingly, this factor also tips in favor of transfer to the Northern District of California.

### 6.    The Respective Case Management Statistics Of The Forums Are Neutral

As for the public interest factors, these either favor transfer or are neutral. For example, as measured by the most recent Federal Court Management Statistics, the respective case management statistics are neutral. Although the District of Oregon is less "congested" as measured by the number of pending cases, the median times for disposition and trial are less in the proposed transferee Court. Specifically, the number of pending cases per judgeship in the District of Oregon is approximately 527. In the Northern District of California, the number of pending cases per judgeship is approximately 643. [Tovey Decl., Exh. G.] Thus, this statistic slightly favors non-transfer.

On the other hand, both the median times from filing to disposition (6.7 months in the N.D. Cal compared to 10.1 month in the District of Oregon) and the median times from filing to trial (24.9 months in the N.D. Cal compared to 25 month in the District of Oregon) favor transfer. [*Id.*]

Accordingly, while the raw number of cases weighs slightly in favor of non-transfer, the interest in a speedy resolution to this dispute favors a transfer. Moreover, even if this factor balances in favor of transfer, it cannot overcome the convenience to the parties, witnesses and access to proof factors set forth above, nor the other public interest factors set forth below.

7.    **The Case Can Be Resolved Expeditiously And Inexpensively In The Northern District of California**

In addition to the cost savings accumulated by litigating this dispute in a forum that is close to home for the parties and non-party witnesses, this case can be resolved expeditiously and inexpensively in the transferee Court.  Specifically, the recent amendments to the Patent Local Rules for the transferee Court are designed to resolve patent cases as expeditiously and inexpensively as possible.  In October 2006, the transferee Court formed a subcommittee whose sole purpose was to study the Patent Local Rules with input from the community for the purpose of encouraging the speeding resolution of patent disputes.  The subcommittee's proposed modifications, which became effective March 3, 2008, are designed to update the rules to account for recent developments in the law and to reflect the accumulated experience of those working with patent local rules throughout the federal district courts.  [Tovey Decl., Exh. H.]

Moreover, because these specialized Local Rules "front load" and sequence each party's obligation to details its infringement and invalidity contentions, respectively, the parties may not defer until expert discovery to reveal its legal contentions – information that may facilitate an earlier disposition.  Through the same mechanisms, these specialized Local Rules for patent litigation also preclude "trial by ambush" tactics.  Accordingly, application of the rules of the proposed transferee court to this case should help the parties achieve a more expeditious and less expensive resolution of the dispute on its merits.

8.    **The Parties' Contacts With This Forum Are Attenuated And Favor Transfer**

Finally, the parties' respective contacts with this forum are, at most, attenuated.  This public interest factor, therefore, also favors transfer to the proposed transferee Court – a venue

where the parties both have substantial contacts. Since 2004, SunLink and its predecessors have sold approximately 170 of the accused assemblies in 18 different states and Canada. [Tilley Decl. ¶ 4.] Of these sales, SunLink sold 85 of them – exactly half – in California. [*Id.*] Of the remaining sales, the next largest market is in New Jersey, where 30 systems were sold. [*Id.*] On the other hand, only 3.5 percent of SunLink's sales on a gross revenue basis have been made for installations in Oregon. [*Id.*] Moreover, *all* of SunLink's sales (a total of eight) of the accused devices in Oregon were made to AES, a company that is now aligned with SunPower. [*See id.*] Accordingly, because this is not a local controversy, no particular public interest in litigating locally exists. Indeed, litigating this action in the District of Oregon would unnecessarily burden jurors with deciding a case that logically belongs in the Northern District of California. This factor also militates in favor of transfer.

## IV.   CONCLUSION

The Court possesses jurisdiction over both the subject matter and the parties, and venue is technically proper in this Court. Nonetheless, for the convenience of the parties and in the interests of justice, the Court should exercise its discretion under 28 U.S.C. Section 1404(a) to transfer the action to the United States District Court for the Northern District of California. Indeed, both the private and public interest factors enumerated by the Ninth Circuit for assessing whether transfer is appropriate under Section 1404(a) militate in favor of transfer. In sum, a stronger nexus exists between the proposed transferee Court and the dispute. Accordingly,

SunLink respectfully requests that the Court grant the motion to transfer the case to the United

States District Court for the Northern District of California.

DATED this the 25th day of March, 2008.

/s/ Morgan W. Tovey_____
Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269


Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Of Attorneys for Defendant
SunLink Corporation

DOCSSFO-12509832.5

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **SUNLINK CORPORATION'S**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

**TO TRANSFER** on the following named person(s) on the date indicated below by

    ☐  mailing with postage prepaid

    ☒  electronic delivery (pdf)

    ☐  overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said

person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.                STOEL RIVES LLP


Randolph C. Foster, OSB No. 78434
E-mail:     *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:     *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Sunlink Corporation

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, <br><br> Defendants. | Case No. 08-CV0148 AA <br><br> **DECLARATION OF MORGAN W. TOVEY IN SUPPORT OF SUNLINK CORPORATION'S MOTION TO TRANSFER** |

I, Morgan W. Tovey, declare:

1.      I am a partner of Reed Smith, LLP, lead counsel for Defendant SunLink Corporation ("SunLink") in this action. I am an attorney licensed to practice before all state and federal courts in California, and I have been admitted *pro hac vice* to appear on behalf of SunLink in this matter. I have personal knowledge of the matters stated in this Declaration and, if called as a witness, I could and would competently testify to them.

2.      Shortly after being retained by SunLink, a company based in the San Francisco Bay Area, to represent it in this action, I analyzed the choice of venue made by Plaintiff SunPower – another company headquartered in the San Francisco Bay Area. Because jurisdiction and venue were both technically proper in this Court and because Plaintiff also joined Advanced Energy Systems, LLC ("AES"), an Oregon company based in Eugene, as a party defendant, I concluded that moving to transfer the case, pursuant to 28 U.S.C. Section 1404(a), to another forum would likely be denied as merely shifting the inconvenience from one defendant, SunLink, to another defendant, AES.

3.      Sometime shortly after approximately 4:30 p.m. on March 20, 2008, I was first notified, through the Court's electronic filing system, that Plaintiff SunPower Corporation, Systems had filed a notice of voluntary dismissal with prejudice of its claims against the local co-Defendant, AES, pursuant to a confidential settlement agreement between those parties. As a result of the settlement and voluntary dismissal of claims against AES, I immediately re-evaluated whether SunLink should move, pursuant to 28 U.S.C. Section 1404(a), to transfer the action to the United States District Court for the Northern District of California. Within two hours of determining that all of the parties and most, if not all, of the key witnesses and material documents relative to conception, reduction to practice and sales of the alleged commercial

embodiments of the asserted patents and development and sales of the accused device are located within the judicial district of the proposed transferee Court, I attempted to contact Mr. Howard Pollack, lead counsel for SunPower, by telephone. I attempted to reach Mr. Pollack to determine whether (1) SunPower would stipulate to a transfer of the action, or (2) if SunPower declined to stipulate to a transfer, whether SunPower would stipulate to (a) extend the time for SunLink to respond to the Complaint and concurrently file its motion to transfer and (b) to an expedited schedule for submitting the motion to transfer to the Court. When Mr. Pollack did not answer his telephone, I left a message for him requesting that he call me later that evening or the next day. In an effort both to comply with the requirements of Local Rule 7.1(a)(1)(A) and respect Mr. Pollack's previous request that we try telephonic communication before engaging in letter writing campaigns, I attempted to reach Mr. Pollack by telephone, rather than writing to him, that evening. Mr. Pollack's outgoing message on March 20th did not indicate that his office would be closed the next day or that he would otherwise be unavailable on March 21st.

4.      After not hearing from Mr. Pollack the following morning (Friday, March 21st), I called and left another voicemail message for him to contact me at his earliest convenience. Mr. Pollack's outgoing voicemail message on March 21, 2008 also did not indicate that he would be out of his office and otherwise unavailable that day . Unable to reach Mr. Pollack by telephone, I also attempted to reach his colleague, Mr. Craig Compton, telephonically during the early afternoon of March 21st. Mr. Compton, who had, earlier in day, sent email correspondence regarding this case to my colleague, James Daire, also did not answer his telephone when I called. Mr. Compton's outgoing voicemail message also did not indicate that his office was closed on March 21st or that he would otherwise be unavailable that day.

5.      Unable to reach SunPower's lead counsel by telephone, I wrote a letter

3 -  MORGAN W. TOVEY DECLARATION IN SUPPORT OF
     SUNLINK CORPORATION'S MOTION TO TRANSFER

detailing SunLink's requests and its rationale for seeking SunPower's consent to transfer the case

or consent to an expedited schedule for briefing and hearing the motion coupled with an

extension of time to respond to the Complaint. I attach, as <u>Exhibit</u> A to this Declaration, a true

and correct copy of my correspondence, dated March 21, 2008 to Mr. Pollack.

   6. Later that afternoon, I received an email response from Mr. Pollack to my

correspondence in which Mr. Pollack stated that his office was closed in observance of Good

Friday and that neither he nor Mr. Compton was available to speak to me by telephone that day.

Mr. Pollack also stated in his email that SunPower declined to stipulate to transfer the case,

declined to stipulate to an expedited schedule for briefing and hearing the motion to transfer and

declined to stipulate to an extension of time for SunLink to respond to the Complaint. I attach

true and correct copies of Mr. Pollack's email dated March 21, 2008 and Mr. Compton's email

of the same date sent earlier to Mr. Daire of my office, as <u>Exhibits</u> B and C, respectively, to this

Declaration. I responded in writing to Mr. Pollack's email later the same day, noting that the

certification accompanying SunPower's motion would necessarily be made pursuant to Local

Rule 7.1(a)(1) (B) ("opposing party willfully refused to confer"). I attach, as <u>Exhibit</u> D to this

Declaration, a true and correct copy of my email correspondence of the same date to Mr. Pollack.

   7. Because Mr. Pollack was not available to meet and confer with me

personally or telephonically and because he refused to stipulate to any of my requests, my

colleague and I continued to work on Friday, March 21st and at various times, both days,

throughout the holiday weekend.

   8. On Sunday, March 23, 2008, Mr. Pollack responded to my email

correspondence, reiterating his positions that SunPower believed that the case should not be

transferred to another venue and that SunPower would not stipulate to any additional extensions

4 -  MORGAN W. TOVEY DECLARATION IN SUPPORT OF
  SUNLINK CORPORATION'S MOTION TO TRANSFER

of time for SunLink to respond to the Complaint. Mr. Pollack's email of Sunday, March 23rd did state that he was willing to talk to me telephonically but that he would not be available until the afternoon of Wednesday, March 26th to do so. I attach, as <u>Exhibit</u> E to this Declaration, a true and correct copy of that email correspondence from Mr. Pollack.

9.      On Monday, March 24, 2008 at approximately 1:00 pm, Mr. Pollack called me and left a voicemail message stating that his schedule had cleared and that he would be available to meet and confer by telephone that afternoon. Mr. Pollack also sent an email to me, a true and correct copy of which is attached as <u>Exhibit</u> F to this Declaration, to that effect.

10.      At approximately 3:30 pm on Monday, March 24th, I spoke by telephone with Mr. Pollack to meet and confer regarding SunLink's proposed motion to transfer and the possibility to stipulating to an expedited schedule for submitting the matter for the Court's consideration. During the conversation, I requested a copy of the settlement terms between SunPower and AES to determine whether the settlement required AES to cooperate with SunPower or at least respond to discovery requests from SunPower as if it were still a party. Mr. Pollack, however, refused to provide the settlement terms. Per Local Rule 7.1(a)(1), this will certify that parties made a good faith effort, through the telephone conversation mentioned immediately above (along with earlier written communications) to resolve the disputed matters set forth in SunLink's accompanying Motion to Transfer and for a hearing on an expedited basis of the same, but the parties were unable to resolve them.

11.      Given that this action is only two months old and that, pursuant to Civil Local Rule 26.2, the parties agreed to forgo the disclosures required by Federal Rule of Civil Procedure 26(a)(1), SunLink is unaware of each and every witness believed to have knowledge of matters alleged in SunPower's complaint. At this juncture, however, SunLink can identify the

5 -  MORGAN W. TOVEY DECLARATION IN SUPPORT OF
     SUNLINK CORPORATION'S MOTION TO TRANSFER

following percipient witnesses likely to have knowledge of matters alleged in SunPower's

complaint, all of whom either reside or presumably reside within California.

        a.     Christopher Tilley, Chief Executive Officer of SunLink.  Mr.

Tilley resides within the boundaries of the Northern District of California.

        b.     Robert Miros, Vice President of Product Design at SunLink.  Mr.

Miros resides within the boundaries of the Northern District of California.

        c.     Thomas Dinwoodie, founder of SunPower's predecessor-in-

interest, named inventor on both of the asserted patents, and current Chief Technology Officer of

SunPower Corporation.  On information and belief, Mr. Dinwoodie resides within the boundaries

of the Northern District of California.

        d.     Rule 30(b)(6) designees of SunPower with knowledge of, among

other topics, investigation and knowledge of prior art to the asserted patents, and the conception,

reduction to practice, design, development, manufacture and marking of the alleged commercial

embodiment of the alleged invention(s) described and claimed in the asserted patents, knowledge

concerning the application and prosecution of the asserted patents.  SunPower's licensing

policies and practices for the asserted patents, SunPower's sales of any alleged commercial

embodiment and its profit margin on the same and knowledge and testing of the accused

assembly.  According to its Complaint, Plaintiff SunPower Corporation, Systems was

incorporated in Delaware and has a regular and established place of business in Richmond, CA

within the Northern District of California.  According to its Corporate Disclosure Statement,

Plaintiff is a wholly owned subsidiary of publicly traded SunPower Corporation.  SunPower

Corporation is headquartered in San Jose, California.  Accordingly, at this juncture, it is

reasonable to assume that most, if not all, of Plaintiff's Rule 30(b)(6) will reside within the

judicial district of the proposed transferee court.  Further, the attorneys listed on the asserted

patents as SunPower's prosecution attorneys are with the Townsend law firm – a firm also based

in the San Francisco Bay Area.

    e.  Michael Huber, former employee of SunLink or its predecessors.

Mr. Huber resides in Livermore, CA, within the boundaries of the Northern District of

California.

    f.  Michael Bowler, former SunLink employee.  Mr. Bowler resides in

Northern California, near Sacramento, and outside the subpoena range of this Court.

    12.  I attach, as <u>Exhibit</u> G to this Declaration, a true and correct copy of the

Federal Court Management Statistics for 2007.

    13.  I attach, as <u>Exhibit</u> H to this Declaration, a true and correct copy of the

January 2008 Patent Rules Advisory Subcommittee Report for the Northern District of

California.

    14.  I attach, as <u>Exhibit</u> I to this Declaration, a true and correct copy of a

February 25, 2008 letter from Mr. Pollack.

    I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

    DATED:  March 25, 2008.

          /s/   Morgan W. Tovey_____
            Morgan W. Tovey

            DOCSSFO-12509959.1

# EXHIBIT A
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

# ReedSmith

Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111-3922
+1 415 543 8700
Fax +1 415 391 8269

**Morgan W. Tovey**
Direct Phone:  415.659.5928
Email:  mtovey@reedsmith.com

March 21, 2008

**VIA E-MAIL AND U.S. MAIL**

Howard G. Pollack (pollack@fr.com)
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, California 94063

  Re: <u>SunPower v. SunLink, et al.</u>

Dear Howard:

  I am writing as a follow-up to the voicemail message I left for you yesterday and the voicemail messages I left for you and Craig today, and to inquire as to your availability this afternoon to speak by telephone. More specifically, pursuant to Local Rule 7.1(a)(1)(A), we seek to meet and confer with you regarding SunLink's intent to move, pursuant to 28 U.S.C. Section 1404, to transfer the action to the United States District Court for the Northern District of California. Because SunLink's response to the Complaint is due next Tuesday and we have been unable to reach you or your colleague, we write to set forth SunLink's position regarding transfer and resolution of the issue on an expedited basis. At a minimum, we hope that you will agree that the time for SunLink to respond to the Complaint should be extended pending determination of the appropriate forum.

  In view of SunPower's dismissal of its claims against Defendant AES, a nexus no longer exists between this dispute and the District Court in Oregon. Accordingly, SunPower's choice of venue is no longer entitled to any deference. Under Section 1404, for "the convenience of the parties, witnesses and in the interests of justice," the action should be transferred to the federal district for the Northern District of California without delay. To that end, per Local Rule 7.1(f), SunLink also seeks SunPower's consent to an expedited briefing and hearing schedule on the motion to transfer.

  The proposed transferee court is the appropriate forum because now all the parties and most, if not all, of the material witnesses and the documentary evidence relating to conception, design, reduction to practice, manufacture and sale of both the commercial embodiments of the asserted patents and the accused assemblies reside, or are located in, Northern California. Indeed, at least one of the designers of the accused assembly no longer works for SunLink and resides within the Northern California judicial district; consequently, he is beyond the subpoena power of the current venue. Accordingly, SunPower cannot credibly dispute that all the private interest factors militate in favor of transfer. Finally, because the case remains at its infancy, with no trial, pretrial or claim construction hearing dates set, the public interest factors do not preclude transfer. In sum, the relevant factors compel the conclusion that the action should be transferred forthwith. Please advise whether you intend to oppose the motion and, if so, whether you will stipulate to an expedited briefing schedule.

  On a related matter, SunLink's response to the Complaint is currently due on March 25, 2008. To the extent that SunPower intends to oppose SunLink's motion to transfer, SunLink seeks an extension

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ WASHINGTON, D.C. ♦ BEIJING ♦ PARIS ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH

OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

r e e d s m i t h . c o m

EXHIBIT A
PAGE 1 of 2

DOCSSFO-12509806.1 3/21/08 3:08 PM

Howard G. Pollack
March 21, 2008
Page 2

**ReedSmith**

of time to defer filing its response to the Complaint until after the Court determines the appropriate forum for this litigation.

We remain hopeful that this matter may be resolved informally. We look forward to hearing from you.

Very truly yours,

Morgan W. Tovey

MWT:nt

cc:    Craig Compton
       Doyle B. Johnson
       James Daire
       Randolph Foster

# EXHIBIT B
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

**From:** Howard Pollack [mailto:pollack@fr.com]
**Sent:** Friday, March 21, 2008 4:10 PM
**To:** Tuttle, Nancy
**Cc:** Craig Compton; rcfoster@stoel.com; Tovey, Morgan W.; Johnson, Doyle B.; Daire, James; brenna@chernofflaw.com; Susan Pitchford
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

Craig and I are out of the office and our office is closed today in observation of Good Friday.  I note that the voicemail you mention having left yesterday was left at 6:50 p.m., after the close of business and after I had left for the day.

I am not available to speak today, and I will be out of the office Monday and Tuesday of next week.

In brief response to your letter, we do not agree with your characterization of the facts and SunPower will oppose any motion to transfer.  Nor will we consent to expedited briefing.  We expect SunLink to respond to the complaint on the present schedule and we will respond to any motion you may file in due course.

Regards,

Howard

EXHIBIT 6
PAGE 1 of 1

# EXHIBIT C
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

**From:** Craig Compton [mailto:Compton@fr.com]
**Sent:** Friday, March 21, 2008 10:15 AM
**To:** Daire, James
**Subject:** Proposed Protective Orders

James – attached are our proposed revisions to the draft protective order (see redlines on second attachment). I have found in the past that single-tier protective orders are much more efficient, but have redlined your proposed protective order as well. For reference, I am also attaching the proposed order that we originally sent to you.

Are you available either next Monday or Tuesday in the a.m. to meet and confer regarding the proposed Protective Order? Monday I am available anytime between 10-noon and 1:30-6. Tuesday I am available anytime between 9-noon. You can see from our redlines the areas I would like to discuss. I would also like to discuss again the benefits of a single-tier order v. two-tier orders.

Sincerely,

Craig Compton
Associate
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
650.839.5061
650.839.5071 (fax)

EXHIBIT _C_
PAGE _1_ of _1_

# EXHIBIT D
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

**From:** Tovey, Morgan W. [mailto:MTovey@ReedSmith.com]
**Sent:** Friday, March 21, 2008 6:13 PM
**To:** Howard Pollack
**Cc:** brenna@chernofflaw.com; Craig Compton; Susan Pitchford; jdaire@reedsmith.com; dbjohnson@reedsmith.com; Foster, Randolph
**Subject:** RE: SunPower v. SunLink, et al.

Dear Howard:

Thank you for your email response notifying us that your office was closed today in observance of Good Friday. While we, of course, honor your absence in observance of a holiday, we are, however, surprised and disappointed by both the tenor and content of your response to our request to meet and confer in a meaningful manner as contemplated by by Local Rule 7.1(a)(1)(A) ("The parties made a good faith effort through *personal or telephone conferences* to resolve the dispute and have been unable to do so") (emphasis added). For example, as a matter of professional courtesy, we would have expected that you would have at least offered a brief extension of time for SunLink to respond to the Complaint – a compromise that would have both accommodated your schedule and allowed sufficient time for counsel to engage in a meaningful dialogue on these issues. Accordingly, our certification accompanying Sun Link's motion to transfer will be made pursuant to Local Rule 7.1(a)(1)(B) ("The opposing party willfully refused to confer"). We also note that your unavailability today, along with your refusal to stipulate to even a brief extension of time to discuss these issues in person or by telephone sometime early next week, requires your opposing counsel -- your professional colleagues -- to work not only today but most of the holiday weekend to file a motion that was triggered by your sudden dismissal late yesterday of the claims against Oregon-based AES. In sum, your refusal to consider even the most basic requests raised in our correspondence today seems to violate the spirit, if not letter, of Local Rule 83.8 ("Cooperation Among Counsel").

Your email correspondence notes that you had already left your office before I left a voicemail message for you last night. For the record, I attempted to contact you yesterday within approximately two hours of the first notice we received -- by the Court's electronic filing notification email -- of your motion to dismiss Sun Power's claims against AES pursuant to a secret settlement with AES. I attempted to contact you by telephone -- rather than write to you -- per your request in your letter of February 25, 2008. We note that your outgoing voicemail message, both yesterday and today, did not reflect that your office would be closed today. And, although you note that Mr. Compton is not in the office today either, Mr. Compton sent email correspondence to my colleague, James Daire, this morning regarding the draft protective order.

In your email correspondence, although you also purport to disagree with our characterization of facts, you fail to identify even one fact recited in support of transfer that you consider erroneous. Indeed, you cannot seriously dispute that both SunPower Systems and SunLink reside in this judicial district, the sole named inventor, Mr. Dinwoodie, resides in this judicial district, and the officers and technical personnel most knowledgeable concerning the accused assemblies reside in this judicial district and most, if not all, of the material document evidence is located here. We do not view your bald assertion to the contrary to constitute a good faith effort to meet and confer. Unfortunately, you have left us with no alternative other than to seek the Court's intervention to resolve these matters.

Finally, your blanket refusal to consider a transfer of the case from a distant forum with no nexus to the parties or to the dispute to a forum where the action obviously belongs further calls into question SunPower's motives for pursuing this litigation.

Very truly yours,

Morgan

**Morgan W. Tovey | Reed Smith LLP**
Two Embarcadero Center, Suite 2000, San Francisco, CA 94111
Direct: 415.659.5928 | Mobile: 415.850.4751
Reception: 415.543.8700 | Fax: 415.391.8269

EXHIBIT D
PAGE 1 of 1

# EXHIBIT E
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

**From:** Howard Pollack
**Sent:** Sunday, March 23, 2008 1:18 PM
**To:** 'Tovey, Morgan W.'
**Cc:** brenna@chernofflaw.com; Craig Compton; Susan Pitchford; jdaire@reedsmith.com; dbjohnson@reedsmith.com; Foster, Randolph
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

I have just returned and had the opportunity to read your rather inflammatory e-mail.  It is clear from it how SunLink intends to litigate this matter.  It is equally clear that SunPower has not "willingly refused to confer."  Rather, we were unable to accommodate your unilateral demand that we confer on your schedule, made after the close of business before a holiday weekend; one on which I had a long-planned trip with my family to a location that was beyond cell phone and email coverage. Craig was also traveling, and in fact was in deposition all day yesterday.

I see no reason why you must file a motion on Monday; SunLink's answer is due on Tuesday, as we have already granted you a 30-day extension in this case.  Nor is SunLink required to file its motion to transfer, if it feels it must, before answering the complaint.  I will be in deposition and out of the office on Monday and Tuesday, but I can discuss our reasons for believing that the fact that AES is no longer a named party makes very little difference with regard to plaintiff's choice to bring this suit where SunLink has done substantial business involving the infringing product.  If after our discussion, SunLink still feels it must file a motion to transfer forum, if such motion is filed by Monday, March 31, 2008, SunPower will not argue the motion is untimely.  On the other hand, we see little need to expedite briefing on such a motion, given that any discovery and pleadings that occur in the meantime will certainly be relevant and useful no matter where the case ultimately proceeds.  We believe SunLink should agree with this view, unless its purpose in seeking transfer is nothing more than delay.

EXHIBIT E
PAGE 1 of 1

# EXHIBIT F
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

**From:** Howard Pollack [mailto:pollack@fr.com]
**Sent:** Monday, March 24, 2008 1:13 PM
**To:** Howard Pollack; Tovey, Morgan W.
**Cc:** brenna@chernofflaw.com; Craig Compton; Susan Pitchford; Daire, James; Johnson, Doyle B.; Foster, Randolph
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

I just left you a voicemail message. The deposition I was defending today wrapped up earlier than expected. So I have some availability this afternoon if you would like to confer today. Please call me in the office; (650) 839-5007. I remain available to confer on Wednesday as well.

Regards,

Howard

EXHIBIT $E$
PAGE $1$ of $1$

# EXHIBIT G
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY





# Federal Court Management Statistics

Federal Court Management Statistics-2007

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2006

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2005

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2004

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2003

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2002

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2001

- **▪** Courts of Appeals
- **▪** District Courts

Federal Court Management Statistics-2000

EXHIBIT G
PAGE 1 of 4



- **Courts of Appeals**
- **District Courts**

Federal Court Management Statistics-1999

- **Courts of Appeals**
- **District Courts**

Federal Court Management Statistics-1998

- **Introduction**
- **Courts of Appeals**
- **District Courts**

Federal Court Management Statistics-1997

- **Introduction**
- **Courts of Appeals**
- **District Courts**

EXHIBIT G
PAGE 2 of 4

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| CALIFORNIA NORTHERN | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings | | 7,970 | 8,683 | 6,362 | 6,727 | 6,919 | 7,887 | | |
| | Terminations | | 6,777 | 6,983 | 6,966 | 6,471 | 7,094 | 6,675 | | |
| | Pending | | 9,005 | 8,157 | 6,557 | 7,267 | 7,567 | 7,958 | | |
| | % Change in Total Filings | Over Last Year | | -8.2 | | | | | 79 | 15 |
| | | Over Earlier Years | | | 25.3 | 18.5 | 15.2 | 1.1 | 35 | 6 |
| | Number of Judgeships | | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | Vacant Judgeship Months | | .0 | .0 | .0 | .0 | 3.1 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 569 | 620 | 455 | 480 | 494 | 563 | 15 | 4 |
| | | Civil | 505 | 558 | 390 | 413 | 424 | 510 | 8 | 2 |
| | | Criminal Felony | 33 | 37 | 39 | 44 | 47 | 42 | 86 | 14 |
| | | Supervised Release Hearings** | 31 | 25 | 26 | 23 | 23 | 11 | 28 | 10 |
| | Pending Cases | | 643 | 583 | 468 | 519 | 541 | 568 | 12 | 2 |
| | Weighted Filings** | | 624 | 621 | 543 | 581 | 631 | 598 | 30 | 7 |
| | Terminations | | 484 | 499 | 498 | 462 | 507 | 477 | 30 | 7 |
| | Trials Completed | | 8 | 8 | 10 | 10 | 11 | 11 | 92 | 14 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 12.4 | 11.2 | 12.6 | 11.1 | 11.7 | 11.8 | 47 | 14 |
| | | Civil** | 6.7 | 7.4 | 9.8 | 8.2 | 10.6 | 9.5 | 11 | 2 |
| | From Filing to Trial (Civil Only) | | 24.9 | 25.0 | 28.0 | 22.5 | 30.3 | 23.5 | 46 | 7 |
| OTHER | Civil Cases Over 3 Years Old | Number | 393 | 528 | 530 | 430 | 377 | 475 | | |
| | | Percentage | 4.7 | 7.3 | 9.5 | 6.9 | 5.7 | 6.7 | 61 | 6 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 53.81 | 59.09 | 55.21 | 61.19 | 65.00 | 66.42 | | |
| | | Percent Not Selected or Challenged | 41.9 | 43.2 | 31.0 | 48.9 | 40.9 | 47.2 | | |

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 7074 | 122 | 975 | 1610 | 94 | 44 | 534 | 527 | 243 | 533 | 732 | 422 | 1238 |
| Criminal* | 455 | 6 | 72 | 162 | 40 | 64 | 11 | 38 | 5 | 6 | 16 | 15 | 20 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

EXHIBIT G
PAGE 3 of 4

Judicial Caseload Profile Report                                    Page 1 of 1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| OREGON | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing |
|---|---|---|---|---|---|---|---|---|---|
| OVERALL CASELOAD STATISTICS | Filings | | 3,422 | 3,319 | 3,614 | 3,554 | 3,462 | 3,236 | | |
| | Terminations | | 3,261 | 3,434 | 3,449 | 3,321 | 3,180 | 3,041 | | |
| | Pending | | 3,160 | 3,032 | 3,212 | 3,087 | 2,893 | 3,004 | | |
| | % Change in Total Filings | Over Last Year | | 3.1 | | | | | | |
| | | Over Earlier Years | | | -5.3 | -3.7 | -1.2 | 5.7 | | |
| | Number of Judgeships | | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months | | .0 | .0 | .0 | .0 | 11.8 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 570 | 553 | 603 | 593 | 577 | 540 | | |
| | | Civil | 421 | 399 | 436 | 423 | 401 | 388 | | |
| | | Criminal Felony | 98 | 107 | 111 | 115 | 128 | 114 | | |
| | | Supervised Release Hearings** | 51 | 47 | 56 | 55 | 48 | 38 | | |
| | Pending Cases | | 527 | 505 | 535 | 515 | 482 | 501 | | |
| | Weighted Filings | | 558 | 555 | 595 | 585 | 567 | 568 | | |
| | Terminations | | 544 | 572 | 575 | 554 | 530 | 507 | | |
| | Trials Completed | | 22 | 20 | 21 | 21 | 25 | 22 | | |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 11.5 | 11.0 | 10.2 | 9.3 | 9.1 | 8.5 | | |
| | | Civil | 10.1 | 11.6 | 10.6 | 10.4 | 9.6 | 9.4 | | |
| | From Filing to Trial (Civil Only) | | 25.0 | 27.0 | 19.0 | 20.5 | 21.5 | 17.5 | | |
| OTHER | Civil Cases Over 3 Years Old | Number | 91 | 80 | 78 | 69 | 54 | 86 | | |
| | | Percentage | 3.6 | 3.4 | 3.1 | 2.8 | 2.4 | 3.5 | | |
| | Average Number of Felony Defendants Filed Per Case | | 1.3 | 1.2 | 1.3 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 42.24 | 44.33 | 23.72 | 33.48 | 52.43 | 45.58 | | |
| | | Percent Not Selected or Challenged | 5.0 | 17.9 | 7.2 | 24.5 | 6.8 | 17.8 | | |

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 2524 | 499 | 26 | 687 | 35 | 20 | 115 | 234 | 140 | 79 | 436 | 5 | 248 |
| Criminal* | 584 | 23 | 101 | 189 | 74 | 58 | 36 | 35 | 3 | 36 | 3 | 6 | 20 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

EXHIBIT G
PAGE 4 of 4

# EXHIBIT H
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

PATENT LOCAL RULES ADVISORY SUBCOMMITTEE REPORT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

### January 2008

## I.

## INTRODUCTION

The Patent Local Rules Advisory Subcommittee of the United States District Court for the Northern District Of California ("Committee") began its work in October 2006. After careful consideration of inputs from the community broadly over the last year plus, the Committee has concluded that, while the existing rules are working well, and have been widely used as a model by many other courts, measured modifications are warranted.

The proposed modifications are designed to: (1) update the rules to account for recent legal developments, (2) conform the rules closer to the practices of judges of the District, (3) address minor technical drafting issues present in the existing rules, and (4) improve the rules based on the accumulated experience of those working with patent local rules in this District and beyond.

## II.

## COMMITTEE METHODOLOGY

The Committee began this project without preconceived notions as to whether major, minor or no changes to the rules were warranted.

To inform its deliberations, the Committee took active steps to collect pertinent information from a diverse range of sources. The Committee collected academic and practical commentaries regarding patent local rules generally and this District's rules in particular. The Committee invited comments on the patent local rules from the community broadly by posting a request for comments on the District's website and publicized this outreach in traditional and non-traditional media. The Committee welcomed comments from members of the Court and reviewed their standing orders. The Committee provoked discussion of potential rules changes on popular websites known to host patent-related blogs. The Committee solicited feedback from those with substantial patent litigation experience, including those in law firms, in-house law departments and the technology community more broadly. The Committee reviewed patent local rules adopted, or being considered, by courts around the country. Finally, the Committee published the proposed modifications and invited comments from the public.

With the benefit of this wide-range of inputs, the Committee reached five consensus conclusions. First, this District's decision to be the first to adopt patent local rules was a good one that has been broadly applauded. Second, the substance of this

EXHIBIT H
PAGE 1 of 3

District's rules has been generally validated by the decision of many courts around the country to use them as a model for their own rules. Third, the accumulated experience of the community suggests meaningful areas for potential improvement. Fourth, legal developments in substantive patent law suggest the need for updates. Fifth, the evolving practices of the judges in the District are a worthy resource and those practices should inform the proposed revisions to the rules.

        In light of these conclusions, and the information upon which they are based, the following is a summary of the Committee's proposed set of amended rules.

## III.

### THE PROPOSED RULES

**A.    Major Conceptual Changes**

        The Committee proposes two major conceptual changes from the existing rules.

        The first conceptual change is a requirement that litigants identify in their joint claim construction statement the 10 most significant claim construction disputes for the efficacious resolution of the case, including those disputes which may be outcome-dispositive. *See* Proposed Section IV. Under the current rules, there is no system for the litigants to identify the most significant claim construction disputes. Such an identification is, in our view, warranted. This is particularly true because litigants tend to identify as many terms as they can for construction to avoid a waiver of rights – even if the construction of all such terms is not necessarily consequential to the disposition of the case. While it is understandable that the litigants do not want to waive their rights, this potential glut of terms for construction can impede the claim construction process. By requiring the 10 most significant terms to be identified, priorities can be identified and resources can most efficiently be deployed to particular claim terms – without resort to a fixed cutoff altogether of the number of terms to be construed. It is important to note that the selection of 10 terms to be identified by the litigants is a default rule. As with all provisions of the local rules, adjustments to that number – upwards or downwards – may be warranted by the circumstances of a particular case. *See* Proposed Rule 1-3.

        The second conceptual change is the elimination of the concept of "preliminary" contentions in favor of a single round of contentions which can be modified only for good cause. *See* Proposed Section III. Under the current rules, the litigants disclose preliminary contentions before claim construction and then, as a matter of right, may have an opportunity to reformulate those disclosures as final contentions after claim construction. This is viewed by many as not tying litigants sufficiently to their positions. At the same time, many have critiqued the current amendment process as allowing changes "as of right" in circumstances where such changes are not in fact warranted, while also creating undue barriers to their amendment when the circumstances do warrant modification. To better rationalize the amendment process, the Committee has proposed the elimination of the unregulated right to amend contentions, with amendments instead being regulated by the well-established "good cause" test. *See* Proposed Rule 3-7. For guidance, the proposed rule sets forth three common situations in which good cause may exist in the exercise of the court's broad discretion, taking into account the prejudice to the non-moving party.



EXHIBIT H
PAGE 2 of 3

**B.    Additional Changes**

The Committee also proposes the following modifications.

- The provision governing modification of the patent local rules applicable to a particular case has been bolstered to make clearer that such modifications are encouraged where the circumstances of a particular case warrant. *See* Proposed Rule 1-3.

- The list of patent local rule topics to be discussed at the initial case management conference has been refined. *See* Proposed Rule 2-1(a).

- A new requirement that the patentee disclose its theories of direct and indirect infringement with its contentions. *See* Proposed Rule 3-1(a) and (d). The considerable development of the law of direct and indirect infringement warrants greater clarity.

- A new requirement that the patentee disclose "public use" related information in addition to "on-sale" related information. *See* Proposed Rule 3-2(a). These two patent law concepts should be treated in parallel in the disclosures.

- A new requirement that the patentee disclose documents evidencing ownership of the asserted patent rights. *See* Proposed Rule 3-2(d). This provision is designed to ensure that issues of subject matter jurisdiction are resolved early.

- A revised disclosure of obviousness contentions consistent with recent Supreme Court authority on the subject. *See* Proposed Rule 3-3(b). The current provision is outdated.

- A new requirement that litigants disclose *all* attorney-client information on which they plan to rely at trial after the claim construction ruling. *See* Proposed Rule 3-7. Under current rules, the litigants need only do so for opinions of counsel on the willfulness issue. The strengthening of the scienter requirement for indirect infringement is among the reasons supporting this proposal.

- A new provision that sanctions, pursuant to 28 U.S.C. § 1927, may be appropriate for failure to meet and confer in good faith in the claim construction process. *See* Proposed Rule 4-7. This underlines to litigants the importance of narrowing their disputes regarding claim construction in good faith.

Finally, other changes have been proposed for clarity or otherwise, but have not been described expressly in this report. Such changes should be considered of equal force and effect.

EXHIBIT H
PAGE 3 of 3

# EXHIBIT I
# TO THE
# DECLARATION OF
# MORGAN W. TOVEY

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Telephone
650 839-5070

VIA E-MAIL AND U.S. MAIL

Facsimile
650 839-5071

February 25, 2008

Web Site
www.fr.com

Morgan W. Tovey, Esq.
Reed Smith LLP
Two Embarcadero Center, Suite 2000
P.O. Box 7936 - 94120-7936
San Francisco, CA 94111

Howard G. Pollack
650 839-5007

Email
pollack@fr.com

FR

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:  *SunPower v. SunLink*
     USDC D. OR - Case No. 08-0148-AA

Dear Morgan:

This letter responds to your February 21 letter regarding SunLink's request that SunPower provide early discovery in the form of claim charts and identification of its asserted claims. As I am sure you are aware, SunPower does not have an obligation at this time to provide such information.

Nevertheless, SunPower notes that SunLink's products, including the SunLink (TM) PV Module Mounting System, installed as intended and instructed by SunLink, infringes, at least, independent claim 1 of United States Patent No. 5,505,788 and independent claims 36 and 55 of United States Patent No. RE38,898. SunPower reserves the right to identify additional claims in due course after the opportunity for discovery.

Any reasonable reading of the above listed claims against SunLink's accused product establishes a clear case of infringement, so SunPower does not take seriously SunLink's feigned confusion as to how its system infringes. SunPower is also very satisfied that the above claims are valid, but if you believe you are aware of relevant prior art, as implied in your letter, SunLink is, of course, free to share that with us at any time, in order to help expedite the ultimate resolution of the action.

I also understand from your letter that you plan to be out of the office this week. Pursuant to the Court's Local Rule 26.1, we need to set up a time for a conference to discuss a discovery schedule. Our meeting needs to take place on or before March 6, 2008. Please advise regarding your availability for a meeting that week.

EXHIBIT I
PAGE 1 of 2

FISH & RICHARDSON P.C.

Morgan W. Tovey, Esq.
February 25, 2008
Page 2

Finally, I have found that the back and forth exchange of self-serving letters does little to advance or move a case forward.  If SunLink has a genuine issue or proposal to discuss, please call me and I'll be happy to speak with you about it.

Sincerely,

Howard G. Pollack

HGP/cms

50466638.doc

EXHIBIT __I__
PAGE __2__ of __2__

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DECLARATION OF MORGAN W. TOVEY IN SUPPORT OF SUNLINK CORPORATION'S MOTION TO TRANSFER** on the following named person(s) on the date indicated below by

☐   mailing with postage prepaid

☒   electronic delivery (pdf)

☐   overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.

STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:     *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:     *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (*pro hac vice*)
Email: *mtovey@reedsmith.com*
Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for SunLink Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | Case No.: 08-CV0148 AA |
| Plaintiff, | **DECLARATION OF CHRISTOPHER TILLEY IN SUPPORT OF SUNLINK CORPORATION'S MOTION TO TRANSFER** |
| vs. | |
| SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company, | |
| Defendants. | |

I, Christopher Tilley, declare:

1.    I am the Chief Executive Officer of SunLink Corporation ("SunLink"), Defendant in this action. I have served in this capacity since June of 2006. I have personal knowledge of the matters stated in this Declaration and, if called as a witness, I could and would competently testify to them.

2.    SunLink is incorporated under the laws of the state of Delaware, and has its principal place of business in the San Francisco Bay Area at 1010 B Street, Suite 400, San Rafael, California, 94901. SunLink also has a warehouse and small office in the San Francisco Bay Area in Livermore, California. The company currently has no other offices. SunLink is a small private company that is growing but still operating in "start-up" mode. SunLink was founded in 2005 as SunLink LLC, a California limited liability company. SunLink LLC was created to continue to develop and market the photovoltaic mounting system originally designed by a team at Eastwood Energy Corporation that included SunLink's Founder and Chairman, John Eastwood. In January 2007, SunLink LLC was converted from a California limited liability company to a Delaware "C Corporation."

3.    SunLink's executive management team currently consists of five individuals: John Eastwood (Chairman) Renny Slatkin (Vice President of Sales) Mike Pile (Vice President of Marketing), Robert Miros (Vice President of Product Design) and me. We all reside in the San Francisco Bay Area. SunLink currently employs eighteen individuals, all of whom also currently live and work in the San Francisco Bay Area.

4.    SunLink designs, manufactures and markets advanced engineered, environmental-friendly, and cost-effective assemblies for deploying and integrating solar

electric (also known as "photovoltaic" or "PV") systems for commercial, flat rooftop and ground mounted applications. SunLink currently sells only one product – the product accused of infringement – the SunLink™ PV Module Mounting System (the "PV MMS"). That product, however, may be configured to meet the individual needs of SunLink's customers – typically installers, integrators and/or project developers. Since 2004, SunLink has sold approximately 170 of these systems, with 85 of these – exactly half – sold and then installed in California. Of the approximately 170 PV MMS sold, only eight of these systems were sold in Oregon. SunLink sold all eight of the systems installed in Oregon to AES. These eight installations in Oregon account for approximately 3.5 percent of SunLink's sales on a gross revenue basis. SunLink's remaining sales have been made for projects in approximately 16 other states and in Canada. After California, the next largest market for these systems is New Jersey, where 30 of the systems were sold.

5.      The PV MMS was first designed and developed by two individuals, Messrs. Michael Huber and Michael Bowler, who are no longer employed or otherwise affiliated with SunLink. Mr. Huber currently resides in Livermore, California in the San Francisco Bay Area. Mr. Bowler resides in Woodbridge, California, also located in Northern California but closer to Sacramento. Most of the development work relating to the PV MMS occurred at SunLink in the San Francisco Bay Area. Existing documents relating to the design, development, manufacture and sale of the accused assembly are all located in the San Francisco Bay Area at SunLink's offices or are within either Mr. Huber or Mr. Bowler's possession and control. In short, all of SunLink's documents, including those documents containing financial information related to the

company and technical documentation related to SunLink's PV MMS are located in the San Francisco Bay Area or elsewhere in Northern California.

      6.     SunLink has no offices or employees in Oregon.  SunLink also does not have any sales representatives who reside or who are physically located in Oregon.  As mentioned above SunLink offers for sale, and has sold eight, PV MMS units within the state of Oregon – all to AES.

      7.     The costs of and inconvenience of testifying and attending trial in the District of Oregon would be substantial for company of SunLink's size and in its stage of development.  Being forced to litigate this matter out-of-state would not only be inconvenient, it would create an enormous hardship for the management team and key employees of SunLink.  Specifically, the costs of litigating in an out-of-state forum for a small company in "start-up" mode, like SunLink, are obviously more substantial and burdensome than for the wholly-owned subsidiary of a large, public company, such as SunPower, and more costly in terms of both money and time than litigating in a local forum.

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  March 25th, 2008.

_____
Christopher Tilley

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DECLARATION OF CHRISTOPHER TILLEY IN SUPPORT OF SUNLINK CORPORATION'S MOTION TO TRANSFER** on the following named person(s) on the date indicated below by

☐ mailing with postage prepaid

☒ electronic delivery (pdf)

☐ overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

DATED:  March 25, 2008.          STOEL RIVES LLP


Randolph C. Foster, OSB No. 78434
E-mail:  ·  *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:     *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, OR  97204
Telephone: (503) 227-5631
Facsimile:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenbach@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C**.
500 Arguello Street, Suite 500
Redwood City, CA  94063
Telephone:  (650) 839-5113
Facsimile:   (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS**, a Delaware corporation,<br><br>  Plaintiff,<br><br> v.<br><br>**SUNLINK CORPORATION**, a Delaware corporation, and **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,<br><br>  Defendants. | Civil Case No. 08-00148-AA<br><br>**PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN OPPOSITION TO SUNLINK CORPORATION'S MOTION TO CHANGE OR TRANSFER**<br><br>**PATENT CASE** |

## I.     INTRODUCTION

Notwithstanding SunLink's  characterization of itself as a "much smaller start-up,"[1] Motion at p. 2, and its attempts to malign SunPower and speculate as to improper motives behind SunPower's decision to file this suit in Oregon, what SunLink's Motion does not say speaks volumes.  SunLink does not, and cannot, contest that this Court has subject matter jurisdiction over this action, that it has personal jurisdiction over the parties, and that venue is proper here.  The motion also fails to give the proper weight to SunPower's choice of forum, ignores the significant amount of relevant evidence in Oregon, and fails to address all third parties whose convenience should be addressed.  Finally, the motion makes dubious assertions about the speed, docket congestion, and cost of litigating in the proposed transferee court, a forum which is highly unlikely to be faster or less expensive given this Court's recent scheduling order setting a close of all discovery on December 10, 2008 and calling for summary judgment briefing 11 months from the filing of the complaint.  For these reasons, developed in detail below, Defendant's motion to transfer venue should be denied.

## II.     STATEMENT OF FACTS

### A.     SunLink's Infringing Activities in Oregon.

SunLink downplays the importance of its sales in Oregon, stating that "only eight" of its systems have been installed in Oregon, accounting for only 3.5 percent of its sales.  [Tilley Decl. at ¶ 4]  The numbers may be small for SunLink, but they are big for Oregon: one of the accused installations, at Industrial Finishes in Eugene, is advertised by the installer as "the largest PV system to be installed in the Pacific Northwest" [Pollack Decl., Ex. C], making it presumably the largest installation, public or private, in the state of Oregon as well.

---

[1]    Missing from SunLink's self-description as a "start-up" is the fact that it is co-owned by Eastwood Energy Corporation and PowerWorks Inc., *see* Pollack Decl. Ex. A; two companies that advertise themselves as having been in the renewable energy industry for decades.  *See* Pollack Decl. Ex. B.

PAGE 2 - PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN
        OPPOSITION TO SUNLINK CORPORATION'S MOTION TO TRANSFER

Moreover, due to its climate and forward-thinking policies, Oregon is poised to become a major solar power market, making it especially vital for SunPower to identify SunLink's infringement in this state and enjoin it going forward. For instance, the Oregon Department of Energy describes part of its mission as "develop[ing] clean energy resources" and "promot[ing] renewable energy," and even maintains a "Solar Energy Home Page" specifically to present information on tax incentives and industry associations that will increase the spread of solar energy in Oregon. [Pollack Decl., Exs. D and E]. In the Summer of 2007, the Oregon legislature passed the Oregon Renewable Energy Act, which aims to produce 25% of the state's electricity from renewable sources, including solar, by 2025. [Pollack Decl., Exs. F and G]. This is a major legislative change that will certainly expand the solar industry in this state and shows the State's clear interest in the promotion and development of solar technology. Oregon cannot be said to have no interest in this dispute.

### B.    The Meet and Confer Process.

SunLink's description of its meet and confer process pursuant to this motion, in an effort to cast further aspersions on the alleged motives of SunPower, omits a few salient details. The alleged "multiple attempts to engage" SunPower's counsel in order to discuss the matter began with a phone call at about 7:00 pm the day before a holiday, and included one other call and two emails over the holiday weekend. [Pollack Decl. at ¶¶ 5-7]. Even so, Plaintiff's counsel responded to both of these emails and, on Easter Sunday, offered to allow Defendant an extra week to file its venue transfer motion. [Pollack Decl., Ex. H]. So there was no need to rush to file this motion alongside its answer. Nor is there any need to expedite the briefing or hearing schedule for this motion because, as SunPower counsel explained, any work done on this case to respond to discovery in the meantime will be equally applicable to the dispute no matter where it is litigated.

Defendant also makes much of the fact that Plaintiff's settlement with AES was "secret" and suggests that Plaintiff "refused" to provide SunLink with the terms of the settlement or a copy of the

agreement, [Tovey Decl. at ¶ 10]. On the contrary, Plaintiff's counsel confirmed that it *would*

provide a copy of the agreement to Defendant, as soon as the parties had entered a protective order

– which is necessary because the agreement contains sensitive confidential information of both AES

and SunPower. [Pollack Decl. at ¶ 9]. Furthermore, Defendant's suggestion that SunPower has

engaged in gamesmanship by "pointedly sandwich[ing]" its dismissal of AES between the

scheduling meeting and the due date for SunLink's answer, *see* Motion at 5, is unwarranted. When

it filed suit here, SunPower could not have known, and did not know, that it would reach a

settlement with AES at all, let alone the specific timing of any agreement. AES was named

because, as an installer of the SunLink product, it was a direct infringer uniquely in possession of

necessary evidence about that infringement. As explained to SunLink counsel, the dismissal based

on the settlement was simply filed promptly upon execution; the agreement with AES had been the

subject of negotiations over several weeks. [Pollack Decl. at ¶ 4]. In any event, SunLink was in no

way prejudiced by this sequence of events, because Plaintiff's infringement case against SunLink

stands on its own, and venue is proper in Oregon because of the extensive infringement that has

taken place here, *see infra* Section III.B.1. In short, any perceived urgency and request for

expedited hearing on this motion was in fact a consequence of Defendant's own choices in the

matter, and not gamesmanship by SunPower.

## III.    ARGUMENT

### A.    Transfer is Improper Under 28 USC § 1404(a) Because this Action Could Not Have Been Brought in California.

An action may be transferred only to a district "where it might have been brought."

28 U.S.C. § 1404(a). This means that (i) the proposed transferee court must have subject matter

jurisdiction, (ii) venue would be proper, and (iii) all defendants must be subject to personal

jurisdiction in that district. *Shapiro v. Bonanza Hotel Co.*, 185 F.2d 777, 780 (9th Cir. 1950).

SunLink gives short shrift to this threshold requirement, and for good reason: former defendant AES is likely not subject to personal jurisdiction in California. Defendant asserts otherwise, based on the fact that AES "enter[ed] into a contract with SunLink, a company based in Northern California," [Motion at p. 9, n. 2], but this is not dispositive of the minimum contacts analysis. Indeed, the Ninth Circuit rule is that the "mere existence of a contract is insufficient to confer personal jurisdiction," *Paccar Int'l., Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1063 (9th Cir. 1985), and SunLink has asserted no other connection between AES and California. SunPower does not believe the Northern District of California would have been a proper venue in which to bring an action against AES. Conversely, AES is subject to personal jurisdiction in Oregon and venue is proper here. Furthermore, SunLink has admitted both that this Court has personal jurisdiction over it, and that venue is proper here for a suit concerning its infringement. [*See* Def.'s Answer to Complaint, at ¶¶ 6-7].

Perhaps recognizing the problem, SunLink summarily asserts that "former co-Defendant AES is irrelevant" for venue transfer purposes, [Motion at p. 9]. For this proposition it cites *In re Fine Paper Antitrust*, 685 F.2d 810 (3rd Cir. 1982). That case is not binding law in this circuit, and furthermore the decision there arguably runs contrary to the Supreme Court's clear ruling in *Hoffman v. Blaski*, 363 U.S. 335 (1960), that "[i]n the normal meaning of words, [the] language of Section 1404(a) directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted," *id*. at 343; *accord, Commercial Lighting Products, Inc. v. District Court (Industrial Lighting Products Company)*, 537 F.2d 1078 (9th Cir. 1976) (denying transfer even where some defendants waived improper venue in proposed transferee court). In the specific situation where some defendants have settled when transfer is sought, at least one court has held that such a transfer is forbidden by *Hoffman v. Blaski* unless the suit could originally have been brought against *all* defendants in the proposed transferee court. *See IP Innovation LLC v. Lexmark Int'l., Inc.*, 289 F.Supp.2d 952, 954 (N.D.Ill. 2003).

PAGE 5 - PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN
       OPPOSITION TO SUNLINK CORPORATION'S MOTION TO TRANSFER

**B. The Balance of Interests Weighs in Favor of Maintaining this Action in Oregon.**

Defendant has failed to meet its burden of proving that this Court should exercise its discretion to transfer this action to Northern California. As plaintiff, SunPower's choice of forum is entitled to great weight and should rarely be disturbed. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). SunLink is required to make "a strong showing of inconvenience" to warrant upsetting SunPower's choice of forum. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

In order to meet its "heavy burden," Defendant must demonstrate that certain private and public factors strongly favor venue in Northern California, including the convenience of the parties, convenience of the witnesses, ease of access to the evidence, possibility of view of premises if view would be appropriate to the action, familiarity of each forum with the applicable law, local interest in the controversy, the relative court congestion and time of trial in each forum, and the contacts relating to the plaintiff's cause of action in the chosen forum *See id.* Defendant has failed to show that the balance of those factors weighs strongly in favor of transferring this action out of Oregon and away from SunPower's chosen forum.

**1. The Public Interest Factors Favor Maintaining this Action in Oregon Because Litigating the Case Here Will Be Faster and Less Expensive.**

Possibly the largest flaw in Defendant's argument to transfer venue comes in its analysis of the public interest factors. It claims that these factors "either favor transfer or are neutral," [Motion at 17], but only arrives at this conclusion by focusing on selected and irrelevant court congestion statistics. Indeed, it cannot seriously be doubted that this case, with the scheduling order *that has already been entered by this Court*, would be seriously slowed by any transfer of venue.

Defendant suggests that, on a per-judge basis, congestion is about the same in both districts, and points to timing statistics to imply that this action would progress faster if it were moved to Northern California. [Motion at 17]. But Defendant has presented statistics for civil matters *in*

*general*, not patent cases in particular, and has ignored this Court's schedule entirely.  If patent cases in particular are examined, it is clear that such cases proceed more quickly in Oregon, on average, than they do in Northern California.  Oregon is over one month faster in terminating patent cases on any ground (14.2 months vs. 15.6, on average), and also over one month faster in terminating them on the merits (20.0 vs. 21.3, on average).  [*See* Pollack Decl., Exs. L and M]. While this advantage is modest in general, in *this* case it is far more significant: this Court has already entered a scheduling order calling for summary judgment briefing to be completed by January 30, 2009 – 11 months after the filing of the complaint.  As a summary judgment could be a resolution "on the merits," Defendant cannot reasonably argue that transferring to the Northern District of California – where it takes on average 21.3 months to reach such a resolution – would be *faster* than staying in Oregon.[2]  Clearly any resolution of this case via summary judgment would come far earlier here than the median in the suggested transferee court.

Defendant's reference to the Northern California Patent Local Rules as a factor *increasing* efficiency is likewise unavailing.  As a preliminary matter, it should be noted that the Northern District of California is one of a very small number of districts to have such local rules governing the sequencing of discovery in patent cases; the vast bulk of districts, including Oregon, use the standard discovery mechanisms of the Federal Rules of Civil Procedure.

Secondly, SunLink has already urged the advantages of such "front loaded," "sequenced" discovery [Motion at p. 18] in its section of the Joint Scheduling Statement.  This Court, having duly considered Defendant's argument at that time, "decline[d] to delineate and specify the parties' discovery schedule," [Docket Entry No. 20].  Defendant's attempt to transfer venue at this point essentially amounts to an effort to escape from that Scheduling Order which, as discussed *supra*,

---

[2]    While it is true that the Court has thus far only scheduled summary judgment briefing, and not the hearing or a decision on the hearing, it strains credulity to suggest that these events could drag on for 10 or more months after the submission of briefs.

already moves the parties along to summary judgment much more quickly than could reasonably be expected if the case were to be transferred.

Third, the Patent Local Rules that Defendant is so eager to have applied to this case do not even lead to the benefits attributed to them in Defendant's Motion. Rather than moving patent cases along more "Expeditiously and Inexpensively," [Motion at p. 18], the rules can actually slow resolution on the merits and create the potential for parallel disputes over the adequacy of disclosures and compliance with the Rules themselves. [Pollack Decl. at ¶ 11] SunPower's counsel is very familiar with litigating patent cases in the Northern District of California and that familiarity, as well as SunPower's desire to litigate in a faster, more efficient and therefore less expensive forum, were key considerations in bringing the case in Oregon. [*Id*. at ¶ 3]. At the very least, the statistics on time to resolution of patent cases in Oregon and Northern California demonstrate that the Patent Local Rules do not sufficiently streamline the litigation process so as to make Northern California a preferable forum. [*See* Pollack Decl., Exs. L and M].

One final important factor to consider is the availability of alternative dispute resolution, such as a conference before a settlement judge, should the parties elect to pursue settlement at some point before trial. In the Northern District of California, securing such a judicially hosted settlement conference is very difficult; to get one the parties are generally required to make a showing that the case is unique. A much more common outcome is paid mediation, at increased expense to the parties. [Pollack Decl. at ¶ 12]. These problems are not nearly so acute in the District of Oregon.

**2. SunLink's Activities Irreparably Harm SunPower in Oregon, and Extensive Evidence of That Infringement Is Located in Oregon.**

Even in its venue transfer motion, SunLink acknowledges that at least eight of the accused systems have been installed in the state of Oregon. [Motion at p. 3]. While SunLink compares this seemingly small number to the bulk of its sales elsewhere in the country, it fails to mention that, as noted above, one of the installations is a 450 KW commercial system that is touted as "the largest

PAGE 8 - PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN OPPOSITION TO SUNLINK CORPORATION'S MOTION TO TRANSFER

PV system to be installed in the Pacific Northwest." [Pollack Decl. Ex. C] In addition, should an inspection of the premises be called for -- one of the factors expressly weighing against transfer, *see Decker Coal*, 805 F.2d at 843 -- it would have to occur in Oregon, for example at this facility in Eugene. Furthermore, all other physical evidence relating to infringement at the Eugene site and seven others Defendant acknowledges have been installed here is obviously located within Oregon as well. And unlike SunLink's California business records, which can be easily transported, the physical evidence of infringement for rooftop-mounted solar power installations would be expensive and difficult, if not impossible, to transfer to a court in another forum.

Moreover, SunLink admits that each installation "may be configured to meet the individual needs of [its] customers," [Tilley Decl. at ¶ 4]. If SunLink argues on this account that its infringement depends on the specific configuration of each customer site, then access to these sites becomes even *more* critical to SunPower's case and this factor even more strongly favors maintaining the action in Oregon, as a simple examination of SunLink's development facilities in California may not suffice to rebut such an assertion.

SunLink misses the point by asserting that its infringing systems have been installed in 17 other states in addition to Oregon. [*See* Motion at 18-19]. SunPower does not dispute that SunLink has sold infringing products, and likely maintains contractor relationships, in those states as well. To support its motion, Defendant must do more than show that it could also have been sued elsewhere; it must also show that the District of Oregon *itself* is so inconvenient, so lacks connection to the infringing activities, as to justify a transfer. It has not made this showing. Insofar as Defendants have infringed SunPower's patents in a number of different states, SunPower will be investigating its activities in all of those states, but it cannot conduct this litigation in all of them as well. Because Oregon is such an efficient venue, because it is such a vital solar power market, and because Defendant's installations here are among the largest in the area, this Court is an appropriate venue despite the fact that Defendant infringes elsewhere as well.

**3.  There are Important Witnesses in Oregon Who Would Be Inconvenienced by Attending Trial in California.**

SunPower agrees that the convenience of non-party witnesses is an important factor for the Court to weigh in considering a venue transfer motion, see *Decker Coal* at 843.  However, Defendant has only identified two of its non-party witnesses who might be better served by a transfer to California, without showing with specificity what these two individuals would testify about, and while ignoring Oregon-based witnesses of substantial importance to SunPower's case.

Specifically, SunLink identifies ex-employees Michael Huber and Michael Bowler as having been "involved in the design and development work for SunLink." [Motion at 14].  Beyond this cursory description, SunLink does not articulate the anticipated nature of these witnesses' testimony, or what their relationship was to the SunLink development process.  They may have been only peripherally involved, or their testimony might be duplicative of the testimony of other witnesses such as Mr. Tilley, the Chief Executive Officer of SunLink [Tilley Decl. at ¶ 1], Mr. Miros, SunLink's Vice President of Product Design [*id*. at ¶ 3], or Mr.Eastwood, SunLink's Founder and Chairman [*id*. at ¶ 2].  Furthermore, SunLink has not shown that these witnesses, if they are necessary, would refuse to attend trial in Oregon.

On the other hand, Defendant overlooks the number of important non-party witnesses whom SunPower might need to call to give testimony, both in the pre-trial discovery process and at trial.  These witnesses include not only representatives from former defendant AES, but also those who purchased the accused installations in Oregon.  As to the AES representatives, SunPower anticipates their cooperation in the discovery process, but they are under no compulsion to appear at trial.  As to the customers who purchased the accused systems, they have no affiliation with SunPower of any kind, and their testimony will be important on subjects such as the importance of the patented features in their choice to purchase SunLink's product over other alternatives.  Therefore, the availability of compulsory process in Oregon could prove critical.

PAGE 10 - PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN OPPOSITION TO SUNLINK CORPORATION'S MOTION TO TRANSFER

### 4.   The Convenience of the Parties is Neutral, or Even Favors Oregon.

While both parties to this lawsuit have their principal places of business in the San Francisco Bay Area, which lies in the Northern District of California, this fact alone does not tilt nearly so far in favor of transfer to that court as to justify transfer. The convenience of the parties during the day to day conduct of this litigation would be almost unaffected by the forum where it was pending, and the convenience of the parties at trial may even be increased by maintaining the action in Oregon, for the reasons detailed below.

First, as to the day to day conduct of the litigation, including access to evidence, it hardly matters that the case is pending in Oregon.  This Court's Local Rules do not call for lodging of discovery with the Court, *see* L.R. 30.1(a), 33.1(a), 34.1(a), and 36.1(a), and so regardless of the volume of documents produced by either party, they will be produced a short distance away at the offices of the other party's attorney.  Indeed, each party has already propounded a set of requests for production, both demanding production at the offices of the propounding attorney.  [Pollack Decl., Exs. I and J].  No one has suggested that the responses to this discovery will be complicated in any way because the action is pending in Oregon.  And there is no reason to believe that this situation would change with respect to either party's future requests for documents.  Party depositions, of course, occur where the witnesses are or at some other location agreed to by counsel, so the choice of forum is immaterial to the efficient conduct of party deposition discovery.

Second, as to the trial process, Defendant ignores a number of salient factors in making its blanket assertion that trial would be more convenient in the Northern District of California.  While SunPower cannot speak to the specific practices of Defendant's law firm, it is common practice in major litigation such as patent litigation for each firm to secure a hotel or other facility near the courthouse where both client and attorneys can reside and prepare for the duration of the trial.  [Pollack Decl. at ¶ 13].  Neither party could likely avoid this necessity simply by moving the trial to Northern California; for instance, even if the matter were assigned to the San Francisco division

(which is by no means assured), the parties could not commute from San Rafael, Richmond, Redwood City, and San Jose to court every morning in a timely fashion.  Assuming then that both firms will secure such facilities regardless of the forum, doing so would be significantly less expensive in Portland than in the Bay Area [Pollack Decl., Ex. K], and would almost certainly even outweigh the airfare that each party would spend traveling to trial.

Therefore, the convenience of the parties should be considered neutral in the venue transfer analysis, or even slightly favor maintaining this action in Oregon.

### C. SunPower's Choice of Forum is Entitled to Deference Because SunLink has Injured SunPower in this District.

Contrary to Defendant's suggestion that out of state plaintiffs are entitled to little deference in their choice of forum, [*see* Motion at 11], courts have been willing to deny venue transfer motions even where neither party is a resident in the forum, especially where, as here, substantial relevant activities have taken place in the forum.  Although a plaintiff's choice of forum may carry less weight when the chosen forum is not the plaintiff's home, *Findley Adhesives, Inc. v. Williams*, 751 F.Supp. 184, 186 (D.Or. 1990), SunPower's choice of forum "is not to be dismissed altogether," *Home Indem. Co. v. Stimson Lumber Co.*, 229 F.Supp.2d 1075, 1085 (D.Or. 2001).  SunPower's selection of Oregon as the forum for this dispute is entitled to deference because it is driven by the logic of its infringement case against SunLink, especially considering the degree of infringement in Oregon, *see supra*.

This Court has frequently denied motions to transfer in circumstances where Oregon is not the plaintiff's home, but the alleged injuries to the plaintiff nonetheless arose out of activities occurring in Oregon.  For example, in *WR Acorn Engineering Ass'n v. Ehrlich-Rominger Architecture*, No. CIV 99-940-KI, 2000 WL 72072 (D.Or. Jan. 26, 2000) (attached as Pollack Decl. Ex. N), this Court denied a motion to transfer an action brought by a foreign plaintiff against a foreign defendant involving a construction project in Oregon.  This Court held that Oregon was the

PAGE 12 - PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' MEMORANDUM IN OPPOSITION TO SUNLINK CORPORATION'S MOTION TO TRANSFER

most appropriate forum given that Oregon had a local interest in resolving the dispute, the ease of access in Oregon to sources of proof, and the presence of third-party witness not subject to compulsory process in the transferee court. As detailed *supra*, SunPower has at least as many important third-party witnesses in Oregon as SunLink does in California, and access to proof in Oregon will be vital to SunPower's case. Oregon also has an interest in this dispute by virtue of its stated desire to promote the development and deployment of solar technology – strong enforcement of intellectual property has been considered key in promoting innovation and commercialization of new technologies, so this is a fact in favor of maintaining the action in Oregon.

SunPower believes that Defendant's motion should be summarily denied for failure to satisfy the statutory threshold of section 1404(a). Should the Court go so far as to balance the interests at stake, however, SunPower respectfully requests that the Court give appropriate deference to its choice of forum as the plaintiff in this action.

## IV.   CONCLUSION.

SunPower respectfully requests that the Court deny Defendant's motion to transfer. SunPower submits that the Defendant's motion can be decided on the briefs without the need for oral argument. Nonetheless, SunPower stands ready to present oral argument should the Court determine that it would be helpful in resolving this matter.

DATED:  April 4, 2008                         CHERNOFF, VILHAUER, McCLUNG &
                                              STENZEL, LLP


                                              By:  /s/ Brenna K. Legaard_____
                                                   Brenna K. Legaard, OSB No. 001658
                                                   Susan D. Pitchford, OSB No. 980911
                                                   Telephone:  (503) 227-5631
                                                   Of Attorneys for Plaintiff

**Brenna K. Legaard, OSB No. 00165**
E-mail: brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 98091**
E-mail: sdp@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Facsimile: (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenbach@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Facsimile:  (650) 839-5071

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | Case No. CV 08-0148-AA |
| Plaintiff, | **DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER** |
| v. | |
| SUNLINK CORPORATION, a Delaware corporation, and ADVANCED ENERGY SYSTEMS LLC, an Oregon Limited liability company, | **PATENT CASE** |
| Defendants. | |

PAGE 1 - DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S
MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR
TRANSFER

I, Howard G. Pollack, declare as follows:

1.     I am a Principal of Fish & Richardson P.C., counsel of record in this action for SunPower Corporation, Systems. I am a member of the Bar of the State of California and of this Court by *pro hac vice* admission. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.     SunPower Corp., Systems ("SunPower") filed a complaint for patent infringement in this Court against SunLink Corp. ("SunLink") and Advanced Energy Systems LLC ("AES") on February 5, 1998.

3.     SunPower desires to reach the merits in this litigation quickly, efficiently, and inexpensively, and, in addition to the Defendants' significant infringement here, these were key considerations in choosing to bring the case in Oregon.

4.     Over the next several weeks after the filing of the complaint, SunPower and AES discussed potential settlement terms. The parties were unable to reach any mutually agreeable settlement until Thursday, March 20, at which point they both executed their settlement agreement and SunPower dismissed AES from the action as agreed therein.

5.     Mr. Tovey, counsel for SunLink, first called me to discuss SunLink's venue transfer concerns at about 7:00 pm on Thursday March 20. I was already out of the office for the day at that time. Mr. Tovey again called and left a voicemail on Friday, March 21, at which point the Fish & Richardson office was closed in observance of Good Friday.

6.     Mr. Tovey also sent me a letter via email on Friday, March 21, regarding the venue transfer matter. I responded via email that same day and indicated that SunPower would not consent to a venue transfer, and that I would be unavailable to discuss the matter through

PAGE 2 - DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S
          MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR
          TRANSFER

Tuesday, March 25 due to previous commitments. A true and correct copy of my March 20 email to Mr. Tovey is attached hereto as Exhibit O.

  7.  Mr. Tovey responded to this email with another email sent Friday evening, March 21. Because I was away in a location that was beyond cell phone and e-mail coverage over the holiday weekend, I was first able to reply to his email on Easter Sunday, March 23. In this email, I stated that SunPower would agree to allow SunLink more time to file any motion to transfer and would not argue that any motion to transfer was untimely if it were filed by Monday, March 31. I offered to discuss the issue further on the following Wednesday which, at the time, was the first available time for me to do so. A true and correct copy of my March 23 email to Mr. Tovey is attached hereto as Exhibit H.

  8.  On Monday, March 24, I both called and emailed Mr. Tovey to inform him that my previous commitment, a deposition for that day, had finished early, and so I was available to discuss his venue transfer concerns that afternoon or on Wednesday March 26.

  9.  Later on the afternoon of March 24, Mr. Tovey returned my phone call and we discussed the venue transfer issue. During this call, Mr. Tovey requested the terms of the settlement agreement between SunPower and former defendant AES. I informed him that we would provide a copy of the agreement when an appropriate protective order was in place. This was necessary due to the sensitive confidential information of both SunPower and AES contained in the agreement.

  10.  By previous stipulation of the parties, SunLink's answer to SunPower's complaint was due on March 25. SunLink filed and served its answer on that day, along with the instant motion to transfer venue and supporting papers.

PAGE 3 - DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S
   MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR
   TRANSFER

11.    I have been admitted to practice before the Northern District of California since 1995. To the best of my recollection, I have participated in 11 patent cases there, and 21 patent cases in a total of 8 other District Courts, including six trials in the District of Delaware. In my experience, the Northern District's Patent Local Rules do not speed up the progress of patent cases. In fact, the Rules can actually slow the resolution of a case on its merits and create the potential for parallel disputes over the adequacy of disclosures and compliance with the Rules themselves.

12.    Through my experience litigating in the Northern District of California, I have further come to understand that securing a settlement conference in front of a Magistrate or District Judge is very difficult there. Parties are generally required to make a showing that the case is unique, or else they will not be granted time with a settlement judge. A much more common outcome is paid mediation, at increased expense to the parties.

13.    It is common practice for attorneys involved in major litigation, such as patent litigation, and it is my personal practice, to secure a hotel or other facility near the courthouse for the duration of a trial. The attorneys and trial witnesses can then reside in this hotel and prepare there for each day of trial without needing to spend time commuting from distant homes and offices and avoiding the potential problems associated with traffic delays.

14.    The cost of doing business is significantly higher in the San Francisco Bay Area than it is in Portland. For example, Forbes.com ranked the three bay-area District Court divisions of San Francisco, San Jose, and Oakland in the top 10 most expensive cities to do business out of 200 major metropolitan areas. Portland was about one third of the way down the list. *See* "Special Report: Best Places For Business and Careers," a true and correct copy of which is attached hereto as Exhibit K. Thus, it is very likely that the costs associated with securing a trial site for the duration of any trial, a substantial portion of the costs associated with

PAGE 4 - DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S
          MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR
          TRANSFER

a patent trial, would be significantly higher in the Northern District of California than they would be in Oregon.

15.    A true and correct copy of a Hoover report on SunLink Corporation is attached hereto as Exhibit A.

16.    A true and correct copy of a July 7, 2004 E-Wire press release regarding the Sun-Link PV Module Mounting System is attached hereto as Exhibit B.

17.    A true and correct copy of a portion of Advanced Energy Systems' website is attached hereto as Exhibit C.

18.    A true and correct copy of a portion of the Oregon Department of Energy's website is attached hereto as Exhibit D.

19.    A true and correct copy of the Solar Energy Home Page from the Oregon Department of Energy's website is attached hereto as Exhibit E.

20.    A true and correct copy of a May 23, 2007 press release from the Majority Office of the Oregon Legislature is attached hereto as Exhibit F.

21.    A true and correct copy of Oregon Senate Bill 838 attached hereto as Exhibit G.

22.    A true and correct copy of SunPower's First Requests for Production of Documents and Things to Defendant SunLink Corporation is attached hereto as Exhibit I.

23.    A true and correct copy of Defendant SunLink's First Set or Requests for Production to Plaintiff SunPower is attached hereto as Exhibit J.

24.    A true and correct copy of excerpts from LegalMetric's District Judge Report, Northern District of California, Patent Cases, October 2006 is attached hereto as Exhibit L.

25.    A true and correct copy of excerpts from LegalMetric's District Judge Report, District of Oregon, Patent Cases, October 2006 is attached hereto as Exhibit M.

PAGE 5 - DECLARATION OF HOWARD G. POLLACK IN SUPPORT OF PLAINTIFF'S
          MEMORANDUM IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR
          TRANSFER

26.    A true and correct copy of *WR Acorn Engineering Ass'n v. Ehrlich-Rominger Architecture*, 2000 WL 72072 (D. Or. Jan. 26, 2000) is attached hereto as exhibit N.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Redwood City, California, this $\underline{4^{th}}$ day of April, 2008.

_____
Howard G. Pollack

50474715.doc

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Case No. CV 08-00148-AA

**SUNPOWER CORPORATION, SYSTEMS,**
a Delaware corporation,

     Plaintiff,

  v.

**SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,

    Defendants.

**EXHIBITS B THROUGH F (Docket No. 33) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)**

**PATENT CASE**

EXHIBITS B THROUGH F (Docket No. 33)

# Exhibit B



   

SUBMIT RELEASE NOW

**Search**

Search

**Circuits**

**Energy**

**Health & Biotech**

**Conservation**

**Corporate Responsibility**

**Tourism**

**Events**

**Agriculture**

**Government**

**Legal & Regulatory**

**Natural Resources**

**Science & Technology**

**Transportation**

**Benefits**

**Products & Services**

**Distribution List**

**Syndication Partners**

**Global Clients**

**Testimonials**

**FAQs**

**Regions**

**Europe**

**Asia**

**Aust-S Pacific**

**Central America**

**Middle East**

**Caribbean**

**Africa**

**Canada**

**United States**

**South America**

```
**********************************************************************
     E-WIRE PRESS RELEASE E-WIRE PRESS RELEASE E-WIRE PRESS RELEASE
**********************************************************************
```
Energy Editors/Business Editors

**Eastwood Energy Announces the Launch of Sun-Link, a Revolutionary Commercial Flat-Roof PV Mounting System**

LARKSPUR, CALIFORNIA, Jul. 7 -/E-Wire/Business Wire/-- Eastwood Energy, a developer of products for the solar power industry, announced today the release of its new Sun-Link(TM) PV module mounting system for flat roofs. The system allows the customer to choose one of four tilt angles -- 5 degrees, 10 degrees, 15 degrees, or 20 degrees -- in order to maximize energy production at a given site. Sun-Link(TM) is compatible with all major solar modules and can be adapted to fit virtually any module.

Sun-Link(TM)'s unique twin-spar architecture makes it the first system on the market to substantially enhance module strength. Yet it is lightweight -- under 3 lbs per square foot for the system including modules.

Sun-Link(TM) is strong enough to be self-ballasting while flexible enough to conform to uneven roof surfaces. It offers several anchoring and ballasting options to handle extreme conditions. Sun-Link(TM) also provides for air circulation to keep the modules cool and efficient.

Sun-Link(TM) has undergone extensive wind tunnel testing, permitting safe performance in winds up to 120 mph. It has also undergone certified static load testing up to 50 lbs/sf. Sun-Link(TM) components are non-corrosive -- aluminum and stainless steel. It is designed and manufactured to ISO 9001-2000 standards and is offered with a 15 year warranty.

Sun-Link(TM) will be displayed at Solar 2004, the National Solar Energy Conference, Portland, Oregon, July 10-13. Sun-Link(TM) is co-sponsored at the conference by Solar PowerWorks, a subsidiary of PowerWorks, a major developer and operator of wind and solar power projects. PowerWorks has offices in Moraga, California and Boise, Idaho.

Total mounting system cost is a function of component cost plus installation cost. Sun-Link(TM) consists of relatively few, lightweight components and is designed to be easy and quick for a small crew to install. No pre-assembly or special tools are required. Fewer components combined with reduced installation time translates to lower overall project cost.

Eastwood Energy Consulting Services

Eastwood has substantial experience in PV system development. As a result, it plans to offer two consulting services: 1) Sun-Link(TM) Sizer, is designed to help customers determine optimal module array configuration taking into account desired energy production, available roof space, and shading effects, as well as to evaluate self-ballasting versus anchoring or external ballasting; 2) Project Development Services include assistance to Sun-Link (TM) customers in PV project design, engineering and costing as well as with project feasibility analysis, financing, and management.

About Eastwood Energy

Eastwood Energy (www.eastwoodenergy.com), headquartered in Larkspur, California, manufactures and markets products for the solar power industry and for other renewable energy and distributed generation applications. Eastwood Energy has developed proprietary products for multi-energy systems and has been a successful developer of renewable energy projects for the past

two decades.

```
        /SOURCE:          Eastwood Energy

        -0-              07-07-2004

        /CONTACT:        Ann Hill Communications, Laura Windisch, 415-
                         491-5901, laura@ahcommunications.com

        /WEB SITE:       http://www.eastwoodenergy.com


**************************************************************************
    To Transmit Your News Over E-Wire, visit http://www.ewire.com or
call 1-800-343-9013. E-Wire Is Broadcast To Millions Of Readers Worldwide
**************************************************************************
```

© ewire.com 1993 – 2008. All Rights Reserved.

# Exhibit C

Advanced Energy Systems

| Home | Products / Services | About AES | Links | Contact |
|---|---|---|---|---|

# INDUSTRIAL FINISHES

**Industrial Finishes and Advanced Energy Systems of Eugene, Oregon unveils a 450 KW solar electric system.  Tax credits, incentives, and utility agreements make Oregon's largest commercial solar array a reality.**

Eugene, Ore.—August 1, 2007— It all started when Stuart Barr began researching solar panels for his ranch's off grid well pump over 3 years ago. Now, under construction is a solar array that is the largest PV system to be installed in the Pacific Northwest.  This 450 KW system will generate almost 500,000 kilowatt hours (kwhs) per year and feed its green electricity directly into the Eugene Water and Electric Board's (EWEB) grid system.

It was a combination of tax credits, financial incentives and the prospect of selling the power generated at a premium rate that attracted Barr's VP of Finance, Randy Friesen, to solar energy. "The tax benefits for installing a solar electric system are substantial and the prospect of EWEB paying us 15 cents per kilowatt hour generated is appealing," said Friesen.  "I don't know why more businesses aren't taking advantage of this. It makes financial sense and it's the right thing to do."



Industrial Finishes 450 KW System



Electrician working on site



Industrial Finishes before installation



Underneath the modules

.**Featured Projects**
.(Listed by Size)

Industrial Finishes
Pepsi Cola-Eugene
Pepsi Cola-K. Falls
Kettle Foods
West Wind FP
Guaranty RV / CW
U of O Living Learning
Rainbow Valley Const.
Market of Choice
Burton Saw & Supply
Encore Ceramics
AEC Test Facility
Pacific Cooperative
Tamarack Wellness Center
Chase Gardens
Kyle Electric
Guaranty Luxury RV
Chambers Comm. Center
Lanphier Associates
Sweet Life Pâtisserie
Calkins & Calkins
Heinz Selig
Engelmann Becker
Oak Street Medical
Autohaus

.**Live Solar Data**

AEC Test Facility
AES Design Studio
Autohaus
Chambers Comm. Center
Chase Gardens
Euroasian Automotive
Guaranty RV / CW
Guaranty RV Luxury Lot
Kaneko Commons
Lanphier Associates

Market of Choice





Industrial Finishes array up close 1          Industrial Finishes array up close 2

Pepsi Cola-K. Falls

West Wind FP

.Project Archive

Projects A-Z

.Employment

Job Opportunities

.Contact AES

This 450 kilowatt system features 2,574 Sharp 175 watt mono-crystalline photovoltaic panels and 2 Satcon 225 KW inverters, and will start generating power in December. The system covers the roofs of 2 buildings and includes 3 different attachment methods.  A non-penetrating clamp and rail system is used on one building which has a "Butler" standing seam metal roof, while a combination of tilt-up racks and a non-penetrating Sunlink system is utilized on the large flat roof of Industrial Finishes.

**Office:**
**(541) 683-2345**

**Fax:**
**(541) 683-2040**

**Email:**
**info@aesrenew.com**

"Advanced Energy Systems (AES) has designed the majority of the commercial PV systems in Oregon, including the largest building integrated system for Pepsi-Cola in Klamath Falls," said David Parker, President of AES, whose company designed and is installing Industrial Finishes's system with Reynolds Electric. "This is the best technology available today to generate clean, renewable solar electricity for the next 35 years with minimal maintenance.  We have created a solar project that will generate more than 100% of the electricity Industrial Finishes needs on an annual basis, to run its operations in Lane County."

The package of incentives and tax credits that closed the deal for Barr and Industrial Finishes included $72,000 per year in generation payments from EWEB, $1.6 million in Business Energy Tax Credits from the Oregon Department of Energy, a $960,000 Federal Tax Credit, and an accelerated 5 year state and federal tax depreciation schedule.  In addition to the financial incentives the environmental benefits are huge. Over its lifetime the system will save over 13,000 tons of greenhouse gases or the equivalent of 1.3 million gallons of gasoline.

As a condition of the 10 year contract with EWEB, all solar electric systems receiving incentives must be directly connected to the local utility grid.  This allows EWEB to then resell this renewable electricity to its customers under its new "Greenpower" program.  See www.eweb.org for more details.

**Project Partners:**
Eugene Water and Electric Board
Reynolds Electric

# Exhibit D

# About Us

Welcome to the Oregon Department of Energy

## Mission Statement

The mission of the Oregon Department of Energy is to ensure Oregon has an adequate supply of reliable and affordable energy and is safe from nuclear contamination, by helping Oregonians save energy, develop clean energy resources, promote renewable energy, and clean up nuclear waste.

## Organization

Annual Performance Measures

The Department of Energy was created in 1975. The department protects Oregon's environment by saving energy, developing clean energy resources and cleaning up nuclear waste. To encourage investments in energy efficiency and conservation, the office offers loans, tax credits, information, and technical expertise to households, businesses, schools and governments. The office aims to ensure that Oregon's mix of energy resources minimizes harm to the environment and reliably meets the state's needs. To meet this commitment, the office formulates energy policies, advances the development of renewable energy resources, and evaluates whether proposed energy facilities are economically and environmentally sound. The office also oversees the cleanup and transport of radioactive waste and develops and implements emergency plans for accidents involving radioactive materials. A major focus is the cleanup of radioactive waste at the Hanford nuclear site on the Columbia River in eastern Washington and the Trojan nuclear plant in Columbia County. The office staffs two energy policy and regulatory boards. The Energy Facility Siting Council is a board of citizens that determines whether energy facilities may be built in Oregon. The Hanford Waste Board represents Oregon's interests related to the Hanford site.

## Programs

- Encouraging investments in conservation and renewable resources by offering tax credits, loans, rebates, and grants.
- Providing information and assistance to households, businesses, schools, and government agencies on ways to save energy.
- Demonstrating the workability of new energy- saving equipment, appliances, materials, manufacturing processes, and building practices.
- Regulating the cleanup and transportation of radioactive wastes through the state.
- Ensuring that the state is prepared to respond to accidents involving radioactive materials.
- Advocating the cleanup of radioactive wastes at the Hanford Nuclear Reservation.
- Providing technical help and financial incentives to promote the use of renewable resources.
- Siting prudent, safe and environmentally sound energy facilities.

# Exhibit E

# Solar Energy Home Page

**Technologies**

 Solar Electric

 Solar Water Heating

 Solar Space Heating

**Incentives**

State

Federal

Utility

**Organizations**

Oregon Solar Energy Industry Association

Solar Oregon

SolWest/EORenew

**Solar Links**

California
Florida
Washington
Million Solar Roofs Program
National Renewable Energy Laboratory
Interstate Renewable Energy Council
American Solar Energy Society
Solar Energy Industry Association
Solar Energy Industry Association (Oregon Chapter)
Northwest Solar Center
Northwest Energy Efficiency Institute
National Center for Appropriate Technology

**Favorite Files**

Tax Credit-Certified Solar
Technicians

Hiring Tips

Basic Solar Information

Solar Tax Credits FAQ

Sun Chart for PV and ST

**ODOE Solar Web Pages**

Solar Home Page

Residential Solar Incentives

Business Solar Incentives

1.5% Solar for Public Buildings

Solar Tour/Events

Solar Professionals

Solar Publications

Case 4:08-cv-02807-SBA     Document 1-38     Filed 06/05/2008     Page 3 of 3

# Exhibit F



**NEWS**
Oregon Legislature • House Majority Office

May 23, 2007
Contact: Rebekah Orr, 503-986-1904
FOR IMMEDIATE RELEASE:

## Oregon House Approves Landmark Oregon Renewable Energy Act

Twenty-five percent of state's electricity will come from renewable sources by 2025

SALEM—House Democrats led the Oregon House today to approve the landmark Oregon Renewable Energy Act with broad bipartisan support

**"This bill is about taking control of Oregon's energy future – and using homegrown renewable resources to do so,"** said State Representative Jackie Dingfelder (D-Portland), Chair of the House Committee on Energy and the Environment, who championed the bill. **"By cutting our reliance on imported fossil fuels, we stabilize rates for consumers and businesses, we cut our global warming pollution, and we build a new 21st-century economy that benefits communities statewide."**

The passage of Senate Bill 838 will result in Oregon generating 25 percent of its electricity from renewable resources by the year 2025. Renewable energy includes biomass, hydropower, and energy derived from wind, solar power, ocean waves and geothermal sources. The 25 percent standard laid out in the bill will phase in gradually, and smaller utilities have lower standards. Oregon, Democrats say, is uniquely positioned to become a national—even international--leader in the alternative energy industry.

**"This bill is not just a renewable energy initiative,"** said State Representative Greg Macpherson (D-Lake Oswego). **"It is an economic development initiative. Oregon produces essentially no fossil fuels, but it does have diverse renewable energy sources. Areas around the Columbia Gorge and in northeastern and**

**southeastern Oregon have excellent wind sites. The Oregon coast has some of the best wave energy potential in the world. All of Oregon has great solar potential – even Oregon's rainiest places get more sun than Germany, the current world leader. Many parts of Eastern Oregon have excellent geothermal energy potential. And Oregon's forests are abundant in biomass material."**

Democrats also say the bill is a win/win for both rural and urban Oregonians.

**"This is one of the best bills this session for rural Oregon,"** said State Representative Brian Clem (D-Salem). **"Renewable energy sources can be a shot in the arm for our ailing rural communities. Farmers, often struggling to make money and keep their land and their family in the farming business, have found a new source of income in renewable energy. Farmers and rural landowners, for example, can make thousands of dollars per wind turbine on land that would bring in only hundreds of dollars in crops – and they can keep farming right up to the base of the turbine."**

Ultimately, Democrats say, the bill sets Oregon on a new course.

**"Today's vote for a renewable energy standard points us down a visionary path toward an economy and culture in Oregon that will allow us to effectively respond to challenges facing health care, public safety, education and the environment now and in the future ,"** said State Representative Ben Cannon (D-Portland)."

The bill, which has strong backing from the Governor, now moves to the Governor's desk for signature.

###

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| | Case No. CV 08-00148-AA |
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation, | |
| Plaintiff, | **EXHIBIT G  (Docket No. 34) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)** |
| v. | |
| **SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company, | |
| Defendants. | **PATENT CASE** |

EXHIBIT G (Docket No. 34)

# Exhibit G

74th OREGON LEGISLATIVE ASSEMBLY--2007 Regular Session

NOTE:  Matter within  { + braces and plus signs + } in an
amended section is new. Matter within  { - braces and minus
signs - } is existing law to be omitted. New sections are within
 { + braces and plus signs + } .

LC 3152-3

C-Engrossed

Senate Bill 838
Ordered by the House May 18
 Including Senate Amendments dated April 6 and House Amendments
dated May 9 and May 18

Sponsored by Senator AVAKIAN; Senators ATKINSON, BATES, BROWN,
  BURDICK, CARTER, COURTNEY, DEVLIN, GORDLY, METSGER, MONNES
  ANDERSON, MONROE, MORRISETTE, PROZANSKI, STARR, WALKER,
  WESTLUND, Representative DINGFELDER (at the request of Governor
  Theodore R.  Kulongoski)


SUMMARY

The following summary is not prepared by the sponsors of the
measure and is not a part of the body thereof subject to
consideration by the Legislative Assembly. It is an editor's
brief statement of the essential features of the measure.

  Establishes renewable portfolio standard for electric utilities
and electricity service suppliers. Specifies renewable energy
sources that can be used to generate electricity for purposes of
complying with standard. Provides exemptions from compliance with
standard.
  Directs State Department of Energy to establish system of
renewable energy certificates. Specifies renewable energy
certificates that may be used to comply with renewable portfolio
standard.
  Establishes compliance requirements for renewable portfolio
standards. Allows use of alternative compliance payments. Allows
Public Utility Commission to impose penalty against electric
company or electricity service supplier that fails to comply with
standard.
  Requires that utilities offer green power rate.
  Extends required collection of public purpose charge to January
1, 2026.
  Modifies laws relating to people's utility districts.
  Declares emergency, effective on passage.

A BILL FOR AN ACT
Relating to electricity; creating new provisions; amending ORS
  261.010, 261.030, 261.050, 261.235, 261.250, 261.253, 261.305,
  261.335, 261.348, 261.355, 262.005, 262.015, 262.075, 757.612
  and 757.687; and declaring an emergency.
  Whereas the Legislative Assembly finds that it is in the
interest of the state to promote research and development of new

renewable energy sources in Oregon; and
   Whereas the Legislative Assembly finds that it is necessary for
Oregon's electric utilities to decrease their reliance on fossil
fuels for electricity generation and to increase their use of
renewable energy sources; and

   Whereas this 2007 Act may be cited as the Oregon Renewable
Energy Act; and
   Whereas the Oregon Renewable Energy Act provides a
comprehensive renewable energy policy for Oregon, enabling
industry, government and all Oregonians to accelerate the
transition to a more reliable and more affordable energy system;
now, therefore,
Be It Enacted by the People of the State of Oregon:

                              { +

DEFINITIONS + }

   SECTION 1.  { +  Definitions. As used in sections 1 to 24 of
this 2007 Act:
   (1) 'Banked renewable energy certificate' means a bundled or
unbundled renewable energy certificate that is not used by an
electric utility or electricity service supplier to comply with a
renewable portfolio standard in a calendar year and that is
carried forward for the purpose of compliance with a renewable
portfolio standard in a subsequent year.
   (2) 'BPA electricity' means electricity provided by the
Bonneville Power Administration, including all electricity from
the Federal Columbia River Power System hydroelectric projects
and other electricity acquired by the Bonneville Power
Administration by contract.
   (3) 'Bundled renewable energy certificate' means a renewable
energy certificate for qualifying electricity that is acquired:
   (a) By an electric utility or electricity service supplier by a
trade, purchase or other transfer of electricity that includes
the certificate that was issued for the electricity; or
   (b) By an electric utility by generation of the electricity for
which the certificate was issued.
   (4) 'Compliance year' means the calendar year for which the
electric utility or electricity service supplier seeks to
establish compliance with the renewable portfolio standard
applicable to the utility or supplier in the compliance report
submitted under section 19 of this 2007 Act.
   (5) 'Consumer-owned utility' means a municipal electric
utility, a people's utility district organized under ORS chapter
261 that sells electricity or an electric cooperative organized
under ORS chapter 62.
   (6) 'Electric company' has the meaning given that term in ORS
757.600.
   (7) 'Electric utility' has the meaning given that term in ORS
757.600.
   (8) 'Electricity service supplier' has the meaning given that
term in ORS 757.600.
   (9) 'Qualifying electricity' means electricity described in
section 2 of this 2007 Act.
   (10) 'Renewable energy source' means a source of electricity
described in section 4 of this 2007 Act.
   (11) 'Retail electricity consumer' means a retail electricity
consumer, as defined in ORS 757.600, that is located in Oregon.
   (12) 'Unbundled renewable energy certificate' means a renewable

energy certificate for qualifying electricity that is acquired by
an electric utility or electricity service supplier by trade,
purchase or other transfer without acquiring the electricity for
which the certificate was issued. + }

{ +
QUALIFYING ELECTRICITY + }

  SECTION 2.  { + Qualifying electricity. (1) Except as provided
in this section, and subject to section 15 of this 2007 Act,
electricity generated from a renewable energy source may be used
to comply with a renewable portfolio standard only if the
facility that generates the electricity meets the requirements of
section 3 of this 2007 Act.
  (2) Any electricity that the Bonneville Power Administration
has designated as environmentally preferred power, or has given a
similar designation for electricity generated from a renewable
resource, may be used to comply with a renewable portfolio
standard.
  (3) The Legislative Assembly finds that hydroelectric energy is
an important renewable energy source and electricity from
hydroelectric generators may be used to comply with a renewable
portfolio standard as provided in sections 1 to 24 of this 2007
Act. + }
  SECTION 3.  { + Qualifying electricity; age of generating
facility. (1) Except as provided in this section, electricity may
be used to comply with a renewable portfolio standard only if the
electricity is generated by a facility that becomes operational
on or after January 1, 1995.
  (2) Electricity from a generating facility, other than a
hydroelectric facility, that became operational before January 1,
1995, may be used to comply with a renewable portfolio standard
if the electricity is attributable to capacity or efficiency
upgrades made on or after January 1, 1995.
  (3) Electricity from a hydroelectric facility that became
operational before January 1, 1995, may be used to comply with a
renewable portfolio standard if the electricity is attributable
to efficiency upgrades made on or after January 1, 1995. If an
efficiency upgrade is made to a Bonneville Power Administration
facility, only that portion of the electricity generation
attributable to Oregon's share of the electricity may be used to
comply with a renewable portfolio standard.
  (4) Subject to the limit imposed by section 4 (5) of this 2007
Act, electricity from a hydroelectric facility that is owned b
an electric utility and that became operational before January 1,
1995, may be used to comply with a renewable portfolio standard
if the facility is certified as a low-impact hydroelectric
facility on or after January 1, 1995, by a national certification
organization recognized by the State Department of Energy by
rule. + }
  SECTION 4.  { + Renewable energy sources. (1) Electricity
generated utilizing the following types of energy may be used to
comply with a renewable portfolio standard:
  (a) Wind energy.
  (b) Solar photovoltaic and solar thermal energy.
  (c) Wave, tidal and ocean thermal energy.
  (d) Geothermal energy.
  (2) Except as provided in subsection (3) of this section,
electricity generated from biomass and biomass byproducts may be
used to comply with a renewable portfolio standard, including but

not limited to electricity generated from:
    (a) Organic human or animal waste;
    (b) Spent pulping liquor;
    (c) Forest or rangeland woody debris from harvesting or
thinning conducted to improve forest or rangeland ecological
health and to reduce uncharacteristic stand replacing wildfire
risk;
    (d) Wood material from hardwood timber grown on land described
in ORS 321.267 (3);
    (e) Agricultural residues;
    (f) Dedicated energy crops; and
    (g) Landfill gas or biogas produced from organic matter,
wastewater, anaerobic digesters or municipal solid waste.
    (3) Electricity generated from the direct combustion of biomass
may not be used to comply with a renewable portfolio standard if
any of the biomass combusted to generate the electricity
includes:
    (a) Municipal solid waste; or
    (b) Wood that has been treated with chemical preservatives such
as creosote, pentachlorophenol or chromated copper arsenate.
    (4) Electricity generated by a hydroelectric facility may be
used to comply with a renewable portfolio standard only if:
    (a) The facility is located outside any protected area
designated by the Pacific Northwest Electric Power and
Conservation Planning Council as of July 23, 1999, or any area
protected under the federal Wild and Scenic Rivers Act, Public
Law 90-542, or the Oregon Scenic Waterways Act, ORS 390.805 to
390.925; or
    (b) The electricity is attributable to efficiency upgrades made
to the facility on or after January 1, 1995.
    (5) Up to 50 average megawatts of electricity per year
generated by an electric utility from certified low-impact
hydroelectric facilities described in section 3 (4) of this 2007
Act may be used to comply with a renewable portfolio standard
without regard to the number of certified facilities operated by
the electric utility or the generating capacity of those
facilities. A hydroelectric facility described in this subsection
is not subject to the requirements of subsection (4) of this
section.
    (6) Electricity generated from hydrogen gas derived from any
source of energy described in subsections (1) to (5) of this
section may be used to comply with a renewable portfolio
standard.
    (7) If electricity generation employs multiple energy sources,
that portion of the electricity generated that is attributable to
energy sources described in subsections (1) to (6) of this
section may be used to comply with a renewable portfolio
standard.
    (8) The State Department of Energy by rule may approve energy
sources other than those described in this section that may be
used to comply with a renewable portfolio standard. The
department may not approve petroleum, natural gas, coal or
nuclear fission as an energy source that may be used to comply
with a renewable portfolio standard. + }

                          { +
RENEWABLE PORTFOLIO STANDARDS + }

    SECTION 5.  { +  Applicable standard. (1) Electric utilities
must comply with the applicable renewable portfolio standard

described in section 6 or 7 of this 2007 Act.

(2) Electricity service suppliers must comply with the renewable portfolio standard established under section 9 of this 2007 Act. + }

SECTION 6. { + Large utility renewable portfolio standard. (1) The large utility renewable portfolio standard imposes the following requirements on an electric utility that makes sales of electricity to retail electricity consumers in an amount that equals three percent or more of all electricity sold to retail electricity consumers:

(a) At least five percent of the electricity sold by the utility to retail electricity consumers in each of the calendar years 2011, 2012, 2013 and 2014 must be qualifying electricity;

(b) At least 15 percent of the electricity sold by the utility to retail electricity consumers in each of the calendar years 2015, 2016, 2017, 2018 and 2019 must be qualifying electricity;

(c) At least 20 percent of the electricity sold by the utility to retail electricity consumers in each of the calendar years 2020, 2021, 2022, 2023 and 2024 must be qualifying electricity; and

(d) At least 25 percent of the electricity sold by the utility to retail electricity consumers in calendar year 2025 and subsequent calendar years must be qualifying electricity.

(2) If, on the effective date of this 2007 Act, an electric utility makes sales of electricity to retail electricity consumers in an amount that equals less than three percent of all electricity sold to retail electricity consumers, but in any three consecutive calendar years thereafter makes sales of electricity to retail electricity consumers in amounts that average three percent or more of all electricity sold to retail electricity consumers, the utility is subject to the renewable portfolio standard described in subsection (3) of this section. The utility becomes subject to the standard described in subsection (3) of this section in the calendar year following the three-year period during which the utility makes sales of electricity to retail electricity consumers in amounts that average three percent or more of all electricity sold to retail electricity consumers.

(3) An electric utility described in subsection (2) of this section must comply with the following renewable portfolio standard:

(a) Beginning in the fourth calendar year after the calendar year in which the utility becomes subject to the standard described in this subsection, at least five percent of the electricity sold by the utility to retail electricity consumers in a calendar year must be qualifying electricity;

(b) Beginning in the 10th calendar year after the calendar year in which the utility becomes subject to the standard described in this subsection, at least 15 percent of the electricity sold by the utility to retail electricity consumers in a calendar year must be qualifying electricity;

(c) Beginning in the 15th calendar year after the calendar year in which the utility becomes subject to the standard described in this subsection, at least 20 percent of the electricity sold by the utility to retail electricity consumers in a calendar year must be qualifying electricity; and

(d) Beginning in the 20th calendar year after the calendar year in which the utility becomes subject to the standard described in this subsection, at least 25 percent of the electricity sold by

the utility to retail electricity consumers in a calendar year must be qualifying electricity. + }

SECTION 7. { + Small electric utilities. (1) Except as provided in this section, an electric utility that makes sales of electricity to retail electricity consumers in an amount that equals less than three percent of all electricity sold to retail electricity consumers is not subject to sections 1 to 24 of this 2007 Act.

(2) Beginning in calendar year 2025, at least five percent of the electricity sold to retail electricity consumers in a calendar year by an electric utility must be qualifying electricity if the electric utility makes sales of electricity to retail electricity consumers in an amount that equals less than one and one-half percent of all electricity sold to retail electricity consumers.

(3) Beginning in calendar year 2025, at least 10 percent of the electricity sold to retail electricity consumers in a calendar year by an electric utility must be qualifying electricity if the electric utility makes sales of electricity to retail electricity consumers in an amount that equals or is more than one and one-half percent, and less than three percent, of all electricity sold to retail electricity consumers.

(4) The exemption provided by subsection (1) of this section terminates if an electric utility, or a joint operating entity that includes the utility as a member, acquires electricity from an electricity generating facility that uses coal as an energy source or makes an investment on or after the effective date of this 2007 Act in an electricity generating facility that uses coal as an energy source. This subsection does not apply to:

(a) A wholesale market purchase by an electric utility for which the energy source for the electricity is not known;

(b) BPA electricity;

(c) Acquisition of electricity under a contract entered into before the effective date of this 2007 Act;

(d) A renewal or replacement contract for a contract for purchase of electricity described in paragraph (c) of this subsection;

(e) A purchase of electricity if the electricity is included in a contract for the purchase of qualifying electricity and is necessary to shape, firm or integrate the qualifying electricity;

(f) Electricity provided to an electric utility under a contract for the acquisition of an interest in an electricity generating facility that was entered into by the utility before the effective date of this 2007 Act or entered into before the effective date of this 2007 Act by an electric cooperative organized under ORS chapter 62 of which the electric utility is a member, without regard to whether the electricity is being used to serve the load of the electric utility on the effective date of this 2007 Act; or

(g) Investments in an electricity generating facility that uses coal as an energy source if the investments are for the purpose of improving the facility's pollution mitigation equipment or the facility's efficiency or are necessary to comply with requirements or standards imposed by governmental entities.

(5) The exemption provided by subsection (1) of this section terminates for a consumer-owned utility if at any time after the effective date of this 2007 Act the utility acquires service territory of an electric company without the consent of the electric company.

   (6) Beginning in the calendar year following the year in which
an electric utility's exemption terminates under subsection (4)
or (5) of this section, the utility is subject to the renewable
portfolio standard described in section 6 (3) of this 2007 Act
and related provisions of sections 1 to 24 of this 2007 Act.
   (7) The provisions of this section do not affect the
requirement that electric utilities offer a green power rate
under section 23 of this 2007 Act. + }
   SECTION 8.  { +  Exemptions from compliance with renewable
portfolio standard. (1) Electric utilities are not required to
comply with the renewable portfolio standards described in
sections 6 and 7 of this 2007 Act to the extent that:
   (a) Compliance with the standard would require the utility to
acquire electricity in excess of the utility's projected load
requirements in any calendar year; and
   (b) Acquiring the additional electricity would require the
utility to substitute qualifying electricity for electricity
derived from an energy source other than coal, natural gas or
petroleum.
   (2)(a) Electric utilities are not required to comply with a
renewable portfolio standard to the extent that compliance would
require the utility to substitute qualifying electricity for
electricity available to the utility under contracts for
electricity from dams that are owned by Washington public utility
districts and are located between the Grand Coulee Dam and the
Columbia River's junction with the Snake River. The provisions of
this subsection apply only to contracts entered into before the
effective date of this 2007 Act and to renewal or replacement
contracts for contracts entered into before the effective date of
this 2007 Act.
   (b) If a contract described in paragraph (a) of this subsection
expires and is not renewed or replaced, the utility must comply,
in the calendar year following the expiration of the contract,
with the renewable portfolio standard applicable to the utility.
   (3) A consumer-owned utility is not required to comply with a
renewable portfolio standard to the extent that compliance would
require the utility to reduce the utility's purchases of the
lowest priced electricity from the Bonneville Power
Administration pursuant to section 5 of the Pacific Northwes
Electric Power Planning and Conservation Act of 1980, P.L.
96-501, as in effect on the effective date of this 2007 Act. The
exemption provided by this subsection applies only to firm
commitments for BPA electricity that the Bonneville Power
Administration has assured will be available to a utility to mee
agreed portions of the utility's load requirements for a defined
period of time. + }
   SECTION 9.  { +  Renewable portfolio standard for electricity
service suppliers. An electricity service supplier must meet the
requirements of the renewable portfolio standards that are
applicable to the electric utilities that serve the territories
in which the electricity service supplier sells electricity to
retail electricity consumers. The Public Utility Commission shall
establish procedures for implementation of the renewable
portfolio standards for electricity service suppliers that sell
electricity in the service territory of an electric company. If
an electricity service supplier sells electricity in territories
served by more than one electric company, the commission may
provide for an aggregate standard based on the amount of
electricity sold by the electricity service supplier in each
territory. Pursuant to ORS 757.676, a consumer-owned utility may

establish procedures for the implementation of the renewable portfolio standards for electricity service suppliers that sell electricity in the territory served by the consumer-owned utility. + }

SECTION 10. { + Manner of complying with renewable portfolio standards. (1) Except as provided in subsection (2) of this section, an electric utility or electricity service supplier must comply with the renewable portfolio standard applicable to the utility or supplier in each calendar year by:

(a) Using bundled renewable energy certificates issued or acquired during the compliance year;

(b) Subject to the limitations described in sections 16 and 17 of this 2007 Act, using unbundled or banked renewable energy certificates; or

(c) Making alternative compliance payments as described in section 20 of this 2007 Act.

(2) Bundled or unbundled renewable energy certificates that are issued or acquired by an electric utility or electricity service supplier on or before March 31 in a calendar year may be used by the utility or supplier to comply with the renewable portfolio standard applicable to the utility or supplier for the preceding calendar year. + }

SECTION 11. { + Implementation plan for electric companies; annual reports. (1) An electric company that is subject to a renewable portfolio standard shall develop an implementation plan for meeting the requirements of the standard and file the plan with the Public Utility Commission. Implementation plans must be revised and updated at least once every two years.

(2) An implementation plan must at a minimum contain:

(a) Annual targets for acquisition and use of qualifying electricity; and

(b) The estimated cost of meeting the annual targets, including the cost of transmission, the cost of firming, shaping and integrating qualifying electricity, the cost of alternative compliance payments and the cost of acquiring renewable energy certificates.

(3) The commission shall acknowledge the implementation plan no later than six months after the plan is filed with the commission. The commission may acknowledge the plan subject to conditions specified by the commission.

(4) The commission shall adopt rules:

(a) Establishing requirements for the content of implementation plans;

(b) Establishing the procedure for acknowledgement of implementation plans under this section, including provisions for public comment; and

(c) Providing for the integration of the implementation plan with the integrated resource planning guidelines established by the commission and in effect on the effective date of this 2007 Act.

(5) The implementation plan filed under this section may include procedures that will be used by the electric company to determine whether the costs of constructing a facility that generates electricity from a renewable energy source, or the costs of acquiring bundled or unbundled renewable energy certificates, are consistent with the standards of the commission relating to least-cost, least-risk planning for acquisition of resources. + }

SECTION 11a. { + An electric company shall develop and file

with the Public Utility Commission an initial implementation plan
under section 11 of this 2007 Act no later than January 1,
2010. + }

                              { +
COST LIMITATION + }

  SECTION 12. { + Limits on cost of compliance with renewable
portfolio standard. (1) Electric utilities are not required to
comply with a renewable portfolio standard during a compliance
year to the extent that the incremental cost of compliance, the
cost of unbundled renewable energy certificates and the cost of
alternative compliance payments under section 20 of this 2007 Act
exceeds four percent of the utility's annual revenue requirement
for the compliance year.
  (2) For each electric company, the Public Utility Commission
shall establish the annual revenue requirement for a compliance
year no later than January 1 of the compliance year. The
governing body of a consumer-owned utility shall establish the
annual revenue requirement for the consumer-owned utility.
  (3) The annual revenue requirement for an electric utility
shall be calculated based only on the operations of the utility
relating to electricity. The annual revenue requirement does not
include any amount expended by the utility for energy efficiency
programs for customers of the utility or for low income energy
assistance, the incremental cost of compliance with a renewable
portfolio standard, the cost of unbundled renewable energy
certificates or the cost of alternative compliance payments under
section 20 of this 2007 Act. The annual revenue requirement does
include:
  (a) All operating expenses of the utility during the compliance
year, including depreciation and taxes; and
  (b) For electric companies, an amount equal to the total rate
base of the company for the compliance year multiplied by the
rate of return established by the commission for debt and equity
of the company.
  (4) For the purposes of this section, the incremental cost of
compliance with a renewable portfolio standard is the difference
between the levelized annual delivered cost of the qualifying
electricity and the levelized annual delivered cost of an
equivalent amount of reasonably available electricity that is not
qualifying electricity. For the purpose of this subsection, the
commission or governing body of a consumer-owned utility shall
use the net present value of delivered cost, including:
  (a) Capital, operating and maintenance costs of generating
facilities;
  (b) Financing costs attributable to capital, operating and
maintenance expenditures for generating facilities;
  (c) Transmission and substation costs;
  (d) Load following and ancillary services costs; and
  (e) Costs associated with using other assets, physical or
financial, to integrate, firm or shape renewable energy sources
on a firm annual basis to meet retail electricity needs.
  (5) For the purposes of this section, the governing body of a
consumer-owned utility may include in the incremental cost of
compliance with a renewable portfolio standard all expenses
associated with research, development and demonstration projects
related to the generation of qualifying electricity by the
consumer-owned utility.
  (6) The commission shall establish limits on the incremental

cost of compliance with the renewable portfolio standard for
electricity service suppliers under section 9 of this 2007 Act
that are the equivalent of the cost limits applicable to the
electric companies that serve the territories in which the
electricity service supplier sells electricity to retail
electricity consumers. If an electricity service supplier sells
electricity in territories served by more than one electric
company, the commission may provide for an aggregate cost limit
based on the amount of electricity sold by the electricity
service supplier in each territory. Pursuant to ORS 757.676, a
consumer-owned utility may establish limits on the cost of
compliance with the renewable portfolio standard for electricity
service suppliers that sell electricity in the territory served
by the consumer-owned utility. + }
  SECTION 12a.  { + The Public Utility Commission shall establish
the methodology for determining the annual revenue requirement of
an electric company for purposes of section 12 of this 2007 Act
no later than July 1, 2008. + }

                                   { +
COST RECOVERY + }

  SECTION 13.  { + Cost recovery by electric companies. (1)
Except as provided in section 20 (5) of this 2007 Act, all
prudently incurred costs associated with compliance with a
renewable portfolio standard are recoverable in the rates of an
electric company, including interconnection costs, costs
associated with using physical or financial assets to integrate,
firm or shape renewable energy sources on a firm annual basis to
meet retail electricity needs and other costs associated with
transmission and delivery of qualifying electricity to retail
electricity consumers.
  (2) Costs associated with compliance with a renewable portfolio
standard are not an above-market cost for the purposes of ORS
757.600 to 757.687.
  (3) The Public Utility Commission shall establish an automatic
adjustment clause as defined in ORS 757.210 or another method
that allows timely recovery of costs prudently incurred by an
electric company to construct or otherwise acquire facilities
that generate electricity from renewable energy sources and for
associated electricity transmission. Notwithstanding any other
provision of law, upon the request of any interested person the
commission shall conduct a proceeding to establish the terms of
the automatic adjustment clause or other method for timely
recovery of costs. The commission shall provide parties to the
proceeding with the procedural rights described in ORS 756.500 to
756.610, including but not limited to the opportunity to develop
an evidentiary record, conduct discovery, introduce evidence,
conduct cross-examination and submit written briefs and oral
argument. The commission shall issue a written order with
findings on the evidentiary record developed in the proceeding.
  (4) An electric company must file with the commission for
approval of a proposed rate change to recover costs under the
terms of an automatic adjustment clause or other method for
timely recovery of costs established under subsection (3) of this
section. Notwithstanding any other provision of law, upon the
request of any interested person the commission shall conduct a
proceeding to determine whether to approve a proposed change in
rates under the automatic adjustment clause or other method for
timely recovery of costs. The commission shall provide parties to

the proceeding with the procedural rights described in ORS
756.500 to 756.610, including but not limited to the opportunity
to develop an evidentiary record, conduct discovery, introduce
evidence, conduct cross-examination and submit written briefs and
oral argument. The commission shall issue a written order with
findings on the evidentiary record developed in the proceeding. A
filing made under this subsection is subject to the commission's
authority under ORS 757.215 to suspend a rate, or schedule of
rates, for investigation. + }

  SECTION 13a.  { + The Public Utility Commission shall establish
the automatic adjustment clause or another method for timely
recovery of costs as required by section 13 (3) of this 2007 Act
no later than January 1, 2008. The clause or method shall apply
to all prudently incurred costs described in section 13 (3) of
this 2007 Act incurred by an electric company since the date of
the company's last general rate case that was decided by the
commission before the effective date of this 2007 Act. + }

                           { +
RENEWABLE ENERGY CERTIFICATES + }

  SECTION 14.  { + Renewable energy certificates system. (1) The
State Department of Energy shall establish a system of renewable
energy certificates that can be used by an electric utility or
electricity service supplier to establish compliance with the
applicable renewable portfolio standard. The department shall
consult with the Public Utility Commission before establishing a
system of renewable energy certificates under this section. The
department may allow use of renewable energy certificates that
are issued, monitored, accounted for or transferred by or through
a regional system or trading program, including but not limited
to the Western Renewable Energy Generation Information System.
The system established by the department shall allow issuance,
transfer and use of renewable energy certificates in electronic
form.
  (2) The validity of a bundled renewable energy certificate for
purposes of compliance with the applicable renewable portfolio
standard is not affected by the substitution of any other
electricity for the qualifying electricity at any point after the
time of generation. + }
  SECTION 15.  { + Renewable energy certificates that may be
used to comply with standards. (1) A bundled renewable energy
certificate may be used to comply with a renewable portfolio
standard if:
  (a) The facility that generates the qualifying electricity for
which the certificate is issued is located in the United States
and within the geographic boundary of the Western Electricity
Coordinating Council; and
  (b) The qualifying electricity for which the certificate is
issued is delivered to the Bonneville Power Administration, to
the transmission system of an electric utility or to another
delivery point designated by an electric utility for the purpose
of subsequent delivery to the electric utility.
  (2) An unbundled renewable energy certificate may be used to
comply with a renewable portfolio standard if the facility that
generates the qualifying electricity for which the certificate is
issued is located within the geographic boundary of the Western
Electricity Coordinating Council.
  (3) Renewable energy certificates issued for any electricity
that the Bonneville Power Administration has designated as

environmentally preferred power, or has given a similar
designation for electricity generated from a renewable resource,
may be used to comply with a renewable portfolio standard without
regard to the location of the generating facility. + }

  SECTION 16.   { +  Use, transfer and banking of certificates.
(1) Renewable energy certificates may be traded, sold or
otherwise transferred.

  (2) Renewable energy certificates that are not used by an
electric utility or electricity service supplier to comply with a
renewable portfolio standard in a calendar year may be banked and
carried forward indefinitely for the purpose of complying with a
renewable portfolio standard in a subsequent year. For the
purpose of complying with a renewable portfolio standard in any
calendar year:

  (a) Banked renewable energy certificates must be used, up to
the limit imposed by section 17 of this 2007 Act, before other
certificates are used; and

  (b) Banked renewable energy certificates with the oldest
issuance date must be used to comply with the standard before
banked renewable energy certificates with more recent issuance
dates are used.

  (3) An electric utility or electricity service supplier is
responsible for demonstrating that a renewable energy certificate
used to comply with a renewable portfolio standard is derived
from a renewable energy source and that the utility or supplier
has not used, traded, sold or otherwise transferred the
certificate.

  (4) The same renewable energy certificate may be used by an
electric utility or electricity service supplier to comply with a
federal renewable portfolio standard and a renewable portfolio
standard established under sections 1 to 24 of this 2007 Act. An
electric utility or electricity service supplier that uses a
renewable energy certificate to comply with a renewable portfolio
standard imposed by any other state may not use the same
certificate to comply with a renewable portfolio standard
established under sections 1 to 24 of this 2007 Act. + }

  SECTION 17.   { +  Limitations on use of unbundled certificates
to meet renewable portfolio standard. (1) Except as otherwise
provided in this section, unbundled renewable energy
certificates, including banked unbundled renewable energy
certificates, may not be used to meet more than 20 percent of the
requirements of the large utility renewable portfolio standard
described in section 6 of this 2007 Act for any compliance year.

  (2) The limitation imposed by subsection (1) of this section
does not apply to renewable energy certificates issued for
electricity generated in Oregon from a renewable energy source by
a net metering facility as defined in ORS 757.300, or another
generating facility that is not directly connected to a
distribution or transmission system.

  (3) The limitation imposed by subsection (1) of this section
does not apply to renewable energy certificates issued for
electricity generated in Oregon by a qualifying facility under
ORS 758.505 to 758.555.

  (4) The limitation imposed by subsection (1) of this section
does not apply to an electricity service supplier. + }

  SECTION 17a.   { + Notwithstanding section 17 (1) of this 2007
Act, for compliance years before 2020, a consume:-owned utility
subject to the large utility renewable portfolio standard
described in section 6 of this 2007 Act may use unbundled
renewable energy certificates, including banked unbundled

renewable energy certificates, to meet up to 50 percent of the
requirements of the standard. + }
  SECTION 18.  { +  Multistate electric companies. The Public
Utility Commission by rule shall establish a process for
allocating the use of renewable energy certificates by an

electric company that makes sales of electricity to retail
customers in more than one state. + }

                              { +
COMPLIANCE REPORTS + }

  SECTION 19.  { +  Compliance reports. (1) Each electric utility
and electricity service supplier that is subject to a renewable
portfolio standard shall make an annual compliance report for the
purpose of detailing compliance, or failure to comply, with the
renewable portfolio standard applicable in the compliance year.
An electric company or electricity service supplier shall mak
the report to the Public Utility Commission. A consumer-owned
utility shall make the report to the members or customers of the
utility.
  (2) The commission shall review each compliance report filed
under this section by an electric company or electricity service
supplier for the purposes of determining whether the company or
supplier has complied with the renewable portfolio standard
applicable to the company or supplier and the manner in which the
company or supplier has complied. In reviewing the reports, the
commission shall consider:
  (a) The relative amounts of renewable energy certificates and
other payments used by the company or supplier to meet the
applicable renewable portfolio standard, including:
  (A) Bundled renewable energy certificates;
  (B) Unbundled renewable energy certificates;
  (C) Banked renewable energy certificates; and
  (D) Alternative compliance payments under section 20 of this
2007 Act.
  (b) The timing of electricity purchases.
  (c) The market prices for electricity purchases and unbundled
renewable energy certificates.
  (d) Whether the actions taken by the company or supplier are
contributing to long term development of generating capacity
using renewable energy sources.
  (e) The effect of the actions taken by the company or supplier
on the rates payable by retail electricity consumers.
  (f) Good faith forecasting differences associated with the
projected number of retail electricity consumers served and the
availability of electricity from renewable energy sources.
  (g) For electric companies, consistency with the implementation
plan filed under section 11 of this 2007 Act, as acknowledged by
the commission.
  (h) Any other factors deemed reasonable by the commission.
  (3) The commission by rule may establish requirements for
compliance reports submitted by an electric company or
electricity service supplier. + }

                              { +
ALTERNATIVE COMPLIANCE PAYMENTS + }

  SECTION 20.  { +  Electric companies; electricity service
suppliers. (1) The Public Utility Commission shall establish an

alternative compliance rate for each compliance year for each
electric company or electricity service supplier that is subject
to a renewable portfolio standard. The rate shall be expressed in
dollars per megawatt-hour.

   (2) The commission shall establish an alternative compliance
rate based on the cost of qualifying electricity, contracts that
the electric company or electricity service supplier has acquired
for future delivery of qualifying electricity and the number of
unbundled renewable energy certificates that the company or
supplier anticipates using in the compliance year to meet the
renewable portfolio standard applicable to the company or
supplier. The commission shall also consider any determinations
made under section 19 of this 2007 Act in reviewing the
compliance report made by the electric company or electricity
service supplier for the previous compliance year. In
establishing an alternative compliance rate, the commission shall
set the rate to provide adequate incentive for the electric
company or electricity service supplier to purchase or generate
qualifying electricity in lieu of using alternative compliance
payments to meet the renewable portfolio standard applicable to
the company or supplier.

   (3) An electric company or electricity service supplier may
elect to use, or may be required by the commission to use,
alternative compliance payments to comply with the renewable
portfolio standard applicable to the company or supplier. Any
election by an electric company or electricity service supplier
to use alternative compliance payments is subject to review by
the commission under section 19 of this 2007 Act. An electric
company or electricity service supplier may not be required to
make alternative compliance payments that would result in the
company or supplier exceeding the cost limitation established
under section 12 of this 2007 Act.

   (4) The commission shall determine for each electric company
the extent to which alternative compliance payments may be
recovered in the rates of the company. Each electric company
shall deposit any amounts recovered in the rates of the company
for alternative compliance payments in a holding account
established by the company. Amounts in the holding account shall
accrue interest at the rate of return authorized by the
commission for the electric company.

   (5) Amounts in holding accounts established under subsection
(4) of this section may be expended by an electric company only
for costs of acquiring new generating capacity from renewable
energy sources, investments in efficiency upgrades to electricity
generating facilities owned by the company and energy
conservation programs within the company's service area. The
commission must approve expenditures by an electric company from
a holding account established under subsection (4) of this
section. Amounts that are collected from customers and spent by
an electric company under this subsection may not be included in
the company's rate base.

   (6) The commission shall require electricity service suppliers
to establish holding accounts and make payments to those accounts
on a substantially similar basis as provided for electric
companies. The commission must approve expenditures by an
electricity service supplier from a holding account established
under this subsection. The commission may approve expenditures
only for energy conservation programs for customers of the
electricity service supplier. + }

   SECTION 20a.  { + The Public Utility Commission shall establish

initial alternative compliance rates as required by section 20 of
this 2007 Act no later than July 1, 2009. + }
  SECTION 21.  { + Consumer-owned utilities. The governing body
of a consumer-owned utility shall establish an alternative
compliance rate for the utility. To the extent possible, the
alternative compliance rate shall be determined by the governing
body of the consumer-owned utility in a manner similar to that
used by the Public Utility Commission in establishing alternative
compliance rates under section 20 of this 2007 Act. Amounts
collected as alternative compliance payments by a consumer-owned
utility may be used for the purposes specified in section 20 (5)
of this 2007 Act and for the purpose of paying expenses
associated with research, development and demonstration projects
related to the generation of qualifying electricity by the
utility. + }


                              { +
PENALTY + }
  SECTION 22.  { + Penalty. If an electric company or
electricity service supplier that is subject to a renewable
portfolio standard under sections 1 to 24 of this 2007 Act fails
to comply with the standard in the manner provided by sections 1
to 24 of this 2007 Act, the Public Utility Commission may impose
a penalty against the company or supplier in an amount determined
by the commission.  A penalty under this section is in addition
to any alternative compliance payment required or elected under
section 20 of this 2007 Act. Moneys paid for penalties under this
section shall be transmitted by the commission to the
nongovernmental entity receiving moneys under ORS 757.612 (3)(d)
and may be used only for the purposes specified in ORS 757.612
(1). + }


                              { +
GREEN POWER RATE + }

  SECTION 23.  { + Green power rate. (1) Electric utilities
shall allow retail electricity consumers to elect a green power
rate. A significant portion of the electricity purchased or
generated by a utility that is attributable to moneys paid by
retail electricity consumers who elect the green power rate must
be qualifying electricity, and the utility must inform consumers
of the sources of the electricity purchased or generated by the
utility that is attributable to moneys paid by consumers who
elect the green power rate. The green power rate shall reasonably
reflect the costs of the electricity purchased or generated by
the utility that is attributable to moneys paid by retail
electricity consumers who elect the green power rate. All
prudently incurred costs associated with the green power rate are
recoverable in a green power rate offered by an electric company.
  (2) Any qualifying electricity procured by an electric utility
to provide electricity under a green power rate under subsection
(1) of this section or ORS 757.603 (2)(a) may not be used by the
utility to comply with the requirements of a renewable portfolio
standard.
  (3) The provisions of subsection (1) of this section do not
apply to electric companies that are subject to ORS 757.603
(2)(a).
  (4) An electric utility may comply with the requirements of
subsection (1) of this section by contracting with a third-party
provider. + }

{ +
COMMUNITY-BASED RENEWABLE ENERGY PROJECTS + }

  SECTION 24. { + Goal for community-based renewable energy
projects. The Legislative Assembly finds that community-based
renewable energy projects are an essential element of Oregon's
energy future, and declares that it is the goal of the State of
Oregon that by 2025 at least eight percent of Oregon's retail
electrical load comes from small-scale renewable energy projects
with a generating capacity of 20 megawatts or less. All agencies
of the executive department as defined in ORS 174.112 shall
establish policies and procedures promoting the goal declared in
this section. + }

                          { +
JOB IMPACT STUDY + }

  SECTION 25. { + Job impact study. (1) The State Department of
Energy shall periodically conduct a study to evaluate the impact
of sections 1 to 24 of this 2007 Act on jobs in this state. The
study shall assess the number of new jobs created in the
renewable energy sector in this state and the average wage rates
and the provision of health care and other benefits for those
jobs. In addition, the study shall investigate the extent to
which workforce training opportunities are being provided to
employees to prepare the employees for jobs in the renewable
energy sector.
  (2) The department shall conduct the first study under this
section not later than two years after the effective date of this
2007 Act. + }
  SECTION 26. { + Section 25 of this 2007 Act is repealed
January 2, 2026. + }

                          { +
PUBLIC PURPOSE CHARGE + }

  SECTION 27. ORS 757.612 is amended to read:
  757.612. (1) There is established an annual public purpose
expenditure standard for electric companies to fund new
cost-effective local energy conservation, new market
transformation efforts, the above-market costs of new renewable
energy resources and new low-income weatherization. The public
purpose expenditure standard shall be funded by the public
purpose charge described in subsection (2) of this section.
  (2)(a) Beginning on the date an electric company offers direct
access to its retail electricity consumers, except residential
electricity consumers, the electric company shall collect a
public purpose charge from all of the retail electricity
consumers located within its service area   { - for a period of
10 years - }  { + until January 1, 2026 + }. Except as provided
in paragraph (b) of this subsection, the public purpose charge
shall be equal to three percent of the total revenues collected
by the electric company or electricity service supplier from its
retail electricity consumers for electricity services,
distribution, ancillary services, metering and billing,
transition charges and other types of costs included in electric
rates on July 23, 1999.
  (b) For an aluminum plant that averages more than 100 average
megawatts of electricity use per year, beginning on March 1,

2002, the electric company whose territory abuts the greatest
percentage of the site of the aluminum plant shall collect from
the aluminum company a public purpose charge equal to one percent
of the total revenue from the sale of electricity services to the
aluminum plant from any source.

(3)(a) The Public Utility Commission shall establish rules
implementing the provisions of this section relating to electric
companies.

(b) Subject to paragraph (e) of this subsection, funds
collected by an electric company through public purpose charges
shall be allocated as follows:

(A) Sixty-three percent for new cost-effective conservation and
new market transformation.

(B) Nineteen percent for the above-market costs of   { – new
renewable energy resources – }   { + constructing and operating
new renewable energy resources with a nominal electric generating
capacity, as defined in ORS 469.300, of 20 megawatts or less + }.

(C) Thirteen percent for new low-income weatherization.

(D) Five percent shall be transferred to the Housing and
Community Services Department Revolving Account created under ORS
456.574 and used for the purpose of providing grants as described
in ORS 458.625 (2). Moneys deposited in the account under this
subparagraph are continuously appropriated to the Housing and
Community Services Department for the purposes of ORS 458.625
(2).  Interest on moneys deposited in the account under this
subparagraph shall accrue to the account.

(c) The costs of administering subsections (1) to (6) of this
section for an electric company shall be paid out of the funds
collected through public purpose charges. The commission may
require that an electric company direct funds collected through
public purpose charges to the state agencies responsible for
implementing subsections (1) to (6) of this section in order to
pay the costs of administering such responsibilities.

(d) The commission shall direct the manner in which public
purpose charges are collected and spent by an electric company
and may require an electric company to expend funds through
competitive bids or other means designed to encourage
competition, except that funds dedicated for low-income
weatherization shall be directed to the Housing and Community
Services Department as provided in subsection (7) of this
section. The commission may also direct that funds collected by
an electric company through public purpose charges be paid to a
nongovernmental entity for investment in public purposes
described in subsection (1) of this section. Notwithstanding any
other provision of this subsection, at least 80 percent of the
funds allocated for conservation shall be spent within the
service area of the electric company that collected the funds.

(e)(A) The first 10 percent of the funds collected annually by
an electric company under subsection (2) of this section shall be
distributed to education service districts, as described in ORS
334.010, that are located in the service territory of the
electric company. The funds shall be distributed to individual
education service districts according to the weighted average
daily membership (ADMw) of the component school districts of the
education service district for the prior fiscal year as
calculated under ORS 327.013. The commission shall establish by
rule a methodology for distributing a proportionate share of
funds under this paragraph to education service districts that
are only partially located in the service territory of the
electric company.

(B) An education service district that receives funds under
this paragraph shall use the funds first to pay for energy audits
for school districts located within the education service
district. An education service district may not expend additional
funds received under this paragraph on a school district facility
until an energy audit has been completed for that school
district.  To the extent practicable, an education service
district shall coordinate with the State Department of Energy and
incorporate federal funding in complying with this paragraph.
Following completion of an energy audit for an individual school
district, the education service district may expend funds
received under this paragraph to implement the energy audit. Once
an energy audit has been conducted and completely implemented for
each school district within the education service district, the
education service district may expend funds received under this
paragraph for any of the following purposes:
   (i) Conducting energy audits. A school district shall conduct
an energy audit prior to expending funds on any other purpose
authorized under this paragraph unless the school district has
performed an energy audit within the three years immediately
prior to receiving the funds.
   (ii) Weatherization and upgrading the energy efficiency of
school district facilities.
   (iii) Energy conservation education programs.
   (iv) Purchasing electricity from environmentally focused
sources and investing in renewable energy resources.
   (f) The commission may  { + not + } establish a different
public purpose charge than the public purpose charge
 { - otherwise - } described in subsection (2) of this section
 { - for an individual retail electricity consumer or any class
of retail electricity consumers located within the service area
of an electric company, provided that a retail electricity
consumer with a load greater than one average megawatt is not
required to pay a public purpose charge in excess of three
percent of its total cost of electricity services- } .

    { - (g) The commission shall remove from the rates of each
electric company any costs for public purposes described in
subsection (1) of this section that are included in rates. A rate
adjustment under this paragraph shall be effective on the date
that the electric company begins collecting public purpose
charges. - }
   (4) An electric company that satisfies its obligations under
this section shall have no further obligation to invest in
conservation, new market transformation  { - , new renewable
energy resources - }  or new low-income weatherization or to
provide a commercial energy conservation services program and is
not subject to ORS 469.631 to 469.645  { - , - }  { + and + }
469.860 to 469.900  { - and 758.505 to 758.555 - } .
   (5)(a) A retail electricity consumer that uses more than one
average megawatt of electricity at any site in the prior year
shall receive a credit against public purpose charges billed by
an electric company for that site. The amount of the credit shall
be equal to the total amount of qualifying expenditures for new
energy conservation, not to exceed 68 percent of the annual
public purpose charges, and the above-market costs of purchases
of new renewable energy resources incurred by the retail
electricity consumer, not to exceed 19 percent of the annual
public purpose charges, less administration costs incurred under
this subsection.  The credit may not exceed, on an annual basis,

the lesser of:
   (A) The amount of the retail electricity consumer's qualifying
expenditures; or
   (B) The portion of the public purpose charge billed to the
retail electricity consumer that is dedicated to new energy
conservation, new market transformation or the above-market costs
of new renewable energy resources.
   (b) To obtain a credit under this subsection, a retail
electricity consumer shall file with the State Department of
Energy a description of the proposed conservation project or new
renewable energy resource and a declaration that the retail
electricity consumer plans to incur the qualifying expenditure.
The State Department of Energy shall issue a notice of
precertification within 30 days of receipt of the filing, if such
filing is consistent with this subsection. The credit may be
taken after a retail electricity consumer provides a letter from
a certified public accountant to the State Department of Energy
verifying that the precertified qualifying expenditure has been
made.
   (c) Credits earned by a retail electricity consumer as a result
of qualifying expenditures that are not used in one year may be
carried forward for use in subsequent years.
   (d)(A) A retail electricity consumer that uses more than one
average megawatt of electricity at any site in the prior year may
request that the State Department of Energy hire an independent
auditor to assess the potential for conservation investments at
the site. If the independent auditor determines there is no
available conservation measure at the site that would have a
simple payback of one to 10 years, the retail electricity
consumer shall be relieved of 54 percent of its payment
obligation for public purpose charges related to the site. If the
independent auditor determines that there are potential
conservation measures available at the site, the retail
electricity consumer shall be entitled to a credit against public
purpose charges related to the site equal to 54 percent of the
public purpose charges less the estimated cost of available
conservation measures.
   (B) A retail electricity consumer shall be entitled each year
to the credit described in this subsection unless a subsequent
independent audit determines that new conservation investment
opportunities are available. The State Department of Energy may
require that a new independent audit be performed on the site to
determine whether new conservation measures are available,
provided that the independent audits shall occur no more than
once every two years.
   (C) The retail electricity consumer shall pay the cost of the
independent audits described in this subsection.
   (6) Electric utilities and retail electricity consumers shall
receive a fair and reasonable credit for the public purpose
expenditures of their energy suppliers. The State Department of
Energy shall adopt rules to determine eligible expenditures and
the methodology by which such credits are accounted for and used.
The rules also shall adopt methods to account for eligible public
purpose expenditures made through consortia or collaborative
projects.
   (7)(a) In addition to the public purpose charge provided under
subsection (2) of this section, beginning on October 1, 2001, an
electric company shall collect funds for low-income electric bill
payment assistance in an amount determined under paragraph (b) of
this subsection.

(b) The total amount collected for low-income electric bill payment assistance under this section shall be $10 million per year. The commission shall determine each electric company's proportionate share of the total amount. The commission shall determine the amount to be collected from a retail electricity consumer, except that a retail electricity consumer is not required to pay more than $500 per month per site for low-income electric bill payment assistance.

(c) Funds collected by the low-income electric bill payment assistance charge shall be paid into the Housing and Community Services Department Revolving Account created under ORS 456.574. Moneys deposited in the account under this paragraph are continuously appropriated to the Housing and Community Services Department for the purpose of funding low-income electric bill payment assistance. Interest earned on moneys deposited in the account under this paragraph shall accrue to the account. The department's cost of administering this subsection shall be paid out of funds collected by the low-income electric bill payment assistance charge. Moneys deposited in the account under this paragraph shall be expended solely for low-income electric bill payment assistance. Funds collected from an electric company shall be expended in the service area of the electric company from which the funds are collected.

(d) The Housing and Community Services Department, in consultation with the federal Advisory Committee on Energy, shall determine the manner in which funds collected under this subsection will be allocated by the department to energy assistance program providers for the purpose of providing low-income bill payment and crisis assistance, including programs that effectively reduce service disconnections and related costs to retail electricity consumers and electric utilities. Priority assistance shall be directed to low-income electricity consumers who are in danger of having their electricity service disconnected.

(e) Notwithstanding ORS 293.140, interest on moneys deposited in the Housing and Community Services Department Revolving Account under this subsection shall accrue to the account and ma be used to provide heating bill payment and crisis assistance to electricity consumers whose primary source of heat is not electricity.

(f) Notwithstanding ORS 757.310, the commission may allow an electric company to provide reduced rates or other payment or crisis assistance or low-income program assistance to a low-income household eligible for assistance under the federal Low Income Home Energy Assistance Act of 1981, as amended and in effect on July 23, 1999.

(8) For purposes of this section, 'retail electricity consumers' includes any direct service industrial consumer that purchases electricity without purchasing distribution services from the electric utility.

SECTION 28.  { + The amendments to ORS 757.612 (3)(b)(B) by section 27 of this 2007 Act become operative on January 1, 2008. + }

SECTION 29. ORS 757.687 is amended to read:

757.687. (1) Beginning on the date a consumer-owned utility provides direct access to any class of retail electric consumers, the consumer-owned utility shall collect from that consumer class a nonbypassable public purpose charge  { - for a period of 10 years - }  { + until January 1, 2026 + }. Except as provided in subsection (8) of this section, the amount of the public purpose

Case 4:08-cv-02807-SBA     Document 1-41     Filed 06/05/2008     Page 22 of 34

charge shall be sufficient to produce revenue of not less than
three percent of the total revenue collected by the
consumer-owned utility from its retail electricity consumers for
electricity services, distribution, ancillary services, metering
and billing, transition charges and any other costs included in
rates as of July 23, 1999, except that the consumer-owned utility
may exclude from the calculation of such costs any cost related
to the public purposes described in subsection (5) of this
section. If a consumer-owned utility has fewer than 17 consumers
per mile of distribution line, the amount of the public purpose
charge shall be sufficient to produce revenue not less than three
percent of the total revenue from the sale of electricity
services in the utility's service area to the consumer class that
is provided direct access, or the utility's consumer class
percentage share of state total electricity sales multiplied by
three percent of total statewide retail electric revenue,
whichever is less.

  (2) Except as provided in subsection (9) of this section, the
governing body of a consumer-owned utility shall determine the
manner of collecting and expending funds for public purposes
required by law to be assessed against and paid by the retail
electric consumers of the utility. A determination by the
governing body shall include:

  (a) The manner for collecting public purpose charges;

  (b) Public purpose programs upon which revenue from the charges
may be expended; and

  (c) The allocation of expenditures for each program.

  (3) Beginning on the same date two years after July 23, 1999, a
consumer-owned utility shall report annually to the State
Department of Energy created under ORS 469.030 on the public
purpose charges paid to the utility by its retail electric
consumers and the public purposes on which the revenue was
expended.

  (4) A consumer-owned utility may comply with the public purpose
requirements of this section by participating in collaborative
efforts with other consumer-owned utilities located in this
state.

  (5) Funds assessed and paid by, and credits or other financial
assistance issued or extended to, retail electric consumers for
purposes of this section may, in the discretion of the governing
body of the consumer-owned utility, be expended to fund programs
for energy conservation, renewable resources or low-income energy
services otherwise required by the laws of this state, adopted by
the governing body pursuant to the National Energy Conservation
Policy Act (Public Law 95-619, as amended November 10, 1981), or
conducted by the utility pursuant to agreement with the
Bonneville Power Administration under the Pacific Northwest
Electric Power Planning and Conservation Act (Public Law 96-501).
All such funds expended, credits issued and incremental cost
incurred in connection with the performance of a consumer-owned
utility's obligations under this section shall be credited toward
the utility's public purpose funding obligation under this
section.

  (6) A consumer-owned utility also may credit toward its funding
obligations under this section any incremental costs incurred by
the utility for capital expenditures made to reduce its
distribution system energy losses, existing biomass gas and waste
to energy systems, existing hydroelectric generation projects
using fish attraction water, for new energy conservation and

renewable resource funding costs included in its wholesale power supplier's charges and for electric power generated by renewable or cogeneration resources pursuant to requirements of the Public Utilities Regulatory Policy Act of 1978 (Public Law 95-617), to the extent that such costs exceed the average cost of the utility's other electric power resources.

(7) A consumer-owned utility also may credit toward its public purpose funding obligations under this section any costs incurred in complying with ORS 469.649 to 469.659.

(8) Beginning on March 1, 2002, a consumer-owned utility whose territory abuts the greatest percentage of the site of an aluminum plant that averages more than 100 megawatts of electricity use per year shall collect from the aluminum company a public purpose charge equal to one percent of the total revenue from the sale of electricity services to the aluminum plant from any source.

(9)(a) A retail electricity consumer that uses more than one average megawatt of electricity at any site in the prior year shall receive a credit against public purpose charges billed by a consumer-owned utility for that site. The amount of the credit shall be equal to the total amount of qualifying expenditures for new energy conservation, not to exceed 68 percent of the annual public purpose charges, and the above-market costs of purchases of new renewable energy resources incurred by the retail electricity consumer, less administration costs incurred under this subsection. The credit shall not exceed, on an annual basis, the lesser of:

(A) The amount of the retail electricity consumer's qualifying expenditures; or

(B) The portion of the public purpose charge billed to the retail electricity consumer that is dedicated to new energy conservation, new market transformation or the above-market costs of new renewable resources.

(b) To obtain a credit under this subsection, a retail electricity consumer shall file with the department a description of the proposed conservation project, new market transformation or new renewable energy resource and a declaration that the retail electricity consumer plans to incur the qualifying expenditure.  The department shall issue a notice of precertification within 30 days of receipt of the filing, if such filing is consistent with this subsection. Notice shall be issued to the retail electricity consumer and the appropriate consumer-owned utility. The credit may be taken after a retail electricity consumer provides a letter from a certified public accountant to the department verifying that the precertified qualifying expenditure has been made.

(c) Credits earned by a retail electricity consumer as a result of qualifying expenditures that are not used in one year may be carried forward for use in subsequent years.

(d)(A) A retail electricity consumer that uses more than one average megawatt of electricity at any site in the prior year may request that the department hire an independent auditor to assess the potential for conservation measures at the site. If the independent auditor determines there is no available conservation measure at the site that would have a simple payback of one to 10 years, the retail electricity consumer shall be relieved of 54 percent of its payment obligation for public purpose charges related to the site. If the auditor determines that there are potential conservation measures available at the site, the retail electricity consumer shall be entitled to a credit against public

purpose charges related to the site equal to 54 percent of the
public purpose charges less the estimated cost of available
conservation measures.

   (B) A retail electricity consumer shall be entitled each year
to the credit described in this paragraph unless a subsequent
audit determines that new conservation investment opportunities
are available. The department may require that a new audit be
performed on the site to determine whether new conservation
measures are available, provided that the audits occur no more
than once every two years.

   (C) The retail electricity consumer shall pay the cost of the
audits described in this subsection.

   (10) A retail electricity consumer with a load greater than one
average megawatt shall not be required to pay a public purpose
charge in excess of three percent of the consumer's total cost of
electricity services unless the charge is established in an
agreement between the consumer and the consumer-owned utility.

   (11) Beginning on March 1, 2002, a consumer-owned utility shall
have in operation a bill assistance program for households that
qualify for federal low-income energy assistance in the
consumer-owned utility's service area. A consumer-owned utility
shall report annually to the Housing and Community Services
Department detailing the utility's program and program
expenditures.

   (12) A consumer-owned utility may require an electricity
service supplier to provide information necessary to ensure
compliance with this section. The consumer-owned utility shall
ensure the privacy and protection of any proprietary information
provided.

                              { +

PEOPLE'S UTILITY DISTRICTS + }

   SECTION 30. ORS 261.010 is amended to read:
   261.010. As used in this chapter, unless otherwise required by
the context:
   (1) 'Affected territory' means that territory proposed to be
formed into, annexed to or consolidated with a district.
   (2) 'Board of directors,' 'directors' or 'board' means the
governing body of a people's utility district, elected and
functioning under the provisions of this chapter.
   (3) 'County governing body' means either the county court or
board of county commissioners and, if the affected territory is
composed of portions of two or more counties, the governing body
of that county having the greatest portion of the assessed value
of all taxable property within the affected territory, as shown
by the most recent assessment roll of the counties.
   (4) 'Electors' petition' means a petition addressed to the
county governing body and filed with the county clerk, containing
the signatures of electors registered in the affected territory,
equal to not less than three percent of the total number of votes
cast for all candidates for Governor within the affected
territory at the most recent election at which a candidate for
Governor was elected to a full term, setting forth and
particularly describing the boundaries of the parcel of
territory, separate parcels of territory, city and district, or
any of them, referred to therein, and requesting the county
governing body to call an election to be held within the
boundaries of the parcel of territory, separate parcels of
territory, city and district, or any of them, for the formation

Case 4:08-cv-02807-SBA    Document 1-41    Filed 06/05/2008    Page 25 of 34

of a district, the annexation of a parcel of territory or a city
to a district, or the consolidation of two or more districts.
  (5) 'Electric cooperative' means a cooperative corporation
owning and operating an electric distribution system.
  (6) 'Initial utility system' means a complete operating utility
system, including energy efficiency measures and installations
within the district or proposed district, capable of supplying
the consumers required to be served by the district at the time
of acquisition or construction with all of their existing water
or electrical energy needs.
  (7) 'Parcel of territory' means a portion of unincorporated
territory, or an area in a city comprised of less than the entire
city.
  (8) 'People's utility district' or 'district' means an
incorporated people's utility district, created under the
provisions of this chapter.
  (9) 'Replacement value of unreimbursed investment' means
original cost new less depreciation of capitalized energy
efficiency measures and installations in the premises of
customers of an investor owned utility.
  (10) 'Separate parcel of territory' means unincorporated
territory that is not contiguous to other territory that is a
part of a district or that is described in a petition filed with
the county clerk in pursuance of the provisions of this chapter,
but when a proposed district includes territory in more than one
county, the contiguous territory in each such county shall be
considered as a separate parcel of territory. When a proposed
district includes any area in a city comprised of less than the
entire city, that area shall be considered as a separate parcel
of territory.
  (11) 'Utility' means a plant, works or other property used for
development, generation, storage, distribution or transmission of
 { - electric energy produced from resources including, but not
limited to, hydroelectric, pump storage, wave, tidal, wind, solid
waste, wood, straw or other fiber, coal or other thermal
generation, geothermal or solar resources - }
 { + electricity + }, or development or transmission of water for
domestic or municipal purposes,    { - waterpower or electric
energy, - }  but transmission of water shall not include water
for irrigation or reclamation purposes, except as secondary to
and when used in conjunction with a hydroelectric plant.
  SECTION 31. ORS 261.030 is amended to read:
  261.030. Nothing contained in this chapter authorizes or
empowers the board of directors of any people's utility district
to interfere with or exercise any control over any existing
utility owned and operated by any electric cooperative or city in
the district unless by consent of the governing body of the
electric cooperative or of the city council or the governing body
of the plant owned by a city, when the control of the plant is
vested in a governing body other than the city council or
governing body of the city. However a district may participate
fully with electric cooperatives and utilities owned by cities
 { + in common facilities under ORS 261.235 to 261.255 and + } in
the formation and operation of joint operating agencies    { - for
electric power - }  under ORS chapter 262.
  SECTION 32. ORS 261.050 is amended to read:
  261.050.  { + (1) + } All property, real and personal, owned,
used, operated or controlled by any people's utility district, in
or for the production, transmission, distribution or furnishing
of

{ - electric power or energy - }   { + electricity + } or
electric service for or to the public, shall be assessed and
taxed in the same manner and for the same purposes, and the
district and the directors and officers thereof shall be subject
to the same requirements, as are provided by law in respect to
assessment and taxation of similar property owned, used, operated
or controlled by private corporations or individuals for the
purpose of furnishing
{ - electric power or energy - }   { + electricity + } or
electric service to the public.
  { +  (2) If a people's utility district owns property jointly
with a tax-exempt governmental or municipal entity, only that
portion of the property, or that proportion of the property
rights, directly owned, used, operated or controlled by the
people's utility district shall be assessed and taxed pursuant to
subsection (1) of this section. + }
  SECTION 33. ORS 261.235 is amended to read:
  261.235. As used in ORS 261.235 to 261.255, unless the context
requires otherwise:
  (1) 'City' means a city organized under the law of California,
Idaho, Montana, Nevada, Oregon or Washington and owning and
operating an electric light and power system.
  (2) 'Common facilities' means any   { - works and facilities
necessary or incidental to - }   { +  property used for + } the
generation, transmission, distribution or marketing of
{ - electric power - }   { + electricity + } and related goods
and   { - commodities - }    { + services that are owned or
operated jointly by a people's utility district organized under
this chapter and at least one other city, district or electric
cooperative + }.
  (3) 'District' means a people's utility district organized
under this chapter or a similar public utility district organized
under the law of California, Idaho, Montana, Nevada or
Washington.
  (4) 'Electric cooperative' means a cooperative corporation
organized under the law of California, Idaho, Montana, Nevada,
Oregon or Washington and owning and operating an electric
distribution system.
  SECTION 34.  { + Section 35 of this 2007 Act is added to and
made a part of ORS 261.235 to 261.255. + }
  SECTION 35.   { + A people's utility district may become a
member of an electric cooperative, or of a limited liability
company, for the purposes of planning, financing, constructing,
acquiring, operating, owning or maintaining property used for the
generation and associated transmission of electricity within or
outside this state. A district may not become a stockholder in,
or lend the credit of the district to, an electric cooperative or
a limited liability company. If a district becomes a member of an
electric cooperative or of a limited liability company, the
district may not exercise the power of eminent domain for the
benefit of the electric cooperative or limited liability
company. + }
  SECTION 36. ORS 261.250 is amended to read:
  261.250. (1) In carrying out the powers granted in ORS
261.245 { +  and section 35 of this 2007 Act + }, a district of
this state
{ - shall be - }   { + is + } liable only for its own acts with
regard to the planning, financing, construction, acquisition,
operation, ownership or maintenance of common facilities. No
moneys or other contributions supplied by a district of this

state for the planning, financing, construction, acquisition, operation or maintenance of common facilities shall be credited or applied otherwise to the account of any other participant in the common facilities.

(2) A district shall not exercise its power of eminent domain to acquire a then existing thermal power plant or any part thereof.

SECTION 37. ORS 261.253 is amended to read:

261.253. (1) { - No - } { + A + } public contract entered into by a noninvestor-owned electric utility  { - shall - } { +  may not + } contain a clause or condition that imposes an unconditional and unlimited financial obligation on the electric utility that is party to the contract unless the terms and conditions of the contract are subject to approval and are approved by the electors of the people's utility district or city that owns the electric utility.

(2) Nothing in subsection (1) of this section is intended to affect provisions of law requiring approval of electors for any particular type of public contract that are in effect on October 15, 1983, or that are later enacted.

(3) Nothing in subsection (1) of this section is intended to conflict with ORS 279C.650 to 279C.670.

{ +  (4) This section does not apply to a public contract executed in connection with:

(a) The acquisition of renewable energy certificates;

(b) The acquisition, construction, improvement or equipping of, or the financing of any interest in, a renewable energy facility; or

(c) The acquisition or financing of any interest in electrical capacity needed to shape, firm or integrate electricity from a renewable energy facility. + }

{ - (4) - } { + (5) + } As used in this section:

(a) 'Public contract' includes a contract, note, general obligation bond or revenue bond by which the people's utility district or city or any subdivision of any of them is obligated to pay for or finance the acquisition of goods, services, materials, real property or any interest therein, improvement, betterments or additions from any funds, including receipts from rates or charges assessed to or collected from its customers.

(b) 'Unconditional and unlimited financial obligation ' means a public contract containing a provision that the people's utility district or city that is party to the contract is obligated to make payments required by the contract whether or not the project to be undertaken thereunder is undertaken, completed, operable or operating notwithstanding the suspension, interruption, interference, reduction or curtailment of the output or product of the project.

SECTION 38. ORS 261.305 is amended to read:

261.305. People's utility districts shall have power:

(1) To have perpetual succession.

(2) To adopt a seal and alter it at pleasure.

(3) To sue and be sued, to plead and be impleaded.

(4) To acquire and hold, including by lease-purchase agreement, real and other property necessary or incident to the business of the districts, within or without, or partly within or partly without, the district, and to sell or dispose of that property; to acquire, develop and otherwise provide for a supply of water for domestic and municipal purposes, waterpower and electric energy, or electric energy generated from any utility, and to distribute, sell and otherwise dispose of water, waterpower and

electric energy, within or without the territory of such
districts.
  { +  (5) To acquire, own, trade, sell or otherwise transfer
renewable energy certificates. + }
  { - (5) - }  { + (6) + } To exercise the power of eminent
domain for the purpose of acquiring any property, within or
without the district, necessary for the carrying out of the
provisions of this chapter.
  { - (6) - }  { + (7) + } To borrow money and incur
indebtedness; to issue, sell and assume evidences of
indebtedness; to refund and retire any indebtedness that may
exist against or be assumed by the district or that may exist
against the revenues of the district and to pledge any part of
its revenues. Except as provided in ORS 261.355 and 261.380, no
revenue or general obligation bonds shall be issued or sold
without the approval of the electors. The board of directors may
borrow from banks or other financial institutions  { - , on notes
payable within 12 months, - }  such sums as the board of
directors deems necessary or advisable  { - ; however, the
amounts so borrowed, together with the principal amounts of other
like borrowings then outstanding and unpaid, shall not exceed the
amount that the board of directors estimates as the district's
net income (determined in accordance with the system of accounts
maintained by the board pursuant to ORS 261.470) for the 12 full
calendar months following the date of the proposed borrowing,
adjusted by adding to the net income an amount equal to the
estimated charges to depreciation for the 12-month period - } .
No indebtedness shall be incurred or assumed except  { - on
account of - }  { + for + } the development, purchase and
operation of   { - a utility - }  { + electric utility facilities
or for the purchase of electricity, electrical capacity or
renewable energy certificates + }.
  { - (7) To enter into rental or lease-purchase agreements to
rent, lease or acquire real or personal property, or both,
required for district purposes. Except when approved by a
majority of the electors of the district voting on the question,
a people's utility district shall not enter into rental or
leasing agreements when the annual aggregate amount of payment
for any and all property directly related to a single transaction
exceeds 10 percent of the revenues of the district in the
preceding fiscal year. - }
  { +  (8) To exercise the powers otherwise granted to districts
by ORS 271.390. + }
  { - (8) - }  { + (9) + } To levy and collect, or cause to be
levied and collected, subject to constitutional limitations,
taxes for the purpose of carrying on the operations and paying
the obligations of the district as provided in this chapter.
  { - (9) - }  { + (10) + } To make contracts, to employ labor
and professional staff, to set wages in conformance with ORS
261.345, to set salaries and provide compensation for services
rendered by employees and by directors, to provide for life
insurance, hospitalization, disability, health and welfare and
retirement plans for employees, and to do all things necessary
and convenient for full exercise of the powers herein granted.
The provision for life insurance, hospitalization, disability,
health and welfare and retirement plans for employees shall be in
addition to any other authority of people's utility districts to
participate in those plans and shall not repeal or modify any
statutes except those that may be in conflict with the provision
for life insurance, hospitalization, disability, health and

welfare and retirement plans.
    { – (10) – }    { + (11) + } To enter into contracts with
 { + any person, any public or private corporation, + } the
United States Government,
  { – with – }  the State of Oregon, or with any other state,
municipality or utility district, and with any department of any
of these, for carrying out any provisions of this chapter.
    { – (11) – }    { + (12) + } To enter into agreements with the
State of Oregon or with any local governmental unit, utility,
special district or private or public corporation for the purpose
of promoting economic growth and the expansion or addition of
business and industry within the territory of the people's
utility district.  Before spending district funds under such an
agreement, the board of directors shall enter on the written
records of the district a brief statement that clearly indicates
the purpose and amount of any proposed expenditure under the
agreement.
    { – (12) – }    { + (13) + } To fix, maintain and collect
rates and charges for any water, waterpower,   { – electric
energy – }   { + electricity + } or other commodity or service
furnished, developed or sold by the district.
    { – (13) – }    { + (14) + } To construct works across or
along any street or public highway, or over any lands which are
property of this state, or any subdivision thereof, and to have
the same rights and privileges appertaining thereto as have been
or may be granted to cities within the state, and to construct
its works across and along any stream of water or watercourse.
Any works across or along any state highway shall be constructe
only with the permission of the Department of Transportation. Any
works across or along any county highway shall be constructed
only with the permission of the appropriate county court. Any
works across or along any city street shall be constructed only
with the permission of the city governing body and upon
compliance with applicable city regulations and payment of any
fees called for under applicable franchise agreements,
intergovernmental agreements under ORS chapter 190 or contracts
providing for payment of such fees. The district shall restore
any such street or highway to its former state as near as may be,
and shall not use the same in a manner unnecessarily to impair
its usefulness.
    { – (14) – }    { + (15) + } To elect a board of five
directors to manage its affairs.
    { – (15) – }    { + (16) + } To enter into franchise
agreements with cities and pay fees under negotiated franchise
agreements, intergovernmental agreements under ORS chapter 190
and contracts providing for the payment of such fees.
    { – (16) – }    { + (17) + } To take any other actions
necessary or convenient for the proper exercise of the powers
granted to a district by this chapter and by section 12, Article
XI of the Oregon Constitution.
  SECTION 39. ORS 261.335 is amended to read:
  261.335.  { + (1) Except as provided in subsection (2) of this
section, + } people's utility districts are subject to the public
contracting and purchasing requirements of ORS 279.835 to
279.855, 279C.005, 279C.100 to 279C.125 and 279C.300 to 279C.470
and ORS chapters 279A and 279B, except ORS 279A.140 and 279A.250
to 279A.290.
    { + (2) The public contracting and purchasing requirements of
ORS 279.835 to 279.855, 279C.005, 279C.100 to 279C.125 and
279C.300 to 279C.470 and ORS chapters 279A and 279B do not apply

to contracts entered into by districts for the acquisition, construction, improvement or equipping of a renewable energy facility or for the purchase or sale of electricity, electrical capacity or renewable energy certificates. + }

  SECTION 40. ORS 261.348 is amended to read:

  261.348. { + (1) + } Notwithstanding any other law, people's utility districts and municipal electric utilities may enter into transactions with other persons or entities for the production, supply or delivery of electricity on an economic, dependable and cost-effective basis, including financial products contracts and other service contracts that reduce the risk of economic losses in the transactions. This   { - section - }   { + subsection + } does not authorize any transaction that:

    { - (1) - }   { + (a) + } Constitutes the investment of surplus funds for the purpose of receiving interest or other earnings from the investment; or

    { - (2) - }   { + (b) + } Is intended or useful for any purpose other than the production, supply or delivery of electricity on a cost-effective basis.

  { + (2) Nothing in subsection (1) of this section prohibits a people's utility district or a municipal electric utility from entering into any transaction for the acquisition, construction, improvement or equipping of a renewable energy facility or for the purchase or sale of electricity, electrical capacity or renewable energy certificates. + }

  SECTION 41. ORS 261.355 is amended to read:

  261.355. (1) For the purpose of carrying into effect the powers granted in this chapter, any district may issue and sell revenue bonds, when authorized by a majority of its electors voting at any primary election, general election or special election.

  (2) All revenue bonds issued and sold under this chapter shall be so conditioned as to be paid solely from that portion of the revenues derived   { - from - }   { + by + } the district { - by - }   { + from + } the sale of water, waterpower and { - electric energy - }   { + electricity + }, or any of them, or any other service, commodity or facility which may be produced, used or furnished in connection therewith, remaining after paying from those revenues all expenses of operation and maintenance, including taxes.

  (3) Notwithstanding subsection (1) of this section and subject to subsection (4) of this section, any district may, by a duly adopted resolution of its board, issue and sell revenue bonds for the purpose of   { + financing + } betterments and extensions { - within the existing boundaries - }   of the district, { + including renewable energy facilities or the purchase or sale of electricity, electrical capacity or renewable energy certificates,   + }but the amount   { + of revenue bonds + } so issued shall be limited to the reasonable value of the betterments and extensions plus an amount not to exceed 10 percent thereof for administrative purposes.  Revenue bonds shall not be issued and sold for the purpose of acquiring an initial utility system or acquiring property or facilities owned by another entity that provides electric utility service { + unless: + }

  { +  (a) The acquisition is a voluntary transaction between the district and the other entity that provides electric utility service; or

  (b)   + }   { - without first obtaining the affirmative vote of - }   The electors within the district   { + have approved issuance of the bonds by a vote + }.

(4) Not later than the 30th day prior to a board meeting at which adoption of a resolution under subsection (3) of this section will be considered, the district shall:

(a) Provide for and give public notice, reasonably calculated to give actual notice to interested persons including news media which have requested notice, of the time and place of the meeting and of the intent of the board to consider and possibly adopt the resolution; and

(b) Mail to its customers notice of the time and place of the meeting and of the intent of the board to consider and possibly adopt the resolution.

(5) { + Except as provided in subsection (3)(a) of this section, + } any authorizing resolution adopted for the purposes of subsection (3) of this section shall provide that electors residing within the district may file a petition with the district asking to have the question of whether to issue such bonds referred to a vote.

(6) If within 60 days after adoption of a resolution under subsection (3) of this section the district receives petitions containing valid signatures of not fewer than five percent of the electors of the district, the question of issuing the bonds shall be placed on the ballot at the next date on which a district election may be held under ORS 255.345 (1).

(7) When petitions containing the number of signatures required under subsection (6) of this section are filed with the district within 60 days after adoption of a resolution under subsection (3) of this section, revenue bonds shall not be sold until the resolution is approved by a majority of the electors of the district voting on the resolution.

(8) Any district issuing revenue bonds may pledge that part of the revenue which the district may derive from its operations as security for payment of principal and interest thereon remaining after payment from such revenues of all expenses of operation and maintenance, including taxes, and consistent with the other provisions of this chapter.

(9) Prior to any district board taking formal action to issue and sell any revenue bonds, the board shall have on file with the secretary of the district a certificate executed by a qualified engineer that the net annual revenues of the district, including the property to be acquired or constructed with the proceeds of the bonds, shall be sufficient to pay the maximum amount that will be due in any one fiscal year for both principal of and interest on both the bonds then proposed to be issued and all bonds of the district then outstanding.

(10) { + Except as provided in subsection (3)(a) of this section, + } the district shall order an election for the authorization of revenue bonds to finance the acquisition or construction of an initial utility system, including the replacement value of the unreimbursed investment of an investor owned utility in energy efficiency measures and installations within the proposed district, as early as practicable under ORS 255.345 after filing the certificate required under subsection (9) of this section. An election under this subsection shall be held no more than twice in any one calendar year for any district. In even-numbered years no election shall be held on any other date than the date of the primary election or general election.

SECTION 42. ORS 262.005 is amended to read:

262.005. As used in ORS 262.015 to 262.105, unless the context requires otherwise:

   (1) 'Electric cooperative' means a cooperative corporation
owning and operating an electric distribution system.
   (2) 'Joint operating agency' means an agency organized by three
or more cities or people's utility districts under the laws of
this state for the purposes and according to ORS 262.005 to
262.105.
   (3) 'Privately owned electric utility company' means an
electric utility operated for profit and subject to regulation by
the Public Utility Commission of Oregon or the equivalent officer
or commission of any other state.
   (4) 'Utility properties' means   { - plants, systems and
facilities, and any enlargement or extension thereof, used for or
incidental to the generation and transmission of electric power
and energy, - }   { + a plant, works or other property used for
development, generation, storage, distribution or transmission of
electricity. + }   { - provided, however, that it shall not
mean - }   { +  'Utility properties' does not include + }
facilities for uranium refining, processing or reprocessing.
   SECTION 43. ORS 262.015 is amended to read:
   262.015. (1) Any three or more cities or people's utility
districts or combinations thereof, organized under the laws of
this state, may form a joint operating agency to plan, acquire,
construct, own, operate and otherwise promote the development of
utility properties   { - in this state - }  for the
generation { + , + }   { - and - } transmission  { + and
marketing + } of   { - electric power and energy - }
 { + electricity, electrical capacity or renewable energy
certificates + }.
   (2) A joint operating agency may participate with other
publicly owned utilities, including other joint operating
agencies, or with electric cooperatives, or with privately owned
electric utility companies, or with any combination thereof, for
any purpose set forth in subsection (1) of this section, whether
such agencies or utilities are organized or incorporated under
the laws of this state or any other jurisdiction. However, no
joint operating agency may act alone or as the managing
participant to acquire, construct, own or operate utility
properties   { - , nor may a joint operating agency own more than
50 percent of any utility property, except combustion
turbines - } .
   (3) Joint operating agencies, cities, people's utility
districts and privately owned utilities, or combinations thereof,
may participate in joint ownership of   { - thermal generation
and transmission - }   { + common + } facilities in accordance
with ORS 225.450 to 225.490 or 261.235 to 261.255.
   SECTION 44. ORS 262.075 is amended to read:
   262.075. (1) Each joint operating agency shall be a political
subdivision of the State of Oregon, and shall be a municipal
corporation with the right to sue and be sued in its own name.
Except as otherwise provided, a joint operating agency shall have
all the powers, rights, privileges and exemptions conferred on
people's utility districts.
   (2) A joint operating agency shall have the power to acquire,
hold, sell and dispose of real and other property, within or
without this state, which the board of directors in its
discretion finds reasonably necessary or incident to the
generation { + , + }   { - and - } transmission  { + and
marketing + } of   { - electric power and energy - }
 { + electricity, electrical capacity or renewable energy
certificates + }.  However, such an agency shall not acquire or

operate any facilities for the distribution of   {- electric
energy - }  { + electricity + }.
  (3) A joint operating agency shall have the power of eminent
domain which it may exercise for the purpose of acquiring
property; however, a joint operating agency shall not condemn any
properties owned by a publicly or privately owned utility which
are being used for the generation or transmission of
 { - electric energy or power - }    { + electricity + } or are
being developed for such purposes with due diligence, except to
acquire a right of way to cross such properties in a manner which
will not interfere with the use thereof by the owner.
  (4) A joint operating agency shall have the power to enter into
contracts, leases and other undertakings considered necessary or
proper by its board, including but not limited to contracts for
any term relating to the purchase, sale, interchange, assignment,
allocation, transfer or wheeling of power with the Government of
the United States, or any agency thereof, and with any other
municipal corporation or privately owned utility, or any
combination thereof, within or without the state, and may
purchase, deliver or receive power anywhere.
  (5) A joint operating agency shall have the power to borrow
money and incur indebtedness, to issue, sell and assume evidences
of indebtedness, to refund and retire any indebtedness that may
exist against the agency or its revenues, and to pledge any part
of its revenues. A joint operating agency may borrow from banks
or other financial institutions such sums on such terms as the
board considers necessary or advisable. A joint operating agency
may also issue, sell and assume bond anticipation notes,
refunding bond anticipation notes, or their equivalent, which
shall bear such date or dates, mature at such time or times, be
in such denominations and in such form, be payable in such
medium, at such place or places, and be subject to such terms of
redemption, as the board considers necessary or advisable. The
issuance and sale of revenue obligations by a joint operating
agency shall be governed by ORS 262.085.
  (6) The joint operating agency may apply for, accept, receive
and expend appropriations, grants, loans, gifts, bequests and
devises in carrying out its functions as provided by law.


                              { +
COST RECOVERY FOR CONSERVATION MEASURES + }

  SECTION 45.  { + Section 46 of this 2007 Act is added to and
made a part of ORS 757.600 to 757.687. + }
  SECTION 46.  { + (1) In addition to the public purpose charge
established by ORS 757.612, the Public Utility Commission may
authorize an electric company to include in its rates the costs
of funding or implementing cost-effective energy conservation
measures implemented on or after the effective date of this 2007
Act. The costs may include amounts for weatherization program
that conserve energy.
  (2) The commission shall ensure that a retail electricity
consumer with a load greater than one average megawatt:

  (a) Is not required to pay an amount that is more than three
percent of the consumer's total cost of electricity service for
the public purpose charge under ORS 757.612 and any amounts
included in rates under this section; and
  (b) Does not receive any direct benefit from energy
conservation measures if the costs of the measures are included

Case 4:08-cv-02807-SBA     Document 1-41     Filed 06/05/2008     Page 34 of 34

```
in rates under this section. + }
                                        { +
MISCELLANEOUS + }

   SECTION 47.   { + The unit and section captions used in this
2007 Act are provided only for the convenience of the reader and
do not become part of the statutory law of this state or express
any legislative intent in the enactment of this 2007 Act. + }
   SECTION 48.   { + This 2007 Act being necessary for the
immediate preservation of the public peace, health and safety, an
emergency is declared to exist, and this 2007 Act takes effect on
its passage. + }
                            ----------
```

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Case No. CV 08-00148-AA

**SUNPOWER CORPORATION, SYSTEMS,**
a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a Delaware
corporation; **ADVANCED ENERGY
SYSTEMS LLC**, an Oregon limited liability
company,

Defendants.

**EXHIBITS H THROUGH O
[End of Exhibits] (Docket No. 35)
TO DECLARATION OF HOWARD
POLLACK IN SUPPORT OF MEMO
IN OPPOSITION TO SUNLINK'S
MOTION TO CHANGE OR TRANSFER
VENUE (Docket No. 32)**

**PATENT CASE**

EXHIBITS H THROUGH O [End of Exhibits] (Docket No. 35)

# Exhibit H

**From:** Howard Pollack
**Sent:** Sunday, March 23, 2008 1:18 PM
**To:** 'Tovey, Morgan W.'
**Cc:** brenna@chernofflaw.com; Craig Compton; Susan Pitchford; jdaire@reedsmith.com;
dbjohnson@reedsmith.com; Foster, Randolph
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

I have just returned and had the opportunity to read your rather inflammatory e-mail.  It is clear from it how SunLink intends to litigate this matter.  It is equally clear that SunPower has not "willingly refused to confer."  Rather, we were unable to accommodate your unilateral demand that we confer on your schedule, made after the close of business before a holiday weekend; one on which I had a long-planned trip with my family to a location that was beyond cell phone and email coverage.  Craig was also traveling, and in fact was in deposition all day yesterday.

I see no reason why you must file a motion on Monday; SunLink's answer is due on Tuesday, as we have already granted you a 30-day extension in this case.  Nor is SunLink required to file its motion to transfer, if it feels it must, before answering the complaint.  I will be in deposition and out of the office on Monday and Tuesday, but I can discuss our reasons for believing that the fact that AES is no longer a named party makes very little difference with regard to plaintiff's choice to bring this suit where SunLink has done substantial business involving the infringing product.  If after our discussion, SunLink still feels it must file a motion to transfer forum, if such motion is filed by Monday, March 31, 2008, SunPower will not argue the motion is untimely.  On the other hand, we see little need to expedite briefing on such a motion, given that any discovery and pleadings that occur in the meantime will certainly be relevant and useful no matter where the case ultimately proceeds.  We believe SunLink should agree with this view, unless its purpose in seeking transfer is nothing more than delay.

I will be available after 11 a.m. on Wednesday to discuss the forum issue further.

Regards,

Howard

**From:** Tovey, Morgan W. [mailto:MTovey@ReedSmith.com]
**Sent:** Friday, March 21, 2008 6:13 PM
**To:** Howard Pollack
**Cc:** brenna@chernofflaw.com; Craig Compton; Susan Pitchford; jdaire@reedsmith.com;
dbjohnson@reedsmith.com; Foster, Randolph
**Subject:** RE: SunPower v. SunLink, et al.

Dear Howard:

Thank you for your email response notifying us that your office was closed today in observance of Good Friday.  While we, of course, honor your absence in observance of a holiday, we are, however, surprised and disappointed by both the tenor and content of your response to our request to meet and confer in a meaningful manner as contemplated by by Local Rule 7.1(a)(1)(A) ("The parties made a good faith effort through ***personal or telephone***

*conferences* to resolve the dispute and have been unable to do so") (emphasis added). For example, as a matter of professional courtesy, we would have expected that you would have at least offered a brief extension of time for SunLink to respond to the Complaint -- a compromise that would have both accommodated your schedule and allowed sufficient time for counsel to engage in a meaningful dialogue on these issues. Accordingly, our certification accompanying Sun Link's motion to transfer will be made pursuant to Local Rule 7.1(a)(1)(B) ("The opposing party willfully refused to confer"). We also note that your unavailability today, along with your refusal to stipulate to even a brief extension of time to discuss these issues in person or by telephone sometime early next week, requires your opposing counsel -- your professional colleagues -- to work not only today but most of the holiday weekend to file a motion that was triggered by your sudden dismissal late yesterday of the claims against Oregon-based AES. In sum, your refusal to consider even the most basic requests raised in our correspondence today seems to violate the spirit, if not letter, of Local Rule 83.8 ("Cooperation Among Counsel").

Your email correspondence notes that you had already left your office before I left a voicemail message for you last night. For the record, I attempted to contact you yesterday within approximately two hours of the first notice we received -- by the Court's electronic filing notification email -- of your motion to dismiss Sun Power's claims against AES pursuant to a secret settlement with AES. I attempted to contact you by telephone -- rather than write to you - - per your request in your letter of February 25, 2008. We note that your outgoing voicemail message, both yesterday and today, did not reflect that your office would be closed today. And, although you note that Mr. Compton is not in the office today either, Mr. Compton sent email correspondence to my colleague, James Daire, this morning regarding the draft protective order.

In your email correspondence, although you also purport to disagree with our characterization of facts, you fail to identify even one fact recited in support of transfer that you consider erroneous. Indeed, you cannot seriously dispute that both SunPower Systems and SunLink reside in this judicial district, the sole named inventor, Mr. Dinwoodie, resides in this judicial district, and the officers and technical personnel most knowledgeable concerning the accused assemblies reside in this judicial district and most, if not all, of the material document evidence is located here. We do not view your bald assertion to the contrary to constitute a good faith effort to meet and confer. Unfortunately, you have left us with no alternative other than to seek the Court's intervention to resolve these matters.

Finally, your blanket refusal to consider a transfer of the case from a distant forum with no nexus to the parties or to the dispute to a forum where the action obviously belongs further calls into question SunPower's motives for pursuing this litigation.

Very truly yours,

Morgan

**Morgan W. Tovey | Reed Smith LLP**
Two Embarcadero Center, Suite 2000, San Francisco, CA 94111
Direct: 415.659.5928 | Mobile: 415.850.4751
Reception: 415.543.8700 | Fax: 415.391.8269

**From:** Howard Pollack [mailto:pollack@fr.com]
**Sent:** Friday, March 21, 2008 4:10 PM
**To:** Tuttle, Nancy
**Cc:** Craig Compton; rcfoster@stoel.com; Tovey, Morgan W.; Johnson, Doyle B.; Daire, James; brenna@chernofflaw.com; Susan Pitchford
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

Craig and I are out of the office and our office is closed today in observation of Good Friday. I note that the voicemail you mention having left yesterday was left at 6:50 p.m., after the close of business and after I had left for the day.

I am not available to speak today, and I will be out of the office Monday and Tuesday of next week.

In brief response to your letter, we do not agree with your characterization of the facts and SunPower will oppose any motion to transfer.  Nor will we consent to expedited briefing.  We expect SunLink to respond to the complaint on the present schedule and we will respond to any motion you may file in due course.

Regards,

Howard

---

**From:** Tuttle, Nancy [mailto:NCTuttle@ReedSmith.com]
**Sent:** Friday, March 21, 2008 3:26 PM
**To:** Howard Pollack
**Cc:** Craig Compton; rcfoster@stoel.com; Tovey, Morgan W.; dbjohnson@reedsmith.com; jdaire@reedsmith.com
**Subject:** SunPower v. SunLink, et al.

Please see attached.

<<Letter to H Pollack 3-21-08.pdf>>

**Nancy C. Tuttle**
**for Morgan W. Tovey**
415.659.5639
nctuttle@reedsmith.com

Reed Smith LLP

Two Embarcadero Center

Suite 2000

San Francisco, CA 94111

415.543.8700

Fax 415.391.8269

\* \* \*

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.
\* \* \*
To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1

# Exhibit I

Brenna K. Legaard, OSB No. 00165
E-mail: brenna@chernofflaw.com
Susan D. Pitchford, OSB No. 98091
E-mail: sdp@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Facsimile: (503) 228-4373

Frank E. Scherkenbach, CSB No. 142549
E-mail: scherkenback@fr.com
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Howard G. Pollack, CSB No. 162897
E-mail: pollack@fr.com
Craig R. Compton, CSB No. 215491
E-mail: compton@fr.com
Robert J. Kent, CSB No. 250905
E-mail: rjkent@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, a<br><br>Delaware corporation,<br><br>       Plaintiff,<br><br>  v.<br><br>SUNLINK CORPORATION, a Delaware<br><br>corporation, and ADVANCED ENERGY | Case No. 08-0148-AA<br><br>**SUNPOWER CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT SUNLINK CORPORATION [NOS. 1-70]** |

SYSTEMS LLC, an Oregon Limited liability

company,

           Defendants.

Pursuant to Federal Rules of Civil Procedures 26 and 34, Plaintiff SunPower Corporation ("SunPower") requests that Defendant SunLink Corporation ("SunLink") produce for inspection and copying all of the following documents and other tangible things that are in its possession, custody, or control. Production shall take place within 30 days of service of this request, at the offices of Fish & Richardson P.C., 500 Arguello Street, Suite 500, Redwood City, California 94063, or at such other location and time as the parties may agree. The following definitions and instructions apply.

## DEFINITIONS AND INSTRUCTIONS

A.     "SunPower" means SunPower Corporation, Systems, including its officers, directors, employees, agents, and attorneys, and including its predecessor(s), including but not limited to PowerLight Corp.

B.     "SunLink," "you," or "your" refers to SunLink Corporation, including without limitation its past and present officers, directors, agents, employees, consultants, attorneys and others acting or purporting to act on its behalf, and including its predecessor(s), including but not limited to SunLink LLC, Eastwood Energy, subsidiaries, parents, and affiliates.

C.     The phrase "Patents-in-Suit" means U.S. Patent Nos. 5,505,788 and RE38,988.

D.     "Product" means a machine, apparatus, device, instrument, mechanism, appliance, assembly, algorithm, software, system, program, or assemblage of components/parts (either individually or collectively), which are designed to function together electrically, mechanically,

electronically, (including the method of use or operation of any such product or equipment) or otherwise, to achieve a particular function or purpose.

E.     "SunLink's Rooftop Photovoltaic Mounting Products" or "the Accused Products" means SunLink products and systems designed to mount  photovoltaic solar cells, modules, or arrays on substantially flat rooftops, including but not limited to the SunLink (TM) PV Module Mounting System and any variant or version thereof.

F.     "Infringe," and any variant thereof, refers to any form of infringement actionable under United States law, including without limitation, direct infringement, contributory infringement, inducement to infringe, literal infringement, and infringement under the doctrine of equivalents.

G.     The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

H.     "Concerning" means referring to, relating to, constituting, pertaining to, mentioning, commenting on, connected with, discussing, describing, identifying, analyzing, explaining, showing, reflecting, dealing with, comprising, consisting of, containing, resulting from, or regarding a particular subject in whole or in part in either directly or indirectly.

I.     The word "Document" is used in its broadest sense to include everything that is contemplated by Rules 26 and 34 of the Federal Rules of Civil Procedure, including without limitation documents stored in electronic form, such as electronic mail, computer source code, object code and microcode, and documents stored on any media accessible by electronic means, and including documents that have been deleted but are still accessible.  A document that includes a comment or notation that is not a part of the original text is to be considered a separate "document."

J.      "Thing" means any tangible object other than a document.

K.      "Person" is defined as any natural person or any business, legal or government entity or association.

L.      The terms "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the request more inclusive.

M.      "Including" shall mean "including, but not limited to."

N.      The singular and masculine form of any noun or pronoun shall embrace and be read and applied as embracing the plural, the feminine, and the neuter, except where circumstances clearly make it inappropriate.

O.      All answers to requests for production shall repeat immediately before each answer the full text of the request being answered.

## INSTRUCTIONS

1.  These requests shall apply to all documents in your possession, custody or control at the present time, or coming into your possession, custody or control prior to the date of the production, including all documents known and available to you regardless of whether such documents are possessed directly by you, or any parent, subsidiary, or affiliated corporation, or any of your officers, directors, employees, agents, representatives, or attorneys.  If you know of the existence, past or present, of any documents or things requested below, but are unable to produce such documents or things because they are not presently in the possession, custody, or control of SunLink, you shall so state and shall identify such documents or things, and the person who has possession, custody or control of the documents or things.

2.  When producing a Document, please produce the Document as it is kept in the ordinary course of business, or indicate the paragraph of these Requests to which that Document is responsive.

3.  If no documents are responsive to a particular request, you are to state that no responsive documents exist.

4.  For any responsive documents or tangible things that have been lost, destroyed or withheld from production based on any ground, you shall provide a written statement to SunPower setting forth:

  (a)   the identity of the document;

  (b)   the nature of the document (e.g., letter, memorandum, chart);

  (c)   the identity of the person(s) who received copies of the document;

  (d)   the date of the document;

  (e)   a brief description of the subject matter of the document; and

  (f)   the circumstances of the loss or destruction of the document.

5.  Should any Document be withheld based on some limitation of discovery (including a claim of privilege), please supply the following information:

  (a)   The identity(ies) of each Document's author(s), writer(s), sender(s), or initiator(s);

  (b)   The identity(ies) of each Document's recipient(s), addressee(s), or party(ies) for whom it was intended;

  (c)   The date of creation or transmittal indicated on each Document, or an estimate of that date, indicated as such, if no date appears on the Document;

  (d)   The general subject matter as described on each Document, or, if no such description appears, then some other description sufficient to identify the Document; and

(e)    The claimed ground(s) for limitation of discovery (*e.g.*, "attorney-client privilege" or "attorney work product doctrine").

6.    The requests set forth herein shall be deemed continuing pursuant to Federal Rules of Civil Procedure 26(e)(1) and (2) so as to require supplemental production of documents and things if SunLink discovers responsive documents and things after the date of response hereto despite a diligent effort to provide all responsive documents within the time specified by Federal Rule of Civil Procedure 34.

## DOCUMENTS AND THINGS TO BE PRODUCED

### REQUEST FOR PRODUCTION NO. 1:

All Documents referring or relating in any way to any of your Document, file, or record retention or destruction policies.

### REQUEST FOR PRODUCTION NO. 2:

All Documents that refer or relate to any SunPower rooftop photovoltaic mounting product or technology, including without limitation any product or technology produced, sold, or marketed by PowerLight Corp. before that company's acquisition by SunPower.

### REQUEST FOR PRODUCTION NO. 3:

Management and/or organization charts setting forth the entities and/or the names and/or titles of individuals involved in the decision to develop, improve, modify, manufacture, market, sell and/or distribute the Accused Products.

### REQUEST FOR PRODUCTION NO. 4:

All Documents that refer or relate to the Patents-in-Suit.

### REQUEST FOR PRODUCTION NO. 5:

All Documents that evidence, refer or relate to any knowledge by you of the Patents-in-Suit, including without limitation any Documents reflecting the earliest date and circumstances

of such knowledge and any related communications or actions taken in response to acquisition of that knowledge.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and Things that comprise, refer or relate to any searches, investigations, opinions, or evaluations as to the novelty, operability, patentability, validity, enforceability, claim construction, scope or value of the Patents-in-Suit, or any genealogically related patents or patent applications.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents found or identified during any enforceability searches, opinions, infringement analyses, prior art searches or studies related to the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Things that constitute, refer or relate to any prior art to the Patents-in-Suit, including without limitation any domestic or foreign patents, patent applications, publications, written descriptions, articles, conference papers, presentations, public disclosures, inventions, products, systems, or other references in any field of art disclosed, described, or claimed in the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Things that evidence, refer or relate to any motivation to modify or combine any prior art references to achieve the invention claimed in the Patents-in-Suit, including without limitation any express or implicit teachings, the general knowledge of persons skilled in the art to which the invention pertains, the nature of the problem to be solved, and any trends in the relevant field.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and Things that refer or relate to the validity or invalidity of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and Things that refer or relate to the enforceability or unenforceability of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents, including without limitation articles and internal technical memoranda authored by you, that relate to the subject matter described, disclosed or claimed in any of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 13:**

All communications or opinions of your officers, directors and/or employees regarding the infringement, validity or enforceability of any of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 14:**

All documents that refer to, describe, discuss, or identify the level of knowledge, schooling, experience, expertise, or relevant technical information of a person having ordinary skill in the art to which any invention disclosed, described, or claimed in the Patents-in-Suit pertains.

**REQUEST FOR PRODUCTION NO. 15:**

Exemplars of all brochures, advertisements, press releases, promotional materials, trade journal articles, catalogs, Documents prepared for trade shows and meetings, package inserts, technical data sheets, specifications, price lists, sales presentations, point-of-sale materials, and sales and marketing forecasts and projections that refer or relate to promotion, advertising and/or marketing of the Accused Products.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents containing, referring to, or relating to mounting systems for photovoltaic solar cells, modules, or arrays on rooftops, including but not limited to magazines, periodicals, and any documents to and from trade associations.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents containing, referring to, or relating to market studies, reports or analysis relating to photovoltaic solar mounting technology, including but not limited to reports on competition, market segments, market share, and any projections.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents containing, describing or relating to any communication between you and any third-party supplier of parts and materials incorporated in the Accused Products, including without limitation engineering drawings, specification sheets, and/or testing data.

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to identify all persons involved in the design, testing, research, development, upgrade, modification or improvement of the Accused Products.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents evidencing individual contributions made by any Person to the conception, design, or development of the Accused Products.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents that refer or relate to the research, development, design and testing of the Accused Products, including but not limited to drawings, prototypes, notes, notebooks, workbooks, project reports, correspondence, memoranda, test results, schematics, flow charts and invention disclosures.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents relating to the decision to develop and market the Accused Products, including all market studies, communications with customers, and internal correspondence and analysis.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show the structure, function, or operation of the Accused Products, including but not limited to any written descriptions, drawings, electronics models or video demonstrations of the Accused Products.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents that refer or relate to the manufacture and production of the Accused Products, from 1996 to the present, including but not limited to the location of all manufacturing and production facilities and the quantity of each Accused Product manufactured or produced at each such facility.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents that refer or relate to the sale within the United States of the Accused Products, from 1996 to the present, including but not limited to documents sufficient to show SunLink's actual and expected gross revenues, net profits, gross revenues, sales, sales prices, and returns for each of the Accused Products.

**REQUEST FOR PRODUCTION NO. 26:**

All documents that refer to any structure or network maintained for selling or licensing SunLink's Accused Products, including documents that refer to the location of all business offices, sales agents, and product distribution outlets and including all documents referring to, depicting, or describing any selling or licensing of SunLink's Accused Products over the Internet.

**REQUEST FOR PRODUCTION NO. 27:**

All documents that identify any person who has acted as an installer, contractor or value-added reseller of any Accused Product, including without limitation all contracts or agreements with any such person.

**REQUEST FOR PRODUCTION NO. 28:**

All documents comprising, referring to, or relating to sales reports or summaries for any sales channel, including without limitation direct sales, partnerships, and value added reseller sales.

**REQUEST FOR PRODUCTION NO. 29:**

All documents comprising, relating to, or referring to sales journals, transaction or invoice registers (electronic or otherwise), and sales invoices, including without limitation any document indicating, for any sale, a customer name, customer identification code, any product or service sold, unit quantities, unit prices, unit cost, date of sale, and any credit terms, discounts, or other adjustments made thereto for any Accused Product.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents constituting negotiations, draft and final agreements or contracts between the company and any partner (including without limitation distributors, resellers, value added resellers, and installers) concerning any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 31:**

All documents comprising, referring to, or relating to sales and service orders, contracts and agreements (draft and final), including without limitation any document indicating a customer, a product or service to be supplied, delivery or service schedule, period, payment and credit terms, any representation of performance or quality, or any correspondence to prospective customers related to the Accused Products.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents that refer or relate to any United States inventory of the Accused

Products, from 1996 to the present, including but not limited to the location of inventory, the

amount of inventory, and the owner and/or holder of each such inventory.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents discussing or making reference to the quality, value, acceptability,

workability, performance or benefits of any Accused Product, including communications

praising, criticizing, or otherwise commenting on the Accused Products.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents that refer or relate to any failures, problems with and/or complaints about

any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 35:**

All Documents that describe the features of any Accused Product(s), including without

limitation customer proposals and correspondence between You and any buyer, distributor,

partner, or value added reseller that reflect attributes of the product.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents that refer or relate to uses, tests, or evaluations of the Accused Products,

including but not limited to, all documentation regarding wind tunnel testing.

**REQUEST FOR PRODUCTION NO. 37:**

All documents referring or relating to research and development costs related to any

Accused Product.

**REQUEST FOR PRODUCTION NO. 38:**

All United States and foreign patents and patent applications, including all documents referring or relating to such patents and patent applications, owned or controlled by you that you contend relate to or cover any feature of the Accused Products.

**REQUEST FOR PRODUCTION NO. 39:**

All documents referring or relating to any acquisition or proposed acquisition by SunLink of any company, patent, or other asset related to any Accused Product.

**REQUEST FOR PRODUCTION NO. 40:**

All documents referring or relating to any acquisition or proposed acquisition of SunLink by any other entity or company.

**REQUEST FOR PRODUCTION NO. 41:**

All Documents constituting or relating to licenses or indemnification agreements between you and any other party relating to the Accused Products.

**REQUEST FOR PRODUCTION NO. 42:**

All articles, speeches, presentations or interviews that have been written or given by your employees, officers, directors or other representatives that refer or relate to the Accused Products.

**REQUEST FOR PRODUCTION NO. 43:**

All Documents that set forth, on a monthly, quarterly or annual basis from 1996 to the present, the number of units developed, used, sold and/or distributed for each of the Accused Products.

**REQUEST FOR PRODUCTION NO. 44:**

All Documents that set forth, on a monthly, quarterly or annual basis from 1996 to

present, the amount of sales in U.S. dollars or local currency (indicate currency type if not U.S.

dollars) for each of the Accused Products.

**REQUEST FOR PRODUCTION NO. 45:**

All projections, forecasts, market share reports, marketing acceptance Documents,

business plans, strategic plans, fiscal plans, marketing plans, or sales plans that refer or relate to

the Accused Products, including without limitation any marketing forecast, any analyses of

competitors' market share, and any analyses of the Accused Products' advantages and

disadvantages in comparison to any other product, with any supporting schedules or reports.

**REQUEST FOR PRODUCTION NO. 46:**

All documents referring to, relating to, or identifying in any way any competitor of

SunLink, any competitor's sales channels, or any products sold by any competitor.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents that, on a monthly, quarterly or annual basis, refer or relate to unit sales,

gross selling price, or net selling price for each of the Accused Products.

**REQUEST FOR PRODUCTION NO. 48:**

All profit-and-loss statements, printouts, statements or other Documents that set forth or

include gross profit figures for the Accused Products on a monthly, quarterly or annual basis

from 1996 to the present, including without limitation profit-and-loss statements, income

statements, balance sheets, statements of cash flow, statements of retained earnings and notes

thereto for SunLink as a whole and for any of your affiliates, divisions or subdivisions that are

involved in the manufacture, distribution and/or sale of the Accused Products.

**REQUEST FOR PRODUCTION NO. 49:**

All annual, semi-annual, quarterly, monthly or other Documents that set forth or include your gross expenses incurred in the manufacture, distribution and sale of the Accused Products, including but not limited to direct labor costs, direct manufacturing costs, selling costs, variable overhead costs, and all other costs associated with the manufacture, distribution and sale of the Accused Products.

**REQUEST FOR PRODUCTION NO. 50:**

All drafts, proposals, final copies, drawings, videotapes, audio tapes, electronic Documents, including web pages for advertising, point-of-sale commercials, or other promotional materials for the Accused Products, including but not limited to any brochures or advertisements.

**REQUEST FOR PRODUCTION NO. 51:**

All Documents that identify by name, company, address and title all third parties hired by you or your counsel to investigate this matter or review any of the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 52:**

All Documents referring or relating to efforts to design around the Patents-in-Suit.

**REQUEST FOR PRODUCTION NO. 53:**

Documents sufficient to identify any other litigation and/or settlements relating to the Accused Products.

**REQUEST FOR PRODUCTION NO. 54:**

All documents provided to or by members of SunLink's Board of Directors for Board meetings and all minutes from Board meetings.

**REQUEST FOR PRODUCTION NO. 55:**

All documents provided to or by members of SunLink's Board of Directors that refer to, discuss, or describe any of the patents-in-suit, SunPower, SunPower's accusation that SunLink's Rooftop Photovoltaic Mounting Products infringe, or this litigation.

**REQUEST FOR PRODUCTION NO. 56:**

All Documents and/or communications concerning this litigation.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show the accounting policies that are followed with respect to recording sales of the Accused Products.

**REQUEST FOR PRODUCTION NO. 58:**

All Documents referring or relating to the pricing policies for the Accused Products, including pricing policies between your subsidiaries and/or affiliated entities.

**REQUEST FOR PRODUCTION NO. 59:**

Documents sufficient to determine planned future production of the Accused Products.

**REQUEST FOR PRODUCTION NO. 60:**

All Documents describing or relating to your policies on licensing or cross-licensing technology.

**REQUEST FOR PRODUCTION NO. 61:**

All Documents referring to, relating to, or comprising any license entered into or proposed by SunLink to obtain rights to make, use or sell the Accused Products.

**REQUEST FOR PRODUCTION NO. 62:**

All Documents referring to, relating to, or comprising any contract or agreement by SunLink to take a license to make, use or sell any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 63:**

All Documents that refer or relate to your contention that you do not infringe the Patents-in-Suit, if you so contend.

**REQUEST FOR PRODUCTION NO. 64:**

All Documents that refer or relate to your contention that the Patents-in-Suit are invalid, if you so contend.

**REQUEST FOR PRODUCTION NO. 65:**

All Documents referring or relating to competition for the Accused Products.

**REQUEST FOR PRODUCTION NO. 66:**

All your Annual Reports since 1996.

**REQUEST FOR PRODUCTION NO. 67:**

The engineering drawings or electronic design files for any software used in modeling or designing the Accused Products.

**REQUEST FOR PRODUCTION NO. 68:**

All documents regarding your efforts to develop the Accused Products, including any documents referring to difficulties encountered during the development and/or the manufacturing of the Accused Products.

**REQUEST FOR PRODUCTION NO. 69:**

All documents related to SunLink's initial decision to develop the Accused Products, including documents concerning what materials should be used in constructing the mounting components and what manufacturing processes should be employed.

/ / /

/ / /

/ / /

**REQUEST FOR PRODUCTION NO. 70:**

All documents that SunLink plans to introduce at trial.


DATED:  March 13, 2008                    FISH & RICHARDSON P.C.

                                          By:  _____
                                               Brenna K. Legaard, OSB No. 00165
                                               E-mail: brenna@chernofflaw.com
                                               Susan D. Pitchford, OSB No. 98091
                                               E-mail: sdp@chernofflaw.com
                                               CHERNOFF, VILHAUER, McCLUNG &
                                               STENZEL, LLP
                                               601 SW Second Avenue, Suite 1600
                                               Portland, Oregon 97204
                                               Telephone: (503) 227-5631
                                               Facsimile: (503) 228-4373

                                               Frank E. Scherkenbach, CSB No. 142549
                                               E-mail: scherkenback@fr.com
                                               FISH & RICHARDSON P.C.
                                               225 Franklin Street
                                               Boston, MA 02110-2804
                                               Telephone: (617) 542-5070
                                               Facsimile:  (617) 542-8906

                                               Howard G. Pollack, CSB No. 162897
                                               E-mail: pollack@fr.com
                                               Craig R. Compton, CSB No. 215491
                                               E-mail:  compton@fr.com
                                               Robert J. Kent, CSB No. 250905
                                               E-mail: rjkent@fr.com
                                               FISH & RICHARDSON P.C.
                                               500 Arguello Street, Suite 500
                                               Redwood City, CA 94063
                                               Telephone: (650) 839-5070
                                               Facsimile:  (650) 839-5071

                                          Attorneys for Plaintiff

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing SUNPOWER

CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND

THINGS TO DEFENDANT SUNLINK CORPORATION [NOS. 1-70] was served by email and

U.S. Mail on this 13th day of March, 2008, on the following:

| | |
|---|---|
| Morgan W. Tovey, Esq.<br>Reed Smith LLP<br>Two  Embarcadero Center, Suite 2000<br>P.O. Box 7936 - 94120-7936<br>San Francisco, CA 94111<br>Telephone:  (415) 543-8700<br>Facsimile:  (415) 391-8269 | Attorney for Defendants<br>SunLink Corporation; Advanced Energy<br>Systems LLC |

_____
Vivian F. Lopez

50467313

# Exhibit J

# Exhibit J

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
Steven T. Lovett (OSB No. 910701)
Email: *stlovett@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey (pending admission *pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Of Attorneys for Defendant
Sunlink Corporation

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>Defendants. | Case No.: 08-CV0148 AA<br><br>**DEFENDANT SUNLINK CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF SUNPOWER CORPORATION, SYSTEMS** |

Propounding Party    :    Defendant Sunlink Corporation

Responding Party    :    Plaintiff SunPower Corporation, Systems

Set Number          :    One

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, and expect where otherwise noted, Defendant Sunlink Corporation hereby requests that Plaintiff SunPower Corporation, Systems produce for inspection and copying the following documents and things at the offices of Reed Smith LLP, Two Embarcadero Center, Suite 2000, San Francisco, California 94111 on April 7, 2008 at 10:00 a.m.

## DEFINITIONS

The following terms have the meanings indicated below:

1.    The terms "**SUNPOWER,**" "**YOU**" and "**YOUR**" refer to Plaintiff SunPower Corporation, Systems, a Delaware corporation, and include all subsidiaries, divisions, predecessors, including PowerLight Corporation, or successors-in-interest, affiliates, parents, officers, directors, employees, agents, contractors, and other persons controlled by or acting on behalf of **SUNPOWER**.

2.    The term "**SUNLINK**" refers to Defendant Sunlink Corporation and includes all subsidiaries, divisions, predecessors or successors-in-interest, affiliates, parents, officers, directors, employees, agents, contractors, and other persons controlled by or acting on behalf of **SUNLINK**.

3.    The term "**ADVANCED ENERGY SYSTEMS, LLC**" refers to co-Defendant Advanced Energy Systems, LLC and includes all subsidiaries, divisions, predecessors or successors-in-interest, affiliates, parents, officers, directors, employees, agents, contractors, and other persons controlled by or acting on behalf of **AES**.

4.    The term "**DEFENDANTS**" refers to SUNLINK and/or AES, either collectively or individually.

5.    The term "**PATENTS-IN-SUIT**" refers to United States Patent No. 5,505,788, entitled "Thermally Regulated Photovoltaic Roofing Assembly" which issued on April 9, 1996 and/or United States Patent No. RE38,988, entitled "Lightweight, Self-Ballasting Photovoltaic Roofing Assembly" which reissued on February 28, 2006, either collectively or individually.

6.    The term "**PERSON**" refers to natural persons, corporations, firms, proprietorships, partnerships, trust, joint ventures, groups, associations, institutes, organizations, and any other business, governmental or legal entities, including any divisions, department and units thereof.

7.    The use of the singular shall be deemed to include the plural, and use of one gender shall include all others as appropriate in the context.

8.    The terms "and" and "or" mean either the conjunctive or the disjunctive as context may require so that the meaning is inclusive rather than exclusive.

9.    The term "including" means including but not limited to.

10.    The term "each" means each and every.

11.    The term "any" means any and all.

12.    The term "**PRIOR ART**" shall be construed in accordance with its generally accepted meaning as applied under 35 U.S.C. Sections 102 and 103.

13.    The terms "**REFERRING TO**" and "**RELATING TO**" request all documents and tangible things which in any way explicitly or implicitly refer to, or could be reasonably construed to refer to, the subject matter of the request, including, but not limited to, all documents and tangible things, which reflect, record, constitute, memorialize, discuss, consider, review or report on the subject matter of the request.

14.    The term "**COMMUNICATION**" is used in the broadest possible sense, and means any transmission or exchange of information from one person or entity to another, by any means.

15.    The term "**DOCUMENT**" is used in the broadest possible sense, and means, without limitation, any written, printed, typed, photostatic, photographed, recorded or otherwise reproduced communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any notes, e-mails, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, projections, estimates, working papers, summaries, statistical statements, financial statements or work papers, accounts, analytical records, reports and/or summaries of investigations, opinions or reports of consultants, opinions or reports of accountants, or other reports, trade letters, press releases, comparisons, books, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, forecasts, drawings, diagrams, instructions, minutes of meetings or other communications of any type, including interoffice and intra office communications of any type, questionnaires, and surveys, charts, graphs, photographs, phonographs, films, videotapes, disks, data cells, drums, printouts and all other data compilations from which information can be obtained, any preliminary versions, drafts or revisions of any kind of the foregoing, and other writings or documents of whatever description or kind, whether produced or authored by you or by anyone else, including non-identical copies of any of the foregoing, now in your possession, custody, or control.

## **INSTRUCTIONS**

1.    If any portion of a document or tangible thing is responsive to a request, the entire document or tangible thing shall be produced, redacting only privileged material, if any.

2.    **YOU** are to produce the original and each non-identical copy of each document or tangible thing requested herein which is in **YOUR** possession, custody or control.

3.      Documents produced pursuant to these requests shall be produced in the original files and shall not be shuffled or otherwise rearranged.  Documents which were stapled, clipped or otherwise fastened together shall be produced in that form. Documents previously produced by **YOU** need not be produced again.

4.      Tangible things produced pursuant to these requests shall be produced in their present form and shall not be changed or modified in any way.

5.      These requests are of a continuing nature, and any additional responsive documents discovered subsequent to the scheduled date of production herein should promptly be produced to **SUNLINK**.

6.      If **YOU** claim that the attorney-client privilege or any other privileges may be applicable to any document or written communication, the production of which is sought by these requests, **YOU** shall, where applicable:

(a)     Describe generally the subject matter of the document and/or communication;

(b)     Identify the author and addresses and recipients of the documents;

(c)     Identify the participants in and witnesses to, the communication and all other persons to whom the substance of such communications has been disclosed;

(d)     State the date on which the document was prepared or that communication was made;

(e)     Identify each person who has ever had possession, custody or control of the document or any copy; and

(f)     Provide sufficient further information concerning the document and/or communication to explain the privilege and permit adjudication of the propriety of such claim.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

The files and notebooks of Mr. Thomas L. Dinwoodie relating to photovoltaic energy systems on building roofs, as the phrase is used in YOUR complaint.

### REQUEST FOR PRODUCTION NO. 2:

All non-privileged DOCUMENTS that refer to this litigation.

### REQUEST FOR PRODUCTION NO. 3:

All DOCUMENTS that refer to ownership of the PATENTS-IN-SUIT.

### REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS that refer to or evidence any transfer of ownership of the PATENTS-IN-SUIT.

### REQUEST FOR PRODUCTION NO. 5:

Any analyses of the PATENTS-IN-SUIT, including but not limited to any analyses of the scope, validity, or value of the PATENTS-IN-SUIT.

### REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS that refer to the conception, reduction to practice, design, development, or manufacture of the invention(s) of the PATENTS-IN-SUIT, including but not limited to all inventors' notes and internal memoranda.

**REQUEST FOR PRODUCTION NO. 7**:

All inventions disclosure statements of the invention(s) of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 8**:

DOCUMENTS sufficient to identify the names, titles, and/or job responsibilities of any PERSON involved in any manner in the conception, reduction to practice, design, development, or manufacture of the invention of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 9**:

The files and notebooks of the named inventor as well as those of any other PERSON who participated in the conception, reduction to practice, design, development, or manufacture of the invention of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 10**:

All DOCUMENTS relating to the application, prosecution and issuance of the PATENTS-IN-SUIT, including any related applications, continuations, continuations-in-part and related foreign patent filings.

**REQUEST FOR PRODUCTION NO. 11**:

All draft, final and/or proposed agreements and/or offers to license the technology embodied in the PATENTS-IN-SUIT or the PATENTS-IN-SUIT themselves, including but not limited to any license or cross-license that includes the PATENTS-IN-SUIT or any covenant not to sue for infringement of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 12**:  All DOCUMENTS referring or relating to royalties received by YOU for the licensing of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 13**:

All payments made to YOU by any PERSON for any license, settlement agreement, covenant not to sue, or any other agreement related to the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 14**:

Any test, analysis, study or evaluation of any SUNLINK product YOU contend infringes the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 15**:

All DOCUMENTS that have been identified as PRIOR ART to the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 16**:

All DOCUMENTS derived from or referring to PRIOR ART searches performed by YOU in connection with the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 17**:

All non-privileged DOCUMENTS reviewed or relied upon by YOU in conducting any pre-filing investigation of any SUNLINK product YOU contend infringes the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 18:**

All non-privileged DOCUMENTS generated by YOU or at YOUR direction referring or relating to any pre-filing investigation of any SUNLINK product YOU contend infringes the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 19**:

All market or competitive analyses or projections performed by or on behalf of SUNPOWER or procured by SUNPOWER which refer or relate to competition with SUNLINK.

**REQUEST FOR PRODUCTION NO. 20**:

DOCUMENTS sufficient to demonstrate, describe or show the corporate or organizational structure of SUNPOWER, including but not limited to any organizational charts.

**REQUEST FOR PRODUCTION NO. 21**:

All DOCUMENTS that evidence or refer to COMMUNICATIONS, discussion, meeting, or correspondence between SUNPOWER and any PERSON or entity, concerning DEFENDANTS and/or the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 22**:

All non-privileged DOCUMENTS that refer to the definition or construction of any term used in any asserted claim in the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 23**:

All non-privileged DOCUMENTS supporting or negating the allegations in Paragraph 13 of YOUR Complaint for Patent Infringement that SUNLINK et al. (as defined in YOUR Complaint) has infringed, induced the infringement of, and/or contributed to the infringement of any claim of United States Patent No. 5,505,788.

**REQUEST FOR PRODUCTION NO. 24**:

All non-privileged DOCUMENTS supporting or negating the allegations in Paragraph 19 of YOUR Complaint for Patent Infringement that SUNLINK et al. (as defined in YOUR Complaint) has infringed, induced the infringement of, and/or contributed to the infringement of any claim of United States Patent No. RE38,988.

**REQUEST FOR PRODUCTION NO. 25**:

The letter(s) dated February 7, 2006 referenced in Paragraphs 14 and 20 of YOUR Complaint for Patent Infringement.

**REQUEST FOR PRODUCTION NO. 26**:

All DOCUMENTS that refer to the best mode known to the inventors of practicing any claimed invention of the PATENTS-IN-SUIT at the time the application for the PATENTS-IN-SUIT was filed.

**REQUEST FOR PRODUCTION NO. 27**:

All prototypes that comprise, embody and/or incorporate or carry out any claimed inventions of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 28**:

All DOCUMENTS that refer to the validity or invalidity of the PATENTS-IN-SUIT or any foreign counterpart.

**REQUEST FOR PRODUCTION NO. 29**:

All studies, analyses and/or opinions concerning the infringement, validity, interpretation and/or enforceability of the PATENTS-IN-SUIT or any foreign counterpart.

**REQUEST FOR PRODUCTION NO. 30**:

DOCUMENTS reflecting YOUR marking activities or the marking activities of any licensees with respect to the PATENTS-IN-SUIT, including but not limited to, DOCUMENTS regarding the date when marking began for each product, the manner in which the marking was applied to each product, identification of the actual marking applied to each product, identification of the patents included in the marking, and the date such marking was terminated.

**REQUEST FOR PRODUCTION NO. 31**:

DOCUMENTS reflecting YOUR first offer for sale, first sale, first public use, and any experimental use of any alleged invention claimed in the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 32**:

Any claim, allegation or alleged notice (including letters such as the correspondence referenced in Paragraphs 14 and 20 of YOUR Complaint) made by YOU of infringement or possible infringement of the PATENTS-IN-SUIT or any foreign counterparts against any PERSON, including all DOCUMENTS referring or relating to any response thereto by any PERSON so charged or notified.

**REQUEST FOR PRODUCTION NO. 33**:

DOCUMENTS that refer YOUR first awareness of use, sale or manufacture of any SUNLINK product YOU contend infringes the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 34**:

All DOCUMENTS and pleadings from any litigation involving allegations of infringement of the PATENTS-IN-SUIT, including, but not limited to, complaints and answers, discovery requests and responses, Court orders, discovery motions or dispositive motions.

**REQUEST FOR PRODUCTION NO. 35**:

All DOCUMENTS that refer to each product made by or for YOU which embody and/or incorporate the technology or claims of the PATENTS-IN-SUIT or which as the basis for any claim made by you for lost profits damages against DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 36**:

All memoranda, correspondence, bulletins, newsletters, brochures, advertisements or other DOCUMENTS which have been distributed or made available to actual or prospective customers, dealers, distributors and/or users referring or relating to YOUR products which embody any claims of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 37**:

All memoranda, correspondence, bulletins, newsletters, brochures, advertisements or other DOCUMENTS which have been made available to actual or prospective licensees of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 38**:

DOCUMENTS reflecting YOUR unit sales for each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 39**:

DOCUMENTS reflecting YOUR costs for each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, including monthly and annual reports of such costs, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 40**:

DOCUMENTS reflecting profits for each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, including monthly and annual reports of such profits, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 41**:

DOCUMENTS reflecting the margins or other indications of profitability of making and selling each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, including indirect and direct labor, material, factory overhead, and selling, general and administrative expenses, and the allocation and allocation method for each of these costs, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 42**:

DOCUMENTS reflecting the gross dollar sales, allowances, discounts and net dollar sales of each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, including DOCUMENTS providing such information on a monthly, quarterly, annual and/or cumulative basis, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 43**:

All sales reports referring or relating to each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 44**:

DOCUMENTS reflecting the establishment and setting of prices for the sale of each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 45**:

Each annual report, statement of profit and loss, budget, income statement and balance sheet created by or for SUNPOWER from 2002 to the present.

**REQUEST FOR PRODUCTION NO. 46**:

All DOCUMENTS referring or relating to YOUR claim for damages against SUNLINK.

**REQUEST FOR PRODUCTION NO. 47**:

All COMMUNICATIONS between YOU and SUNLINK concerning SUNLINK products or the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 48**:

All COMMUNICATIONS internal to SUNPOWER concerning SUNLINK, SUNLINK PRODUCTS and/or any of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 49**:

YOUR DOCUMENT destruction and/or retention policies.


**REQUEST FOR PRODUCTION NO. 50**:

DOCUMENTS sufficient to show the structure of YOUR e-mail system and any matter of automatic deletion of e-mail.


**REQUEST FOR PRODUCTION NO. 51**:

All COMMUNICATIONS between YOU and AES concerning SUNLINK products or the PATENTS-IN-SUIT.


**REQUEST FOR PRODUCTION NO. 52**:

All DOCUMENTS referring or relating to the PATENTS-IN-SUIT.


**REQUEST FOR PRODUCTION NO. 53**:

The files and notebooks of the named inventor as well as those of any other PERSON who participated in the conception, reduction to practice, design, development, or manufacture of the invention of the PRIOR ART patents disclosed by the PATENTS-IN-SUIT.


**REQUEST FOR PRODUCTION NO. 54**:

The files and notebooks of the named inventor as well as those of any other PERSON who participated in the conception, reduction to practice, design, development, or manufacture of the invention of any patent which references the PATENTS-IN-SUIT as PRIOR ART.

**REQUEST FOR PRODUCTION NO. 55**:

All non-privileged DOCUMENTS YOU examined prior to YOUR acquisition of PowerLight Corporation that refer to the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 56**:

All documents that contain YOUR infringement analyses or freedom to operate opinions of the PATENTS-IN-SUIT prepared prior to YOUR acquisition of PowerLight Corporation.

**REQUEST FOR PRODUCTION NO. 57**:

All DOCUMENTS referencing the market or potential market for YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 58**:

All strategic plans, marketing plans, reports and presentations which reference YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT.

**REQUEST FOR PRODUCTION NO. 59**:

All competitive analyses, plans, presentations, marketing materials and marketing proposals which reference any SUNLINK product, including market share analyses, functionality critiques and feature comparisons.

**REQUEST FOR PRODUCTION NO. 60**:

All competitive analyses, plans, presentations, marketing materials and marketing proposals which reference any third party's system for mounting solar panels, including market share analyses, functionality critiques and feature comparisons.

PAGE 16 -DEFENDANT SUNLINK CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF SUNPOWER CORPORATION, SYSTEMS

**REQUEST FOR PRODUCTION NO. 61**:

All sales, marketing and promotional materials for each of YOUR products which embody and/or incorporate any claims of the PATENTS-IN-SUIT, including without limitation PowerPoint presentations; brochures and trade show promotional material; press releases; catalogues, price lists, sell sheets, product descriptions, sales literature and the like.

**REQUEST FOR PRODUCTION NO. 62**:

All DOCUMENTS identified in YOUR responses to SUNLINK's First Set of Interrogatories served concurrently herewith.

DATED this the 12th day of March, 2008.

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
Steven T. Lovett (OSB No. 910701)
Email: *stlovett@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 1700
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Morgan W. Tovey
(pending admission *pro hac vice*)
Email: *mtovey@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:  +1 415 543 8700
Facsimile:  +1 415 391 8269

Of Attorneys for Defendant
Sunlink Corporation

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DEFENDANT SUNLINK CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF SUNPOWER CORPORATION, SYSTEMS** on the following named person(s) on the date indicated below by

    ☒  mailing with postage prepaid

    ☒  electronic delivery (pdf and WORD format)

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone: (617) 542-5070
Fax: (617) 542-8906

**David VanSpeybroeck**
E-mail:
david.vanspeybroeck@bullivant.com
**Susan L. Ford**
Email: susan.ford@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: (503) 228-6371
Fax: (503) 295-0915

Attorneys for Defendant
ADVANCED ENERGY
SYSTEMS, LLC

**Howard G. Pollack**
Email: pollack@fr.com
Fish & Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone: (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email: sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 227-5631
Fax: (503) 228-4373

DATED:  March 13, 2008.    STOEL RIVES LLP

Randolph C. Foster, OSB No. 78434
E-mail:    *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:    *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

# Exhibit K



Special Report
# Best Places For Business And Careers
03.19.08, 6:00 PM ET

Page 1

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 84 | Greensboro NC | 1 | 139 | 115 | 696 |
| 26 | Asheville NC | 2 | 91 | 125 | 404 |
| 38 | Wilmington NC | 3 | 12 | 107 | 335 |
| 177 | Hickory NC | 4 | 195 | 196 | 363 |
| 162 | Shreveport LA | 5 | 81 | 158 | 387 |
| 172 | Fayetteville NC | 6 | 40 | 171 | 344 |
| 59 | Winston-Salem NC | 7 | 118 | 112 | 463 |
| 115 | Kingsport TN | 8 | 148 | 186 | 303 |
| 97 | Fort Smith AR | 9 | 63 | 198 | 292 |
| 19 | Springfield MO | 10 | 41 | 140 | 410 |
| 73 | Fort Wayne IN | 11 | 134 | 142 | 412 |
| 17 | Fayetteville AR | 12 | 16 | 143 | 431 |
| 145 | El Paso TX | 13 | 105 | 182 | 750 |
| 98 | Roanoke VA | 14 | 169 | 150 | 296 |
| 39 | San Antonio TX | 15 | 49 | 120 | 1,989 |
| 1 | Raleigh NC | 16 | 21 | 11 | 1,034 |
| 2 | Boise ID | 17 | 13 | 87 | 585 |
| 130 | Chattanooga TN | 18 | 106 | 157 | 497 |
| 10 | Knoxville TN | 19 | 84 | 95 | 673 |
| 42 | Cedar Rapids IA | 20 | 131 | 83 | 252 |
| 18 | Lincoln NE | 21 | 132 | 24 | 288 |
| 36 | Eugene OR | 22 | 78 | 81 | 341 |
| 45 | Oklahoma City OK | 23 | 86 | 97 | 1,181 |
| 117 | Clarksville TN | 24 | 56 | 181 | 242 |
| 159 | Mobile AL | 25 | 107 | 165 | 413 |

Page 1



[1]Index based on cost of labor, energy, taxes and office space.
[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 2

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 136 | Evansville IN | 26 | 176 | 177 | 352 |
| 24 | Lynchburg VA | 27 | 58 | 164 | 241 |
| 87 | South Bend IN | 28 | 178 | 141 | 320 |
| 28 | Virginia Beach VA | 29 | 100 | 111 | 1,660 |
| 116 | Davenport IA | 30 | 142 | 155 | 377 |
| 32 | Little Rock AR | 31 | 72 | 104 | 660 |
| 163 | Lafayette LA | 32 | 50 | 133 | 256 |
| 79 | Gary IN | 33 | 147 | 175 | 705 |
| 13 | Albuquerque NM | 34 | 47 | 55 | 833 |
| 9 | Spokane WA | 35 | 36 | 85 | 452 |
| 12 | Durham NC | 36 | 82 | 8 | 472 |
| 91 | Louisville KY | 37 | 126 | 144 | 1,232 |
| 100 | Huntington WV | 38 | 90 | 190 | 285 |
| 150 | Charleston WV | 39 | 164 | 176 | 306 |
| 5 | Lexington KY | 40 | 110 | 37 | 443 |
| 68 | Wilmington DE | 41 | 127 | 77 | 699 |
| 15 | Nashville TN | 42 | 45 | 79 | 1,470 |
| 183 | Beaumont TX | 43 | 133 | 191 | 368 |
| 175 | Canton OH | 44 | 197 | 180 | 410 |
| 128 | Amarillo TX | 45 | 67 | 145 | 244 |
| 7 | Richmond VA | 46 | 75 | 62 | 1,211 |
| 127 | Columbus GA | 47 | 146 | 162 | 297 |
| 139 | Wichita KS | 48 | 121 | 92 | 597 |
| 4 | Des Moines IA | 49 | 60 | 44 | 543 |
| 142 | Baton Rouge LA | 50 | 43 | 126 | 759 |

Page 2

[1]Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 3

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 60 | Salem OR | 51 | 54 | 149 | 389 |
| 189 | Corpus Christi TX | 52 | 87 | 168 | 419 |
| 102 | Montgomery AL | 53 | 57 | 88 | 369 |
| 156 | Myrtle Beach SC | 54 | 9 | 161 | 248 |
| 158 | Augusta GA | 55 | 128 | 147 | 529 |
| 161 | New Orleans LA | 56 | 200 | 110 | 1,093 |
| 37 | Charlotte NC | 57 | 53 | 51 | 1,633 |
| 108 | Peoria IL | 58 | 102 | 146 | 371 |
| 56 | Columbia SC | 59 | 74 | 71 | 719 |
| 3 | Fort Collins CO | 60 | 80 | 6 | 281 |
| 178 | Youngstown OH | 61 | 192 | 185 | 585 |
| 27 | Gainesville FL | 62 | 73 | 13 | 247 |
| 81 | Scranton PA | 63 | 140 | 178 | 550 |
| 30 | Allentown PA | 64 | 85 | 131 | 811 |
| 140 | Tulsa OK | 65 | 101 | 128 | 903 |
| 181 | Spartanburg SC | 66 | 170 | 169 | 273 |
| 126 | Grand Rapids MI | 67 | 183 | 124 | 779 |
| 23 | Ogden UT | 68 | 29 | 94 | 506 |
| 124 | Duluth MN | 69 | 155 | 151 | 273 |
| 144 | Dayton OH | 70 | 193 | 122 | 838 |
| 14 | Indianapolis IN | 71 | 95 | 64 | 1,688 |
| 173 | Toledo OH | 72 | 182 | 137 | 653 |
| 54 | Pensacola FL | 73 | 35 | 134 | 443 |
| 58 | Hagerstown MD | 74 | 89 | 189 | 265 |
| 11 | Provo UT | 75 | 8 | 30 | 483 |

Page 3

[1]Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 4

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 125 | Greenville SC | 76 | 103 | 113 | 610 |
| 69 | St. Louis MO | 77 | 151 | 98 | 2,831 |
| 34 | Omaha NE | 78 | 109 | 57 | 838 |
| 61 | Lakeland FL | 79 | 15 | 188 | 571 |
| 96 | Deltona FL | 80 | 19 | 173 | 507 |
| 152 | Memphis TN | 81 | 112 | 129 | 1,285 |
| 123 | Lancaster PA | 82 | 117 | 153 | 499 |
| 90 | Savannah GA | 83 | 18 | 121 | 327 |
| 43 | Tacoma WA | 84 | 31 | 152 | 782 |
| 153 | Birmingham AL | 85 | 111 | 119 | 1,114 |
| 52 | Rochester NY | 86 | 175 | 58 | 1,035 |
| 176 | Rockford IL | 87 | 162 | 160 | 355 |
| 50 | Huntsville AL | 88 | 34 | 27 | 383 |
| 16 | Colorado Springs CO | 89 | 115 | 25 | 608 |
| 55 | Jackson MS | 90 | 70 | 76 | 534 |
| 138 | Lansing MI | 91 | 194 | 54 | 454 |
| 89 | Charleston SC | 92 | 37 | 84 | 617 |
| 111 | Green Bay WI | 93 | 123 | 154 | 301 |
| 76 | Cape Coral FL | 94 | 1 | 138 | 591 |
| 190 | Flint MI | 95 | 198 | 183 | 441 |
| 63 | Fort Worth-Arlington TX | 96 | 66 | 86 | 2,031 |
| 80 | Columbus OH | 97 | 150 | 48 | 1,743 |
| 99 | York PA | 98 | 65 | 166 | 422 |
| 65 | Tallahassee FL | 99 | 52 | 17 | 341 |
| 8 | Olympia WA | 100 | 22 | 41 | 240 |

Page 4

[1]Index based on cost of labor, energy, taxes and office space.



[2] 5-year annualized figures.
[3] Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 5

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 46 | Sarasota FL | 101 | 14 | 100 | 695 |
| 135 | Akron OH | 102 | 94 | 102 | 700 |
| 22 | Naples FL | 103 | 5 | 49 | 320 |
| 82 | Salt Lake City UT | 104 | 26 | 63 | 1,085 |
| 146 | Anchorage AK | 105 | 68 | 74 | 363 |
| 137 | Reno NV | 106 | 20 | 108 | 410 |
| 49 | Tucson AZ | 107 | 27 | 72 | 964 |
| 53 | Harrisburg PA | 108 | 136 | 106 | 529 |
| 110 | Ocala FL | 109 | 6 | 194 | 331 |
| 182 | Lubbock TX | 110 | 77 | 103 | 263 |
| 57 | Greeley CO | 111 | 23 | 127 | 241 |
| 197 | Killeen TX | 112 | 93 | 170 | 355 |
| 41 | Tampa-St. Petersburg FL | 113 | 32 | 132 | 2,739 |
| 6 | Atlanta GA | 114 | 69 | 34 | 5,266 |
| 88 | Holland MI | 115 | 166 | 80 | 261 |
| 191 | Brownsville TX | 116 | 83 | 195 | 396 |
| 119 | Port St. Lucie FL | 117 | 4 | 156 | 403 |
| 83 | Pittsburgh PA | 118 | 179 | 116 | 2,363 |
| 70 | Palm Bay FL | 119 | 33 | 114 | 544 |
| 101 | Cincinnati OH | 120 | 144 | 96 | 2,118 |
| 112 | Las Vegas NV | 121 | 2 | 167 | 1,846 |
| 33 | Houston TX | 122 | 46 | 69 | 5,682 |
| 148 | Kalamazoo MI | 123 | 188 | 66 | 320 |
| 78 | Riverside CA | 124 | 7 | 184 | 4,120 |
| 180 | Reading PA | 125 | 130 | 163 | 405 |

Page 5

[1] Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 6

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 77 | Boulder CO | **126** | 129 | 1 | 285 |
| 95 | Kansas City MO | **127** | 122 | 47 | 1,988 |
| 170 | McAllen TX | **128** | 3 | 197 | 715 |
| 31 | Denver CO | **129** | 113 | 20 | 2,454 |
| 44 | Phoenix AZ | **130** | 10 | 93 | 4,157 |
| 29 | Madison WI | **131** | 96 | 12 | 549 |
| 66 | Jacksonville FL | **132** | 30 | 123 | 1,296 |
| 198 | Modesto CA | **133** | 99 | 192 | 520 |
| 35 | Portland OR | **134** | 55 | 52 | 2,173 |
| 74 | Poughkeepsie NY | **135** | 108 | 101 | 677 |
| 167 | Binghamton NY | **136** | 189 | 130 | 247 |
| 64 | Orlando FL | **137** | 11 | 99 | 2,038 |
| 40 | Lake County IL | **138** | 120 | 21 | 885 |
| 149 | Cleveland OH | **139** | 185 | 109 | 2,104 |
| 48 | Ann Arbor MI | **140** | 191 | 3 | 347 |
| 184 | Erie PA | **141** | 160 | 148 | 279 |
| 72 | Fort Lauderdale FL | **142** | 25 | 90 | 1,825 |
| 47 | Austin TX | **143** | 28 | 14 | 1,568 |
| 114 | Warren MI | **144** | 196 | 61 | 2,510 |
| 118 | Providence RI | **145** | 152 | 118 | 1,619 |
| 109 | Hartford CT | **146** | 167 | 35 | 1,195 |
| 86 | New Haven CT | **147** | 173 | 65 | 849 |
| 186 | Fresno CA | **148** | 62 | 172 | 903 |
| 75 | Camden NJ | **149** | 71 | 89 | 1,260 |
| 200 | Salinas CA | **150** | 186 | 136 | 411 |

Page 6

[1]Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 7

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 164 | Buffalo NY | **151** | 177 | 117 | 1,135 |
| 194 | Visalia CA | **152** | 44 | 199 | 429 |
| 113 | Milwaukee WI | **153** | 158 | 68 | 1,515 |
| 71 | Baltimore MD | **154** | 124 | 40 | 2,670 |
| 105 | Chicago IL | **155** | 157 | 42 | 7,984 |
| 67 | Portland ME | **156** | 145 | 50 | 514 |
| 165 | Santa Barbara CA | **157** | 114 | 53 | 403 |
| 20 | Seattle WA | **158** | 61 | 15 | 2,545 |
| 192 | Vallejo CA | **159** | 48 | 139 | 416 |
| 21 | Mercer County NJ | **160** | 42 | 18 | 370 |
| 179 | Bakersfield CA | **161** | 17 | 193 | 789 |
| 195 | Detroit MI | **162** | 199 | 179 | 1,946 |
| 141 | Syracuse NY | **163** | 172 | 82 | 650 |
| 104 | Bethesda MD | **164** | 104 | 2 | 1,172 |
| 147 | Miami FL | **165** | 88 | 135 | 2,435 |
| 168 | Springfield MA | **166** | 174 | 91 | 687 |
| 151 | Norwich CT | **167** | 161 | 78 | 263 |
| 93 | Dallas TX | **168** | 59 | 31 | 4,113 |
| 85 | Sacramento CA | **169** | 51 | 67 | 2,097 |
| 129 | Long Island NY | **170** | 141 | 32 | 2,790 |
| 187 | Santa Cruz CA | **171** | 138 | 22 | 251 |
| 103 | Minneapolis-St. Paul MN | **172** | 116 | 23 | 3,214 |
| 62 | West Palm Beach FL | **173** | 24 | 59 | 1,311 |
| 131 | Oxnard CA | **174** | 92 | 75 | 811 |
| 188 | Santa Rosa CA | **175** | 137 | 56 | 469 |

Page 7

[1]Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

Page 8

| RANK | METRO AREA | COST OF DOING BUSINESS (RANK)[1] | JOB GROWTH (RANK)[2] | EDUCATIONAL ATTAINMENT (RANK)[3] | METRO AREA POPULATION (THOU) |
|---|---|---|---|---|---|
| 94 | Albany NY | 176 | 159 | 43 | 853 |
| 169 | San Luis Obispo CA | 177 | 119 | 73 | 260 |
| 154 | Los Angeles CA | 178 | 154 | 105 | 9,986 |
| 51 | Edison NJ | 179 | 135 | 26 | 2,320 |
| 199 | Merced CA | 180 | 76 | 200 | 249 |
| 25 | Washington DC-Northern VA | 181 | 39 | 7 | 4,191 |
| 185 | Atlantic City NJ | 182 | 149 | 159 | 273 |
| 196 | Stockton CA | 183 | 79 | 187 | 684 |
| 92 | Santa Ana CA | 184 | 64 | 29 | 3,016 |
| 107 | Newark NJ | 185 | 171 | 28 | 2,159 |
| 122 | Rockingham County NH | 186 | 98 | 36 | 420 |
| 134 | Manchester NH | 187 | 125 | 39 | 404 |
| 120 | Worcester MA | 188 | 153 | 70 | 788 |
| 106 | San Diego CA | 189 | 97 | 38 | 2,953 |
| 193 | Utica NY | 190 | 181 | 174 | 297 |
| 133 | Southern Conn. | 191 | 156 | 9 | 905 |
| 157 | Oakland CA | 192 | 163 | 19 | 2,501 |
| 132 | Philadelphia PA | 193 | 165 | 45 | 3,893 |
| 171 | Peabody MA | 194 | 180 | 33 | 739 |
| 143 | Honolulu HI | 195 | 38 | 60 | 915 |
| 155 | Cambridge MA | 196 | 190 | 4 | 1,473 |
| 166 | San Francisco CA | 197 | 184 | 5 | 1,709 |
| 174 | San Jose CA | 198 | 187 | 10 | 1,803 |
| 160 | Boston MA | 199 | 168 | 16 | 1,843 |
| 121 | New York NY | 200 | 143 | 46 | 11,570 |

Page 8

[1]Index based on cost of labor, energy, taxes and office space.



[2]5-year annualized figures.
[3]Share of Population over age 25 with a bachelor's degree or higher.
*Sources: Economy.com; Sperling's BestPlaces.*

# Exhibit L



# LegalMetric District Judge Report

## Northern District of California

### Patent Cases

### October, 2006

This report contains confidential and proprietary information of LegalMetric, LLC. Use of this information by anyone other than the purchaser, or disclosure of this information, without the consent of LegalMetric, LLC is prohibited.

The information contained in this report is obtained from the official docket records of the federal courts. No attempt has been made to correct that data. For example, cases may be misclassified in the official docket records. In addition, cases are classified only by the primary cause of action. Cases having multiple causes of action are analyzed only under the primary cause of action identified on the official court docket.

LegalMetric, LLC is not a law firm, does not provide legal advice, and is not engaged in the practice of law. No attorney-client relationship exists between LegalMetric, LLC and any user of its products. LegalMetric provides statistical and analytical information to anyone who desires to purchase that information. Any purchaser of LegalMetric products who wants legal advice should hire an attorney.

# Table of Contents

**Overview** ............................................................................................................ 3
**Breakdown by Judge and Division** .................................................................. 4
**Divisional Comparisons** .................................................................................. 5
**What are the Odds—Terminations on the Merits** ........................................ 7
**Patentee Win Rate by Judge** ........................................................................... 9
**Breakout of Patentee & Accused Infringer Win Rate Statistics** ................ 11
**At Trial** .............................................................................................................. 11
**Patentee—Other Than Trial** ........................................................................... 11
**Accused Infringer—Other Than Trial** ........................................................... 11
**All Parties—All Terminations on the Merits** ................................................ 12
**Decisions on Involuntary Motions to Dismiss—By Judge** .......................... 13
**Dispositions by Summary Judgment** ............................................................. 13
**Case Outcomes** ................................................................................................. 14
**Bench Trials—Number By Judge** ................................................................... 16
**Jury Trials—Number By Judge** ...................................................................... 16
**Terminations by Transfer—Number By Judge** ............................................ 17
**Trials—District-Wide by Prevailing Party and Trial Type** ......................... 18
**How Long?—Time to Termination** ................................................................ 20
    **a. Terminations by Month** ........................................................................ 21
    **b. Terminations by Outcome** .................................................................... 22
    **c. Terminations as a Function of Jury Demands** ................................... 23
**Average Pendency for All Terminations on the Merits—By Judge** ............ 24
**Average Pendency for Bench Trials—By Judge** ........................................... 25
**Average Pendency for Jury Trials—By Judge** .............................................. 25
**Average Pendency for Cases Terminated by Summary Judgment—By Judge** ........ 26
**Average Pendency for Cases Terminated by Transfer—By Judge** ............. 27
**Appeals** .............................................................................................................. 28
**Jury Demands** ................................................................................................... 36
**Experience** ........................................................................................................ 37
**Total Number of Patent Cases—By Judge** ................................................... 37
**Total Number of Cases with Claim Construction Activity—By Judge** ...... 38
**Cases with Summary Judgment Activity—By Judge** ................................... 39
**Cases with Preliminary Injunction Activity—By Judge** .............................. 43

## Overview

This report covers the patent cases of the active judges in the Northern District of California as of October, 2006. Cases of inactive judges are not included. For purposes of this report, senior judges who have not been assigned a patent case for the past two years are considered inactive.

<table>
<tr>
<td>

**Total Patent Cases**:     1634 Total/1387 Closed
Number of Cases, each Judge:  2 to 217 (Average 102 per Judge)

</td>
<td>

**Total Judgments on the Merits**: 304
Each Judge:  0 to 49

</td>
</tr>
<tr>
<td>

**Average Patentee Win Rate**: 56%

**Contested Win Rate:** 20.7% (34 of 164) (does not include consent and default judgments)

**Number of Trials**:  35
Number, each Judge: 0 to 8
Patentee Win Rate at Trial: 63%

</td>
<td>



(Larger Version in Body of Report)

</td>
</tr>
<tr>
<td>

**Average Time to Termination—All Cases**: 15.6 months
Average by Judge from 10.1 to 19.3 months

**Average Time to Termination—On the Merits**: 21.3 months
Average by Judge from 11.4 to 29.7 months

**Summary Judgment Activity**: 486 Cases
Activity by Judge: 1 Case to 63 Cases

**Markman/Claim Construction:** 635 Cases
Activity by Judge: 2 Cases to 65 Cases

</td>
<td>

**Average Time to Termination on the Merits by Judge**

| Judge | Months |
|---|---|
| White | 11.4 |
| Hamilton | 11.8 |
| Breyer | 12.4 |
| Chesney | 15 |
| Armstrong | 16.5 |
| Alsup | 18.9 |
| Patel | 20.9 |
| Average | 21.3 |
| Ware | 21.6 |
| Jenkins | 22.3 |
| Walker | 22.5 |
| Whyte | 22.6 |
| Jensen | 23.3 |
| Illston | 23.3 |
| Fogel | 29.5 |
| Wilken | 29.7 |

Months from Filing

(Larger Version in Body of Report)

**Total Appeals**: 158

**Complete Affirmance Rate**: 60.0% (48 of 80)

</td>
</tr>
</table>

# Exhibit M



# LegalMetric District Judge Report

## District of Oregon

### Patent Cases

### October, 2006

This report contains confidential and proprietary information of LegalMetric, LLC. Use of this information by anyone other than the purchaser, or disclosure of this information, without the consent of LegalMetric, LLC is prohibited.

The information contained in this report is obtained from the official docket records of the federal courts. No attempt has been made to correct that data. For example, cases may be misclassified in the official docket records. In addition, cases are classified only by the primary cause of action. Cases having multiple causes of action are analyzed only under the primary cause of action identified on the official court docket.

LegalMetric, LLC is not a law firm, does not provide legal advice, and is not engaged in the practice of law. No attorney-client relationship exists between LegalMetric, LLC and any user of its products. LegalMetric provides statistical and analytical information to anyone who desires to purchase that information. Any purchaser of LegalMetric products who wants legal advice should hire an attorney.

# Table of Contents

**Overview** ................................................................................................................ **3**

**Breakdown by Judge and Division** ....................................................................... **4**

**Divisional Comparisons** ......................................................................................... **5**

**What are the Odds—Terminations on the Merits** ................................................. **7**

**Patentee Win Rate by Judge** ................................................................................. **9**

**Breakout of Patentee & Accused Infringer Win Rate Statistics** ........................ **11**

**At Trial** .................................................................................................................. **11**

**Patentee—Other Than Trial** ................................................................................. **11**

**Accused Infringer—Other Than Trial** .................................................................. **11**

**All Parties—All Terminations on the Merits** ....................................................... **12**

**Decisions on Involuntary Motions to Dismiss—By Judge** .................................. **13**

**Dispositions by Summary Judgment** ..................................................................... **13**

**Case Outcomes** ...................................................................................................... **14**

**Bench Trials—Number By Judge** .......................................................................... **15**

**Jury Trials—Number By Judge** ............................................................................. **15**

**Terminations by Transfer—Number By Judge** ..................................................... **15**

**Trials—District-Wide by Prevailing Party and Trial Type** .................................. **16**

**How Long?—Time to Termination** ....................................................................... **17**

    **a. Terminations by Month** ............................................................................. **18**

    **b. Terminations by Outcome** ......................................................................... **19**

    **c. Terminations as a Function of Jury Demands** ........................................... **20**

**Average Pendency for All Terminations on the Merits—By Judge** ...................... **21**

**Average Pendency for Bench Trials—By Judge** .................................................... **22**

**Average Pendency for Jury Trials—By Judge** ....................................................... **22**

**Average Pendency for Cases Terminated by Summary Judgment—By Judge** ........ **23**

**Average Pendency for Cases Terminated by Transfer—By Judge** ......................... **23**

**Appeals** ................................................................................................................... **24**

**Jury Demands** ......................................................................................................... **26**

**Experience** .............................................................................................................. **27**

**Total Number of Patent Cases—By Judge** ........................................................... **27**

**Total Number of Cases with Claim Construction Activity—By Judge** .................... **27**

**Cases with Summary Judgment Activity—By Judge** .............................................. **28**

**Cases with Preliminary Injunction Activity—By Judge** ........................................ **32**

© Copyright 2006, LegalMetric, LLC, All Rights Reserved

October 2006

# Overview

This report covers the patent cases of the active judges in the District of Oregon as of October, 2006.  Cases of inactive judges are not included.  For purposes of this report, senior judges who have not been assigned a patent case for the past two years are considered inactive.

| | |
|---|---|
| **Total Patent Cases**:  158 Total/131 Closed<br>    Number of Cases, each Judge:  7 to 46 (Average 26 per Judge) | **Total Judgments on the Merits**: 35<br>    Each Judge:  1 to 11 |
| **Average Patentee Win Rate**: 66%<br><br>**Contested Win Rate**: 25.0% (4 of 16)<br>    (does not include consent and default judgments)<br><br>**Number of Trials**:  4<br>    Number, each Judge: 0 to 2<br>    Patentee Win Rate at Trial: 75% | <br>(Larger Version in Body of Report) |
| **Average Time to Termination—All Cases**: 14.2 months<br>    Average by Judge from 9.6 to 24.2 months<br><br>**Average Time to Termination—On the Merits**:  20.0 months<br>    Average by Judge from 11.9 to 25.7 months<br><br>**Summary Judgment Activity**: 44 Cases<br>    Activity by Judge: 1 Case to 13 Cases<br><br>**Markman/Claim Construction:** 43 Cases<br>    Activity by Judge: 1 Case to 11 Cases | <br>(Larger Version in Body of Report)<br><br>**Total Appeals**: 17<br><br>**Complete Affirmance Rate:** 80.0% (4 of 5) |

# Exhibit N

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2000 WL 72072 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

CWR Acorn Engineering Ass'n v. **Ehrlich-Rominger** Architecture
D.Or.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.
WR ACORN ENGINEERING ASSOCIATION, an
Arizona Corporation, dba ACORN ENGINEERING
& CONSULTING, Plaintiff,

v.

**EHRLICH-ROMINGER** ARCHITECTURE, a
California Corporation, ATA Design/Build, Inc., an
unregistered entity, United States Fidelity &
Guaranty Co., a Maryland Corporation, Inc., an
unregistered entity, DPR Construction, Inc., a
California Corporation, ETEC Systems, Inc., a
Nevada Corporation, Defendants.
**No. CIV. 99-940-KI.**

Jan. 26, 2000.

Thomas J. Murphy, Furrer & Scott, Tigard, OR, for
plaintiff.
Scott J. Kaplan, Stoel Rives LLP, Portland, OR, for
defendants Ehrlich-Rominger Architecture and ETEC
Systems, Inc.
Joseph A. Yazbeck, Jr., Allen, Yazbeck & O'Halloran
P.C., Portland, OR, for defendants ATA
Design/Build Inc., United States Fidelity & Guaranty
Co., Advanced Technology Associates, Inc., and
DPR Construction, Inc.

OPINION AND ORDER

KING.
**\*1** Before the court is the motion to transfer (# 25) by
defendants Ehrlich-Rominger Architecture ("E-R")
and Etec Systems, Inc. ("Etec"). The motion is joined
by the remaining defendants in this action: ATA
Design/Build, Inc. ("ATA"), United States Fidelity &
Guaranty Co. ("USF & G"), Advanced Technology
Associates, Inc. ("Advanced"), and DPR
Construction, Inc. ("DPR"). For the reasons set forth
below, I deny the motion.

FACTS

On June 30, 1999, this case was removed from the
Circuit Court for the State of Oregon for the County
of Washington. The case concerns a dispute between
plaintiff W.R. Acorn Engineering Association
("Acorn") and the defendants regarding engineering
and consulting work performed by Acorn on a
semiconductor equipment manufacturing plant being
constructed in Hillsboro, Oregon. As alleged in the
Complaint, Acorn filed a construction lien against the
project on January 22, 1999 and Etec filed a release-
of-lien bond (with ATA as the principal and USF &
G as the surety) on February 24, 1999. Acorn
acknowledges that, by virtue of ORS 87.083(1), the
lien attaches to the bond and no longer encumbers the
relevant real property or its improvements.
Complaint, ¶ 18. The Complaint includes a claim for
lien foreclosure and a claim against the release-of-
lien bond, as well as claims for quantum meruit and
breach of contract.

Acorn was an Arizona-based engineering firm that,
apparently, is no longer in business. E-R is an
architectural and engineering firm based in Los
Altos, California. E-R does not have an office in
Oregon or any employees based in Oregon. Etec is
based in Hayward, California, and produces systems
for the manufacture of semiconductor chips.
Defendants DPR, ATA, and Advanced are California
companies. ATA and Advanced are owned by the
principals of E-R and DPR.

Etec contracted with ATA for the design and
construction of two semiconductor equipment
facilities: one in Hayward, California, and the other
in Hillsboro, Oregon. ATA, through E-R,
subcontracted with Acorn for certain engineering
work on the two facilities. Acorn's claims in this
action relate only to its work on the Hillsboro facility.

E-R and Etec allege that the terms of the contracts
between Etec and ATA also apply to Acorn, although
Acorn was not a party to those contracts.
Specifically, E-R and Etec argue that "E-R informed
Acorn that the subcontract was subject to the terms of
the ATA-Etec master contracts."Defendant's
Memorandum, p. 3. Because such "master contracts"
contain a California choice of law provision, E-R and
Etec argue that the issues in this lawsuit are governed
by California law. The president of Acorn, William

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2000 WL 72072 (D.Or.)

**(Cite as: Not Reported in F.Supp.2d)**

R. Acorn, denies that he was informed or otherwise agreed that his company's legal rights and remedies as to work on the Hillsboro plant would be controlled by California law. *See* Affidavit of William R. Acorn, ¶ 4.

Pursuant to 28 U.S.C. § 1404(a), and on the basis that it would be more convenient for employees and representatives of defendants to litigate this case in California, E-R and Etec move to transfer this action to the United States District Court for the Northern District of California.

## LEGAL STANDARDS

**\*2** The merits of this motion are governed by 28 U.S.C. § 1404(a), which states:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The purpose of Section 1404(a) is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense. *Van Dusen v. Barrack,* 376 U.S. 612 (1964). The court must balance the preference given to the plaintiff's choice of forum with the burden of litigating in an inconvenient forum. *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). The defendant has the burden of making a strong showing of inconvenience before a transfer is allowed. Private factors considered by the court include:

relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Id.* (quotation omitted). Public factors include:the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated

forum with jury duty.

*Id.* (quotation omitted).

## DISCUSSION

Acorn argues that the text of 28 U.S.C. § 1404(a), by itself, settles the issue of whether this case can be transferred to California. Acorn argues that, because Oregon statutes require that a lien claim be filed in the Oregon circuit court in which the relevant real property is located, there is no way that a case of this nature could have been brought in a California court. In response, E-R and Etec emphasize that a surety bond has released the lien from the real property and this case has been successfully removed to federal court. As such, they argue that the relevant considerations in deciding where the case "might have been brought" are only the federal procedural requirements of venue, subject matter jurisdiction, and personal jurisdiction. Because venue is proper in the Northern District of California (all defendants reside in California), subject matter jurisdiction exists (there is complete diversity between plaintiff and defendants), and personal jurisdiction exists (each of the defendants has sufficient contacts with California), E-R and Etec argue that this action is eligible for transfer under Section 1404(a).

Assuming that this action is eligible for transfer, I conclude that the relevant factors under Section 1404(a) do not weigh in favor of transfer. In short, whether or not this case is technically a "local action" as Acorn argues, it is highly significant that the construction project at issue is located in Oregon. As evident from the Complaint and admitted by defendants, this case concerns the quality and cost of Acorn's subcontract services vis-a-vis the Hillsboro project. As such, the applicable "private factors," such as ease of access to sources of proof and to the premises, favor maintaining this action in this judicial district. Furthermore, witnesses who were actually involved in the construction or operation of the Hillsboro plant, as opposed to defendants' employees in California who negotiated the deal with Acorn, are likely to play a key role in the case. In his affidavit, the president of Acorn lists many of such witnesses and alleges that, to his knowledge, they live in Oregon. Acorn Aff., ¶ 2. Moreover, I note that some of the witnesses that Acorn plans to call are employed by Oregon subcontractors that are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 72072 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

parties to this case and, presumably, would not be subject to compulsory process in California.

**\*3** I also find that the applicable "public factors" do not warrant transfer of this case. As discussed above, this controversy is "localized" in Oregon and there is a local interest in resolving the dispute here. If, in fact, the rights and obligations of Acorn are governed by California law, that factor would weigh in favor of transfer to the Northern District of California. However, notwithstanding the arguments and affidavits submitted by E-R and Etec, I cannot conclusively determine from the existing record whether California law does apply. As such, choice of law has little impact on my decision.

### CONCLUSION

Although I recognize that it would be more convenient for defendants' California employees to litigate this case in the Northern District of California, that is not enough to warrant transfer of the case given the other factors discussed above. Accordingly, the motion to transfer (# 25) by defendants E-R and Etec is denied.

IT IS SO ORDERED.

D.Or.,2000.
WR Acorn Engineering Ass'n v. Ehrlich-Rominger Architecture
Not Reported in F.Supp.2d, 2000 WL 72072 (D.Or.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit O

**From:** Howard Pollack
**Sent:** Friday, March 21, 2008 4:10 PM
**To:** 'Tuttle, Nancy'
**Cc:** Craig Compton; rcfoster@stoel.com; Tovey, Morgan W.; dbjohnson@reedsmith.com; jdaire@reedsmith.com; brenna@chernofflaw.com; Susan Pitchford
**Subject:** RE: SunPower v. SunLink, et al.

Morgan,

Craig and I are out of the office and our office is closed today in observation of Good Friday.  I note that the voicemail you mention having left yesterday was left at 6:50 p.m., after the close of business and after I had left for the day.

I am not available to speak today, and I will be out of the office Monday and Tuesday of next week.

In brief response to your letter, we do not agree with your characterization of the facts and SunPower will oppose any motion to transfer.  Nor will we consent to expedited briefing.  We expect SunLink to respond to the complaint on the present schedule and we will respond to any motion you may file in due course.

Regards,

Howard


**From:** Tuttle, Nancy [mailto:NCTuttle@ReedSmith.com]
**Sent:** Friday, March 21, 2008 3:26 PM
**To:** Howard Pollack
**Cc:** Craig Compton; rcfoster@stoel.com; Tovey, Morgan W.; dbjohnson@reedsmith.com; jdaire@reedsmith.com
**Subject:** SunPower v. SunLink, et al.


Please see attached.

<<Letter to H Pollack 3-21-08.pdf>>

**Nancy C. Tuttle**
**for Morgan W. Tovey**
415.659.5639
nctuttle@reedsmith.com

Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111
415.543.8700
Fax 415.391.8269

\* \* \*

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

\* \* \*

To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication  (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373


**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071


Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS



UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| | Case No. CV 08-00148-AA |
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation, | |
| Plaintiff, | **EXHIBIT A (Docket No. 36) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)** |
| v. | |
| **SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company, | |
| Defendants. | **PATENT CASE** |

EXHIBIT A (Docket No. 36)

# Exhibit A



## A D&B COMPANY

## Hoover's Custom Report Builder
## Sunlink Corporation

100 Larkspur Landing Cir
Larkspur, CA 94939−1764 United States (Map)

Phone: 415−925−9650

# Table of Contents

**The Basics**............................................................................................................................................................1
      Key Information.................................................................................................................................................1
      Key Numbers....................................................................................................................................................1

**Officers and Employees**........................................................................................................................................2
      Corporate Officers...........................................................................................................................................2

**Other Resources Available On Hoover's Online**................................................................................................3
      Additional Reports..........................................................................................................................................3

# The Basics

100 Larkspur Landing Cir
Larkspur, CA 94939−1764 United States (Map)

Phone: 415−925−9650

## Key Information

| | |
|---|---|
| **D−U−N−S Number** | 627265460 |
| **Doing Business As** | "Sunlink Corporation" |
| **Company Type** | Private |
| **Location Type** | Single Location |
| **Year Of Founding or Change In Control** | 2006 |

## Key Numbers

| | |
|---|---|
| **Fiscal Year−End** | December |
| **Sales (mil.)** | $3.6 |
| **Total Employees** | 15 |
| **Employees At This Location** | 11 |



1

# Officers and Employees

**Corporate Officers**

| Title | Name | Age |
|---|---|---|
| Shareholder | Eastwood E Corp | |
| Finance; Director | Ms Lila Beckford | |
| Shareholder | Power Works | |
| Chairman of the Board; Chief Financial Officer | Mr John Eastwood | |
| President; Chief Executive Officer | Mr Christopher Tilley | |



2

# Other Resources Available On Hoover's Online

- News and Press Releases for Sunlink Corporation (last 90 days)
- Financial Data Definitions
- Market Data Definitions
- Comparison Data Definitions
- Historical Financials & Employees Definitions

# Additional Reports

These reports are available for purchase from our Trusted Partners. To see more reports, try our specialized report search.

| Title | Publisher | Pages | Price | Date of Report |
|-------|-----------|-------|-------|----------------|
| Other Nondepository Credit Intermediation in the US | IBISWorld | 39 | $595.00 | Mar 31, 2007 |

Additional 3rd Party Libraries

**The Rich Register**

Featuring information on 4,700 individuals with a net worth greater than $25 million, The Rich Register is available in both hardcover and CD-ROM format.

Learn More

**Build Lead Lists**

Use Hoover's Lead Finder to create prospect and contact lists.



**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Case No. CV 08-00148-AA

**SUNPOWER CORPORATION, SYSTEMS,**
a Delaware corporation,

Plaintiff,

v.

**SUNLINK CORPORATION,** a Delaware
corporation; **ADVANCED ENERGY
SYSTEMS LLC**, an Oregon limited liability
company,

Defendants.

**PLAINTIFF'S MOTION FOR
ADMINISTRATIVE CORRECTION
OF THE RECORD**

**PATENT CASE**

PAGE 1 – PLAINTIFF'S MOTION FOR ADMINISTRATIVE CORRECTION OF THE
          RECORD

Plaintiff hereby moves the Court for an Order allowing administrative correction of the record to add the attached case caption pages for Docket Nos. 33, 34, 35 (filed electronically on April 4, 2008) and Docket No. 36 (filed electronically on  April 7, 2008).  Due to technical difficulties, the Court's ECF system rejected plaintiff's attempts to attach the exhibits to Docket No. 32 (Declaration of Howard Pollack in Support of Memo in Opposition to Sunlink's Motion to Change or Transfer Venue), causing plaintiff to file the exhibits separately.


DATED:  April 8, 2008

CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP


/s/ Brenna K. Legaard
Brenna K. Legaard, OSB No. 001658
Susan D. Pitchford, OSB No. 980911
Telephone:  (503) 227-5631
Of Attorneys for Plaintiff

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Case No. CV 08-00148-AA

**SUNPOWER CORPORATION, SYSTEMS,**
a Delaware corporation,

                    Plaintiff,

          v.

**SUNLINK CORPORATION,** a Delaware
corporation; **ADVANCED ENERGY
SYSTEMS LLC**, an Oregon limited liability
company,

                    Defendants.

**EXHIBITS B THROUGH F (Docket No. 33)
TO DECLARATION OF HOWARD
POLLACK IN SUPPORT OF MEMO
IN OPPOSITION TO SUNLINK'S
MOTION TO CHANGE OR TRANSFER
VENUE (Docket No. 32)**

**PATENT CASE**

EXHIBITS B THROUGH F (Docket No. 33)

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373


**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071


Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS



UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>**SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,<br><br>Defendants. | Case No. CV 08-00148-AA<br><br>**EXHIBIT G  (Docket No. 34) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)**<br><br>**<u>PATENT CASE</u>** |

EXHIBIT G (Docket No. 34)

**Susan D. Pitchford, OSB No. 980911**
E-mail: sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail: brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>**SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company,<br><br>Defendants. | Case No. CV 08-00148-AA<br><br>**EXHIBITS H THROUGH O [End of Exhibits] (Docket No. 35) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)**<br><br>**<u>PATENT CASE</u>** |

EXHIBITS H THROUGH O [End of Exhibits] (Docket No. 35)

**Susan D. Pitchford, OSB No. 980911**
E-mail:  sdp@chernofflaw.com
**Brenna K. Legaard, OSB No. 001658**
E-mail:  brenna@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjk@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION, SYSTEMS


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| | Case No. CV 08-00148-AA |
| **SUNPOWER CORPORATION, SYSTEMS,** a Delaware corporation, | |
| Plaintiff, | **EXHIBIT A (Docket No. 36) TO DECLARATION OF HOWARD POLLACK IN SUPPORT OF MEMO IN OPPOSITION TO SUNLINK'S MOTION TO CHANGE OR TRANSFER VENUE (Docket No. 32)** |
| v. | |
| **SUNLINK CORPORATION,** a Delaware corporation; **ADVANCED ENERGY SYSTEMS LLC**, an Oregon limited liability company, | |
| Defendants. | **PATENT CASE** |

EXHIBIT A (Docket No. 36)

**Brenna K. Legaard, OSB No. 00165**
E-mail: brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 98091**
E-mail: sdp@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631 / Facsimile: (503) 228-4373

**Frank E. Scherkenbach, (*Pro Hac Vice*)**
E-mail: scherkenback@fr.com
**FISH & RICHARDSON P.C.**
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070 / Facsimile:  (617) 542-8906

**Howard G. Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Craig R. Compton (*Pro Hac Vice*)**
E-mail:  compton@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail:  rjkent@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070 / Facsimile:  (650) 839-5071

Attorneys for Plaintiff SUNPOWER CORPORATION SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION SYSTEMS, a Delaware corporation, | Case No. 08-00148-AA |
| Plaintiff, | **PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSE TO DEFENDANT SUNLINK'S COUNTERCLAIMS** |
| v. | |
| SUNLINK CORPORATION, a Delaware Corporation, et al., | |
| Defendants. | **PATENT CASE** |

## RESPONSE TO COUNTERCLAIMS

Plaintiff SunPower Corporation, Systems ("Sunpower"), in response to the counterclaims raised in Defendant's Answer and Counterclaims, filed on March 25, 2008, states as follows:

## THE PARTIES

1.    Admitted based on information and belief that defendant SunLink Corporation ("SunLink") is a Delaware Corporation with a place of business located in San Rafael, California.

2.    Admitted.

## JURISDICTION

3.    Admitted that the Court has subject matter jurisdiction over SunLink's counterclaims.

## VENUE

4.    Denied.  Venue is proper in the District of Oregon as detailed in SunPower's April 4, 2008 opposition to SunLink's Motion to Transfer.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of Non-Infringement of United States Patent No. 5,505,788)

5.    SunPower incorporates its responses to paragraphs 1-4 as if fully set forth herein.

6.    Admitted.

7.    Denied.

8.    Admitted.

9.    Denied.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Invalidity of United States Patent No. 5,505,788)

10.    SunPower incorporates its responses to paragraphs 1-9 as if fully set forth herein.

11.    Denied.

12.    Admitted.

13.    Denied.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of United States Patent No. RE38,988)**

14.    SunPower incorporates its responses to paragraphs 1-13 as if fully set forth herein.

15.    Admitted.

16.    Denied.

17.    Admitted.

18.    Denied.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Judgment of Invalidity of United States Patent No. RE38,988)**

19.    SunPower incorporates its responses to paragraphs 1-18 as if fully set forth herein.

20.    Denied.

21.    Admitted.

22.    Denied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SunPower prays for judgment and relief as follows:

(a)    dismiss with prejudice SunLink's counterclaims for declaratory judgment;

(b)    judgment against SunLink as to infringement of United States Patent No. 5,505,788;

(c)    judgment against SunLink as to infringement of United States Patent No. RE38,988;

(d)    judgment for SunPower that United States Patent No. 5,505,788 is valid and enforceable;

(e)    judgment for SunPower that United States Patent No. RE38,988 is valid and enforceable;

(f)      a permanent injunction preventing SunLink and its officers, directors, agents, servants, employees, attorneys, licensees, successors, assigns, and customers, and those in active concert or participation with any of them, from making, using, importing, offering to sell or selling any device that infringes any claim of the '788 or '988 patents;

(g)      judgment against SunLink for money damages sustained as a result of its infringement of the '788 and '988 patents;

(h)      costs and reasonable attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285; and

(i)      such other and further relief as this Court finds just and proper.

## JURY DEMAND

Plaintiff requests trial by jury.

DATED:  April 14, 2008

                              CHERNOFF, VILHAUER, McCLUNG &
                                 STENZEL, LLP


                              /s/ Susan D. Pitchford
                              Brenna K. Legaard, OSB No. 00165
                              Susan D. Pitchford, OSB No. 98091
                              Telephone:  (503) 227-5631
                              Of Attorneys for Plaintiff

Randolph C. Foster (OSB No. 784340)
Email:  *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480

Doyle B. Johnson (*pro hac vice*)
Email:  *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email:  *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Telephone:     +1 415 543 8700
Facsimile:     +1 415 391 8269

Attorneys for Defendant and Counterclaimant
SunLink Corporation

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>Defendants. | Case No. 08-CV0148 AA<br><br>**SUNLINK CORPORATION'S REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER** |

# I .    PRELIMINARY STATEMENT

In its haste to justify its forum shopping, SunPower Corporation, Systems' ("SunPower") Opposition both misstates the law and mischaracterizes the facts. SunPower's Opposition misstates the law by arguing that the recently dismissed co-Defendant, Advanced Energy Systems LLC ("AES"), must be considered when determining whether the proposed transferee Court is a venue in which the action could have been brought. The weight of the authority is, however, to the contrary. The relevant inquiry is whether the Northern District of California (the "Northern District of California" or "the proposed transferee Court") is an appropriate forum for the two remaining parties – SunPower and SunLink Corporation (SunLink") – both headquartered within that judicial district. Not surprisingly, the case law confirms the commonsense answer: "yes." Even if, however, the Court considers AES, the Northern District of California is still a venue in which the action could have been brought because in patent cases venue is appropriate in any district in which the parties are amenable to personal jurisdiction. Because AES entered into multiple contracts with SunLink to purchase and install the allegedly infringing assemblies, SunPower cannot seriously argue that AES would not have been subject to personal jurisdiction in the Northern District of California.

SunPower's Opposition also mischaracterizes the facts by, among other things, suggesting that it would take longer to dispose of the case in the proposed transferee Court. SunPower's argument, however, omits at least one critical detail: SunLink has already offered to stipulate to an expedited schedule under the Northern District of California Patent Local Rules ("Patent Local Rules"), so the interest of justice factors are, at worst, neutral. Indeed, because the Patent Local Rules in the transferee Court require both parties to come forward with their legal contentions early on – rather than waiting for expert discovery as SunPower is attempting

2- SUNLINK CORPORATION'S
    REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

to do here – the case should be in a posture for case dispositive motions much sooner in the Northern District of California.

As the smoke clears, one issue remains:  should this patent litigation be transferred, for the convenience of the parties and witnesses and in the interests of justice to the Northern District of California where (a) both remaining parties are headquartered in Northern California, (b) the accused products and alleged inventions were all conceived, developed, manufactured and marketed in Northern California, and (c) the key witnesses – the sole inventor on both patents and the Defendant's technical and financial personnel – all reside?  Once again, the law comports with common sense.  SunLink, therefore, respectfully submits that the Court should grant the motion to transfer.

## II.    LEGAL ANALYSIS

### A.    SunPower's Argument That This Action Cannot Be Transferred To Northern California Contradicts The Weight Of Authority

The parties agree that courts generally enjoy wide discretion to transfer if the transferee court is a district where the action "might have been brought."  *See* 28 U.S.C. §1404(a). SunPower, however, cannot credibly argue that the action could not be brought in Northern California as to SunLink – a Northern California resident and the sole existing Defendant – so it tries to argue instead that the Court must consider SunLink *and* AES, the dismissed Defendant, for the purpose of a motion to transfer.  According to SunPower, the Court should assume that AES is still a Defendant and deny the motion if AES, a non-party now, could hypothetically object to transfer.  SunPower is wrong.

1.     **SunPower's Settlement with, and Dismissal with Prejudice of its Claims Against, Former Defendant AES Renders AES' Residence Irrelevant To The Section 1404 Inquiry**

SunPower invites the Court to ignore the fact that SunPower has dismissed its claims with prejudice against the only party with a real nexus to this judicial district, Eugene-based, former Defendant AES.  The Court should decline the invitation.  Indeed, the Court need not, and, respectfully, should not, confine its inquiry to venue and jurisdiction at the time the original complaint was filed, where, as here, the party providing a nexus is no longer part of the action.  Contrary to what SunPower would have the Court believe, the weight of authority holds that an action may be transferred to another venue without consideration of settled or dismissed defendants.  *See* Moore's Federal Practice, Civil - § 111.12 (3rd. 2007); *In re Fine Paper Antitrust Litigation*, 685 F.2d. 810, 819 (3rd Cir. 1982); *Magee v. Essex-Tec Corp.*, 704 F. Supp. 543, 546 (D. Del. 1988) (alleged infringer's motion to transfer patent infringement case granted where former defendants as to whom venue in transferee court would have been improper had been dismissed from the case); *Fairfax Dental Ltd. V. S. J. Finol Ltd.*, 645 F. Supp. 89, 91 (E.D.N.Y. 1988) (same); *Hess Oil Virgin Islands Corp. v. UOP, Inc*., 447 F. Supp. 381, 383 (N.D.Okla. 1978) (court had authority in civil action for damages to transfer suit to another district after one of the defendants which could not have been served in transferee district settled with plaintiff).

In *Magee*, the patentee originally filed an infringement action against four separate accused infringers.  *Magee, 704 F.Supp.* at 546-47.  Subsequently, the action was dismissed against three of the accused infringers and the remaining accused infringer moved to transfer the lawsuit from the District of Delaware to the Central District of California.  *Id.*  For purposes of

the transfer motion, the court deemed the three dismissed accused infringers irrelevant and granted the motion, because the Central District of California was proper as to the sole remaining defendant. *Id.* at 547. "[T]his Court is not required to confine its venue consideration to the facts as they existed at the time of the complaint." *Id.* at 546.

Here, as in *Magee*, the residence of AES – the former Defendant – should now be irrelevant to a motion to transfer. SunPower initiated this lawsuit by naming two defendants, then dismissed one – leaving SunLink as the only remaining defendant. SunLink resides in the Northern District of California, and SunPower does not and could not dispute that venue in the proposed transferee Court is appropriate as to SunLink. Accordingly, the Court should exercise its discretion to transfer this action to the Northern District of California.

Notably, SunPower cites no authority that this Court must consider a former party to this action for the purpose of transfer. SunPower's reliance on *Hoffman v. Blaski*, 363 U.S. 335 (1960) and *Commercial Lighting Products, Inc. v. District Court*, 537 F.2d 1078 (9th Cir. 1976) is misplaced. Those cases both involved *existing* co-defendants at the time of the transfer who consented to jurisdiction and venue in the proposed transferee court. Both courts denied the transfer motions because the power to transfer under Section 1404(a) does not depend "upon the wish or waiver of the defendant" and the existing co-defendants could not establish venue merely by waiving their possible objections. *Hoffman*, 363 U.S. at 343. Conversely, in this case, only two parties remain – SunPower and SunLink – and both reside in the Northern District of California. SunPower has settled with and dismissed, with prejudice, its claims against AES. To state the obvious, AES can no longer either object or consent to venue in this action, because it is no longer a party. Indeed, it would defy the weight of authority and commonsense to deny a transfer on convenience grounds because of a hypothetical objection that could only be raised by

5- SUNLINK CORPORATION'S
  REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

a defendant no longer in the case.  *See In re Fine Paper Antitrust Litigation*, 685 F.2d. at 819.

Accordingly, AES is not relevant for the purpose of determining whether the proposed transferee

Court is a proper venue.

The only other authority SunPower cites, *IP Innovation LLC v. Lexmark Int'l, Inc.*, 289 F.

Supp. 951, 954, (N.D. Ill. 2003) is not binding on the Court, and, indeed, runs contrary to the

weight of authority expressed by the Third Circuit and multiple district courts located in the

Second, Third and Tenth Circuits.  Moreover, neither party in *IP Innovation LLC* actually briefed

the issue of timing of the venue analysis in that case, and the court extended the reach of

*Hoffman* beyond its holding without addressing the contrary authority developed in the

intervening fifty years.  *Id.*  It should be weighted accordingly by this Court.

2.    **Even If The Court Were To Consider AES' Residence In Determining Whether Venue Is Proper In The Proposed Transferee Court, The Conclusion Remains The Same:  Transfer Is Appropriate**

For the reasons discussed above, in determining whether the case could have been

brought in the proposed transferee Court, SunPower's dismissal of its claims against AES moots

the issue of whether AES would be subject to personal jurisdiction in the Northern District of

California.  Assuming for the sake of argument only, however, that the Court considers AES, the

proposed transferee Court remains an appropriate venue.  Under 28 U.S.C. Section 1400(b),

venue is proper in any district court where the defendant is subject to personal jurisdiction.  Here,

venue is proper in the proposed transferee Court because AES would be subject to personal

jurisdiction in that Court by virtue of AES' multiple purchases and installations of the accused

product from Northern California-based SunLink.

SunPower erroneously argues that AES' purchases of the accused product from SunLink

are "not dispositive" of the minimum contacts analysis under Ninth Circuit law because the

"mere existence of a contract is insufficient to confer personal jurisdiction." *Paccar Int'l, Inc. v.*

*Commercial Bank of Kuwait, S.A.K,.* 757 F.2d 1058, 1063 (9th Cir. 1985). SunPower fails to

mention, however, that the law of Federal Circuit – not the law of the regional circuit – applies to

determine whether a district court has personal jurisdiction over the defendant in a patent

infringement case. *Red Wing Shoe Co, Inc. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1358

(Fed .Cir. 1998); *Huntco Supply, LLC v. Starlite Media*, LLC, 2007 WL 4570818, \*2 (D. Or.

Dec. 20, 2007). Under applicable Federal Circuit law, even a single contact with a forum state

may suffice for personal jurisdiction in a patent case if the contact directly and substantially

relates to the plaintiff's claim. *Red Wing Shoe Co, Inc.*, 148 F.3d at 1359.[1]

Thus, even a single contract entered by AES with Northern California-based SunLink to

purchase and install the accused products could be sufficient to confer personal jurisdiction,

because such contact is directly and substantially related to SunPower's infringement case. In

fact, AES' contacts with the proposed transferee forum go well beyond a single contract -- AES

entered eight contracts with SunLink to purchase and install the accused products. [*See*

Declaration of Christopher Tilley ("Tilley Decl.") ¶ 4.] Accordingly, AES would be subject to

personal jurisdiction in the proposed transferee Court, and the proposed transferee Court is a

proper venue whether or not AES' residence is considered.

---

1    *Paccar* is also distinguishable from this case. In *Paccar,* the foreign defendant's only
two contacts with the Central District of California forum were a letter of credit issued by a
California bank the defendant did not choose, and the defendant's attempt to draw funds under
the letter of credit. *Id.* at 1062. The Ninth Circuit found no personal jurisdiction in the Central
District because the defendant "could be forced to defend a suit in California even though it had
never committed an affirmative act in California." *Id.* at 1063. In this case, AES purposefully
availed itself of the proposed transferee Court through eight contracts with a company
headquartered in the Northern District of California for the purchase and installation of the
accused product developed in the Northern District of California. Thus, AES, unlike the *Paccar*
defendant, committed a series of affirmative acts in California, and this suit arises from those
acts.

**B.    The Balance Of Interests Favors Transfer**

**1.    SunPower's Forum Shopping Is Not Entitled To Special Deference**

SunPower's argument that SunLink is required to make "a strong showing of inconvenience" to disturb SunPower's forum shopping in Oregon – outside both parties' Northern California headquarters – misses the mark once again.  [Opposition, p. 6.]  The law of the regional circuit governs motions to transfer under Section 1404, and the Ninth Circuit rejects any strong presumption in favor of a foreign plaintiff's choice of forum.  *Ravelo Monegro v. Rosa,* 211 F.3d 509, 513 (9th Cir. 2000) (citing *Piper Aircraft v. Reyno,* 454 U.S. 235, 256 (1981)).  In short, SunPower is not an Oregon corporation, does not have its principal place of business in the State of Oregon, and does not maintain an office in the State of Oregon. Accordingly, SunPower's choice of forum here is entitled to little, if any, deference by the Court. *See Findley Adhesives, Inc. v. Williams*, 751 F.Supp. 184, 186 (D. Or. 1990) (granting motion to transfer from the District of Oregon to the Northern District of California where plaintiff was not an Oregon corporation, did not have its principal place of business in the State of Oregon, and did not maintain an office in the State of Oregon).

SunPower attempts to concoct an exception to this rule where "the alleged injuries to the plaintiff nonetheless arose out of activities occurring in Oregon."  [Opposition p. 12.]  The only authority SunPower cites, however, for this "frequent" circumstance is *WR Acorn Engineering Ass'n v. Ehrlich-Rominger Architecture*, 2000 WL 72072 (D. Or. Jan 26, 2006), in which the court denied a motion to transfer an action brought by a foreign plaintiff against a foreign defendant involving a construction project in Oregon.  Critical to that court's decision in that case was the fact that the dispute centered on a single construction project that "localized" the

action in Oregon.  Thus, the *WR Acorn* case stands for the unremarkable proposition that where a direct nexus exists between the dispute and the forum, a local interest in resolving the dispute in Oregon also exists.  Id. at *3.  Unlike in *WR Acorn*, SunPower does not allege here that its injuries arise solely out of local activities occurring in Oregon; in fact, it alleges the opposite. Specifically, SunPower takes pains to allege in its Opposition that, although SunLink's products may be configured to meet the individual customers. "SunLink has sold infringing products" in 17 other states and that "SunPower will be investigating its activities in all of those states." [Opposition p. 9.]  Thus, this action is not "localized" to Oregon, and given the location of both parties and most, if not all, of the key witnesses, SunPower's choice of forum should be accorded little weight.

### 2.    Transfer Would Not "Seriously Slow" Disposition Of This Case

SunPower also opposes transfer ostensibly because SunPower believes that transfer would "seriously slow" disposition of the case.  [Opposition p. 6.]  In fact, SunPower's refusal to provide its infringement contentions at the outset of the case is the factor most responsible for slowing the ultimate disposition of the case.  Because its patents are either not infringed or invalid, depending on how SunPower attempts to construe and read them on the accused devices, SunPower has taken the position that it is neither required to respond to contention interrogatories nor otherwise provide its theory of infringement until expert discovery.  For example, SunLink objected and refused to provide any response to an interrogatory seeking the identity of the asserted claims of the patents-in-suit and an explanation as to where each term, element or limitation of the asserted claims is allegedly present in the accused product.[2]

---

[2]    Among other boilerplate objections, SunPower objected to the interrogatory on the

Continued on following page

9- SUNLINK CORPORATION'S
  REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

[Declaration of Morgan W. Tovey in Support of Reply Brief ("Reply Tovey Decl."), Exh. A at p. 7-8.] Plaintiff's "wait and see" approach not only turns Rule 11 and the burdens of proof upside down, it also delays SunPower's day of reckoning. While SunPower apparently seeks a strategic advantage in attempting to delay disclosing these legal contentions, SunPower's strategy serves only to delay, rather than expedite, summary disposition of this action.

Moreover, and contrary to SunPower's argument, the time to trial factor is, at worst, neutral. Although in *general*, time to trial is longer in the proposed transferee Court, SunPower omits a critical detail regarding time to trial *here*. [Reply Tovey Decl. ¶ 4.] More specifically, SunLink offered to stipulate to a schedule that would compress the normal timing requirements set forth in the Patent Local Rules in the proposed transferee Court and closely approximate the Court's partial scheduling order in this forum. [*Id.*] Thus, transfer to the proposed transferee Court would not delay ultimate disposition of this action and would not substantially delay or defer this Court's existing scheduling dates. Although the Patent Local Rules in the proposed transferee Court would require both parties to come forward with their legal contentions regarding infringement and validity well before expert discovery, this obligation, combined with SunLink's offer to stipulate to an accelerated schedule, would not slow disposition of this case. Indeed, these obligations, within the confines of a compressed schedule, should posture the case for dispositive motions sooner.

SunPower also wrongly argues that the availability of alternative dispute resolution

---

Continued from previous page

ground that it is "impermissible" under District of Oregon Local Rule 33.1(d). That Rule, however, does not prohibit SunLink's interrogatory – it prohibits "[b]road general interrogatories, such as those which ask an opposing party to "state all facts on which a contention is based" or to "apply law to facts." LR 33.1(d). SunLink's interrogatory does not ask SunPower to state all facts or apply law to facts; it seeks the basic identity of the asserted claims and how SunPower reads them on the accused product – narrow and elemental discovery in a patent lawsuit.

("ADR") favors transfer.  According to SunPower, securing a judicially hosted settlement conference in the Northern District of California is "very difficult" and requires a "showing that the case is unique."  [Opposition p. 8.]  Noticeably absent from SunPower's discussion, however, is the proposed transferee Court's ADR Local Rules, which provide that civil cases may be assigned to the Northern District of California's Multi-Option ADR Program either by automatic assignment, stipulation, or motion.  [Reply Tovey Decl., Exh. B at p. 8 (N.D. Cal. ADR LR 3-3).]  Indeed, the proposed transferee Court offers *three* forms of Court-sponsored ADR options, including non-binding arbitration, early neutral evaluation or mediation.  [*Id*. at p. 9 (N.D. Cal. ADR LR 3-4).]  The menu of Court-sponsored (and private) ADR options in the proposed transferee Court weighs in favor of transfer.

Accordingly, the interest of justice favors, or at a minimum, fails to defeat the other private and public interest factors, each of which heavily favors transfer.

3.     **SunPower's Arguments That The Private Interest Factors Favor Non-Transfer Should Be Rejected**

a.     **SunPower's Contention That It Is Equally Convenient For Two Northern California-Based Parties To Litigate This Action In Oregon As Northern California Defies Commonsense**

SunPower speciously argues that although both remaining parties reside in Northern California, the convenience of the parties should be considered neutral to the venue transfer analysis, or even slightly favors maintaining this action in Oregon.  [Opposition p. 11.]  Indeed, SunPower would have the Court believe that it "hardly matters" that the case is pending in Oregon because requests for production and party depositions will cost the same in Oregon as in

Northern California.  SunPower simply ignores all the other pretrial costs and burdens which make future conduct of the litigation more convenient in Northern California.  Among other things, the parties would be obligated to travel to Oregon for a summary judgment hearing, pretrial-conference and any other management or ADR conferences requiring personal appearances.  In addition, if one party files a discovery motion (or any other non-dispositive motion) requiring personal appearances, the parties would be further inconvenienced by the distant Oregon forum.  Moreover, if the case was venued in the proposed transferee Court, neither party would be required to retain separate local counsel.  The "day to day" conduct of the litigation strongly favors transfer.

Equally absurd is SunPower's claim that a trial in Oregon would be no more inconvenient than a trial in Northern California.  According to SunPower's counsel, its standard practice is to secure a hotel near the courthouse where both attorneys and clients stay for the duration of the trial and, assuming it does so in this case, the cost of a hotel would be less in Portland than in the Bay Area and would outweigh the airfare expense to Oregon.  [Opposition pp. 11-12.] SunPower's argument ignores reality for multiple reasons.  For example, trial in Oregon would require incurring the cost of air fare, hotel rooms, and other travel expenses, whereas trial in California may, but would not necessarily, involve the costs of hotel rooms.  More importantly, SunPower fails to address all the other conveniences to both parties in litigating the case in their "home court," including among other things the opportunity costs associated with diverting the attention of the parties' officers and employees from their respective offices, especially for a start-up company such as SunLink.

Notably, SunPower wrongly suggests that SunLink is somehow not a start-up because it is owned by two private companies that have been in the renewable energy industry from several

years.  The identity and background of SunLink's owners are immaterial to SunLink's status as a

small start-up venture.  As SunPower's own evidence shows, SunLink was founded less than

three years ago and currently has less than 20 employees, 5 of whom are part of its management

team.  [Declaration of Howard G. Pollack ("Pollack Decl."), Exh. A; Tilley Decl. ¶ 2-3.]

SunPower Corporation, Systems, by contrast, is several times larger than SunLink and the

wholly owned subsidiary of publicly traded SunPower Corporation.  Litigation of this patent

dispute in a distant forum, to which SunLink is tangentially connected, at most, costs a start-up

like SunLink – with a small number of total employees – a disproportionate amount of time and

money.

      Further, transfer from the District of Oregon to the Northern District of California would

*not* shift the burden of litigating in a distant forum from one party to the other.  *Both* remaining

parties reside in the proposed transferee Court.

      In sum, the convenience of the parties heavily favors transfer to Northern California.

      **b.    SunLink's Vague Assertions About AES And Customer Representatives Do Not Militate Against Transfer**

      SunPower proffers vague and conclusory allegations about "important" non-party

witnesses whom SunPower "might" need to call to provide oral testimony.  [Opposition p. 10.]

Upon closer scrutiny, SunPower does not credibly explain why these non-party witnesses – who

are never specifically named – are important to its patent infringement claims, especially in

comparison to the SunLink ex-employees (Michael Huber and Michael Bowler) actually

involved in the design and development of the accused product.[3]

---

[3]      Curiously, SunPower makes no mention in its Opposition of 13 other SunPower-affiliated individuals who SunPower believes have information relevant to this dispute, and who

Continued on following page

13- SUNLINK CORPORATION'S
  REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

SunPower also cryptically argues that it "anticipates" AES' cooperation in discovery, but that AES is under no compulsion to appear at trial. [*Id.*] The settlement agreement between SunPower and AES may or may not be the basis for SunPower's anticipation; SunPower has opted to keep both SunLink and the Court in the dark. SunLink's counsel did request the terms of the settlement agreement, but SunPower refused to disclose any terms supposedly because a protective order had not yet been entered. [Reply Tovey Decl. ¶ 3; Declaration of G. Howard Pollack ¶ 9.] SunPower baselessly accuses SunLink of omitting details of the parties' "meet and confer" discussion concerning the settlement agreement, and then abbreviates its own account of the very same discussion. Specifically, after SunPower's counsel explained that certain terms of the agreement are confidential, SunLink's counsel immediately offered to provisionally treat the terms of the settlement agreement as "Attorney's Eyes Only" until entry of a formal protective order. SunPower omits this offer – as well as SunPower's continued refusal to discuss the terms of the settlement on an "Attorney's Eyes Only" basis. SunPower's vague assertions about unnamed AES "representatives" with whom it has a secret settlement agreement, does not weigh against transfer, especially in comparison to the more important development witnesses resident in Northern California. *See Amazon.com v. Cendant Corp.*, 404 F.Supp.2d 1256, 1260 (W.D. Wash. 2005) (convenience of the most important lay and expert witnesses to the asserted patent and the accused device favored transfer).

---

Continued from previous page

SunPower disclosed on April 14, 2008 in response to SunLink's discovery requests. [Reply Tovey Decl., Exh. A at p. 4-5.] Presumably, all or most of these potential witnesses are also California residents.

### 4.    SunLink's Attempt To Manufacture An Oregon Interest Ignores The Well Settled "Hub Of Activity" Preference In Patent Cases

SunPower also erroneously claims that there is critical "extensive evidence" of alleged infringement in Oregon in the form of site inspections.  Not surprisingly, SunPower does not explain why site inspections are critical or even relevant here.  Indeed, site inspections are not relevant to this patent infringement lawsuit, in which there are documents which describe the layout, functions and features of the accused assemblies.

Moreover, SunPower rebuts its own argument that Oregon is an efficient venue by alleging that its infringement claim is not specific to Oregon.  Specifically, SunPower offers that site inspections "might" be "critical," especially because the accused product may be configured to meet the individual needs of SunLink customers.  In the next breath, however, SunPower is careful to state its claim is *not* local to Oregon, and that it believes SunLink is infringing the patents-in-suit in every state it makes sales.  [Opposition p. 13.]  Thus, if site inspection is going to be critical to SunPower's infringement claim, it will need to be done in 18 different states.  SunPower does not, and cannot, explain why Oregon – where SunLink has made approximately 3.5 percent of its gross revenue basis – is "such an efficient venue" as opposed to Northern California – where as many as half of the supposed "critical" site inspections can take place through non-party cooperation, compulsory process, or both.  If site inspection is necessary, it is more convenient for this dispute to be venued in the Northern District of California.

More importantly, SunPower ignores the well-settled rule that the preferred forum in patent litigation is "that which is the center of gravity of the accused activity."  *Amazon.com,* 404 F.Supp.2d at 1260 (granting motion to transfer patent case to Delaware because the hub of allegedly infringing activity lied far to the east of Seattle), quoting *S.C. Johnson & Son, Inc., v.*

15- SUNLINK CORPORATION'S
  REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

*Gillette Co.*, 571 F.Supp. 1185, 1188 (N.D. Ill. 1983).  Here, SunPower cannot credibly dispute that Northern California is the single center of gravity for the conception, development and marketing of the purported commercial embodiments of the alleged inventions in the patents-in-suit and the development, marketing and sale of the accused product.

Accordingly, venue in the proposed transferee Court makes both geographical and evidentiary sense, and this factor weighs heavily in favor of transfer.

### III.     CONCLUSION

Hoping to defer detailing its dubious infringement contentions for as long as possible, SunPower studiously avoided filing this action in the geographically most logical forum, which requires the plaintiff, at the outset of the case, to come forward with, among other things, its disclosure of asserted claims and its infringement contentions in the form of claim charts. Instead, SunPower shopped for an alternative forum that did not expressly require such disclosures.  SunPower attempted to prop up its forum shopping by initially naming a second, local defendant – AES – a customer and installer of SunLink's PV Module Mounting Systems. Now that SunPower has settled with AES – on terms it refuses to disclose – and concurrently dismissed, with prejudice, its claims against AES, any nexus among the parties, the dispute and

this forum is, at best, tenuous.  Because the Northern District of California, unlike the District of

Oregon, has significant connections with both parties, important non-party witnesses and the

operative facts, SunLink respectfully submits that this motion should be granted.


DATED this the 15th day of April, 2008.

_____ /s/ James A. Daire _____

James A. Daire (*pro hac vice*)
Email:  *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922
Telephone:     +1 415 543 8700
Facsimile:      +1 415 391 8269


Randolph C. Foster (OSB No. 784340)
Email:  *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480

Attorneys for SunLink Corporation

DOCSSFO-12511582.6-JDAIRE

17- SUNLINK CORPORATION'S
REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

Attorneys for Defendant and Counterclaimant
SunLink Corporation

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>                    Defendants. | Case No. 08-CV0148 AA<br><br>**DECLARATION OF MORGAN W. TOVEY IN SUPPORT OF SUNLINK CORPORATION'S REPLY BRIEF RE MOTION TO TRANSFER** |

I, Morgan W. Tovey, declare:

1.      I am counsel for Defendant and Counterclaimant SunLink Corporation

("SunLink") in this action. I am an attorney licensed to practice before all state and federal

courts in California, and I have been admitted *pro hac vice* to appear on behalf of SunLink in this

matter. I have personal knowledge of the matters stated in this Declaration and, if called as a

witness, I could and would competently testify to them.

2.      I have read the Declaration of Howard G. Pollack, lead counsel for SunPower

Corporation, Systems ("SunPower"), in support of Plaintiff's Memorandum in Opposition to

SunLink's Motion to Change or Transfer, and am familiar with its contents. Mr. Pollack's

Declaration omits certain details about the meet and confer efforts preceding this motion,

including as follows:

3.      On Monday, March 24th, I spoke by telephone with Mr. Pollack. During this

conversation, Mr. Pollack said that SunPower would not stipulate to a transfer of the action,

because, among other things, employees of former defendant Advance Energy Systems LLC

("AES") would be material witnesses in this matter. I responded by asking Mr. Pollack whether

the terms of SunPower's settlement with AES required AES to respond to discovery or trial

subpoenas as if AES were still a party. I also requested a copy of the settlement terms between

SunPower and AES to determine whether the settlement required AES to cooperate with

SunPower and to understand the nature of any such cooperation. Mr. Pollack, however, refused

to provide the settlement agreement on the grounds that certain terms of the settlement were

confidential and a protective order was not in place. I immediately offered to treat provisionally

the terms of the settlement agreement as "Confidential -- Attorney's Eyes Only" until entry of a

formal protective order, and to not disclose any terms of the settlement agreement to SunLink.

Mr. Pollack still refused to provide the settlement agreement. As a result, SunLink has no knowledge regarding whether AES is required to cooperate in this matter, and if so to what degree.

4.    During the same conversation and as part of SunLink's meet and confer efforts, Mr. Pollack also stated that SunPower would not stipulate to a transfer because the docket of the proposed transferee Court is more congested than the docket in this forum. I responded by offering to stipulate to an accelerated schedule in the Northern District of California if SunPower would stipulate to transfer the litigation to the Northern District of California. More specifically, I said that the parties could simply stipulate to compress the schedule set forth in the Patent Local Rules in the proposed transferee Court to approximate closely the Court's partial scheduling order in this forum. Mr. Pollack responded by reiterating that SunPower would not stipulate to a transfer. SunLink, however, remains willing to stipulate to a compressed schedule if this case is transferred to the Northern District of California.

5.    A true and correct copy of SunPower's April 14, 2008 Responses to SunLink's First Set of Interrogatories is attached hereto as Exhibit A.

6.    A true and correct copy of relevant portions of the ADR Local Rules for the Northern District of California is attached hereto as Exhibit B.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


DATED: April 15, 2008.                                                      \

                                        /s/   Morgan W. Tovey
                                              Morgan W. Tovey


3 - MORGAN W. TOVEY DECLARATION IN SUPPORT OF
      SUNLINK CORPORATION'S REPLY BRIEF RE MOTION TO TRANSFER

# EXHIBIT A

**Brenna K. Legaard, OSB No. 00165**
E-mail: brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 98091**
E-mail: sdp@chernofflaw.com
CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 227-5631
Facsimile: (503) 228-4373

**Howard Pollack (*Pro Hac Vice*)**
E-mail: pollack@fr.com
**Robert Kent (*Pro Hac Vice*)**
E-mail: rjkent@fr.com
**Frank Scherkenbach (*Pro Hac Vice*)**
E-mail: scherkenbach@fr.com
**Craig Compton  (*Pro Hac Vice*)**
E-mail: compton@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5113
Facsimile: (650) 839-5071

Attorneys for Plaintiff, SUNPOWER CORPORATION, SYSTEMS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation, | Case No. CV 08-0148-AA |
| Plaintiff, | **PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |
| v. | |
| SUNLINK CORPORATION, a Delaware corporation, and ADVANCED ENERGY SYSTEMS LLC, an Oregon Limited liability company, | **PATENT CASE** |
| Defendants. | |

PAGE 1    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
         DEFENDANT'S FIRST SET OF INTERROGATORIES

EXHIBIT A
PAGE 1 of 11

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff SunPower Corporation, Systems ("SunPower" or "Plaintiff") hereby responds and provides objections to Defendant SunLink Corporation's ("SunLink" or "Defendant") First Set of Interrogatories (Nos. 1-7). The responses and objections are made according to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Oregon and are based upon information presently available to Plaintiffs. These responses and objections are without prejudice to Plaintiffs' right to use or rely on subsequently discovered information.

## GENERAL OBJECTIONS

1.    SunPower objects to the Interrogatories and, in particular, to the Definitions and Instructions, on the ground and to the extent they seek to impose obligations upon SunPower beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Oregon, or the Court's Scheduling Order in this case.

2.    SunPower objects to the Interrogatories insofar as they are vague, ambiguous, indefinite, overbroad, unduly burdensome, duplicative, cumulative, unlimited in time or scope, unintelligible or otherwise unclear as to the precise information sought.

3.    SunPower objects to the Interrogatories to the extent they seek information that is neither relevant to a claim or defense of any party, nor reasonably calculated to lead to the discovery of admissible evidence.

4.    SunPower objects to the Interrogatories on the ground and to the extent they seek information protected from disclosure by attorney-client privilege, the attorney work product protection, and/or any other applicable privilege or protection.

5.    SunPower objects to the Interrogatories on the ground and to the extent they call for information that SunPower is under an obligation to third parties not to disclose.

PAGE 2    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
             DEFENDANT'S FIRST SET OF INTERROGATORIES

6.    SunPower objects to the Interrogatories on the ground and to the extent they seek to obtain information not in SunPower's possession, custody, or control.

7.    SunPower objects to the Interrogatories on the ground and to the extent they seek information already in SunLink's possession or information that is a matter of public record or that is otherwise equally available to SunLink.

8.    SunPower objects to Definition 1 regarding the terms "Plaintiff", "SunPower", "you", or "your" on the grounds and to the extent SunLink seeks to include documents or things that are not within SunPower's possession, custody, or control.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify the name and, if known, the address and telephone number of each individual likely to have discoverable information related to the factual allegations of your complaint, identifying the subjects of the information believed to be known by that person.

### RESPONSE TO INTERROGATORY NO. 1:

SunPower incorporates its General Objections and further objects to this Interrogatory as overbroad and unduly burdensome as it requests identification of individuals and requests description of the "subjects" of any "information" known to anyone "likely to have discoverable information," without any limitation.  SunPower further objects that this Interrogatory calls for information not in its possession, custody, or control.  SunPower further object to this Interrogatory to the extent it requests information in the possession, custody and control of SunLink.  SunPower further objects to this request as unduly burdensome and overbroad to the extent it requests the identification of individuals with lesser or duplicative knowledge.

PAGE 3    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
         DEFENDANT'S FIRST SET OF INTERROGATORIES

Subject to its general objections and the foregoing specific objections, SunPower responds as follows:

The following individuals may have discoverable information related to the factual allegations of the complaint:

| Individual: | Last Known Contact Information: | Subject(s): |
|---|---|---|
| Thomas Dinwoodie | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | SunPower corporate information; knowledge of U.S. Patent Nos. 5,505,788 and RE38,988; research and development, conception and reduction to practice |
| Daniel Shugar | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | SunPower corporate information; sales and marketing information re: products |
| Jonathan Botkin | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Sales and marketing information re: products; background and industry information |
| Howard Wenger | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Background and industry information |
| Shawn Fitzgerald | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Financial information, sales and cost information re: products |
| Eric Potts | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Sales and marketing information re: products |
| Matthew Culligan | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Sales information re: products, background and industry information |
| Bill Green | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Value added reseller market |

PAGE 4    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

| Individual: | Last Known Contact Information: | Subject(s): |
|---|---|---|
| Jack Peurach | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Research and Development re: PV module and systems product |
| Mark Liffman | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Marketing re: value added reseller market |
| James Hann | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Prosecution of the patents-in-suit |
| Dr. Bogusz Bienkiewicz | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 (650) 839-5070 | Testing of invention – see file history for '988 patent and its predecessor |
| Other individuals identified in the file history of the '988 patent and its predecessor | | Knowledge re: statements made to patent office – see file history for '988 patent and its predecessor |

**INTERROGATORY NO. 2:**

Identify (including by name and model number) each commercial product or system manufactured or sold by YOU which allegedly embodies the claimed invention (i.e., each and every claim element of the claimed combination) of one or more claims of the PATENTS-IN-SUIT.

**RESPONSE TO INTERROGATORY NO. 2:**

SunPower incorporates its General Objections and further objects to this Interrogatory to the extent it requires a legal conclusion in order to respond.

Subject to the foregoing general and specific objections, SunPower responds that each of the following SunPower products embodies one or more claim of one or more of the patents in suit: PowerGuard®, RFT10 Solar Roof Tile, and T10 Solar Roof Tile.

PAGE 5    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 3:**

For each commercial product or system identified in response to Interrogatory No. 1, identify any claim term, element or limitation that YOU contend is present in the commercial product or system, or the use thereof, and explain why each such claim term, element or limitation is present, either literally or under the doctrine of equivalents.

**RESPONSE TO INTERROGATORY NO. 3:**

SunPower incorporates its General Objections and further objects to this Interrogatory to the extent it calls for a legal conclusion. SunPower further objects to this Interrogatory to the extent it not limited to the asserted claims in this matter and thus seeks information that is not relevant to any claim or defense. SunPower further objects that this Interrogatory is of a form prohibited by District of Oregon Local Rule LR 33.1(d) and is thus impermissible.

**INTERROGATORY NO. 4:**

State the basis for YOUR claim that SUNPOWER has suffered damages as a result of alleged infringement by SUNLINK, including in YOUR response a full description of the type (e.g., reasonable royalty or lost profits) and amount of damages claimed by YOU, the manner or method of calculation of such damages, and the identity of all documents used or referred to in calculating such alleged damages.

**RESPONSE TO INTERROGATORY NO. 4:**

SunPower incorporates its General Objections and further objects to this Interrogatory to the extent it calls for the production of communications and materials protected by the attorney client privilege and/or work product doctrine. SunPower further objects that this Interrogatory is compound and contains multiple subparts that should count towards the maximum number of interrogatories allowed under Fed. R. Civ. P. 33(a). SunPower further objects to this request as premature to the extent that it calls for expert opinions before the exchange of expert reports.

PAGE 6    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
         DEFENDANT'S FIRST SET OF INTERROGATORIES

SunPower further objects to this request to the extent that SunPower's answer is dependent upon the production of financial information from SunLink, and SunLink has not even begun to produce such information, and thus SunPower's analysis is necessarily incomplete. SunPower further objects to this Interrogatory to the extent it is of the form prohibited by District of Oregon Local Rule LR 33.1(d).

Subject to the foregoing general and specific objections, SunPower responds as follows: SunPower seeks damages in the form of lost profits as well as a reasonable royalty, but it is premature to provide any more detail or calculations until SunPower receives adequate discovery from SunLink.

**INTERROGATORY NO. 5:**

Identify each ASSERTED CLAIM that YOU contend is infringed by any SUNLINK product, or the use thereof, and explain where in the SUNLINK product each claim term, element or limitation of the ASSERTED CLAIM is present, either literally or under the doctrine of equivalents.

**RESPONSE TO INTERROGATORY NO. 5:**

SunPower incorporates its General Objections and further objects that this Interrogatory is compound and contains multiple subparts, each of which should count towards the maximum number of interrogatories allowed under Fed. R. Civ. P. 33(a). SunPower further objects to this request as premature to the extent that it calls for expert opinions before the exchange of expert reports. SunPower further objects to this request to the extent that SunPower's answer is dependent upon the production of product information from SunLink, and SunLink has not even begun to produce such information, and thus SunPower's analysis is necessarily incomplete. SunPower reserves the right to supplement this response, including through its expert reports.

PAGE 7    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
        DEFENDANT'S FIRST SET OF INTERROGATORIES

SunPower further objects to this Interrogatory to the extent it calls for a legal conclusion.

SunPower objects that this Interrogatory is of a form prohibited by District of Oregon Local Rule

LR 33.1(d) and is thus impermissible.

**INTERROGATORY NO. 6:**

Identify (including by name and model number) each product or system manufactured,

used, offered for sale, or sold by SUNLINK which YOU contend has infringed the PATENTS-

IN SUIT, actively induced infringement of the PATENTS IN SUIT and/or contributed to

infringement of the PATENTS IN SUIT.

**RESPONSE TO INTERROGATORY NO. 6:**

SunPower incorporates its General Objections and further objects to this request as

premature to the extent that it calls for expert opinions before the exchange of expert reports.

SunPower further objects to this request to the extent that SunPower's answer is dependent upon

the production of product information from SunLink, and SunLink has not even begun to

produce such information, and thus SunPower's analysis is necessarily incomplete. SunPower

reserves the right to supplement this response, including through its expert reports. SunPower

further objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to the foregoing general and specific objections, SunPower responds as follows:

At least the following product manufactured, sold, or offered for sale by SunLink

infringes, actively induces infringement of, and/or contributes to the infringement of each of the

patents in suit: SunLink™ PV Module Mounting System.

/ / /

/ / /

/ / /

PAGE 8    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 7:**

IDENTIFY the PERSON(S) (and provide contact information for each) involved in the

conception, reduction to practice, design, development, or manufacture of the invention(s) of the

PATENTS-IN-SUIT.

**RESPONSE TO INTERROGATORY NO. 7:**

SunPower incorporates its General Objections and further objects to this Interrogatory as

too vague and overly broad as to permit any reasonable narrative response in that it purports to

request a complete list of all people "involved" in the design, development, or manufacture of

the inventions underlying the patents-in-suit in any way, without any limitation whatsoever.

SunPower further objects that this Interrogatory calls for information not in its possession,

custody, or control. Sunpower further objects to this Interrogatory to the extent it requires a legal

conclusion in order to respond.

Subject to its general objections and the foregoing specific objections, SunPower

responds as follows:

The following individual contributed to, participated in and/or has knowledge of the

conception, research, design, engineering, development, and/or reduction to practice of the

subject matter for at least some of the asserted claims of the patents-in-suit:

| Individual: | Last Known Contact Information: |
|---|---|
| Thomas Dinwoodie | Fish & Richardson P.C. 500 Arguello St., Ste. 500 Redwood City, CA 94063 |

/ / /

/ / /

/ / /

PAGE 9    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

DATED:  April 14, 2008

CHERNOFF, VILHAUER, McCLUNG &
STENZEL, LLP

By: _____
Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
Telephone: (503) 227-5631

Howard Pollack (*Pro Hac Vice*)
E-mail:  pollack@fr.com
Robert Kent (*Pro Hac Vice*)
E-mail:  rjkent@fr.com
Frank Scherkenbach (*Pro Hac Vice*)
E-mail:  scherkenbach@fr.com
Craig Compton  (*Pro Hac Vice*)
E-mail:  compton@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Facsimile:  (650) 839-5071

Of Attorneys for Plaintiff

50471696.doc

PAGE 10    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

EXHIBIT  A
PAGE  10  of  11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF SUNPOWER

CORPORATION, SYSTEMS' RESPONSES TO DEFENDANT'S FIRST SET OF

INTERROGATORIES was served on April 14, 2008, as follows:

**BY EMAIL AND US MAIL**
Morgan W. Tovey, Esq.                          Attorneys for Defendants
Doyle B. Johnson                               SUNLINK CORPORATION
James A. Daire
Reed Smith LLP
Two Embarcadero Center, Suite 2000
P.O. Box 7936 - 94120-7936
San Francisco, CA 94111
Telephone: (415) 543-8700
Facsimile: (415) 391-8269
Email: mtovey@reedsmith.com
Email: dbjohnson@reedsmith.com
Email: jdaire@reedsmith.com

**BY EMAIL AND US MAIL**
Randolph C. Foster                             Attorneys for Defendant
Steven T. Lovett                               SUNLINK CORPORATION
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, Oregon 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480
Email: rcfoster@stoel.com
Email: stlovett@stoel.com


_____
Cheryl Marchesi-Sherwood

50471696.doc

PAGE 11    PLAINTIFF SUNPOWER CORPORATION, SYSTEMS' RESPONSES TO
           DEFENDANT'S FIRST SET OF INTERROGATORIES

EXHIBIT A
PAGE 11 of 11

# EXHIBIT B

ADR Local Rules

# TABLE OF CONTENTS
# LOCAL RULES
# FOR
# ALTERNATIVE DISPUTE RESOLUTION

Page

1. PURPOSE AND SCOPE OF RULES ......................... ADR 6
    1-1. Title ................................................. ADR 6
    1-2. Purpose and Scope ................................. ADR 6
        (a) Purpose ..................................... ADR 6
        (b) Scope ....................................... ADR 6
        (c) Magistrate Judges Consent Cases .............. ADR 7

2. GENERAL PROVISIONS ................................. ADR 8
    2-1. ADR Unit ....................................... ADR 8
        (a) Staff and Responsibilities ................... ADR 8
        (b) ADR Internet Site and Handbook .............. ADR 8
        (c) Contacting the ADR Unit ..................... ADR 8
    2-2. ADR Magistrate Judge ............................ ADR 9
    2-3. Referral to ADR Program by Stipulation, Motion or Order
        .............................................. ADR 9
    2-4. Violation of the ADR Local Rules ................ ADR 9
        (a) Reporting Violation ......................... ADR 9
        (b) Proceeding in Response to Complaint or Report of
            Violation and Sanctions .................... ADR 10
    2-5. Neutrals ....................................... ADR 10
        (a) Panel ....................................... ADR 10
        (b) Qualifications and Training .................. ADR 10
        (c) Oath ....................................... ADR 11
        (d) Disqualification of Neutrals ................. ADR 11
        (e) Immunities .................................. ADR 12
    2-6. Evaluation of ADR Programs ...................... ADR 12

3. ADR MULTI-OPTION PROGRAM ....................... ADR 13
    3-1. Purpose ........................................ ADR 13
    3-2. Summary Description ............................. ADR 13
    3-3. Assignment to ADR Multi-Option Program .......... ADR 13
        (a) Automatic Assignment ....................... ADR 13
        (b) By Stipulation, Motion or Order ............. ADR 13
        (c) Relief from Automatic Referral. .............. ADR 13
    3-4. ADR Options. ................................... ADR 14
        (a) Court-Sponsored ADR Processes ............... ADR 14
        (b) Private ADR ................................. ADR 14
        (c) Early Settlement Conference with a Magistrate Judge
            .......................................... ADR 14
    3-5. Selecting an ADR Process ........................ ADR 14

**ADR 1**

EXHIBIT B
PAGE 1 of 9

**ADR Local Rules**

    (a) Meet and Confer to Select ADR Process . . . . . . . . . ADR 14
    (b) ADR Certification . . . . . . . . . . . . . . . . . . . . . . . ADR 14
    (c) Stipulation to ADR Process or Notice of Need for ADR
        Telephone Conference . . . . . . . . . . . . . . . . . . . . . ADR 15
    (d) Selection Through ADR Phone Conference . . . . . . ADR 16
    (e) Selection at Case Management Conference . . . . . . ADR 16
  3-6. Timing of ADR Process in the ADR Multi-Option Program
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 17

4. NON-BINDING ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
  4-1. Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
  4-2. Eligible Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
  4-3. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
    (a) Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
    (b) Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 18
    (c) Payment and Reimbursement . . . . . . . . . . . . . . . ADR 18
  4-4. Timing and Scheduling the Hearing . . . . . . . . . . . . . . . ADR 19
    (a) Scheduling by Arbitrator . . . . . . . . . . . . . . . . . . ADR 19
    (b) Place and Time . . . . . . . . . . . . . . . . . . . . . . . . . ADR 19
  4-5. Requests to Extend Deadline. . . . . . . . . . . . . . . . . . . . . ADR 19
    (a) Motion Required. . . . . . . . . . . . . . . . . . . . . . . . . ADR 19
    (b) Content of Motion. . . . . . . . . . . . . . . . . . . . . . . . ADR 19
  4-6. *Ex Parte* Contact Prohibited . . . . . . . . . . . . . . . . . . . . ADR 19
  4-7. Telephone Conference Before Arbitration. . . . . . . . . . . . ADR 20
  4-8. Written Arbitration Statements . . . . . . . . . . . . . . . . . . . ADR 20
    (a) Time for Submission . . . . . . . . . . . . . . . . . . . . . ADR 20
    (b) Prohibition against Filing . . . . . . . . . . . . . . . . . ADR 20
    (c) Content of Statement . . . . . . . . . . . . . . . . . . . . . ADR 20
    (d) Modification of Requirement by Arbitrator(s) . . . ADR 20
  4-9. Attendance at Arbitration . . . . . . . . . . . . . . . . . . . . . . . ADR 20
    (a) Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 20
    (b) Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 21
    (c) Request to be Excused . . . . . . . . . . . . . . . . . . . . ADR 21
    (d) Participation by Telephone . . . . . . . . . . . . . . . . . ADR 21
  4-10. Authority of Arbitrators and Procedures at Arbitration
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 21
    (a) Authority of Arbitrators . . . . . . . . . . . . . . . . . . . ADR 21
    (b) Prohibition on Facilitating Settlement Discussions
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
    (c) Presumption against Bifurcation . . . . . . . . . . . . . ADR 22
    (d) Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
    (e) Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
    (f) Transcript or Recording . . . . . . . . . . . . . . . . . . . ADR 22
    (g) Default of Party . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
  4-11. Award and Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
    (a) Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . ADR 22
    (b) Filing and Serving the Award . . . . . . . . . . . . . . . ADR 23

        **ADR 2**

EXHIBIT B
PAGE 2 of 9

**ADR Local Rules**

      (c) Sealing of Award ............................. ADR 23
      (d) Entry of Judgment on Award ................. ADR 23
   4-12. Trial *De Novo* ................................. ADR 23
      (a) Time for Demand ......................... ADR 23
      (b) Limitation on Admission of Evidence .......... ADR 23
      (c) Award Not to be Attached ................. ADR 23
   4-13.  Stipulation to Binding Arbitration ................. ADR 24
   4-14. Federal Arbitration Act Presumptively Inapplicable  .. ADR 24

5. EARLY NEUTRAL EVALUATION ........................ ADR 25
   5-1. Description .................................. ADR 25
   5-2. Eligible Cases ................................ ADR 25
   5-3. Evaluators ................................... ADR 25
      (a) Appointment ............................ ADR 25
      (b) Compensation .......................... ADR 25
      (c) Payment ............................... ADR 26
   5-4. Timing and Scheduling the ENE Session ............ ADR 26
      (a) Scheduling by Evaluator .................... ADR 26
      (b) Deadline for Conducting Session ............... ADR 26
   5-5. Requests to Extend Deadline ..................... ADR 26
      (a) Motion Required ......................... ADR 26
      (b) Content of Motion ........................ ADR 26
   5-6. *Ex Parte* Contact Prohibited ..................... ADR 26
   5-7. Telephone Conference Before ENE Session .......... ADR 27
   5-8. Written ENE Statements ........................ ADR 27
      (a) Time for Submission ....................... ADR 27
      (b) Prohibition Against Filing ................... ADR 27
      (c) Content of Statement ...................... ADR 27
   5-9. Special Provisions for Patent, Copyright, or Trademark Cases
      ....................................... ADR 28
      (a) Patent Cases ............................. ADR 28
      (b) Copyright Cases .......................... ADR 28
      (c) Trademark Cases ......................... ADR 28
   5-10. Attendance at Session ......................... ADR 29
      (a) Parties ................................. ADR 29
      (b) Counsel ................................ ADR 29
      (c) Insurers ................................ ADR 29
      (d) Request to be Excused ...................... ADR 29
      (e) Participation by Telephone ................... ADR 30
   5-11. Procedure at ENE Session ...................... ADR 30
      (a) Components of ENE Session ................. ADR 30
      (b) Process Rules ........................... ADR 30
      (c) Evaluation and Settlement Discussions .......... ADR 31
   5-12. Confidentiality .............................. ADR 31
      (a) Confidential Treatment ..................... ADR 31
      (b) Limited Exceptions to Confidentiality .......... ADR 31
      (c) Confidentiality Agreement ................... ADR 31

EXHIBIT B
PAGE 3 of 9

ADR Local Rules

5-13. Follow Up ........................................ ADR 32
    (a) Discussion at Close of ENE ..................... ADR 32
    (b) Follow Up the Evaluator May Order .......... ADR 32
    (c) Stipulation to Follow Up Session .............. ADR 32
    (d) Limitations on Authority of Evaluator ......... ADR 32
5-14. Certification of Session ......................... ADR 33

6. MEDIATION ........................................... ADR 34
  6-1. Description ..................................... ADR 34
  6-2. Eligible Cases ................................. ADR 34
  6-3. Mediators ..................................... ADR 34
    (a) Appointment ................................ ADR 34
    (b) Compensation .............................. ADR 34
    (c) Payment ................................... ADR 34
  6-4. Timing and Scheduling the Mediation .............. ADR 35
    (a) Scheduling by Mediator ...................... ADR 35
    (b) Deadline for Conducting Mediation ............ ADR 35
  6-5. Request To Extend the Deadline .................. ADR 35
    (a) Motion Required ............................ ADR 35
    (b) Content of Motion .......................... ADR 35
  6-6. Telephone Conference Before Mediation ............ ADR 35
  6-7. Written Mediation Statements ..................... ADR 35
    (a) Time for Submission ......................... ADR 35
    (b) Prohibition Against Filing ................... ADR 35
    (c) Content of Statement ........................ ADR 36
  6-8. Contact with Mediator Before the Mediation ......... ADR 36
  6-9. Attendance at Session ........................... ADR 37
    (a) Parties .................................... ADR 37
    (b) Counsel ................................... ADR 37
    (c) Insurers .................................. ADR 37
    (d) Request to be Excused ...................... ADR 37
    (e) Participation by Telephone ................... ADR 38
  6-10. Procedure at Mediation ......................... ADR 38
    (a) Procedure ................................. ADR 38
    (b) Separate Caucuses .......................... ADR 38
  6-11. Confidentiality ................................ ADR 38
    (a) Confidential Treatment ...................... ADR 38
    (b) Limited Exceptions to Confidentiality .......... ADR 38
    (c) Confidentiality Agreement .................... ADR 39
  6-12. Follow Up .................................... ADR 39
  6-13. Certification of Session ........................ ADR 39

7. SETTLEMENT CONFERENCES .......................... ADR 40
  7-1. Description ..................................... ADR 40
  7-2. Referral to a Settlement Conference ............... ADR 40
  7-3. Request of a Party .............................. ADR 40
  7-4. Directives from the Settlement Judge ............... ADR 40

**ADR Local Rules**

(a)  Corporation or Other Entity  . . . . . . . . . . . . . . . . . .  ADR 41
(b)  Government Entity. . . . . . . . . . . . . . . . . . . . . . . . . . .  ADR 41
(c)  Insurers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ADR 41
7-5.  Settlement Conference Confidentiality  . . . . . . . . . . . . . .  ADR 41
(a)  Confidential Treatment  . . . . . . . . . . . . . . . . . . . . . .  ADR 41
(b)  Limited Exceptions to Confidentiality  . . . . . . . . . .  ADR 41

8.  OTHER ADR PROCESSES  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ADR 42
8-1.  Other Court ADR Processes . . . . . . . . . . . . . . . . . . . . . . .  ADR 42
(a)  Non-binding Summary Bench or Jury Trial  . . . . .  ADR 42
(b)  Special Masters . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ADR 42
8-2.  Private ADR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ADR 42

**ADR 5**

EXHIBIT B
PAGE 5 of 9

ADR Local Rules

# LOCAL RULES
# FOR
# ALTERNATIVE DISPUTE RESOLUTION

## 1. PURPOSE AND SCOPE OF RULES

**1-1. Title.**

These are the Local Rules for Alternative Dispute Resolution in the United States District Court for the Northern District of California. They should be referred to as "ADR L.R. ___."

**1-2. Purpose and Scope.**

(a) **Purpose.** The Court recognizes that full, formal litigation of claims can impose large economic burdens on parties and can delay resolution of disputes for considerable periods. The Court also recognizes that sometimes an alternative dispute resolution procedure can improve the quality of justice by improving the parties' clarity of understanding of their case, their access to evidence, and their satisfaction with the process and result. The Court adopts these ADR Local Rules to make available to litigants a broad range of court-sponsored ADR processes to provide quicker, less expensive and potentially more satisfying alternatives to continuing litigation without impairing the quality of justice or the right to trial. The Court offers diverse ADR services to enable parties to use the ADR process that promises to deliver the greatest benefits to their particular case. In administering these Local Rules and the ADR program, the Court will take appropriate steps to assure that no referral to ADR results in imposing on any party an unfair or unreasonable economic burden.

### Commentary
The Alternative Dispute Resolution Act of 1998, 28 U.S.C. Sections 651-658, requires each federal district court to authorize by local rule the use of at least one ADR process in all civil actions. In accordance with § 651(c), the Court has examined the effectiveness of its ADR programs and has adopted improvements consistent with the Act.

(b) **Scope.** These ADR Local Rules are effective January 1, 2006 and shall govern actions pending or commenced on or after that date. These rules supplement the Civil Local Rules of the Court and, except as otherwise indicated, apply to all civil actions filed in this Court. Cases subject to these ADR Local rules also remain subject to the other local rules of the Court.

**ADR 6**

**ADR Local Rules**

    **(c) Magistrate Judges Consent Cases.** In cases in which the parties have consented to jurisdiction by a Magistrate Judge under 28 U.S.C. § 636(c), the Magistrate Judge shall have the full scope of powers that these ADR local rules confer on District Judges, including the authority to refer cases to ADR programs and to grant relief from the requirements of these ADR local rules.

EXHIBIT B
PAGE 7 of 9

ADR Local Rules

# 3. ADR MULTI-OPTION PROGRAM

## 3-1. Purpose.

The ADR Multi-Option Program is designed to encourage litigants in a broad range of cases to use ADR and to provide parties with sophisticated assistance in identifying the ADR process that is best suited to their particular case.

## 3-2. Summary Description.

Litigants in certain cases designated when the complaint or notice of removal is filed are presumptively required to participate in one non-binding ADR process offered by the Court (Arbitration, Early Neutral Evaluation, or Mediation) or, with the assigned Judge's permission, may substitute an ADR process offered by a private provider. Unless they have stipulated to an ADR process, counsel may be required to participate in a joint phone conference with the legal staff of the ADR Unit to consider the suitability of the ADR options for their case. When litigants have not stipulated to an ADR process before the Case Management Conference, the assigned Judge will discuss the ADR options with counsel at that conference. If the parties cannot agree on a process before the end of the Case Management Conference, the Judge will select one of the ADR processes offered by the Court, or may refer the case to a settlement conference hosted by a Magistrate Judge, unless persuaded that no ADR process is likely to deliver benefits to the parties sufficient to justify the resources consumed by its use.

**Cross Reference**
See Case Management Conference provisions of Civil L.R. 16.

## 3-3. Assignment to ADR Multi-Option Program.

(a) **Automatic Assignment.** Appropriate civil cases may be assigned to the ADR Multi-Option Program by the Clerk when the complaint or notice of removal is filed. Notice of such assignment will be given in the Order Setting Initial Case Management Conference and ADR Deadlines issued under Civil Local Rule 16-2..

(b) **By Stipulation, Motion or Order.** Cases not assigned at filing may be assigned to the ADR Multi-Option Program, or to a specific ADR process, by order of the assigned Judge following a stipulation by all parties, on motion by a party under Civil L.R. 7, or on the Judge's initiative.

(c) **Relief from Automatic Referral.** Any party whose case has been referred automatically to the ADR Multi-Option Program may file with the assigned Judge a motion for relief from automatic referral under Civil L.R. 7.

EXHIBIT B
PAGE 8 of 9

**3-4. ADR Options.**

    **(a) Court-Sponsored ADR Processes.** The Court-sponsored ADR options for cases assigned to the ADR Multi-Option Program include:

        **(1)** Non-binding Arbitration;

        **(2)** Early Neutral Evaluation (ENE); and

        **(3)** Mediation.

    **(b) Private ADR.** A private ADR procedure may be substituted for a Court program if the parties so stipulate and the assigned Judge approves. Private ADR proceedings, however, are not subject to the enforcement, immunity or other provisions of the ADR Local Rules.

    **(c) Early Settlement Conference with a Magistrate Judge.** A case may be referred to a settlement conference only by order of the assigned Judge.

**Commentary**

Because of the many other duties assigned to Magistrate Judges, the Court refers only a limited number of cases to Magistrate Judges for early settlement conferences.

**Cross Reference**

See ADR L.R. 3-5(c)(2).

**3-5. Selecting an ADR Process.**

    **(a) Meet and Confer to Select ADR Process.** In cases assigned to the ADR Multi-Option Program, as soon as feasible after filing or removal and no later than the deadline to meet and confer, counsel must confer to attempt to agree on an ADR process.

    **(b) ADR Certification.** In cases assigned to the ADR Multi-Option Program, unless otherwise ordered, no later than the date specified in the Order Setting Initial Case Management Conference and ADR Deadlines, counsel and client must sign, serve and file an ADR Certification and shall provide a copy to the ADR Unit. The certification must be filed on a form established for that purpose by the Court and in conformity with the instructions approved by the Court. Separate Certifications may be filed by each party. If the client is a government or government agency, the certificate shall be signed by a person who meets the requirements of Civil L.R. 3-9(c). Counsel and client must certify that both have:

**ADR 14**

EXHIBIT _B_
PAGE _9_ of _9_

Randolph C. Foster (OSB No. 784340)
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:     +1 415 543 8700
Facsimile:     +1 415 391 8269

Morgan W. Tovey (*pro hac vice*)
Email: *morgantovey@quinnemanuel.com*
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for Defendant and Counterclaimant
SunLink Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SUNPOWER CORPORATION, SYSTEMS, a Delaware corporation,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>SUNLINK CORPORATION, a Delaware corporation; ADVANCED ENERGY SYSTEMS LLC, an Oregon limited liability company,<br><br>　　　　Defendants. | Case No.: 08-CV0148 AA<br><br>**SUNLINK CORPORATION'S NOTICE OF SUBSTITUTION OF COUNSEL** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that Defendant and Counterclaimant SunLink Corporation hereby substitutes as its counsel of record in the above action Morgan W. Tovey of the law firm Quinn Emanuel Urquhart Oliver & Hedges, LLP, located at 50 California Street, 22nd Floor, San Francisco, CA 94111, in the place and stead of Doyle B. Johnson and James A. Daire of Reed Smith LLP, Two Embarcadero Center, Suite 2000, San Francisco, CA 94111. Reed Smith LLP, and Doyle B. Johnson and James A. Daire, admitted *pro hac vice*, hereby give notice that they are withdrawing from the representation of Defendant and Counterclaimant SunLink Corporation.

Pursuant to Local Rule 83.10, the clerk's office is hereby given notice that the service address and affiliation of counsel for Defendant SunLink Corporation shall be changed to the following:

> Randolph C. Foster (OSB No. 784340)
> Email: *rcfoster@stoel.com*
> STOEL RIVES LLP
> 900 SW Fifth Ave., Suite 2600
> Portland, OR 97204
> Telephone: (503) 294-9453
> Facsimile: (503) 220-2480
>
> Morgan W. Tovey (*pro hac vice*)
> Email: *morgantovey@quinnemanuel.com*
> QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
> 50 California Street, 22nd Floor
> San Francisco, California 94111
> Telephone:     (415) 875-6600
> Facsimile:     (415) 875-6700

SunLink Corporation hereby agrees and consents to this substitution.

DATED this 22nd day of April, 2008.

Morgan W. Tovey (*pro hac vice*)
Email: morgantovey@quinnemanuel.com
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Randolph C. Foster
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone: (503) 294-9453
Facsimile: (503) 220-2480

Attorneys for Defendant
SunLink Corporation

I agree to and accept the above substitution of counsel.

Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

By: Christopher Tilley
Title: Chief Executive Officer
SUNLINK CORPORATION

SUNLINK CORPORATION'S NOTICE          3
OF SUBSTITUTION OF COUNSEL

DATED this _22_ nd day of April, 2008.

Morgan W. Tovey (*pro hac vice*)
Email: *morgantovey@quinnemanuel.com*
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Randolph C. Foster
Email: *rcfoster@stoel.com*
STOEL RIVES LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
Telephone:  (503) 294-9453
Facsimile:  (503) 220-2480

Attorneys for Defendant
SunLink Corporation

I agree to and accept the above substitution of counsel.

Doyle B. Johnson (*pro hac vice*)
Email: *dbjohnson@reedsmith.com*
James A. Daire (*pro hac vice*)
Email: *jdaire@reedsmith.com*
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922
Telephone:    +1 415 543 8700
Facsimile:    +1 415 391 8269

By: Christopher Tilley
Title: Chief Executive Officer
SUNLINK CORPORATION

SUNLINK CORPORATION'S NOTICE          3
OF SUBSTITUTION OF COUNSEL

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **SUNLINK CORPORATION'S NOTICE OF SUBSTITUTION OF COUNSEL** on the following named persons on the date indicated below by

☐  mailing with postage prepaid

☒  electronic delivery (pdf)

☐  overnight delivery

to said persons at his or her last-known email addresses indicated below:

**Brenna Kristine Legaard**
Email: brenna@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373

**Craig Compton**
Email: compton@fr.com
Fish & Richardson PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Frank E. Scherkenbach**
Email: scherkenbach@fr.com
Fish & Richardson, P.C.
225 Franklin Street
Boston, Ma 02110
Telephone:  (617) 542-5070
Fax: (617) 542-8906

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Howard G. Pollack**
Email: pollack@fr.com Fish
& Richardson, P.C.
500 Arguello Street, Suite #500
Redwood City, Ca 94063
Telephone:  (650) 839-5070
Fax: (650) 839-5071

**Robert Kent**
Email: rjk@fr.com
Fish & Richardson, PC
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone:  (650) 839-5113
Fax: (650) 839-5071

**Susan D. Pitchford**
Email:  sdp@chernofflaw.com
Chernoff Vilhauer McClung
& Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, OR 97204
Telephone:  (503) 227-5631
Fax: (503) 228-4373

Of Attorneys for Plaintiff
SUNPOWER CORPORATION,
SYSTEMS

**Doyle B. Johnson**
Email: dbjohnson@reedsmith.com
**James D. Daire**
Email: jdaire@reedsmith.com
Reed Smith LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111
Telephone: (415) 543.8700
Fax: (415) 391.8269

Former Counsel for Defendant
SUNLINK CORPORATION

DATED: April 23, 2008.                STOEL RIVES LLP


/S/ RANDOLPH C. FOSTER
Randolph C. Foster, OSB No. 78434
E-mail:    *rcfoster@stoel.com*
Steven T. Lovett, OSB No. 910701
E-mail:    *stlovett@stoel.com*
900 SW Fifth Avenue, Suite 2600
Portland, Oregon 97204
Telephone:(503) 224-3380
Facsimile: (503) 220-2480

Of Attorneys for Defendant
Sunlink Corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SUNPOWER CORPORATION, SYSTEMS, a             Civil No. 08-148-AA
Delaware corporation,                              OPINION AND ORDER

       Plaintiff,

   vs.

SUNLINK CORPORATION, a Delaware
corporation; ADVANCED ENERGY
SYSTEMS LLC, an Oregon limited
liability company,

       Defendants.
_____

Brenna Legaard
Susan Pitchford
Chernoff, Vilhauer, McClung & Stenzel, LLP
601 SW Second Avenue, Suite 1600
Portland, Oregon 97204
    Attorneys for plaintiff

Randolph Foster
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, Oregon 97204
    Attorney for defendant SunLink Corporation


AIKEN, Judge:


Page 1 - OPINION AND ORDER

Defendant SunLink Corporation filed a motion pursuant to 28 U.S.C. § 1404(a) for an Order transferring this case to the United States District Court for the Northern District of California. Defendant's motion is granted and this case is transferred.

## BACKGROUND

Defendant SunLink is a privately held start-up company with its only places of business in San Rafael, California and Livermore, California, both within the boundaries of the Northern District of California. SunLink designs, manufactures and markets assemblies for deploying and integrating solar electric systems for commercial, flat rooftop and ground mounted applications. SunLink currently sells only one product - the SunLink PV Module Mounting System (trademarked, the "PV MMS"). SunLink usually markets and sells the accused product to system integrators or installers. Plaintiff Sunpower Corporation Systems filed a patent infringement lawsuit alleging that defendant's PV MMS product infringes two of plaintiff's patents.

Exactly 50% of defendant's device sales have occurred in California. Defendant sold a total of 8 systems, or 3.5% of its sales on a gross revenue basis, for installation in Oregon. Defendant sold all eight of those Oregon units to the former co-defendant in this case, Advanced Energy Systems (AES), an Oregon limited liability company. Upon the court's issuance of a

scheduling order in this case, plaintiff filed a Notice of Voluntary Dismissal with Prejudice of its claims against AES.

The two remaining parties, plaintiff and defendant, both maintain principal places of business in the San Francisco Bay Area in Northern California.

<u>STANDARDS</u>

Pursuant to 28 U.S.C. § 1404(a), a court has broad discretion to transfer a civil action to any other district where the action may have been brought initially, as a matter of convenience for the parties and witnesses, and to further the interests of justice.  <u>Id.</u>  Section 1404(a) was enacted to allow "easy change of venue" and "reflects an increased desire to have federal suits tried in the federal system at a place called for in the particular case by considerations of convenience and justice."  <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 254 (1981).

To transfer a case, a defendant must first show that the transferee court is one in which the action could have been commenced originally.  Second, the defendant must show that transfer would result in greater convenience to the parties and witnesses, as well as advance the interest of justice.  28 U.S.C. § 1404(a).  The court must balance the preference given to the plaintiff's choice of forum with the burden of litigating in an inconvenient forum.  <u>Decker Coal Co. v. Commonwealth Edison Co.</u>,

805 F.2d 834, 843 (9th Cir. 1986).[1]

<u>DISCUSSION</u>

I find that this action could have been brought initially in the proposed transferee court, the Northern District of California. The venue statute for patent cases provides that a patent infringement action may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business. <u>See</u> 28 U.S.C. § 1400(b). Defendant Sunlink is headquartered in Northern California. Even if the court considers former co-defendant AES, the action still could have been brought in the Northern District of California due to AES's entering into a contract with SunLink, a company based in Northern California, to purchase and install the allegedly infringing assembly. Under Federal Circuit law, even a single contact with a forum state may suffice for personal jurisdiction in a patent case if the contact directly and substantially relates to the plaintiff's claim. <u>Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.</u>, 148 F.3d 1355, 1359 (Fed. Cir. 1998). Here, former defendant AES purposefully availed itself of the proposed transferee court through eight contracts with a company headquartered in the Northern District of California for

---

[1] <u>See</u> <u>Storage Technology Corp. v. Cisco Systems, Inc.</u>, 329 F.3d 823, 836 (Fed. Cir. 2003)(law of the appropriate regional circuit governs motion to transfer a patent infringement action).

the purchase and installation of the accused product developed in
the Northern District of California.    Therefore, this action
"could have been brought" in the transferee court, the Northern
District of California.

Regarding the second requirement, the court should evaluate
each of the factors listed in § 1404(a): (1) the convenience of
the parties; (2) the convenience of the witnesses; and (3) the
interests of justice.    Defendant is required to make "a strong
showing of inconvenience" to warrant disturbing plaintiff's
choice of forum.    Decker Coal, 805 F.2d at 843.    In order to meet
that burden, defendant must demonstrate that certain private and
public factors favor venue in Northern California, including:

> the administrative difficulties flowing from court
> congestion; the local interest in having localized
> controversies decided at home; the interest in having
> the trial of a diversity case in a forum that is at
> home with the law that must govern the action; the
> avoidance of unnecessary problems in conflict of laws,
> or in the application of foreign law; and the unfairness
> of burdening citizens in an unrelated forum with jury
> duty.

Decker Coal, 805 F.2d at 843.

The defendant asserts that in addition to Northern
California being the principal place of business for both
parties, most, if not all, of the key witnesses and material
documents are located in the Northern District of California.    It
is notable here that neither party in this lawsuit resides in
this judicial district, moreover, both parties reside in the

Northern District of California.  See Findley Adhesives, Inc. v. Williams, 751 F.Supp. 184, 186 (D. Or. 1990)(granting motion to transfer from the District of Oregon to the Northern District of California where plaintiff was not an Oregon corporation, did not have its principal place of business in the State of Oregon, and did not maintain an office in the State of Oregon).  Further, the facts at issue  relating to plaintiff's patent infringement allegations, including plaintiff's conception, reduction to practice and marketing of the purported commercial embodiments of the asserted patents as well as the defendant's design, development and marketing of the accused device all occurred within the Northern District of California.  See Defendant's Tilley Decl. ¶¶ 3-6; Tovey Decl. in Support of Motion to Transfer, ¶ 11.

Further, defendant alleges that the costs and inconvenience of testifying and attending trial in this District would create an enormous hardship.  See Tilley Decl. ¶ 7.  The defendant also stated that it would stipulate to an expedited schedule under the Northern District of California Patent Local Rules resulting in a case schedule similar to the one entered by this court. Moreover, I find no allegation that transfer to the Northern District of California would create a burden for plaintiff.  In fact, as stated earlier, plaintiff is headquartered in Northern California and wholly owned by SunPower Corporation, a large,

publicly traded company also headquartered within the Northern District of California.

The court further relies on the convenience to witnesses factor.  Most, if not all, of the currently known witnesses reside in California.  Those witnesses include the two individuals involved in the design and development work for defendant and its predecessors, individuals Huber and Bowler, who are no longer employed or otherwise affiliated with defendant. Both individuals currently reside in Northern California. Proceeding in the District of Oregon would be less convenient for the party affiliated officers and employees and may even preclude live testimony from those witnesses who reside beyond the subpoena power of this court.  Regarding plaintiff's witnesses, the named inventor on both patents at issue is currently serving as plaintiff's Chief Technology Officer and also resides in Northern California.  Further, the lawyers listed on defendant's patents at issue are associated with a law firm located in Norther California.

Finally, in considering where the evidence is located, the court notes that Northern California was the place of conception, development and marketing of the commercial embodiments of the patents at issue, and similarly, the development, marketing and sale of the accused product occurred in Northern California.
///

Page 7 - OPINION AND ORDER

<u>CONCLUSION</u>

Defendant's motion to transfer this case to the United States District Court for the Northern District of California (doc. 27) is granted.  Further, defendant's motion for expedited hearing is denied as unnecessary.

IT IS SO ORDERED.

Dated this  20  day of May 2008.


<u>        /s/ Ann Aiken        </u>
                Ann Aiken
        United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

SUNPOWER CORPORATION, SYSTEMS,
a Delaware corporation,

**Plaintiff,**

**v.**                                               **Civil No. 08-148-AA**

SUNLINK CORPORATION, a Delaware
corporation; ADVANCED ENERGY
SYSTEMS LLC, an Oregon limited
liability company,

**Defendants.**

_____

# JUDGMENT

This action is transferred to the United States District Court for the Northern District of

California.

Dated: May 21, 2008.


SHERYL MC CONNELL, CLERK


by:     /s/ Leslie Engdall
        Leslie Engdall, Deputy


**JUDGMENT**                          **DOCUMENT NO: _____**